# EXHIBIT 1

**SCHMIDT KRAMER PC**
BY:   Scott B. Cooper
       I.D. #7024270242
       209 State Street
       Harrisburg, PA  17101
       (717) 232-6300                     Attorneys for Plaintiff
       scooper@schmidtkramer.com

| | | |
|---|---|---|
| **TOP CUISINE INC. d/b/a** | : | **IN THE COURT OF COMMON PLEAS** |
| **ANTHRACITE CAFE,** | : | **LUZERNE COUNTY, PENNSYLVANIA** |
| | : | |
| **Plaintiff** | : | |
| **v.** | : | **No. 2021-01855** |
| | : | |
| **UTICA FIRST INSURANCE** | : | **CIVIL ACTION – LAW** |
| **COMPANY and W N TUSCANO** | | |
| **AGENCY INC.,** | | |
| | : | |
| **Defendant** | : | **JURY TRIAL DEMANDED** |

## N O T I C E

YOU HAVE BEEN SUED IN COURT.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Wilkes-Barre Law and Library Association
Lawyer Referral Service
Luzerne County Courthouse
Room 23
200 North River Street
Wilkes-Barre, PA 18711-1001
Telephone (570) 822-6029

## A V I S O

USTED HA SIDO DEMANDADO/A EN CORTE.  Si usted desea defenderse de las demandas que se presentan más adelante en las siguientes páginas, debe tomar acción dentro de los próximos veinte (20) días después de la notificación de esta Demanda y Aviso radicando personalmente o por medio de un abogado una comparecencia escrita y radicando en la Corte por escrito sus defensas de, y objecciones a, las demandas presentadas aquí en contra suya.  Se le advierte de que si usted falla de tomar acción como se describe anteriormente, el caso puede proceder sin usted y un fallo por cualquier suma de dinero reclamada en la demanda o cualquier otra reclamación o remedio solicitado por el demandante puede ser dictado en contra suya por la Corte sin más aviso adicional.  Usted puede perder dinero o propiedad u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE.  SI USTED NO TIENE UN ABOGADO, LLAME O VAYA A LA SIGUIENTE OFICINA. ESTA OFICINA PUEDE PROVEERLE INFORMACION A CERCA DE COMO CONSEGUIR UN ABOGADO.

SI USTED NO PUEDE PAGAR POR LOS SERVICIOS DE UN ABOGADO, ES POSIBLE QUE ESTA OFICINA LE PUEDA PROVEER INFORMACION SOBRE AGENCIAS QUE OFREZCAN SERVICIOS LEGALES SIN CARGO O BAJO COSTO A PERSONAS QUE CUALIFICAN.

Wilkes-Barre Law and Library Association
Lawyer Referral Service
Luzerne County Courthouse
Room 23
200 North River Street
Wilkes-Barre, PA 18711-1001
Telephone (570) 822-6029

**SCHMIDT KRAMER PC**
BY:   Scott B. Cooper
       I.D. #7024270242
       209 State Street
       Harrisburg, PA  17101
       (717) 232-6300                   Attorneys for Plaintiff
       scooper@schmidtkramer.com

| | | |
|---|---|---|
| **TOP CUISINE INC. d/b/a ANTHRACITE CAFE,** | : | **IN THE COURT OF COMMON PLEAS** |
| | : | **LUZERNE COUNTY, PENNSYLVANIA** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **No. 2021-01855** |
| | : | |
| **UTICA FIRST INSURANCE COMPANY and W N TUSCANO AGENCY INC.,** | : | **CIVIL ACTION – LAW** |
| | : | |
| **Defendant** | : | **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

AND NOW, comes Plaintiff Top Cuisine Inc. d/b/a Anthracite Cafe by and through  attorney, Mr. Scott B. Cooper, Esquire, and SCHMIDT KRAMER PC and avers the following:

1.      Plaintiff Top Cuisine Inc. d/b/a Anthracite Cafe, ("Plaintiff"), a corporation and/or other business entity organized and existing under the

laws of the Commonwealth of Pennsylvania with a principal place of business located at 804 Scott St., Wilkes Barre, PA 18705.

2.     Defendant Utica First Insurance Company ("Defendant Utica"), upon information and belief, is an insurance company licensed to transact business in the Commonwealth of Pennsylvania, with an address for doing business at PO Box 851, Utica, Oneida County, New York 13503.

3.     Defendant W N Tuscano Agency, Inc. ("Defendant W N Tuscano"), upon information and belief, is a Corporation and/or other business entity organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 950 Highland Avenue, Greensburg, Pennsylvania 15601.

4.     Defendant W N Tuscano is an insurance broker engaged in the business of obtaining insurance coverage for commercial entities, such as Plaintiff in Pennsylvania and elsewhere.

5.     It is believed and therefore averred that at all times material hereto, Defendant Utica and Defendant W N Tuscano issued a policy of insurance to Plaintiff.

6.     It is believed and therefore averred that at all times material hereto, Defendant W N Tuscano was Plaintiffs insurance agent and was responsible for procuring insurance to cover his business premises.

7.     At all times pertinent hereto, upon information and belief, there was a business arrangement between Defendant Utica and

Defendant W N Tuscano to their mutual pecuniary benefit, the details of which are unknown to the Plaintiff.

8.      Upon information and belief, Defendant W N Tuscano was authorized by Defendant Utica to bind coverage and did bind coverage on behalf of Defendant Utica.

9.      Upon information and belief, Defendant W N Tuscano was an agent, ostensible agent, servant and/or employee of Defendant Utica.

10.      Upon information and belief, it is alleged that Plaintiff sought commercial property insurance from Defendant W N Tuscano.

11.      It is believed and averred that Defendant Utica and Defendant W N Tuscano supervised, directed and controlled the activities with respect to the handling of Plaintiff's business interruption claim and formulated guidelines and policies for handling, adjusting, negotiating and paying claims.

12.      Defendant Utica is an insurance company, licensed to do business within the Commonwealth of Pennsylvania, and did in fact conduct business, including but not limited to selling policies, adjusting claims and accepting premiums, and conducting insurance activities in Lackawanna County.

**Background**

13.     Plaintiff incorporates by reference the preceding paragraphs above as if same were more fully set forth herein at length.

14.     At all times pertinent hereto, Plaintiff owned and/or operated a restaurant named the "Anthracite Cafe" located at 804 Scott Street, Wilkes Barre, Luzerne County, Pennsylvania, which has been forced, by orders issued by the Commonwealth of Pennsylvania, to cease its operations-through no fault of its own-as part of the Commonwealth's efforts to slow the spread of the COVID-19 global pandemic.

15.     In exchange for substantial premiums, Defendant Utica and Defendant W N Tuscano sold a commercial property insurance policy, Policy No. BOP 4466431 00, effective 09/03/19 to 09/03/20, for the premise located at 804 Scott Street, Wilkes Barre, PA 18705 ("the Policy"). *See* the Policy and Denial Letter, attached hereto as "Exhibit A."

16.     The closures mandated by the below orders present an existential threat to small, local businesses that employ hundreds of Pennsylvania residents. To protect its business from situations like these, which threaten its livelihoods based on factors wholly outside of its control, Plaintiff obtained business interruption insurance from Defendants. In blatant breach of its insurance obligations that it voluntarily undertook in exchange for Plaintiff's premium payments, Defendant Utica has denied Plaintiff's claims arising from the State-ordered interruption of its business.

17.     As a result, Plaintiff now brings this action against Defendant Utica and Defendant W N Tuscano for their failure to honor its obligations under a commercial businessowner insurance policy issued to Plaintiff, which provides coverage for losses incurred due to a "necessary suspension" of its operations, including when its business is forced to close due to a government order.

18.     On March 6, 2020, during the term of the policy issued by Defendant Utica and Defendant W N Tuscano to Plaintiff, the Governor of the Commonwealth of Pennsylvania, Tom Wolf ("Governor Wolf"), issued a Proclamation of Disaster Emergency due to the emergence of COVID-19 in the United States and the Commonwealth of Pennsylvania. *See* Proclamation, attached hereto as "Exhibit B."

19.     On March 19, 2020, during the term of the policy issued by Defendant Utica and Defendant W N Tuscano to Plaintiff, Governor Wolf issued an Order providing that "(n]o person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work from home), so long as social distancing and other mitigation measures are followed in such operations." *See* Order, attached hereto as "Exhibit C."

20.     On that same date, during the term of the policy issued by Defendant Utica and Defendant W N Tuscano to Plaintiff, Secretary of the Pennsylvania Department of Health, Rachel Levine, M.D. ("Secretary of Health, Dr. Levine"), issued an Order that no person or entity shall operate a place of business that is not a life sustaining business regardless of whether the business is open to members of the public. *See* Order, attached hereto as "Exhibit C."

21.     The Supreme Court of Pennsylvania in <u>Friends of Danny Devito, et al. v. Tom Wolf, Governor, et al.,</u> 68 MM 2020, found that the COVID-19 pandemic triggered Governor Wolfs authority under the Emergency Code and that as a result of the COVID-19 pandemic, Governor Wolf had the authority under the Emergency Code to declare the entirety of the Commonwealth a disaster area.

22.     The Supreme Court of Pennsylvania further found that the COVID-19 pandemic is, by all definitions, a natural disaster and a catastrophe of massive proportions and its presence in and movement through Pennsylvania triggered Governor Wolfs authority under the Emergency Code.

23.     As a result of the Closure Orders and the determination that the entire Commonwealth be considered a disaster area, the Plaintiff has been forced to halt ordinary operations, resulting in substantial lost revenues.

24.     Despite Defendant Utica's express promise in its policy to cover the Plaintiffs business interruption losses when the government forces them to close, Defendant Utica failed to conduct any "reasonable investigation" based on all available information as required under Pennsylvania Law.

25.     Defendant Utica's assertion that Plaintiffs losses are not covered is based on the following: (1) the claim does not involve direct, physical loss to property at Plaintiffs premises; (2) coverage would ultimately be excluded under the Pollutants exclusion; and (3) there is no evidence that the subject order was entered because of direct damage to property at other locations or dangerous physical conditions at other locations nor does the order restrict access to the area immediately surrounding Plaintiffs premises triggering Civil Authority coverage.

26.     Moreover, unlike many commercial property policies available in the market, the policy sold by Defendant Utica and Defendant W N Tuscano does not include an exclusion for loss caused by a pandemic. Thus, Plaintiff reasonably expected that the insurance it purchased from Defendant Utica and Defendant W N Tuscano included coverage for property damage and business interruption losses caused by a pandemic like the COVID-19 coronavirus.

27.     Further, there exists no applicable exclusion in the Policy for

pandemic related losses.

28.     Thus, Defendant Utica's denial is arbitrary, unreasonable, inconsistent with the facts and plain language of the Policy and inconsistent with Pennsylvania law. This denial appears to be driven by Defendant Utica's desire to preempt its own financial exposure to the economic fallout resulting from the COVID-19 crisis, rather than to initiate, as Defendant Utica is obligated to do, a full and fair investigation of the claims and a careful review of the policy it sold to Plaintiff in exchange for valuable premiums.

29.     As a result of Defendant Utica's wrongful denial of coverage, Plaintiff files this action for a declaratory judgment establishing that it is entitled to receive the benefit of the insurance coverage it purchased, for indemnification of the business losses it has sustained, for breach of contract, and for bad faith claims handling under 42 Pa. C.S. §8371.

## **FACTUAL ALLEGATIONS**

30.     Plaintiff incorporates by reference the preceding paragraphs above as if same were more fully set forth herein at length.

### A. **The Policy**

31.     In exchange for substantial premiums, Defendant Utica and Defendant W N Tuscano sold the Policy, Policy No. BOP 4466431 00, effective 09/03/19 to 09/03/20, for the premise located at 804 Scott

Street, Wilkes Barre, PA 18705, promising to indemnify Plaintiff for losses resulting from occurrences, including the "necessary suspension" of business operations at the insured location caused by a government order, during the relevant time period. *See* the Policy at "Exhibit A."

32.   The Policy is an "Businessowners Program" policy that provides broad coverage for losses caused by any cause unless expressly excluded. *Id.*

33.   The Policy does not exclude losses from pandemics. Thus, the Premier Businessowner Policy purchased by the Plaintiff covers losses caused by a pandemic, such as COVID-19.

34. Plaintiff faithfully paid policy premiums to Defendant Utica and Defendant W N Tuscano, specifically to provide additional coverages for "Business Income and Extra Expense Coverage" in the event of business closures by order of Civil Authority.

35.   Specifically, in addition to property damage losses, Defendant Utica also agreed to "pay for the actual loss of Business Income" sustained by Plaintiff "due to the necessary suspension" of Plaintiffs operations during the period of business interruption caused by "direct loss to property" at the insured's premises.

36.   With respect to business interruption losses, "suspension" commonly means: (1) "the slowdown or cessation of your business activities"; or (2) "that a part or all of the premises is rendered untenantable.

37.    "Business Income" is traditionally defined in relevant part under a Policy as "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred" plus "continuing normal operating expenses."

38.    The Policy should also provide coverage for "Extended Business Income" which generally provides that "[i]f the necessary 'suspension' of [Plaintiffs] 'operations' produces a 'Business Income' 'loss' payable... [Defendant] will pay for the actual loss of 'Business Income' [Plaintiff] sustain[s] during the period that: (a) Begins on the date property ... is actually repaired, rebuilt or replaced and 'operations' are resumed; and (b) Ends on the earlier of: (i) The date you could restore your 'operations', with reasonable speed, to the level which would generate the 'Business Income' amount that would have existed if no direct 'loss' had occurred; or (ii) 60 consecutive days after the date determined in c.(l)(a) above."

39.    Defendant Utica's Policy also includes "Civil Authority" coverage, pursuant to which Defendant promised to pay for the loss of Business Income and necessary Extra Expense sustained by Plaintiff "caused by action of civil authority that prohibits access" to Plaintiffs insured premises.

40.    This Civil Authority coverage is triggered when "(1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and (2) The action of civil authority is taken in response to dangerous physical conditions resulting

from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property."

**B. <u>The Plaintiff's Losses Due to the Coronavirus Pandemic and the Closure Orders.</u>**

41.     On March 11, 2020, the World Health Organization declared that the emerging threat from the novel coronavirus--otherwise known as COVID-19--constituted a global pandemic.

42.     Emerging research on the virus and recent reports from the Centers for Disease Control and Prevention ("CDC") indicate that the COVID-19 strains physically infect and can stay alive on surfaces for at least 17 days, a characteristic that renders property exposed to the contagion potentially unsafe and dangerous. Other research indicates that the virus may linger on surfaces for up to four weeks in low temperatures.

43.     In response to the pandemic, and the spread of the coronavirus throughout Pennsylvania, on March 6, 2020, Governor Wolf, issued a Proclamation of Disaster Emergency due to the emergence of COVID-19 in the United States and the Commonwealth of Pennsylvania. *See* the Proclamation at "Exhibit B."

44.     Subsequently, on March 19, 2020, during the term of the policy issued by Defendant to Plaintiff, Governor Wolf issued an Order providing that "[n]o person or entity shall operate a place of business in the

Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work from home), so long as social distancing and other mitigation measures are followed in such operations." *See* Order at "Exhibit C."

45.     This Order was entered upon Governor Wolfs power "to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein." *Id.*

46.     Additionally, on that same date, during the term of the policy issued by Defendant to Plaintiff, Secretary of Health Dr. Levine, issued an Order highlighting how exposure to COVID-19 is possible by touching a surface or object that has the virus on it." *See* the Order at "Exhibit C."

47.     Pursuant to these orders, Plaintiff has suffered a physical loss of use of its premises.

48.     The continuous presence of the coronavirus on or around Plaintiffs premises rendered the premises unsafe and unfit for its intended use and therefore caused property damage or loss under the Policy.

49.     The Orders of the Governor of Pennsylvania and the Secretary of the Pennsylvania Department of Health were issued in direct response to these dangerous physical conditions, and prohibited the public from accessing Plaintiff's business, thereby causing the necessary suspension of its operations and triggering the Civil

Authority coverage under the Policy. The Order specifically states, "non-life sustaining businesses present the opportunity for unnecessary gatherings, personal contact and interaction that will increase the risk of transmission and the risk of community spread of COVID-19."

50.     The March 19, 2020, Closure Orders closing all "non-essential" businesses, including florists, likewise was made in direct response to the continued and increasing presence of the coronavirus on property including property around Plaintiffs premises.

51.     The March 19, 2020, Closure Orders prohibited the public from accessing Plaintiff's premises, thereby causing the necessary suspension of its operations and triggering the Civil Authority coverage under the Policy.

52.     The COVID-19 virus, as evidenced by the Closure Orders, causes damages to property, particularly in places of business, such as that of Plaintiff, and other similarly situated persons and organizations, where the operation of the business requires interaction, gatherings and contact in areas where there exists a heightened risk of the COVID-19 virus.

53.     As a result of the March 6, 2020, and March 19, 2020, Closure Orders, Plaintiff has suffered substantial Business Income losses and incurred Extra Expense. The covered losses incurred by Plaintiff and owed under the Policy is increasing every day.

54.     On March 16, 2020, the Plaintiff submitted a claim to

Defendant Utica requesting coverage for its business interruption losses promised under the Policy.

55.     On June 8, 2020, Defendant Utica misrepresented the law applicable to Plaintiffs claims, mislead Plaintiff regarding the coverage limits that were available to it, and misrepresented the terms of the policy.

56.     In Defendant Utica's June 8, 2020 letter, it represented to the Plaintiff that in order for coverage to apply, there must be a physical effect on the property such as deformation or permanent change in physical appearance.

57.     Defendant Utica's representation is inconsistent and in contrast to the terms of the policy itself and the applicable law of the Commonwealth. In fact, in three Pennsylvania trial court opinions have concluded that there is coverage for these claims. (See Opinions and Orders attached as Exhibits D, E, F, G, and H).

58.     As noted in Defendant Utica's letter, the policy provides coverage for direct loss to covered property.

59.     The policy defines "loss" as "accidental physical loss or accidental physical damage."

60.     Despite this definition contained within the policy, Defendant Utica's letter misrepresents what "loss" is covered by the policy and seeks to redefine the term.

61.     It is clear from the Defendant Utica's letter in conjunction with

their conduct in handling Plaintiffs claim, including, but not limited to, providing a biased and favorable insurance article to Plaintiff through its agent, claiming there is no coverage, that Defendant was attempting to dissuade Plaintiff from making a claim for business income losses, which were due and owned to Plaintiff under the policy.

62.     Any reasonable investigation of this claim would reveal that Plaintiff sustained direct physical loss and/or direct physical damage to the insured premises.

63.     Defendant Utica also provided that there is no evidence of damage to property at other locations, precluding coverage for orders of Civil Authority.

64.     Any reasonable investigation of Plaintiffs claim would have revealed evidence of damage to property, other than the insured location, which prompted the civil authority that suspended Plaintiffs business operations resulting in loss of business income.

65.     Defendant Utica also denied coverage, relying on the pollutant exclusion.

66.     Any reasonable evaluation of the Plaintiffs claim would reveal that the pollutant's exclusion is inapplicable to the claim.

67.     Defendant Utica and Defendant W N Tuscano failed to inquire into documentation pertaining to loss of business income related to Plaintiffs business interruption claim.

68.     Defendant Utica and Defendant W N Tuscano never intended to

fairly and objectively evaluate Plaintiff's business interruption claim.

69.    Defendant Utica and Defendant W N Tuscano's actions forced Plaintiff to retain counsel to obtain benefits that were due and owed under the Policy.

70.    Immediately after Plaintiff submitted its claim to Defendant Utica, Defendant Utica engaged in conduct with the intention of denying coverage rather than objectively evaluating the claims with the goal of providing coverage to Plaintiff, its insured, as required under the Pennsylvania Insurance Regulations

71.    The conduct of Defendant Utica includes, but is not limited to, the following:

   a.   Unreasonably delaying and providing policy information and otherinformation requested by Plaintiff;

   b.   Misrepresenting the coverage available to Plaintiff;

   c.   Failing to investigate and process Plaintiff's claim;

   d.   Withholding information and/or documents pertaining to coverage underthe Policy;

   e.   Asserting frivolous defenses;

   f.   Asserting defenses in coverage which Defendant knew or should haveknown have no foundation in fact or law;

   g.   Asserting defenses and offering evidence which may be false andfraudulent;

   h.   Certifying policy information containing inaccurate and/or

incomplete information;

1.   Misleading Plaintiff as to the coverage and policy information;

j.   Denying coverage of the Plaintiffs claim;

k.   Defendant knew or recklessly disregarded, the lack of reasonable basis to contest coverage;

l.   Failing to conduct a prompt, thorough and timely investigation regarding coverage under the Policy;

m.   Forcing Plaintiff to file a Complaint to obtain the benefits that are due and owed to it;

n.   Engaging in actions designed to delay ultimate payment of the claim;

o.   Ignoring clear legal precedent;

p.   Misinterpreting its own Policy;

q.   Knowing and/or recklessly disregarding the lack of a reasonable basis in denying Plaintiffs claim; .

r.   Failing to give equal consideration to provide coverage to Plaintiff under the Policy;

s.   Failing to objectively and fairly evaluate Plaintiffs claim;

t   Failing to timely investigate, evaluate and pay Plaintiffs claim;

u.   Dilatory and abusive claims handling;

v.   Failing to make coverage determinations when the claim was presented or in a timely manner thereafter;

w.   Failing to promptly and/or properly advise Plaintiff of

the basis of Defendant's denial of Plaintiffs claim;

x.   Misrepresenting the applicable coverage;

y.   Conducting an unfair, unreasonable and untimely investigation of Plaintiffs claims and/or coverage issues;

z.   Assuming a fiduciary obligation and failing to carry out the same in good faith;

aa.  Forcing Plaintiff to retain counsel and the expenses associated therewith to secure payment of monies that otherwise should have been volunteered;

bb.  Unreasonably and unfairly withholding policy benefits justly due and owed to Plaintiff;

cc.  Failing to maintain a full, complete and accurate claims file as required by Pa law, specifically 31 Pa Code 146.3;

dd.  Failing to timely complete its investigation and keep Plaintiff apprised of the status of its investigation including coverage/denial issues, in violation of 31 Pa Code 146.6;

ee.  Violation of the standards for prompt, fair and equitable settlements applicable to insures as set forth in 31 Pa Code 146.7;

ff.  Failing to fully disclose and/or misrepresenting the coverage available to Plaintiffs claims;

gg. Misrepresenting the benefits, conditions and terms of the applicable insurance policy and limits and/or pertinent facts or policy or contract provisions relating to coverages at issue in violation of 40 P.S. § 1171.5;

hh. Failing to acknowledge and act promptly upon written and oral communications with respect to claims arising under its policy in violation of 40 P.S. § 1171.5;

ii. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under its insurance policies including coverage determinations in violation of 40 P.S. §1171.5;

jj. Refusing to pay claims without conducting a reasonable investigation based upon all information available in violation of 40 P.S. §1171.5;

kk. Failing to affirm or deny coverage of claims within a reasonable time after the claim was submitted by Plaintiff and communicated to the company or its representative in violation of 40 P.S.§1171.5;

ll. Compelling Plaintiff to institute litigation and recover amounts due under the insurance policy in violation of 40 P.S. § II 71.5;

mm. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or

applicable law for denial of the claim in violation of 40 P.S. §1171.5;

nn. Making false or fraudulent statements or representations on or relative to an application for insurance policy for the purpose of obtaining a fee, commission, money or other benefit in violation of 40 P.S. § 1171.5;

oo. Failing to fully disclose to Plaintiff pertinent benefits, coverages or other provisions of the insurance policy or insurance contract under which a claim is presented in violation of 31 Pa Code 146.4;

pp. Failing to fully disclose to Plaintiff benefits, coverages or other provisions of an insurance policy or insurance contract when the benefits, coverages or other provisions are pertinent to a claim in violation of 31 Pa Code 146.4;

qq. Failing to properly advise the acceptance or denial of the claim pursuant to 31 Pa Code 146.7;

rr. Breaching its fiduciary duty of good faith and fair dealing;

ss. Placing its interest over the interest of its insured;

tt. Unnecessarily requiring the insured to incur the time and expense associated with filing a claim when

Defendant knew or should have known they had no good faith basis to deny coverage of the claim;

uu. Failing to disclose and/or acknowledge the true coverage;

vv. Improperly certifying the Policy;

ww. Failing to honestly, fairly, intelligently and objectively evaluate the coverage issue;

xx. Failing to accurately assess the strength or weaknesses of the evidence as a whole;

yy. Refusing to make settlement offer;

zz. Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services in violation of 73 P.S. 201-2 et seq;

aaa. Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another in violation of 73 P.S. 201-2 et seq; have in violation of 73 P.S. 201-2 et seq;

bbb. Advertising goods or services with the intent not to sell them as advertised in violation of 73 P.S. 201-2 et seq;

ccc. Failing to comply with the terms of a written guarantee or warranty given to a buyer, at, prior to or after a contract for the purchase of goods or services in violation of 73 P.S. 201-2 et seq;

ddd. Engaging in fraudulent or deceptive conduct which created a likelihood of confusion or of misunderstanding in violation of 73 P.S. 201-2 et seq; and

eee. Representing that goods or services have sponsorship, approval, characteristics, benefits or quantities that they do not have or that a person has sponsorship, approval, status, affiliation or connection that he does not.

72.    The conduct of Defendant Utica evidences a reckless disregard and indifference to the rights of its insureds.

73.    As a result of the conduct described above, Plaintiff has not been reimbursed for its loss in business income, which has unnecessarily forced Plaintiff to incur legal fees, costs, and lost interest otherwise available together with related economical loss, emotional discomfort and humiliation, financial hardship and financial losses associated with Defendant Utica and Defendant W N Tuscano's failure to honor the appropriate limits of coverage and delaying in processing and payment of Plaintiffs claim.

74.    At all times mentioned in this complaint, Defendant Utica acted by and through its actual or apparent authorized agents, servants, workmen, employees or ostensible agents, acting under the direction and/or control of Defendant. Defendant Utica is therefore vicariously liable for the grossly negligent, reckless, intentional,

fraudulent, and deceitful conduct of those agents, servants, employees, ostensible agents who at all times, were furthering Defendant Utica's interests within the aforesaid enterprise and were acting within the scope of their actual or ostensible agency and/or employment.

75.     Alternatively, at all times material hereto, Defendant Utica authorized, acquiesced and otherwise the conduct and activities of its agents, employees, servants and/or ostensible agents with regard to the handling of this claim. Accordingly, Defendant Utica accepted and retained the benefits of the wrongful and tortious conduct and acts of its agents. Defendant Utica is therefore vicariously liable for said conduct.

**COUNT I**
**Top Cuisine Inc. d/b/a Anthracite Cafe v. Utica First Insurance**
**Company**
**Declaratory Judgment**

76.     Plaintiff incorporates by reference all of the allegations contained in the preceding paragraphs above as if same were more fully set forth herein at length.

77.     The Policy is an insurance contract under which Defendant Utica was paid premiums in exchange for its promise to pay Plaintiffs losses for claims covered by the Policy, such as business losses incurred as a result of the government orders forcing it to close its

business.

78.     Plaintiff has complied with all applicable provisions of the Policy, including payment of the premiums in exchange for coverage under the Policy.

79.     Defendant Utica has arbitrarily and without justification refused to reimburse Plaintiff for any losses incurred by Plaintiff in connection with the covered business losses related to the Closure Orders and the necessary interruption of their businesses stemming from the COVID-19 pandemic.

80.     An actual case or controversy exists regarding Plaintiffs rights and Defendant Utica's obligations under the Policies to reimburse Plaintiff for the full amount of losses incurred by Plaintiff in connection with Closure Orders and the necessary interruption of its business stemming from the COVID-19 pandemic.

81.     Pursuant to 42 Pa. C.S.A. § 7532, Plaintiff seeks a declaratory judgment from this Court declaring the following:

    a) Plaintiffs losses incurred in connection with the Closure Orders and the and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under the Policy; and

    b) Defendant Utica is obligated to pay Plaintiff for the full amount of the losses incurred and to be incurred in connection with the

covered business losses related to the Closure Orders.

**WHEREFORE,** Plaintiff Top Cuisine Inc. d/b/a Anthracite Cafe, demands judgment against Defendant Utica First Insurance Company, jointly and severally, in an amount in excess of $50,000.00 plus interests, costs, and other such relief as this Court deems appropriate.

**COUNT II**
**Top Cuisine Inc. d/b/a Anthracite Cafe v. Utica First Insurance**
**Company**
**Breach of Contract**

82.    Plaintiff incorporates by reference all of the allegations contained in the preceding paragraphs above as if same were more fully set forth herein at length.

83.    The Policy is an insurance contract under which Defendant Utica was paid premiums in exchange for its promise to pay Plaintiffs losses for claims covered by the Policy, such as business losses incurred as a result of the government orders forcing it to close its business.

84.    Plaintiff has complied with all applicable provisions of the Policy, including payment of the premiums in exchange for coverage under the Policy, and yet Defendant Utica has abrogated its insurance coverage obligations pursuant to the Policy's clear and unambiguous terms.

85.    By denying coverage for any business losses incurred by Plaintiff in connection with the Closure Orders and the COVID-19 pandemic, Defendant Utica has breached its coverage obligations under the Policy.

86.     The conduct described in this Complaint by Defendant Utica constitutes breach of the contract of insurance with Plaintiff in failing to honor Plaintiff's claim and denying coverage under the policy in violation of Pennsylvania statutes and applicable case law.

87.     The foregoing conduct of Defendant Utica also constitutes a breach of the Policy's implied covenant of good faith and fair dealing.

88.     Plaintiff has satisfied all of its obligations under the policy, including but not limited to all conditions precedent and all conditions subsequent.

89.     As a consequence of Defendant Utica's breach of contract, Defendant is liable to Plaintiff for actual and consequential damages.

**WHEREFORE,** Plaintiff Top Cuisine Inc. d/b/a Anthracite Cafe,, demands judgment against Defendant Utica First Insurance Company, jointly and severally, in an amount in excess of $50,000.00 plus inter sts, costs, and other such relief as this Court deems appropriate.

## COUNT III
### Top Cuisine Inc. d/b/a Anthracite Cafe v. Utica First Insurance Company
### Bad Faith 42 Pa. C.S. §8371.

90.     Plaintiff incorporates by reference all of the allegations contained in the preceding paragraphs above as if same were more

fully set forth herein at length.

91.     On or about February 7, 1990, the Governor of Pennsylvania signed into law 42 Pa.C.S.A. §8371, effective July 1, 1990, entitled "Action Insurance Policies" which provides a private cause of action for bad faith against an insurance company as follows:

> "In an action arising under an insurance policy, if the Court finds that an insurer has acted in bad faith toward the insured, the Court may take all of the following actions:
>
>> (1) Award interest on the amount of the claims when the basic claim was made by the insured in an amount equal to the prime rate of interest plus 3%;
>> (2) Award punitive damages against an insurer;
>> (3) Assess Court costs and attorney's fees against the insurer."

92.     Defendant has engaged in a pattern of conduct against its insured, the Plaintiff in this case as set forth above.

93.     By virtue of its conduct, outlined at length above, Defendant knew or should have known it lacked a reasonable basis to deny coverage of the business interruption claim made by Plaintiff and recklessly disregarded its lack of reasonable basis by a course of conduct that denied or delayed Plaintiff's entitlement to business interruption income benefits.

94.     The action and conduct of Defendant Utica constitutes bad faith in violation of 42 Pa. C.S.A. §8371.

95.     Pursuant to 42 Pa C.S.A. §8371, Plaintiff is entitled to the following damages as a result of Defendant's bad faith conduct: Interest

on the claims for the date the claims were made in an amount equal to the prime rate of interest plus 3%, costs and attorney's fees for this action, punitive damages, and such other compensatory and/or consequential damages allowed by law.

**WHEREFORE,** Plaintiff Top Cuisine Inc. d/b/a Anthracite Cafe, Inc., demands judgment against Defendant Utica First Insurance Companies, in an amount in excess of $50,000.00 plus interests, costs, and other such relief as this Court deems appropriate.

## COUNT IV
## Top Cuisine Inc. d/b/a Anthracite Cafe, v. W N Tuscano Agency Inc.
## Negligence

96.     Plaintiff incorporates by reference all of the allegations contained in the preceding paragraphs above as if same were more fully set forth herein at length.

97.     In the event that the fact finder determines that the Policy does not cover Plaintiffs losses in full, this Count is pleaded in the alternative to Counts I to III and only against Defendant W N Tuscano.

98.     Defendant W N Tuscano undertook a duty to exercise reasonable care and/or skill and knowledge normally possessed by insurance brokers in selecting, preparing and processing Plaintiffs policy application and in obtaining an insurance policy including Business Income, Contingent Business Income, Extra Expense and Civil Authority coverages.

99.     Plaintiff requested and Defendant W N Tuscano undertook to

secure as broad as possible Business Income, Contingent Business Income, Extra Expense, and Civil Authority coverage.

100.     Plaintiff had a reasonable expectation in purchasing the Business Income, Contingent Business Income, Extra Expense, and Civil Authority coverage that such coverages would apply in the event that a civil authority issued an order effectively closing Plaintiffs business because of a public health emergency, such as the COVID-19 pandemic.

101.     Defendant W N Tuscano breached its duties of care by their negligence and other acts and/or omissions including, but not limited to:

　　a. Failing to ensure that the necessary and appropriate forms were completed to ensure the application for the requested as broad as possible insurance coverage as instructed by Plaintiff;

　　b. Failing to exercise reasonable care in obtaining as broad as possible insurance policies to provide the requested coverage for Plaintiff;

　　c. Failing to exercise reasonable care in obtaining insurance policies to provide as broad as possible Business Income, Contingent Business Income, Extra Expense and Civil Authority coverages for Plaintiff that would cover losses due to a public health emergency arising from a virus such as COVID-19;

　　d. Failing to exercise reasonable care in obtaining

insurance policies to provide as broad as possible Business Income, Contingent Business Income, and Extra Expense coverage to Plaintiff that would cover losses due to order of a civil authority relating to a public health emergency arising from a virus such as COVID-19;

e.  Failing to inform Plaintiff that the Policy obtained did not have coverage which would provide as broad as possible Business Expense, Contingent Business Income, and Extra Income coverage applicable to Plaintiffs business operations in the event of a public health emergency arising from a virus such as COVID-19; and

f.  Failing to inform Plaintiff that the Policy obtained did not have coverage which would provide as broad as possible Business Expense, Contingent Business Expense, and Extra Income coverage applicable to Plaintiffs business operations due to order of a civil authority relating to a public health emergency arising from a virus such as COVID-19.

102.  As a direct and proximate result of Defendant's negligence, Plaintiff has sustained substantial damages for which Defendant W N Tuscano is liable, in an amount to be established at trial. (A trial court has held that this claim can be pursued see attached as Exhibit I).

WHEREFORE, Plaintiff Top Cuisine Inc. d/b/a Anthracite Cafe,, demands judgment against Defendant W N Tuscano Insurance Agency Inc., jointly and severally, in an amount in excess of $50,000.00 plus interests, costs, and other such relief as this Court deems appropriate.

## COUNT V
### Top Cuisine Inc. d/b/a Anthracite Cafe v. W N Tuscano Agency, Inc.
### Negligent Supplying for the Information or Guidance of Others,
### Restatement (Second) of Torts Section 552

103.    Plaintiff incorporates by reference all of the allegations contained in the preceding paragraphs above as if same were more fully set forth herein at length.

104.    In the event that the fact finder determines that the Policy does not cover Plaintiffs losses in full, this Count is pleaded in the alternative to Counts I to III and only against Defendant W N Tuscano.

105.    Defendant W N Tuscano, for its own pecuniary interest, negligently supplied incorrect and incomplete information to Plaintiff regarding the amounts and applicability of the Business Income, Contingent Business Income, Extra Expense, and Civil Authority coverage under the Policy.

106.    Defendant W N Tuscano made the recommendations for coverage with the intent that Plaintiff purchase the Policy.

107.    Plaintiff foreseeably and justifiably relied to its detriment on Defendant W N Tuscano's recommendations, expertise, and

affiliations, and followed their advice, which, in fact, included material and negligent misrepresentations and/or omissions, and, as a result, its coverage with Defendant Utica was, if the fact finder determines that the Policy does not cover Plaintiffs losses in full, insufficient to compensate Plaintiff for its Business Income, Contingent Business Income and Extra Expense losses resulting from the COVID-19 pandemic and the Closure Orders.

108.    As a direct and proximate result of Defendant's negligent supplying of information, Plaintiff has sustained substantial damages for which Defendant W N Tuscano is liable, in an amount to be established at trial.

**WHEREFORE,** Plaintiff Top Cuisine Inc. d/b/a Anthracite Cafe, demands judgment against Defendant W N Tuscano Insurance Agency, Inc., jointly and severally, in an amount in excess of $50,000.00 plus interests, costs, and other such relief as this Court deems appropriate.

### COUNT VI
**Top Cuisine Inc. d/b/a Anthracite Cafe v. W N Tuscano Agency, Inc**
**Negligent Misrepresentation**

109.    Plaintiff incorporates by reference all of the allegations contained in the preceding paragraphs above as if same were more fully set forth herein at length.

110.    In the event that the fact finder determines that the Policy does not cover Plaintiffs losses in full, this Count is pleaded in the alternative

to Counts I to III and only against Defendant W N Tuscano.

111.     Defendant W N Tuscano misrepresented and/or failed to present material facts to Plaintiff including, but not limited to, that Defendant Utica would disclaim the coverage Plaintiff purchased for Civil Authority coverage, business interruption, and virus coverage. As a result, if the fact finder determines that the Policy does not cover Plaintiffs losses in full, Plaintiff paid substantial premiums on illusory coverage.

112.     Defendant W N Tuscano made the recommendations for coverage with the intent that Plaintiff purchase the Policy.

113.     Plaintiff foreseeably and justifiably relied to its detriment on Defendant W N Tuscano's recommendations, expertise, and affiliations, and followed its advice, which, in fact, included material and negligent misrepresentations and/or omissions, and, as a result, its coverage with Defendant Utica was, if the fact finder determines that the Policy does not cover Plaintiffs losses in full, insufficient to compensate Plaintiff for its Business Income, Contingent Business Income and Extra Expense losses resulting from the COVID-19 pandemic and the Closure Orders.

114.     As a direct and proximate result of Defendant's negligent misrepresentations and omissions, Plaintiff has sustained substantial damages for which Defendant W N Tuscano is liable, in an amount to be established at trial.

**WHEREFORE,** Plaintiff Top Cuisine Inc. d/b/a Anthracite Cafe., demands judgment against Defendant W N Tuscano Agency, Inc., jointly and severally, in an amount in excess of $50,000.00 plus interests, costs, and other such relief as this Court deems appropriate.

Respectfully submitted,

**SCHMIDT KRAMER PC**

By: _____
Scott Cooper (Trial Laptop 3 (Sep 23, 2021 08:54 EDT)
Scott B. Cooper
I.D. No. 70242
209 State Street
Harrisburg, Pa 17101
(717) 232-6300
(717) 232-6467 Fax
scooper@schmidtkramer.com
Date:  Sep 23, 2021          Attorney for Plaintiff

## VERIFICATION BASED UPON PERSONAL KNOWLEDGE
## AND INFORMATION OBTAINED THROUGH COUNSEL

I, Top Cuisine Inc. d/b/a Anthracite Cafe, verify that I am the Plaintiff in the foregoing action and that the attached Complaint is based upon information which has been gathered by my counsel in the preparation of this lawsuit. The language of the Complaint to the extent that it is based upon information that I have given to my counsel is true and correct to the best of my knowledge, information and belief. To the extent that the contents of the Complaint are that of counsel, I relied upon counsel making this Verification.

I understand that intentional false statements herein are subject to the penalties of 18 Pa. C.S.A. § 4904 relating to unsworn falsifications to authorities.

Date: Sep 23, 2021

Michael Prushinski, on behalf of Top
Cuisine Inc. d/b/a Anthracite Cafe

**EXHIBIT A**



## UTICA FIRST
### INSURANCE COMPANY

June 8, 2020                         <u>**Certified Mailing #9214 8901 0661 5400 0151 7718 17**</u>

ANTHRACITE CAFE
TOP CUISINE INC DBA
804 SCOTT STREET
WILKES BARRE, PA 18705

RE:   Our Insured:    ANTHRACITE CAFE
      Policy #:       BOP 4466431
      Claim #:        575180
      Claimant:       ANTHRACITE CAFE
      Date of Loss:   3/16/2020

Dear Insured,

Utica First Insurance Company acknowledges notice of a claim occurring at 804 SCOTT STREET   WILKES BARRE, PA for loss of income and food spoilage due to the Covid19 virus and closure of your business due to government mandate relating to the virus.

After reviewing your policy and the circumstances involved, we are unable to provide coverage to you for this loss.

Please refer to page 19 through 21 of your policy form BP 0200 (ed 06-12).

_____

## COVERAGE C -- LOSS OF INCOME

"We" provide the Loss of Income coverages described below during the "restoration period" when "your" business sustains a necessary "interruption" resulting from direct physical loss or damage to real or personal property as a result of a covered peril.

### LOSS OF INCOME COVERAGE EXTENSIONS

"We" provide the following Loss of Income Coverage Extensions. These Loss of Income Coverage Extensions are part of and not in addition to the applicable Loss of Income coverage "limit".

3. **Interruption By Civil Authority** -- "We" extend "your" coverage to include loss while access to the described premises is specifically denied by an order of civil authority.

This order must be a result of damage to property other than at the described premises that is caused by a covered peril, subject to the following:

a.  the described premises is:

    1)  within one mile of the damaged property; and
    2)  within the area where access is denied by civil authority; and

b.  the order is initiated:

    1)  to allow civil authority to have access to the damaged property without interference; or
    2)  due to dangerous conditions as a result of the damage or continuation of the covered peril that caused the damage.

Please refer to page 23 of your policy form BP 0200 (ed 06-12).

---

## PERILS EXCLUDED

"We" do not pay for loss or damage if one or more of the following exclusions apply to the loss or damage, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

1.  **Civil Authority** -- "We" do not pay for loss or damage caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

7.  **Virus Or Bacteria** -- "We" do not pay for loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

    This exclusion applies to, but is not limited to, any loss, cost, or expense as a result of:

    a.  any contamination by any virus, bacterium, or other microorganism; or

    b.  any denial of access to property because of any virus, bacterium, or other microorganism.

    This exclusion does not apply to loss, cost, or expense resulting from "fungus or related perils".

    This exclusion supersedes the "terms" of any other exclusions referring to "pollutants" or to contamination with respect to any loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

Based on the above, your insurance policy does not provide coverage for this type of loss.

If you have further information regarding this matter, it should be referred to us immediately.  Utica First Insurance Company reserves its rights to invoke any additional policy provisions, which may be unknown or inapplicable at this time, but which may become known or applicable in the future.

Sincerely,

Justin Tangorra
Examiner
(315) 736-8211

CC:

W N TUSCANO AGENCY INC
PO BOX 1027
GREENSBURG, PA 15601


## UTICA FIRST
### INSURANCE COMPANY

June 8, 2020                    <u>*Certified Mailing #9214 8901 0661 5400 0151 7718 17*</u>


ANTHRACITE CAFE
TOP CUISINE INC DBA
804 SCOTT STREET
WILKES BARRE, PA 18705


RE:  Our Insured:   ANTHRACITE CAFE
     Policy #:      BOP 4466431
     Claim #:       575180
     Claimant:      ANTHRACITE CAFE
     Date of Loss:  3/16/2020


Dear Insured,


Utica First Insurance Company acknowledges notice of a claim occurring at 804 SCOTT STREET   WILKES
BARRE, PA for loss of income and food spoilage due to the Covid19 virus and closure of your business
due to government mandate relating to the virus.

After reviewing your policy and the circumstances involved, we are unable to provide coverage to you
for this loss.


Please refer to page 19 through 21 of your policy form BP 0200 (ed 06-12).

---

## COVERAGE C -- LOSS OF INCOME


"We" provide the Loss of Income coverages described below during the "restoration period" when
"your" business sustains a necessary "interruption" resulting from direct physical loss or damage to real
or personal property as a result of a covered peril.


## LOSS OF INCOME COVERAGE EXTENSIONS

"We" provide the following Loss of Income Coverage Extensions. These Loss of Income Coverage
Extensions are part of and not in addition to the applicable Loss of Income coverage "limit".

3. **Interruption By Civil Authority** -- "We" extend "your" coverage to include loss while access to the
   described premises is specifically denied by an order of civil authority.

This order must be a result of damage to property other than at the described premises that is caused by a covered peril, subject to the following:

a.  the described premises is:

1) within one mile of the damaged property; and
2) within the area where access is denied by civil authority; and

b.  the order is initiated:

1) to allow civil authority to have access to the damaged property without interference; or
2) due to dangerous conditions as a result of the damage or continuation of the covered peril that caused the damage.

Please refer to page 23 of your policy form BP 0200 (ed 06-12).

## PERILS EXCLUDED

"We" do not pay for loss or damage if one or more of the following exclusions apply to the loss or damage, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded causes or events.

1.  **Civil Authority** -- "We" do not pay for loss or damage caused by order of any civil authority, including seizure, confiscation, destruction, or quarantine of property.

7.  **Virus Or Bacteria** -- "We" do not pay for loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

This exclusion applies to, but is not limited to, any loss, cost, or expense as a result of:

a.  any contamination by any virus, bacterium, or other microorganism; or

b.  any denial of access to property because of any virus, bacterium, or other microorganism.

This exclusion does not apply to loss, cost, or expense resulting from "fungus or related perils".

This exclusion supersedes the "terms" of any other exclusions referring to "pollutants" or to contamination with respect to any loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress.

Based on the above, your insurance policy does not provide coverage for this type of loss.

If you have further information regarding this matter, it should be referred to us immediately. Utica First Insurance Company reserves its rights to invoke any additional policy provisions, which may be unknown or inapplicable at this time, but which may become known or applicable in the future.

Sincerely,

Justin Tangorra
Examiner
(315) 736-8211

CC:

W N TUSCANO AGENCY INC
PO BOX 1027
GREENSBURG, PA 15601

**UTICA FIRST**
· INSURANCE COMPANY
CONSTITUTED IN OHIO AS
**UTICA FIRST INSURANCE COMPANY (MUTUAL)**
P.O. Box 851, Utica, NY 13503-0851

# POLICY MAILER PAGE

## POLICY NUMBER:   BOP 4466431 00

ANTHRACITE CAFE
TOP CUISINE INC DBA
804 SCOTT STREET
WILKES BARRE PA 18705

# For Sales and Service contact your agent:

## AGENT:  2624000

W N TUSCANO AGENCY INC
PO BOX 1027
GREENSBURG, PA  15601

724-836-1510

**Additional policy forms:**

**FORM NAME**                                          **FORM NAME**

BP 0200 (06/12)

# UTICA FIRST
## INSURANCE COMPANY

### Utica First is excited to introduce our new online

## "POLICY HOLDER SERVICE CENTER"

As a Utica First Insurance policy holder, you will now be able to setup an on-line account that will allow you to access your policy information. This information includes:

Policy Documents
- View your policy on-line
- View policy forms for new, renewals and endorsements

Online billing and payment information
- Pay your bills on-line
- View billing statements
- Schedule future payments
- Future/recurring EFT and Credit Card payments

View policy details

View information for any claims associated with your policy

Go Paperless
- Easy access to your online account for your policy
- Eliminate mail
- Environmentally friendly

View contact information for your Utica First Agent

Available on-line 24 hours - 7 days a week

To access this new insured website you will first need to register by entering some basic policy information and the Online Access Code shown below.

| | |
|---|---|
| **Policy Number** | BOP 4466431 00 |
| **Mailing Address Zip Code** | 18705 |
| **Service Center Access Code** | 2646126 |

**Instructions:**
Go to **www.uticafirst.com** and click on 'My Policy'.
Click on 'Register Now' to sign up.

# Why would I need an Umbrella Policy?

- Because the cost of additional liability protection above your current policy is much more affordable than you might think.

- Because you've worked hard for your business and home, and you want to safeguard your assets.

- Because people <u>are</u> injured in accidents every day. Lawsuits can and will happen. No one is immune.

- Because medical costs and the expenses of a possible lawsuit can be incredibly high these days.

- Because you <u>can</u> be held legally liable for damage you cause to other people's property.

In most cases, you can protect the assets of your business or family for an additional $ 1 million (or more) for just a few hundred dollars a year. This is an extra measure of protection, over and above the policies you already carry. Utica First offers both Umbrella and Excess Liability Policies in values up to $5 million.

Don't take chances. Buy yourself some cheap additional protection. Call your Utica First agent or broker and ask for a free, no obligation quote on an Umbrella or Excess Liability Insurance Policy. If you have a claim, you'll realize this was the smartest insurance decision you ever made.



**UTICA FIRST**
INSURANCE COMPANY

**Utica First Insurance Company**                                                   **Policy Jacket Insert**
**PROVISIONS REQUIRED BY LAW TO BE STATED IN THIS POLICY**

This policy is issued by Utica First Insurance Company (the "Company"), an Advance Premium Co-operative Property and Casualty Insurance Company having Bylaws and special regulations relating to meetings of members, election of directors, rights and obligations of members as printed below.  The holder of this policy is not subject to liability for assessment.

**Qualification for Membership.**  Any natural person or Organization (as that term is hereinafter defined) that becomes a policyholder of one or more policies of insurance issued by the Company within its authority pursuant to the Company's Charter and licenses is a member of the Company (a "Member" or "Members").  The status as Member of any natural person or Organization shall cease immediately at the time such natural person or Organization ceases to hold at least one policy of insurance issued by the Company.  Non-residents who own property within the territory in which the Company may do business may be insured therein and shall have all the rights and privileges of Members of the Company and be accountable as are other persons insured therein, but shall not be eligible to hold office in the Company.
**Membership by an Organization.**  The term "Organization" means any legal entity other than a natural person that is authorized to insure in an advance premium corporation under Section 6626(a) of the Insurance Law, or any successor statute, together with multiple named insureds with joint interests under one or more policies of insurance.  Each Organization that becomes a Member of the Company may designate in writing one officer, trustee, board member or legal representative (an "Authorized Representative") of such Organization who is to be recognized by the Company pursuant to Section 6626(b) of the Insurance Law or any successor statute to act for or on behalf of such Organization for the purpose of membership.  Only the Authorized Representative of an Organization which is a Member may perform any act or exercise any right on behalf of the Organization which is associated with such Organization's status as Member.
**Annual Meeting.**  The annual meeting of the Members of the Company is held at the Home Office of the Company at 4:00 p.m. on the first Monday in March of each year, if not a legal holiday, and if a legal holiday, then on the next succeeding Monday which is not a legal holiday.  At the annual meeting the Members shall elect Directors and transact such business as may properly come before the meeting.
**Special Meetings.**  Special meetings of the Members of the Company may be called at any time by the Chief Executive Officer and two Directors other than the Chief Executive Officer and shall be called at any time upon written request of at least ten of the Members.  The call for the meeting shall state the time, place, and object of the meeting.  All special meetings of the Members of the Company shall occur not more than 60 days following the date of the call for the meeting and shall take place at the Home Office.
**Notice of Meetings.**  Notice of the time, place and object of each annual and special meeting of the Members of the Company shall be published twice each week for two successive weeks immediately preceding such meeting, in at least two newspapers published in Oneida County, New York.
**Voting.**  Except as otherwise required by law or the Company's Charter, each Member is entitled to one vote only upon each matter submitted to a vote at any meeting of the Members.  Except for the election of Directors, all questions are decided by a vote of a majority of the Members voting thereon.
**Number and Qualification of Directors.**  The Board of Directors shall consist of not less than nine nor more than fifteen Directors, the exact number within such range to be determined from time to time by resolution of the Board of Directors, provided that no decrease in the number of Directors shall shorten the term of an incumbent Director.  Each Director shall be a Member of the Company and a resident of the territory in which the Company is licensed to do business.  At all times, a majority of the Directors shall be citizens and residents of New York State.
**Election of Directors.**  The Board of Directors shall be divided into three (3) groups which are as equal in size as possible.  Each Director shall serve for a term of three (3) years beginning on the date of the annual meeting at which he is elected, and within each group, the terms of the Directors shall be coextensive.  The terms for each group shall be staggered such that only one group shall be elected at each annual meeting of the Members.  At the annual meeting of Members, each Member in attendance shall cast one vote for each vacancy on the Board of Directors.  Those candidates receiving a plurality of the votes cast shall be elected.
**Nomination of Directors.**  Only persons who are nominated in accordance with the following procedures shall be eligible for election as Directors.  Nominations of persons for election to the Board of Directors of the Company may be made (a) at a meeting of Members by or at the direction of the Board of Directors or (b) at a meeting of the Members by any Member of the Company who complies with the following notice.  Nominations other than those made by or at the direction of the Board of Directors must be filed with the Secretary of the Company not less than 30 nor more than 60 days before the Annual Meeting, provided such nominations be in writing and endorsed by not less than 15 Members of the Company (a "Member Notice").  Such Member Notice shall set forth (a) as to each person whom the Members propose to nominate for election or re-election as a Director, (i) the  name, age, business address and residence address of such person, (ii) the principal occupation or employment of such person, (iii) whether such person is a Member of the Company, such person's name and address as they appear on the Company's records and evidence whether such person is a citizen and resident of New York State and of the territory in which the Company is licensed to do business and is otherwise qualified to be a Director of the Company, and (iv) any relationship or affiliation that such proposed nominee has with the persons nominating him; and (b) as to the Members giving notice, the Members' name and address, as they appear in the Company's records.  No persons, except those whose names have been identified in a notice which was filed as provided in this section, are eligible for election.  The term "Qualified Persons" shall mean natural persons who are qualified to serve as Directors of the Company pursuant to the Charter, Bylaws, or applicable law.
**Assessments.**  The Company shall issue policies without contingent mutual liability of the policyholders for assessment.

**Procedure for Amendment.** The Bylaws may be amended by addition, alteration or repeal only by a majority vote of all of the Members who are present in person at any Annual Meeting of the Members or other stated meeting or any special meeting duly called for such purpose except that the Board of Directors, at any regular or special meeting, may amend the Bylaws as to any provisions which do not impair the Members' rights or enlarge their obligations under insurance policies by a vote in favor of such amendment of not less than two-thirds of the Directors present, provided that notice of the substance or character of the proposed change has been given in the call for such meeting, and provided that such amendments are approved by the Superintendent of Insurance of the State of New York.

## Utica First Insurance Company

This policy jacket with the Declarations Page (or Renewal Certificate page), policy conditions and definitions, and forms and endorsements, if any, issued to form a part thereof, completes this policy.

To the extent that coverage in this policy replaces coverage in other policies terminating noon standard time on the inception date of this policy, coverage under this policy shall not become effective until such other coverage has terminated.

### Renewal Certificates

This initial policy expires on the date shown on the Declarations Page and coverage may be continued to subsequent annual policy periods by the use of an Annual Renewal Certificate. The Declarations Page of the Renewal Certificate will replace all previously issued policy Declarations and will apply only to accidents, occurrences, or losses which happen during the policy period shown on the Renewal Certificate.

Furthermore, the policy will apply only to those coverages for which a limit of insurance and/or a limit of liability or charge is shown on the Renewal Certificate. Our limit for each coverage shall not be more than the amount stated for such coverage on the Renewal Certificate, subject to all the terms, conditions, forms, and endorsements attached to the policy or to the Renewal Certificate.

### Important Notice

In compliance with the requirements of the Fair Credit Reporting Act (Public Law 91-08), we advise that as part of our routine procedure in reviewing applications for insurance or renewals of insurance policies, this insurance company may procure an investigative consumer report including information as to the consumer's character, general reputation, personal characteristics or mode of living, if such insurance is for an individual and is primarily for personal, family or household purposes. Such information will be obtained through personal interviewing neighbors, friends, or others with whom the consumer is acquainted.

Upon written request to this insurance company, made within a reasonable period of time after receipt of this notice, this company will provide in writing a complete and accurate disclosure of the nature and scope of the investigation requested, if one was requested, or advise that none was requested.

| BUSINESSOWNERS PROGRAM DECLARATIONS Policy Number | POLICY ISSUED ON THE CO-OPERATIVE PLAN **UTICA FIRST INSURANCE COMPANY** CONSTITUTED IN OHIO AS **UTICA FIRST INSURANCE COMPANY (MUTUAL)** Home Office - 5981 Airport Road, Oriskany, NY 13424 Mail Address - P.O. Box 851, Utica, NY 13503-0851 | NON-ASSESSABLE POLICY |
|---|---|---|

BOP 4466431 00

**Named Insured and P.O. Address**   (Number, Street, Town or City, County, State, Zip Code)          Direct Billed - Insured

ANTHRACITE CAFE
TOP CUISINE INC DBA
804 SCOTT STREET
WILKES BARRE PA 18705

Policy Period: From     09/03/19     to     09/03/20     12:01 a.m. Standard Time

Business Description: Tavern

The Insured is: _____ an individual_____ a partnership _____ a joint venture _X_ Other (Describe)

All known exposures at the beginning of the policy period have been identified below.
Location of all premises owned, rented, occupied or controlled by the insured:

| Loc. | Bld. | Prot | Con. | Occupancy | Situated | Zip Code |
|---|---|---|---|---|---|---|
| 1 | 1 | PR | J | Tavern | 804 SCOTT STREET WILKES BARRE, PA | 18705 |

This replaces all previously issued policy Declarations, if any. This policy applies only to accidents, occurrences or losses which happen during the policy period shown above. This policy applies only to those coverages below for which a limit of Insurance and/or a limit of liability or charge is shown. Our limit for each coverage shall not be more than the amount stated for such coverage, subject to all terms of this policy.

| Property Coverage | Protective Devices (List Type) | Deductible | Limit of Insurance | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Loc. No. | Bldg. No. | RC | ACV | Loc. No. | Bldg. No. | RC | ACV |
| | | | 1 | 1 | | | | | | |
| Cov. A - Building(s) | | | $ | | | | $ | | | |
| Cov. B - Business Property | Cntrl | $1,000 | $ 100,000 | | X | | $ | | | |
| Cov. C - Loss of Income | | | $ ACTUAL LOSS | | | | $ | | | |

| Liability Coverage | Liability Insurance Limits | |
|---|---|---|
| Cov. (L) Each Occurrence Limit | $ 1,000,000 | /per occurrence |
| General Aggregate Limit | $ 2,000,000 | |
| Cov. (M) Medical Payments Limit | $ 5,000 | /per person |
| Cov. (N) Aggregate Limit Products/Completed Work | $ 1,000,000 | |
| Cov. (O) Fire Legal Liability | $ 50,000 | /per occurrence |
| Cov. (P) Pers and/or Adv Injury Liability | $ 1,000,000 | /per occurrence |

If this is checked _____ we do not provide coverage for Products Completed Work, and the each occurrence Limit does not apply to Coverage N.

Add'l Cov. (Specify)                                          CYBER LIABILITY          $166.00

SYSTEMS BREAKDOWN COV.

| Subject to following forms and endorsements | SEE FORMS INVENTORY PAGE | | | ANNUAL |
|---|---|---|---|---|
| | | | | 3,487.00 |
| | | POLICY TOTAL | | 3,487.00 |

Agency at   2624000
W N TUSCANO AGENCY INC
PO BOX 1027
GREENSBURG, PA  15601

Our Authorized Representative and
Countersignature Date 09/12/19

BPDEC (01 18)                              INSURED COPY



**UTICA FIRST INSURANCE COMPANY**
*CONSTITUTED IN OHIO AS*
**UTICA FIRST INSURANCE COMPANY (MUTUAL)**
Home Office - 5981 Airport Road, Oriskany NY 13424
Mail Address - P.O. Box 851, Utica, NY 13503-0851

**Businessowner Policy**
**FORMS INVENTORY PAGE**

| Policy Number: | BOP 4466431 00 | |
|---|---|---|
| Named Insured: | ANTHRACITE CAFE | |
| Agent: | W N TUSCANO AGENCY INC | 2624000 |

# FORMS INVENTORY

| | | | | | |
|---|---|---|---|---|---|
| BP 0335 | (06/12) | PA Amendatory Endorsement | BP 0868 | (06/12) | Cross Liab Excl Inj Certn Insd |
| BP 0734 | (01/04) | Lead Liability Exclusion | ML-0120 | (03/99) | Ins Consul Serv Exemption Act |
| BP 0839 | (10/05) | Asbestos Exclusion | BP 0722 | (01/04) | Punitive Damages Exclusion |
| BP 0798 | (01/15) | Exclusion - Data Breach Liab | BP 0816 | (01/15) | Amendatory Endorsement |
| BP 0200 | (06/12) | Businessowners Special Policy | BP 0331 | (01/04) | Protective Devices |
| UA504B | (02/17) | Protective Safeguard End't | BP 0676 | (06/12) | Excl-Fungus or Related Perils |
| BP 0678 | (01/04) | EIFS Exclusion | BP 0760 | (01/15) | Cert. Act of Terrorism Exclus |
| BP 0838 | (10/05) | Silica Exclusion | BP 0867 | (04/11) | Defense Cost Amend Endorsemt |
| BP 0680 | (01/04) | Excl-Damage To Work of Insured | BP 0736 | (01/04) | Excl-Abuse or Molestation |
| BP-001 | (07/18) | Systems Breakdown Coverage | UFCYBC | (01/16) | Cyber Liability Coverage Form |
| UA-506 | (06/09) | Assault & Battery Exclusion | APPT2 | (2.00) | Appetizer 2 Package Form |
| UFCYBSD | (01/16) | Cyber Liab Supplemental Dec | PRIV0401 | (04/01) | Privacy Statement |

**Issued Date:** 09/12/19

FORMINV 06 09

INSURED COPY

**UTICA FIRST**
INSURANCE COMPANY

P.O. Box 851, Utica, NY  13503-0851  Telephone No: (315)736-8211  Fax:(315)768-4408

# APPETIZER 2 ENDORSEMENT

WHAT "We" COVER:

In addition to any coverage shown on:

    1. the Declarations Page,
    2. the Supplemental Declarations Page,
    3. the General Policy Provisions, or
    4. any other coverage attached to "your" policy.

For an additional premium, "we" provide the following coverages or extensions of coverage subject to the terms contained in the policy. These added coverages apply only as excess over other coverage contained in "your" policy unless otherwise specified.

| | |
|---|---|
| $   10,000. | ACCOUNTS RECEIVABLE |
| $    5,000. | ADDITIONAL DEBRIS REMOVAL |
| $    2,000. | ADDITIONAL EXPENSE |
| $   10,000. | BACKUP OF SEWERS OR DRAINS |
| $    5,000. | BUSINESS CREDIT CARD, FORGERY, AND COUNTERFEIT MONEY |
| $   10,000. | BUSINESS PROPERTY AT NEWLY ACQUIRED LOCATIONS |
| $   10,000. | COMPUTER COVERAGE |
| $    5,000. | CREDIT CARD RECEIPTS COVERAGE |
| $    5,000. | DEMOLITION COVERAGE |
| $   10,000. | EMPLOYEE DISHONESTY |
| $    5,000. | EXTERIOR SIGNS |
| $    1,000. | LOCK REPLACEMENT |
| $ 250,000. | FIRE LEGAL LIABILITY |
| $    5,000. | GLASS COVERAGE |
| $   10,000. | MONEY AND SECURITIES |
| $   25,000. | REFRIGERATED FOOD PRODUCTS |
| $    5,000. | TREES, PLANTS, AND SHRUBS |
| $    5,000. | UTILITY INTERRUPTION PROPERTY DAMAGE |
| $   10,000. | UTILITY SERVICE DISRUPTION TIME ELEMENT COVERAGE |
| $   10,000. | VALUABLE PAPERS AND RECORDS |

APPT2 2.0

# PRINCIPAL COVERAGES

## ACCOUNTS RECEIVABLE

**What "We" Pay For:**

"We" pay up to $10,000 for loss or damage to Accounts Receivable on the described premises.

**What "We" Do Not Pay For:**

1. loss due to any fraudulent, dishonest or criminal act by any **"Insured"** a partner, or an officer, director or trustee, while working or otherwise, and whether acting alone or in collusion with others;

2. loss due to bookkeeping, accounting or billing errors or omissions;

3. loss, the proof of which as to factual existence, is dependent upon an audit of records or an inventory computation. This shall not prevent the use of such procedures in support of a claim for loss which the **"Insured"** can prove, through evidence wholly apart from an audit of records or an inventory, is due solely to a risk of loss of records of accounts receivable but not otherwise excluded under this policy;

4. loss due to alteration, falsification, manipulation, concealment, destruction or disposal of records of accounts receivable committed to conceal the wrongful giving, taking, obtaining or withholding of **"money"**, **"securities"** or other property but only to the extent of such wrongful giving, taking obtaining or withholding;

5. loss due to electrical or magnetic injury, disturbance or erasure of electronic recordings, except by lightning;

6. loss due to nuclear reaction, nuclear radiation or radioactive contamination, or any other act or condition incident to them; or

7. loss caused by or resulting from:

   a. hostile or warlike action in time of peace or war, including any action in hindering, combating or defending against an actual, impending or expected attack by:

      1) any government or sovereign power, or by any authority maintaining or using military, naval or air forces;
      2) military, naval or air forces; or
      3) an agent of any such government, power, authority or forces;

   b. any weapon of war employing atomic fission or radioactive force whether in time of peace or war; or
   c. insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence, seizure or destruction under quarantine or customs regulations, confiscation by order of any government or public authority, or risks of contraband or illegal transportation or trade.

## ADDITIONAL DEBRIS REMOVAL

**What "We" Pay For:**

"We" pay up to $5,000, as an additional amount, only when the sum of necessary expense of removal of the covered debris and the covered property loss exceeds the amount of insurance applicable on **"your"** policy.

## ADDITIONAL EXPENSE

**What "We" Pay For:**

**"We"** pay up to $2,000 for additional expense which **"you"** must incur to continue business as usual had no damage occurred.

**"You"** must do everything reasonable to reduce the amount of loss. **"You"** must do everything reasonable to resume operations with the same quality of service which existed immediately before the loss; and **"you"** must resume partial or complete operation of the property making use of merchandise, stock or other property at **"your"** other locations.

## BACKUP OF SEWERS, DRAINS OR SUMPS

**What "We" Pay For:**

**"We"** pay up to $10,000 for water damage due to the backup of sewers, drains and sumps. **"We"** cover direct physical loss or damage to property while at the premises caused by water, or material present in or carried or otherwise moved by water that backs up through, overflows from, or is otherwise discharged from:

    a.    a sewer or drain;

    b.    a sump, sump pump, or related equipment, even if the backup, overflow, or discharge is due to mechanical breakdown of such sump pump or related equipment. However, **"we"** do not cover the cost to repair or replace any sump pump or related equipment due to mechanical breakdown; or

    c.    any other type of system designed to remove subsurface water which is drained from the foundation area.

With respect to coverage provided by this endorsement, the following exclusions are added:

    a.    Ordinary Maintenance - **"We"** do not pay for loss or damage caused by an **"insured's"** failure to perform the ordinary maintenance or repair necessary to keep a sewer or drain cleared of obstructions.

    b.    Proper Condition - **"We"** do not pay for loss or damage caused by an **"insured's"** failure to maintain in proper working condition a sump pump or related equipment or any other type of system designed to remove subsurface water which is drained from the foundation area.

## BUSINESS CREDIT CARD, FORGERY AND COUNTERFEIT MONEY

**What "We" Pay For:**

**"We"** pay up to $5,000 for loss when **"you"**.

1. become legally obligated to pay for the unauthorized use of credit cards issued or registered in **"your"** name;
2. suffer a loss through forgery or alteration of checks, drafts, certificates of deposit and notes including negotiable orders of withdrawal drawn or issued by **"you"**; or
3. accept in good faith, counterfeit United States or Canadian paper currency.

**What "We" Do Not Pay For:**

1. any loss sustained as a result of **"your"** failure to comply with all of the requirements of the credit card;
2. any loss resulting from **"your"** dishonesty;
3. any loss resulting from use of the credit card by anyone with **"your"** permission; or
4. any loss involving a bank debit card or similar device used to deposit, withdraw or transfer funds.

## BUSINESS PROPERTY AT NEWLY ACQUIRED LOCATIONS

**What "We" Pay For:**

**"We"** pay up to $10,000 for business personal property at newly acquired locations.

**What "We" Do Not Pay For:**

This coverage ceases:

1. on the date more specific insurance takes effect;
2. 30 days from the date of the acquisition of the newly acquired business property;
3. on the date that the value of such property is reported to **"us"**, or
4. on the date this coverage is terminated;

whichever occurs first.

## COMPUTER COVERAGE

**What "We" Pay For:**

**"We"** cover direct physical loss to **"your"** **"hardware"** and **"software"** up to an amount of $10,000 which is caused by a covered peril while at a business address shown on the Declarations Page. This includes similar property of others that is in **"your"** care, custody, or control.

## DEFINITIONS

**"Hardware"** means a network of electronic machine components (microprocessors) capable of accepting instructions and information, processing the information according to the instructions, and producing desired results.

**"Hardware"** includes, but is not limited to:
a. mainframe and mid-range computers and servers;
b. personal computers and workstations;
c. laptops, hand-held computers, notebook PCs, and other portable computer devices and accessories, such as multimedia projectors; and
d. peripheral data processing equipment, such as printers, keyboards, monitors, and modems.

**"Software"** means **"media"**, **"data records"**, **"programs"** and **"applications"** and **"proprietary programs"**.

## CREDIT CARDS RECEIPTS COVERAGE

Coverage applies, up to $5,000, at each described location, when as a direct result of a covered loss **"you"** are unable to collect sums due from **"your"** customers because of loss of credit card evidences of sale.

Any loss under this Extension would be calculated as follows:

A. The amount of credit card sales as compared to total sales, as a percentage, will be calculated over the past period of operation up to one year.

B. This percentage will be applied to the sales for the month ending at the time of loss.

C. If this month sales are unknown, the most recent month where sales are known will be used.

D. From this figure will be deducted those credit card sales with evidences of sale not damaged or destroyed.

## DEMOLITION COVERAGE

**What "We" Pay For:**

**"We"** pay up to $5,000 for the costs incurred in demolishing any undamaged portion of the building(s) covered under this policy. The order for demolition must rise from enforcement of a state or municipal law or ordinance regulating the construction or repair of buildings and it must be in force at the time of loss necessitating such demolition.

## EMPLOYEE DISHONESTY

**What "We" Pay For:**

**"We"** pay up to $10,000 for loss of **"money", "securities"** and other business property by any fraudulent or dishonest act committed by any of **"your"** employees, whether acting alone or in collusion with others.

**What "We" Do Not Pay For:**

This endorsement does not apply:

1. to loss due to any fraudulent, dishonest or criminal act by **"you"**, or by any of **"your"** partners, officers, directors, trustees or joint venturers, whether acting alone or in collusion with others;

2. to loss, the proof of which, either as to its factual existence or its amount, is dependent upon an inventory computation or profit and loss computation. However, this exclusion does not apply to loss which **"you"** can prove through evidence wholly apart from such computations; or

3. to any mysterious or unexplained disappearance or shortage of property.

The loss must be discovered not later than one year from the date on which the coverage terminates.

**"Employee"** dishonesty coverage shall be canceled as to any **"employee"** immediately on discovery by the **"insured"** or by any partner or officer of the company not in collusion with such **"employee"**, of any fraudulent or dishonest act on the part of such **"employee"**.

**"Our"** payment of any loss under this agreement shall not reduce the amounts of insurance of **"your"** policy.

**DEFINITIONS** - The following definitions apply to this policy for Employee Dishonesty;

**"Money"** means currency, coins, bank notes and bullion; and travelers checks, register checks and money orders held for sale to the public.

**"Securities"** means all negotiable and non-negotiable instruments or contracts representing either **"money"** or other property and includes revenue and other stamps in current use, tokens and tickets, but does not include **"money"**.

**"Employee"** means a person who is engaged in a service usual to **"your"** business operations and to whom **"you"** pay salary, wages or commission. **"You"** have the exclusive right to direct this person in the performance of his/her service. This definition excludes any broker, factor, commission merchant, consignee, contractor or other agent or representative.

## EXTERIOR SIGNS

**What "We" Pay For:**

**"We"** pay up to $5,000 for the repair or replacement of any physically damaged or destroyed exterior signs located at a business address shown on the Declarations Page.

## FIRE LEGAL LIABILITY

Coverage O (Fire Legal Liability) as shown on **"your"** declarations page is increased by an amount of $250,000.

## GLASS COVERAGE

**"We"** provide up to $5,000 per occurrence for breakage of building glass from loss caused by **"Specified Perils"**. This applies to buildings **"you"** own or buildings in **"your"** care, custody and control as described on the declarations.

**"Specified perils"** means aircraft; civil commotion; explosion; falling objects; fire; hail; leakage from fire extinguishing equipment; lightning; riot; "sinkhole collapse"; smoke; sonic boom; vandalism; vehicles; "volcanic action"; water damage; weight of ice, snow, or sleet; and windstorm, all except as excluded or limited.

## LOCK REPLACEMENT COVERAGE

This policy may be extended up to $1,000 for replacement of locks necessitated by theft of keys. **"We"** do not cover unexplained or mysterious disappearance of keys.

## MONEY AND SECURITIES

### What "We" Pay For:

**"We"** pay up to $10,000 for the loss of **"money"** and **"securities"** because of the actual destruction, disappearance or a dishonest act. This coverage applies if loss occurs:

1. within **"your"** place of business at the business address shown on the Declarations Page;

2. within any banking premises or similar place of safe deposit;

3. outside **"your"** place of business (but within the policy territory) while in the possession of any person whom **"you"** have authorized to have the care and custody of **"money"** and **"securities"** away from **"your"** place of business; and

The amount of $10,000 shall be the total limit of insurance on all loss of **"money"** and **"securities"** arising out of any one event. All loss connected with an actual or attempted dishonest act, or series of related acts, whether committed by one or more persons, shall be judged to arise out of one event.

### What "We" Do Not Pay For:

This coverage for loss of **"money"** and **"securities"** does not apply:

1. to loss due to any fraudulent, dishonest or criminal act by **"you"**, by any of **"your"** employees, partners, officers, directors, trustees, joint venturers or authorized representatives, whether acting alone or in collusion with others;

2. to loss due to giving or surrendering of **"money"** and **"securities"** in any exchange or purchase;

3. to loss of **"money"** contained in coin-operated amusement devices or vending machines, unless the device or machine has an instrument that records the amount of **"money"** deposited; or

4. to loss due to accounting or arithmetical errors or omissions.

**DEFINITIONS** - The following definitions apply to this coverage for **Money and Securities**

**"Money"** means currency, coins, bank notes and bullion; and travelers checks, register checks and money orders held for sale to the public.

**"Securities"** means all negotiable and non-negotiable instruments or contracts representing either **"money"** or other property and includes revenue and other stamps in current use, tokens and tickets, but does not include **"money"**.

**"Employee"** means a person who is engaged in a service usual to **"your"** business operations and to whom **"you"** pay salary, wages or commission. **"You"** have the exclusive right to direct this person in the performance of his/her service. This definition excludes any broker, factor, commission merchant, consignee, contractor or other agent or representative.

## REFRIGERATED FOOD PRODUCTS

### What "We" Pay For:

**"We"** pay up to $25,000 for direct damage from spoilage to the contents of a freezer or refrigeration unit on the insured premises and owned by **"you"** caused by or resulting from:

1. Temperature change due to:

   a. mechanical breakdown or failure of the refrigeration system;
   b. burning out of electrical motors;
   c. blowing of fuses or circuit breakers;
   d. the breakdown or malfunction of the equipment or apparatus connecting or controlling refrigeration systems, electrical motors or electric power; or
   e. complete or partial lack of power to operate the refrigeration system.

2. Contamination by refrigerant.

3. the reasonable expense **"you"** incur to reduce loss or damage covered under this endorsement to the extent that such loss or damage is reduced. However, the total expenses recoverable shall not increase the amount of insurance applicable to the covered property; and

4. the reasonable expenses **"you"** incur to clean up and dispose of spoiled property for which coverage is provided under this endorsement. The total expenses recoverable shall not increase the amount of insurance applicable to the covered property.

### What "We" Do Not Pay For:

**"We"** do not pay for loss or damage due to:

1. explosion, rupture or bursting of:
   a. water pipes;
   b. steam boilers, steam pipes, steam turbines or steam engines;

2. the disconnecting of any refrigeration units from the source of electrical power or the termination of electrical power caused by throwing off of any switch or other device (on premises) usual to the shutting off of electrical current or electrical power;

3. the leaking or escape of refrigerant gas or gases from any cause including the rupture or bursting of refrigerant gas pipes or lines;

## REFRIGERATED FOOD PRODUCTS continued

**"We"** do not pay for loss or damage due to:

4. the breaking of any glass that is a permanent part of any refrigerating unit;

5. insufficient fuel or complete lack of fuel used in the normal operation of the stationary heating plant;

6. gradual deterioration, inherent vice, natural spoilage or any processing operation; or

7. the intentional decision or inability of any electrical utility company or other source of electrical power to provide sufficient power due to lack of fuel or governmental order or lack of generating capacity to meet demand.

**DEFINITIONS** - The following definitions apply to this policy for **Refrigerated Food Products**:

**"Change of Temperature"** as stated in this endorsement covers only direct damage to stock or merchandise and does not apply to any loss due to interruption of business.

**"Mechanical Breakdown"** is defined as being the actual breaking, parting, or separating of any mechanical part(s) of the refrigeration unit (other than gas pipes or lines or the breaking of any glass as is specifically excluded) or the "burning out" of any electrical motor serving such unit, when such breaking or burning out shall result in the complete stopping of the mechanical action of said refrigerant equipment and which shall then require replacement of damaged part(s) to become functional. Faulty operation or malfunction of equipment which results in temperature changes but does not cause the complete stopping of the mechanical action and does not require the replacement of broken parts shall not be construed as "mechanical breakdown" and there shall be no liability under this endorsement for spoilage resulting from such malfunction.

## TREES, PLANTS AND SHRUBS

**What "We" Pay For:**

"**We**" pay up to $5,000 for loss or damage to trees, plants and shrubs on the insured premises caused by a specified cause of loss. The specified causes of loss are fire, lightning, explosion, riot, civil commotion, aircraft, vehicles not owned or operated by an "**insured**" an "**employee**" or any occupant of the insured premises and vandalism.

**What "We" Do Not Pay For:**

1. "**We**" do not pay for loss or damage to trees, plants and shrubs that are grown for business purposes; and

2. "**We**" do not pay more than $500 for any one tree, plant or shrub including the cost of removing the debris of the covered item.

## UTILITY INTERRUPTION PROPERTY DAMAGE

**SCHEDULE**

(The information required below may be shown on a separate schedule or supplemental declarations.)

| | | | | Utility Services | | | |
|---|---|---|---|---|---|---|---|
| Prem. No. | Bldg No. | Property Covered | Perils Part | Water Supply | Communi -cations Supply | Electricity, Steam, or Gas Supply | Including Overhead Transmission Lines |
| | | As shown on declaration sheet Automatic Limit Available $5,000 per location | | X | X | X | X |

**PROPERTY COVERED**

"**We**" cover loss up to $5,000 to covered property shown on the schedule above caused by the interruption of a utility service to the described premises. The interruption must result from direct physical loss or damage caused by a covered peril to the utilities (of Water Supply, Electricity, Steam, or Gas Supply) not on the described premises.

This does not include overhead transmission lines unless indicated by an "X" on the schedule above.

**PERILS COVERED**

See the applicable Perils Part shown on the schedule above.

APPT2 2.0

## UTILITY SERVICE DISRUPTION TIME ELEMENT COVERAGE

### SCHEDULE
(The information required below may be shown on a separate schedule or supplemental declarations.)

| Prem No. | Bldg No. | Property Covered | Perils Part | Utility Services | | | |
|---|---|---|---|---|---|---|---|
| | | | | Water Supply | Communi-cations Supply | Electricity, Steam, or Gas Supply | Including Overhead Transmission Lines |
| | | "Your" Loss of earnings & Extra Expenses<br>Automatic Limit Available:<br>$10,000 per Location | | X | X | X | X |

### COVERAGE

**"We"** cover **"your"** loss of earnings and the necessary extra expenses that **"you"** incur caused by the disruption of a utility service to the described premises shown in the Schedule above.

1. The disruption must result from direct physical loss or damage caused by a covered peril to the utility services that are indicated by an entry in the Schedule above.

2. The disruption must exceed 24 hours of continuous utility disruption.

3. **"We"** do not cover **"your"** loss of earnings and extra expenses that results from a disruption in utility service which causes loss, damage, corruption, or destruction of data records, programs and applications, or proprietary programs.

4. Utility Service means property providing communications supply, electricity, steam, or gas supply, or water supply to the described premises.

5. Electricity, Steam, Or Gas Supply means switching stations, substations, transformers, transmission lines and utility generating plants through which electricity, steam, or gas is supplied or transmitted to the described premises. Overhead transmission lines are not included unless designated in the Schedule above.

## UTILITY SERVICE DISRUPTION TIME ELEMENT COVERAGE continued

6  Communications Supply means property through which the supply or transmission of communication services to the described premises occurs. These services include telephone, television, radio and internet connectivity via transmission lines, fiber optic lines, coaxial cables, and microwave relays excluding satellites. Overhead transmission lines are not included unless designated in the Schedule above.

7.  Water Supply means pumping stations and water mains which supply water to the described premises.

### HOW MUCH "WE" PAY

1.  The most **"we"** pay for the utility disruption coverage provided by this endorsement is the limit shown on the Schedule above. If a limit for Coverage C -- Loss of Income is shown on the declarations, the limit shown on the Schedule above for the utility disruption coverage is part of and not in addition to the applicable Coverage C -- Loss of Income limit shown on the declarations.


## VALUABLE PAPERS AND RECORDS

### What "We" Pay For:

**"We"** pay up to $10,000 for loss or damage to **"Valuable Papers and Records"** on the described **"premises"**.

### What "We" Do Not Pay For:

1. loss due to any fraudulent, dishonest or criminal act by **"you"**, a partner, an officer, director or trustee;
2. loss resulting from errors or omissions in processing or copying;
3. loss due to wear and tear;
4. loss to property which cannot be replaced with other of like kind or quality;
5. loss due to electrical or magnetic injury, disturbance or erasure of electronic recordings, except by lightning;
6. loss to property held as samples or for sale or for delivery after sale; and
7. loss of **"money"** or **"securities"**.

**DEFINITIONS** - The following definitions apply to this policy for **"Valuable Papers and Records"**;

**"Valuable Papers and Records"** means written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts.

**"Premises"** means the interior portion of the building occupied by **"you"** for business purposes.

**"Money"** means currency, coins, bank notes and bullion, travelers checks, register checks and money orders held for sale to the public.

**"Securities"** means all negotiable and non-negotiable instruments or contracts representing either **"money"** or other property and includes revenue and other stamps in current use, tokens and tickets, but does not include **"money"**.



**UTICA FIRST**
INSURANCE COMPANY

BP-001 07 18
Page 1 of 12                    THIS ENDORSEMENT CHANGES THE POLICY. PLEASE **READ IT CAREFULLY**

## EQUIPMENT BREAKDOWN ENDORSEMENT
### (Including Electronic Circuitry Impairment)
**(Entries required to complete this coverage will be shown on the "declarations".)**

### AGREEMENT

In return for "your" payment of the required premium, "we" provide the coverage described in this endorsement. This coverage is subject to the "terms" of this endorsement, the Common Policy Conditions, the Common Policy Definitions, and the "terms" applicable to Property Coverages, except as provided below.

### ADDITIONAL DEFINITIONS

1. With respect to the coverage provided by this endorsement, the following definitions are added:

   a. "Accident"" means a fortuitous event that causes direct physical damage to "covered equipment". The event must be one of the following:
      1) mechanical breakdown;
      2) rupturing or bursting of moving parts of machinery caused by centrifugal force;
      3) artificially generated electrical, electromagnetic, or magnetic energy, including electric arcing, that damages, disturbs, disrupts, or otherwise interferes with any electrical or electronic wiring, networks, systems, appliances, or devices;
      4) explosion of steam boilers, steam pipes, steam turbines, or steam engines that "you" own or lease or that are operated under "your" control;
      5) loss to steam boilers, steam pipes, steam turbines, or steam engines caused by any condition or occurrence within such equipment; or

      6) loss to hot water boilers or heaters caused by any condition or occurrence within such equipment.

   a. None of the following is an "accident", however caused and without regard to whether such condition or event is normal and expected or unusual and unexpected. However, if an event as defined under 1.a. above results from any of the following, it will be considered an "accident".
      1) depletion, deterioration, rust, corrosion, erosion, settling, wear and tear, marring or scratching;
      2) any gradually developing condition;
      3) any defect, programming error, programming limitation, computer virus, malicious code, loss of "data", loss of access, loss of use, loss of functionality or other condition within or involving "data" or "media"" of any kind;
      4) contamination by a "hazardous substance".
      5) any loss caused by animals, including birds, insects, or vermin; or
      6) misalignment, miscalibration, tripping off-line, or any condition which can be corrected by resetting, tightening, adjusting or cleaning, or by the performance of maintenance.

      2. "Cloud computing services" means professional, on-demand, self-service data storage or data processing services provided through the Internet or over telecommunications lines. This includes services known as IaaS (infrastructure as a service), PaaS (platform as a service), SaaS (software as a service) and NaaS (network as a service). This includes business models known as public clouds

© 2015, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.
Contains copyrighted material of American Association of Insurance Services.

community clouds and hybrid clouds. "Cloud computing services"" include private clouds if such services are owned and operated by a third party.

3. Subject to the restrictions set forth below:

   a. "Covered equipment", means covered property under Coverage A -- Buildings or Coverage B - Business Personal Property:

      1) that generates, transmits or utilizes energy; or

      2) which, during normal usage, operates under vacuum or pressure, other than the weight of its contents.

      "Covered equipment"" may utilize conventional design and technology or new or newly commercialized design and technology.

   b. "Covered equipment"" does not mean:

      1) structure, foundation, cabinet or compartment;

      2) insulating or refractory material;

      3) sewer piping, buried vessels or piping, or piping forming a part of a sprinkler or fire suppression system;

      4) water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system;

      5) "vehicle" or any equipment mounted on a "vehicle";

      6) satellite, spacecraft or any equipment mounted on a satellite or spacecraft;

      7) dragline, excavation or construction equipment; or

      8) equipment manufactured by "you" for sale.

4. "Data" means information or instructions stored in digital code capable of being processed by machinery.

5. "Electronic circuitry" means micro-electronic components, including but not limited to circuit boards, integrated

circuits, computer chips and disk drives.

6. "Electronic circuitry impairment" means a fortuitous event involving "electronic circuitry" within "covered equipment" that causes the "covered equipment" to suddenly lose its ability to function as it had been functioning immediately before such event. This definition is subject to the conditions specified in a., b. and c. below.

   a. "We" shall determine that the reasonable and appropriate remedy to restore such "covered equipment's" ability to function is the replacement of one or more "electronic circuitry" components of the "covered equipment".

   b. The "covered equipment" must be owned or leased by "you", or operated under "your" control.

   c. None of the following is an "electronic circuitry impairment"

      1) any condition that can be reasonably remedied by:

         a) normal maintenance, including but not limited to replacing expendable parts, recharging batteries or cleaning;

         b) rebooting, reloading or up- dating software or firmware; or

         c) providing necessary power or supply.

      2) any condition caused by or related to:

         a) incompatibility of the "covered equipment" with any software or equipment installed, intro-duced or networked within the prior 30 days; or

         b) insufficient size, capability or capacity of the "covered equipment".

© 2015, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.
Contains copyrighted material of American Association of Insurance Services.

3) exposure to adverse environmental conditions, including but not limited to change in temperature or humidity, unless such conditions result in an observable loss of functionality. Loss of warranty shall not be considered an observable loss of functionality.

7. With respect to the coverage provided by this endorsement only, the definition of "Fungus or related perils"" is deleted and replaced by the following:

"Fungus or related perils" means:

a. a fungus, including but not limited to mildew and mold;

b. a protist, including but not limited to algae and slime mold;

c. wet rot;

d. dry rot;

e. a bacterium; or

f. a chemical, matter, or compound produced or released by a fungus, a protist, wet rot, dry rot, or a bacterium, including but not limited to toxins, spores, fragments, and metabolites such as microbial volatile organic compounds.

8. "Hazardous substance" means any substance that is hazardous to health or has been declared to be hazardous to health by a governmental agency.

9. With respect to the coverage provided by this endorsement, the definition of "media" is deleted and replaced by the following:

"Media" means material on which "data" is recorded, such as solid state drives, hard disks, optical disks, flash drives, magnetic tapes or floppy disks.

10. "One equipment breakdown" means: If an initial "accident" or "electronic circuitry impairment" causes other "accidents" or ""electronic circuitry impairments", all will

be considered "one equipment breakdown". All "accidents" or "electronic circuitry impairments" that are the result of the same "accident" or "electronic circuitry impairment" will be considered "one equipment breakdown".

11. "Perishable stock" means business personal property that is preserved and maintained under conditions that control temperature or humidity and that is susceptible to loss if the controlled conditions change.

12. With respect to the coverage provided by this endorsement, the definition of "restoration period"" is deleted and replaced by the following:

"Restoration period" means the time it should reasonably take to resume "your" normal business activities, starting from the date of loss at the described premises caused by an "accident" or "electronic circuitry impairment" to "covered equipment" and ending on the date the property should be rebuilt, repaired, or replaced or the date business is resumed at a permanent location. This is not limited by the expiration date of the policy.

**Restrictions** - "Restoration period" does not include any increase in time due to the enforcement of any code, ordinance, law, or decree that regulates or requires:

a. the construction, use, repair, or demolition of any property; or

a. that "you" or anyone else test for, abate, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of "pollutants" or "fungus or related perils";

13. "Vehicle" means any machine or apparatus that is used for transportation or moves under its own power. "Vehicle" includes, but is not limited to: car, truck, bus, trailer, train, aircraft, watercraft, forklift, bulldozer, tractor or harvester.
However, any property that is stationary, permanently installed at a covered location and that receives electrical power from an external source

© 2015, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.
Contains copyrighted material of American Association of Insurance Services.

will not be considered a "vehicle".

## COVERAGE

"We" cover direct physical loss to covered property caused by or resulting from an "accident" or "electronic circuitry impairment" to "covered equipment". "We" will consider "electronic circuitry impairment" to be direct physical loss to "covered equipment".

## ADDITIONAL PROPERTY NOT COVERED

In addition to the property identified under the Property Not Covered in the Businessowners Policy, the following additional property is not covered:

**Animals** - "We" do not cover animals, including but not limited to:

a.  birds and fish;

b.  animals owned by others and boarded by "you"; and

c.  animals "you" own and hold for sale.

## ADDITIONAL COVERAGES

The following additional coverages also apply to loss caused by or resulting from an "accident" or "electronic circuitry impairment" to "covered equipment". However, with respect to coverage 6., Service Interruption and any Dependent Locations coverage provided by this policy, coverage will apply only to the direct result of an "accident" and will not apply to the direct result of an "electronic circuitry impairment".

If two or more ""limits" apply to the same portion of a loss, "we" will only pay the smaller "limit" for that portion of the loss.

Except as otherwise provided, the "limits" for the additional coverages are a part of, and not in addition to, the Equipment Breakdown Limit.

1.  **Data Restoration**

    a.  "We" pay for "your"" reasonable and necessary cost to research, replace and restore lost "data".

    b.  The most "we"" pay for loss or expense under this coverage is $25,000.

2.  **Expediting Expenses**

    a.  With respect to "your" damaged covered property, "we" pay the reasonable extra cost to:

        1)  make temporary repairs; and
        2)  expedite permanent repairs or permanent replacement.

    b.  The most "we" pay for loss or expense under this coverage is $25,000.

3.  **Hazardous Substances**

    a.  "We"" pay "your" additional cost to repair or replace covered property because of contamination to a "hazardous substance". This includes the additional expenses to clean up or dispose of such property.

    b.  This does not include contamination of "perishable stock" by refrigerant, including but not limited to ammonia, which is addressed in 8.a.2) below.   As used in this coverage, additional costs mean those beyond what would have been payable under this Equipment Breakdown Coverage had no "hazardous substance" been involved.

    c.  The most "we" pay for loss, damage or expense under this coverage is $25,000.

© 2015, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.
Contains copyrighted material of American Association of Insurance Services.

4. **Off Premises Equipment Breakdown —**

   a. "We" pay for physical damage to transportable "covered equipment" that, at the time of the "accident" or "electronic circuitry impairment", is not at a "covered location". As respects this Off Premises Equipment Breakdown coverage only, the "accident" or "electronic circuitry impairment" may occur in any country except one in which the United States has imposed sanctions, embargoes or similar restrictions on the provision of insurance.

   b. "We" also pay for "your" loss and expense as defined under Income Coverages that is the result of 4.a. above, if such coverage is otherwise applicable under this coverage part. This coverage is included within and subject to "your"" Off Premises Equipment Breakdown limit.

   c. "We" also pay for "your" reasonable and necessary cost to research, replace and restore lost "data" contained within "covered equipment" as described under 4.a. above. This amount may not exceed the limit applicable to Data Restoration coverage.

   d. The most "we" pay for loss, damage or expense under this coverage is $10,000.

5. **Public Relations**

   a. This coverage only applies if "you" have sustained an actual loss of Earnings covered under this endorsement.

   b. "We" pay for "your" reasonable costs for professional services to create and disseminate communications, when the need for such communications arises directly from the interruption of "your" business. This communication must be directed to one or more of the following:

      1) the media;

      2) the public; or

      3) "your" customers, clients or members.

   c. Such costs must be incurred during the "restoration period" or up to 30 days after the "restoration period" has ended.

   d. The most "we" pay for loss or expense under this coverage is $5,000.

6. **Service Interruption**

   a. Any insurance provided for Loss of Income, Data Restoration or Spoilage coverages is extended to apply to "your" loss, damage or expense caused by a failure or disruption of service. The failure or disruption of service must be caused by an "accident" to equipment, including overhead transmission lines, that is owned by a utility, landlord, a landlord's utility or other supplier who provides "you" with any of the following services: electrical power, waste disposal, air conditioning, refrigeration, heating, natural gas, compressed air, water, steam, Internet access, telecommunications services, "cloud computing services", wide area networks or data transmission. The equipment must meet the definition of "covered equipment" except that it is not covered property.

   b. "Cloud computing services" must be provided by a professional provider with whom "you" have a contract.

   c. With respect to the Data Restoration portion of this Service Interruption coverage, coverage will also apply to "data" stored in the equipment of a provider of "cloud computing services".

   d. Service Interruption coverage will not apply unless the failure or disruption of service exceeds 24 hours immediately following the "accident". If the interruption exceeds 24 hours,

© 2015, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.
Contains copyrighted material of American Association of Insurance Services.

BP -001 07 18
Page 6 of 12

coverage will begin at the time of the disruption, and the applicable deductible will apply.

e. The most "we" pay in any "one equipment breakdown" for loss, damage or expense under this coverage is the applicable limit for Loss of Income, Data Restoration or Spoilage.

7. **Spoilage**

a. "We"" pay for:

1) physical damage to "perishable stock" due to "spoilage";

2) physical damage to "perishable stock" due to contamination from the release of refrigerant, including but not limited to ammonia;

3) any necessary expenses "you" incur to reduce the amount of loss under this coverage to the extent that they do not exceed the amount of loss that otherwise would have been payable under this coverage.

b. If "you" are unable to replace the "perishable stock" before its anticipated sale, the amount of "our" payment will be determined on the basis of the sales price of the "perishable stock" at the time of the "accident" or "electronic circuitry impairment"", less discounts and expenses "you" otherwise would have had. Otherwise "our" payment will be determined in accordance with the Valuation of Property Losses provision.

c. The most "we" pay for loss, damage or expense under this coverage is $25,000.

## COVERAGE C -- LOSS OF INCOME

Any insurance provided under the policy for Coverage C -- Loss Of Income is extended to the coverage provided by this endorsement.

The most "we" pay for loss or expense under this coverage is the applicable limit for Loss Of Income.

## PERILS COVERED

With respect to the coverage provided by this endorsement, Perils Covered is deleted and replaced by the following:

Unless otherwise stated, the Perils Covered apply to Coverage A -- Buildings, Coverage B -- Business Personal Property, and Coverage C -- Loss Of Income.

We cover risks of direct physical loss caused by or resulting from an accident or "electronic circuitry impairment" to "covered equipment" unless the loss is limited or caused by a peril that is excluded. "We" will consider "electronic circuitry impairment" to be direct physical loss to "covered equipment".

## PERILS EXCLUDED

With respect to the coverage provided by this endorsement, Perils Excluded is deleted and replaced by the following:

"We" do not pay for any excluded loss, damage or expense, even though any other cause or event contributes concurrently or in any sequence to the loss, damage or expense.

1. "We"" do not pay for loss, damage or expense caused directly or indirectly by one or more of the following excluded causes or events, whether or not caused by or resulting from a peril covered.

© 2015, The Hartford Steam Boiler Inspection and Insurance Company.  All rights reserved.
Contains copyrighted material of American Association of Insurance Services.

a. **Fire and Explosion** - "We" do not pay for loss caused by:

   1) fire, including smoke from a fire.

   2) combustion explosion. This includes, but is not limited to, a combustion explosion of any steam boiler or other fired vessel.

   3) any other explosion, except as specifically provided in the definition of "accident".

b. **Ordinance or Law** — Except as provided under Additional Coverages, Increased Costs - Ordinance or Law, "we" do not pay for the enforcement of, or change in, any ordinance, law, regulation, rule or ruling regulating or restricting repair, replacement, alteration, use, operation, construction, installation or demolition of any building or structure including the cost of removing its debris.

c. **Earth Movement or Volcanic Action** - "We" do not pay for loss caused by any earth movement whether natural or human-made. Earth movement includes, but is not limited to earthquake; shock; tremor; landslide; rock fall; mudflow; mudslide; mine subsidence; sinking, rising, shifting of earth; "sinkhole collapse" or tsunami. "We" do not pay for loss caused by any volcanic action, including loss caused by eruption, explosion or effusion of a volcano.

d. **Civil Authority** - "We" do not pay for loss caused by order of any civil authority, including seizure, confis-cation, destruction, or quarantine of property.

e. **Nuclear Hazard** –"We" do not pay for loss caused by or resulting from nuclear reaction, nuclear detonation, nuclear radiation, or radioactive contamination (whether controlled or uncontrolled by natural, accidental, or artificial means).

f. **War and Military Action** - "We" do not pay for loss caused by:

   1) war, including undeclared or civil war;

   2) warlike action by a military force, including action taken to prevent or defend against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   3) insurrection, rebellion, revolu-tion, unlawful seizure of power including action taken by governmental authority to prevent or defend against any of these.

   With regard to any action that comes within the "terms" of this exclusion and involves nuclear reaction, nuclear radiation, or radioactive contam-ination, this War and Military Exclusion will apply in place of the Nuclear Hazard Exclusion.

g. **Water** - "We" do not pay for loss caused by water. This means:

   1) flood; surface water; waves, including, but not limited to, tidal wave and tsunami; tidal water; tides; overflow of any body of water; or spray from any of these; all whether or not driven by wind. This includes, but is not limited to, storm surge, storm tide, and tidal surge;

   2) mudslide or mudflow;

   3) water that backs up through, overflows from, or is otherwise discharged from:

      a) a sewer or drain;
      b) a sump, sump pump, or related equipment; or
      c) any other type of system designed to remove subsurface water which is drained from the foundation area;

© 2015, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.
Contains copyrighted material of American Association of Insurance Services.

4) water below the surface of the ground. This includes water that exerts pressure on or flows, seeps, or leaks through or into:

   a) basements, whether paved or not;
   b) doors, windows, or other openings;
   c) foundations, floors, walls, or paved surfaces; or
   d) swimming pools, septic tanks, or other structures; or

5) material present in or carried or otherwise moved by water described in items 1) through 4) above.

However, if electrical "covered equipment" requires drying out as a result of the above described peril, "we" pay for the amount "you" actually expend to dry out such equipment, subject to the applicable "limit" and Property Coverage deductible. "We" do not pay more than the Actual Cash Value of the affected electrical "covered equipment". "We" do not pay to replace such equipment or for any other loss, damage or expense.

This Water exclusion:

1) applies regardless of the cause of the water or the material carried or moved by water described under items g.1) through g.5) above, whether or not such cause is an act of nature; and

2) applies to, but is not limited to, water and material present in or carried or moved by water, whether or not driven by wind, that:

   a) overtops;
   b) escapes from;
   c) is released from; or
   d) is otherwise discharged from;

   a dam, levee, dike, floodgate, seawall, or other device or

feature designed or used to retain, contain, or control water.

h. **Neglect** - "We" do not pay for loss caused by "your" neglect to use all reasonable means to save covered property at and after the time of the loss.

i. **Fines** - "We" do not pay any fine, penalty or punitive damage.

j. **Fungus Or Related Perils** - "We" do not pay for loss, damage or expense caused directly or indirectly by the following whether or not caused or resulting from an "accident" or "electronic circuitry impairment"". Any "fungus or related perils"", including any presence, growth, proliferation, spread or any activity of "fungus or related perils". This includes, but is not limited to, costs arising from clean up, removal, or abatement of such "fungus or related perils".

However, this exclusion does not apply to spoilage of "perishable stock" to the extent that spoilage is covered under the Spoilage "terms" of this endorsement.

k. **Increased Hazard** - "We" do not pay for loss occurring while the hazard has been materially increased by any means within "your" knowledge or "your" control.

l. **"Data", Software Programs and operating systems** – "We" do not pay to reproduce:

   1) software programs or operating systems that are not commercially available; or

   2) "data" that is obsolete, unnecessary or useless to "you".

m. **Vandalism** - "We" do not pay for willful and malicious acts that cause damage or destruction.

© 2015, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.
Contains copyrighted material of American Association of Insurance Services.

n.  **Loss of Use** - "We'" do not pay for loss caused by loss of use, delay or loss of market.

o.  **Pollutants** - "We'"do not pay for loss caused by or resulting from release, discharge, seepage, migration, dispersal or escape of "pollutants" except as specifically provided under the Additional Coverage for Hazardous Substances.

p.  **Seepage** - "We'" do not pay for loss caused by continuous or repeated seepage or leakage of water or steam that occurs over a period of 14 days or more.

q.  **Smoke, Vapor, Gas or Smog** - "We" do not pay for loss caused by smoke, vapor or gas from agricultural smudging or industrial operations or for loss caused by smog.

2.  "We" do not pay for an "accident" or "electronic circuitry impairment" that is caused by or results from one or more of the following causes or events:

a.  **Lightning**

b.  **Windstorm and Hail** - "We" do not pay for loss caused by windstorm or hail. However, this exclusion does not apply when:

1)  "Covered equipment" located within a building or structure suffers an "accident" or "electronic circuitry impairment" that results from wind-blown rain, snow, sand or dust; and

2)  The building or structure did not first sustain wind or hail damage to its roof or walls through which the rain, snow, sand or dust entered.

c.  **Collision** – "We" do not pay for loss caused by collision or any physical contact caused by a "vehicle". This includes damage by objects falling from aircraft. However, this exclusion does not apply to any unlicensed "vehicles"

which "you" own or which are operated in the course of "your" business.

d.  **Riot or Civil Commotion**

e.  **Discharge of Water** - "We" do not pay for loss caused by the discharge of water or other extinguishing agent to fight a fire, including leakage or discharge of any substance from an automatic sprinkler system, or collapse of a tank that is part of the system.

f.  **Testing** - "We" do not pay for loss or damage caused by a hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment.

g.  **Elevator Collision**

h.  **Falling Objects**

i.  **Weight of Snow, Ice or Sleet**

j.  **Water Damage** - "We" do not pay for loss caused by discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance containing water or steam;

k.  **Collapse**

l.  **Breakage of Glass**

m.  **Weather Related Freezing**

n.  **Molten Material** – "We'" do not pay for loss causes by discharge of molten material from equipment, including the heat from such discharged material.

2.  Exclusion 2. does not apply if all of the following are true:

a.  the excluded peril occurs away from any covered location and causes an electrical surge or other electrical disturbance;

© 2015, The Hartford Steam Boiler Inspection and Insurance Company.  All rights reserved.
Contains copyrighted material of American Association of Insurance Services.

b. such surge or disturbance is transmitted through utility service transmission lines to a covered location;

c. at the covered location, the surge or disturbance results in an "accident" or "electronic circuitry impairment" to "covered equipment" that is owned or operated under the control of "you" or "your" landlord; and

d. the loss, damage or expense caused by such surge or disturbance is not covered elsewhere under the policy.

4. "We" do not pay for "your" loss of Earnings or Extra Expenses that "you" incur if one or more of the following excluded causes or events apply.

   a. **Leases, Licenses, Contracts, or Orders -** "We" do not pay for any increase in loss of Earnings or Extra Expenses due to the suspension, lapse, or cancellation of leases, licenses, contracts, or orders. However, "we" do cover loss during the "restoration period" if the suspension, lapse, or cancellation results directly from the interruption of "your" "business".

      "We" do not cover any loss of Earnings or Extra Expenses beyond the "restoration period" caused by the suspension, lapse, or cancellation of leases, licenses, contracts, or orders.

   b. **Due Diligence to Resume Your Business -** "We" do not pay for any increase in loss of Earnings or Extra Expenses due to "your" failure to use due diligence and dispatch and all reasonable means to resume "your" "business".

   c. **Customer or Supplier Agreement -** "We" do not pay for any increase in loss resulting from an agreement between "you" and "your" customer or supplier. This includes, but is not limited to, contingent bonuses or penalties, late fees, demand charges, demurrage charges and liquidated charge

"We" also do not pay for loss associated with "business" that would not or could not have been carried on if the "accident" or "electronic circuitry impairment"" had not occurred.

## VALUATION OF PROPERTY LOSSES

With respect to the coverage provided by this endorsement, Valuation of Property Losses in the Businessowners Policy is deleted and replaced with the following:

"We" will determine the value of covered property as follows:

1. Except as specified otherwise, "our" payment for damaged covered property will be the smallest of:

   a. the cost to repair the damaged property;

   b. the cost to replace the damaged property on the same site; or

   c. the amount "you" actually spend that is necessary to repair or replace the damaged property.

2. The amount of "our" payment will be based on the most cost-effective means to replace the function, capacity and remaining useful life of the damaged property. This may include the use of generic, used or reconditioned parts, equipment or property.

3. Except as described in 4. below, "you" must pay the extra cost of replacing damaged property with property of better kind or quality or of a different size or capacity.

4. **Environmental, Safety and Efficiency Improvements**

   If "covered equipment" requires replacement due to an "accident" or "electronic circuitry impairment", "we" pay "your" additional cost to replace with equipment that is better for the environment, safer for people or more energy or water

© 2015, The Hartford Steam Boiler Inspection and Insurance Company.  All rights reserved.
Contains copyrighted material of American Association of Insurance Services.

efficient than the equipment being replaced. However, "we" do not pay to increase the size or capacity of the equipment and "we" do not pay more than 150% of what the cost would have been to replace with like kind and quality. This provision does not apply to the replacement of component parts or to any property to which Actual Cash Value applies and does not increase any of the applicable limits.

5. The following property will be valued on an Actual Cash Value basis:

   a. any property that does not currently serve a useful or necessary function for "you";

   b. any covered property that "you" do not repair or replace within 24 months after the date of the "accident" or "electronic circuitry impairment"; and

   c. any covered property for which Actual Cash Value coverage is specified in a "schedule".

   Actual Cash Value includes deductions for depreciation.

6. If any one of the following conditions is met, property held for sale by "you" will be valued at the sales price as if no loss or damage had occurred, less any discounts and expenses that otherwise would have applied:

   a. the property was manufactured by "you";

   b. the sales price of the property is less than the replacement cost of the property; or

   c. "you" are unable to replace the property before its anticipated sale.

7. Except as specifically provided for under Data Restoration coverage, "data" and "media" will be valued on the following basis:

   a. for mass-produced and commercially available software, at the replacement cost.

   b. for all other "data" and "media", at the cost of blank "media" for reproducing the records. "We" do not pay for "data" representing financial records based on the face value of such records.

## HOW MUCH WE PAY

With respect to the coverage provided by this endorsement, How Much "We" Pay in the Businessowners Policy is deleted and replaced with the following:

1. **Insurable Interest** - "We" do not cover more than "your" insurable interest in any property.

2. **Deductible** - "We" pay only that part of "your" loss in excess of the deductible amount stated on the "declarations".

3. **Loss Settlement Terms** - Subject to paragraphs 1., 2., 4. and 5. under How Much We Pay, "we" pay the lesser of:

   a. the amount determined under Valuation of Property Losses;

   b. the cost to repair, replace or rebuild the property with material of like kind and quality to the extent practicable subject to the Valuations provisions under Environmental, Safety and Efficiency Improvements; or

   c. the "limit" that applies to the covered property.

   The most "we" pay for loss, damage or expense arising from any "one equipment breakdown" is the applicable "limit" of insurance in the "declarations". Coverage provided under this endorsement does not provide an additional amount of insurance.

4. **Insurance Under More Than One Coverage —** If more than one coverage of this policy insures the same loss, "we" "pay no more than the actual claim, loss, or damage sustained.

© 2015, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.
Contains copyrighted material of American Association of Insurance Services.

5. **Insurance Under More Than One Policy** - "You""may have another policy subject to the same plan, "terms", conditions, and provisions as this policy. If "you" do,"we" will pay "our" share of the covered loss. "Our" share is the proportion that the applicable "limit" under this policy bears to the "limit" of all policies covering on the same basis.

If there is another policy covering the same loss, other than that described above, "we" pay only for the amount of covered loss in excess of the amount due from that other policy, whether "you" can collect on it or not. But "we" do not pay more than the applicable "limit".

## ADDITIONAL CONDITIONS

1. **Suspension** -- When any "covered equipment" is discovered to be in, or exposed to a dangerous situation or condition, any representative of "ours" may immediately suspend the insurance coverage against loss from an "accident" or "electronic circuitry impairment"" to that equipment.

   "We" can do this by mailing or delivering a written notice of suspension to "your" address as shown in the "declarations", or at the address where the "covered equipment" is located.

   Once so suspended, "your" insurance can be reinstated only by written notice from "us". If "your" insurance is so suspended, "you" will get a pro rata premium refund. But the suspension is effective even if "we" have not yet offered or made a refund.

2. **Jurisdictional Inspections** -- If any property that is "covered equipment" under this Equipment Breakdown Coverage requires inspection to comply with state or municipal boiler and pressure vessel regulations, "we" agree to perform such inspection on "your"

behalf. "We" do not warrant that conditions are safe or healthful.

© 2015, The Hartford Steam Boiler Inspection and Insurance Company. All rights reserved.
Contains copyrighted material of American Association of Insurance Services.

AAIS
BP 0331 01 04
Page 1 of 1

This endorsement changes the
Property Coverages provided by the policy
-- PLEASE READ THIS CAREFULLY --

# PROTECTIVE DEVICES

(Entries required to complete the Schedule
will be shown below or on the "declarations".)

## SCHEDULE

| Prem. No. | Bldg. No. | Protective Devices or Services |
|---|---|---|
| 1 | 1 | Central Burglar Alarm |

## ADDITIONAL EXCLUSIONS

The Commercial Liability Coverages are amended as follows:

1. The following additional exclusion applies only when a device or service, shown in the Schedule, provides fire protection.

   "We" do not pay for loss or damage caused by fire if, prior to the fire, "you":

   a. had knowledge of any suspension or impairment in any protective device or service, shown in the Schedule, and "you" did not notify "us"; or

   b. failed to maintain in complete working order, any protective device or service, shown in the Schedule, which "you" control.

   However, if part of an automatic sprinkler system is shut off and "you" restore full protection within 48 hours, notification to "us" is not required.

2. The following additional exclusion applies only when a device or service, shown in the Schedule, provides theft protection

"We" do not pay for loss caused by theft if, prior to the theft, "you":

   a. had knowledge of any suspension or impairment in any protective device or service, shown in the Schedule, and "you" did not notify "us"; or

   b. failed to maintain in complete working order, any protective device or service, shown in the Schedule, which "you" control.

## ADDITIONAL CONDITIONS

The following condition is added:

**Protective Devices --** "You" are required to maintain in complete working order, the protective devices and services shown in the Schedule.

BP 0331 01 04

Copyright, American Association of Insurance Services, Inc., 2004

This endorsement changes the Commercial Liability
Coverage provided by this policy
-- PLEASE READ CAREFULLY --

# EXCLUSION -- FUNGUS OR RELATED PERILS

The Commercial Liability Coverages are amended as
follows. All other "terms" of the policy apply, except as
amended by this endorsement.

## COMMON POLICY DEFINITIONS

The definition of "fungus or related perils" is deleted and
replaced by the following, but only with respect to the
Liability Coverages provided by this policy:

"Fungus or related perils" means:

a.  a fungus, including but not limited to mildew and
    mold;

b.  a protist, including but not limited to algae and slime
    mold;

c.  wet rot;

d.  dry rot;

e.  a bacterium; or

f.  a chemical, matter, or compound produced or
    released by a fungus, a protist, wet rot, dry rot, or a
    bacterium, including but not limited to toxins, spores,
    fragments, and metabolites such as microbial
    volatile organic compounds.

## COMMERCIAL LIABILITY COVERAGES

1.  The following is added to the exclusions under
    Coverage L -- Bodily Injury Liability and Property
    Damage Liability:

a.  "We" do not pay for actual or alleged "bodily
    injury" or "property damage" that results directly
    or indirectly from ingestion of, inhalation of,
    physical contact with, or exposure to "fungus or
    related perils".

However, this exclusion does not apply to:

1)  "bodily injury" or "property damage" that
    results from a fungus cultivated or harvested
    for human consumption or a food-borne or
    beverage-borne bacterium that causes
    illness commonly known as food poisoning
    (Food-borne or beverage-borne bacteria that
    cause illness commonly known as food
    poisoning include but are not limited to
    Staphylococcus aureus, Salmonella,
    Clostridium perfringens, Campylobacter,
    Listeria monocytogenes, Vibro
    parahaemolyticus, Bacillus cereus, and
    Escherichia coli.);

2)  "bodily injury" suffered by an "employee" of
    an "insured" while performing duties in
    connection with the "insured's" farming
    operations, but only to the extent that "bodily
    injury" to an "insured's" "employees" is
    covered by this policy; or

3)  "bodily injury" or "property damage" that
    results from a slip, fall, or loss of footing
    attributable to a surface made slippery by
    the presence of or existence of "fungus or
    related perils".

b.  "We" do not pay for any loss, cost, or expense
    arising out of any request, demand, or order that
    any "insured" or others test for, abate, monitor,
    clean up, remove, contain, treat, detoxify,
    neutralize, or in any way respond to or assess
    the effects of "fungus or related perils".

AAIS
BP 0676 06 12
Page 2 of 2

c.  "We" do not pay for any loss, cost, or expense arising out of any claim or "suit" by or on behalf of any governmental authority relating to testing for, abating, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to or assessing the effects of "fungus or related perils".

2.  The following is added to the exclusions under Coverage P -- Personal and Advertising Injury Liability:

a.  "We" do not pay for actual or alleged "personal and advertising injury" that results directly or indirectly from ingestion of, inhalation of, physical contact with, or exposure to "fungus or related perils".

b.  "We" do not pay for any loss, cost, or expense arising out of any request, demand, or order that any "insured" or others test for, abate, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of "fungus or related perils".

c.  "We" do not pay for any loss, cost, or expense arising out of any claim or "suit" by or on behalf of any governmental authority relating to testing for, abating, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to or assessing the effects of "fungus or related perils".

BP 0676 06 12

AAIS
BP 0678 01 04
Page 1 of 2

This endorsement changes the Commercial
Liability Coverages provided by this policy
—PLEASE READ THIS CAREFULLY —

# EXCLUSION -- EXTERIOR INSULATION AND FINISH SYSTEMS

The Commercial Liability Coverages are
amended as follows:

## ADDITIONAL DEFINITIONS

The following definition is added:

"EIFS" means an exterior wall cladding or finish
system used on any part of any structure
consisting of:

a.  a rigid or semi-rigid insulation board made of
    expanded polystyrene or other materials;

b.  an adhesive or mechanical attachment of the
    insulation board to the substrate;

c.  a reinforced base coat on the face of the
    insulation board or base coat and mesh;

d.  a protective finish applied to the surface of
    the base coat providing surface texture to
    which color may be added; and

e.  any conditioners, primers, accessories,
    flashings, coatings, caulking, and sealants
    that interact to form an energy efficient wall.

## COMMERCIAL LIABILITY COVERAGES

1.  The following is added to the exclusions
    under Coverage L -- Bodily Injury Liability and
    Property Damage Liability:

a.  "We" do not pay for actual or alleged
    "bodily injury" or "property damage" that
    arises out of the design, manufacture,
    sale, service, construction, fabrication,
    preparation, installation, application,
    maintenance, or repair, including any
    remodeling, correction, or replacement, of
    an "EIFS" or any part thereof, or any
    substantially similar system or any part
    thereof, including any method or
    procedure to correct problems with
    installed or partially installed systems
    performed by or on behalf of an "insured".

b.  "We" do not pay for actual or alleged
    "bodily injury" or "property damage" that
    arises out of "your work" and that results
    directly or indirectly from any exterior
    component, fixture, or feature of any
    structure if an "EIFS" is used on any part
    of that structure.

c.  "We" do not pay for actual or alleged
    "bodily injury" or "property damage"
    included in the "products/completed work
    hazard" and that results directly or
    indirectly from any exterior component,
    fixture, or feature of any structure if an
    "EIFS" is used on any part of that
    structure.

d.  "We" do not pay for "bodily injury" or
    "property damage" liability assumed by
    an "insured" under a contract or
    agreement for the design, manufacture,
    sale, service, construction, fabrication,
    preparation, installation, application,
    maintenance, repair, including any
    remodeling, correction, or replacement of
    an "EIFS" or any part thereof, or any
    substantially similar system or any part
    thereof.

Copyright, American Association of Insurance Services, Inc., 2004

2. The following is added to the exclusions under Coverage O -- Fire Legal Liability:

   a. "We" do not pay for actual or alleged "property damage" that arises out of the design, manufacture, sale, service, construction, fabrication, preparation, installation, application, maintenance, or repair, including any remodeling, correction, or replacement of an "EIFS" or any part thereof, or any substantially similar system or any part thereof, including any method or procedure to correct problems with installed or partially installed systems performed by or on behalf of an "insured".

   b. "We" do not pay for actual or alleged "property damage" that arises out of "your work" and that results directly or indirectly from any exterior component, fixture, or feature of any structure if an "EIFS" is used on any part of that structure.

3. The following is added to the exclusions under Coverage P -- Personal and Advertising Injury Liability:

   a. "We" do not pay for actual or alleged "personal and advertising injury" that arises out of the design, manufacture, sale, service, construction, fabrication, preparation, installation, application, maintenance, or repair, including any remodeling, correction, or replacement of an "EIFS" or any part thereof, or any substantially similar system or any part thereof, including any method or procedure to correct problems with installed or partially installed systems performed by or on behalf of an "insured".

   b. "We" do not pay for actual or alleged "personal and advertising injury" that arises out of "your work" and that results directly or indirectly from any exterior component, fixture, or feature of any structure if an "EIFS" is used on any part of that structure.

BP 0678 01 04

Copyright, American Association of Insurance Services, Inc., 2004

**AAIS**
**BP 0680 01 04**
**Page 1 of 1**

This endorsement changes the Commercial
Liability Coverage provided by this policy
**—PLEASE READ THIS CAREFULLY—**

## EXCLUSION -- DAMAGE TO WORK PERFORMED
## BY THE INSURED OR ON THE INSURED's BEHALF

The Commercial Liability Coverages are amended as follows:

### COMMERCIAL LIABILITY COVERAGES

Under Coverage L -- Bodily Injury Liability and Property Damage Liability, item t.
under Exclusions is deleted and replaced by the following:
"We" do not pay for "property damage" to "your work" if the "property damage"
arises out of "your work" and is included in the "products/completed work
hazard".

**BP 0680 01 04**

Copyright, American Association of Insurance Services, Inc., 2004

AAIS
BP 0722 01 04
Page 1 of 1

This endorsement changes the Commercial
Coverages provided by the policy
**— PLEASE READ THIS CAREFULLY —**

## PUNITIVE DAMAGES EXCLUSION

The Commercial Liability Coverages are amended as follows:

### COMMERCIAL LIABILITY COVERAGES

The following is added to the exclusions under Coverage L -- Bodily Injury Liability and Property Damage Liability, Coverage O -- Fire Legal Liability, and Coverage P -- Personal and Advertising Injury Liability:

"We" do not pay for punitive, exemplary, or vindictive "damages".

BP 0722 01 04

Copyright, American Association of Insurance Services, Inc., 2004

This endorsement changes the Commercial
Liability Coverage provided by this policy
--PLEASE READ THIS CAREFULLY--

# LEAD LIABILITY EXCLUSION

The Commercial Liability Coverages are amended as follows:

## COMMERCIAL LIABILITY COVERAGES

The following is added to the exclusions under Coverage L -- Bodily Injury Liability and Property Damage Liability, Coverage O -- Fire Legal Liability, and Coverage P -- Personal and Advertising Injury Liability:

"We" do not pay for:

1. actual or alleged "bodily injury" arising out of the ingestion, inhalation, or absorption of lead in any form;

2. actual or alleged "property damage" or "personal and advertising injury" arising out of any form of lead;

3. any loss, cost, or expense arising out of any request, demand, or order that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of lead; or

4. any loss, cost, or expense arising out of any claim or "suit" by or on behalf of any governmental authority for damages resulting from testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to or assessing the effects of lead.

BP 0734 01 04

Copyright, American Association of Insurance Services, Inc., 2004

AAIS
BP 0736 01 04
Page 1 of 1

This endorsement changes the Commercial
Liability Coverage provided by this policy
--PLEASE READ THIS CAREFULLY--

# EXCLUSION
## ABUSE OR MOLESTATION

The Commercial Liability Coverages are amended as follows:

## COMMERCIAL LIABILITY COVERAGES

The following is added to the exclusions under Coverage L -- Bodily Injury Liability
and Property Damage Liability, Coverage O -- Fire Legal Liability, and
Coverage P -- Personal and Advertising Injury Liability:

"We" do not pay for "bodily injury", "property damage", or "personal and advertising injury"
that arises out of:

1. the actual or threatened abuse or molestation of anyone while in the care, custody, or
   control of an "insured"; or

2. negligent employment, investigation, supervision, reporting, or failure to report to
   proper authorities, or retention of a person for whom an "insured" is or was legally
   responsible and whose conduct would be excluded under paragraph 1. above.

BP 0736 01 04

Copyright, American Association of Insurance Services, Inc., 2004

AAIS
BP 0760 01 15
Page 1 of 1

This endorsement changes
the policy
**— PLEASE READ THIS CAREFULLY —**

# CERTIFIED ACT OF TERRORISM EXCLUSION

1. The following definition is added.

   "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States:

   a. to be an act of terrorism;

   b. to be a violent act or an act that is dangerous to human life, property, or infrastructure;

   c. to have resulted in damage:

      1) within the United States; or
      2) to an air carrier (as defined in section 40102 of title 49, United States Code); to a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or at the premises of any United States mission;

   d. to have been committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion; and

   e. to have resulted in insured losses in excess of five million dollars in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act, as amended

2. Under Property Coverages, the following exclusion is added.

   **CERTIFIED ACT OF TERRORISM EXCLUSION**

   "We" will not pay for loss or damage caused directly or indirectly by a "certified act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

3. Under Property Coverages, the following provisions are added.

   a. Neither the "terms" of this endorsement nor the "terms" of any other terrorism endorsement attached to the Property Coverages section of this policy provide coverage for any loss that would otherwise be excluded by the Property Coverages section of this policy under:

      1) exclusions that address war, military action, or nuclear hazard; or
      2) any other exclusion; and

   b. the absence of any other terrorism endorsement does not imply coverage for any loss that would otherwise be excluded by the Property Coverages section of this policy under:

      1) exclusions that address war, military action, or nuclear hazard; or
      2) any other exclusion.

4. Under Commercial Liability Coverages, the following exclusion is added.

   **CERTIFIED ACT OF TERRORISM EXCLUSION**

   "We" will not pay for any injury or damage caused directly or indirectly by a "certified act of terrorism". Such injury or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

---

**BP 0760 01 15**

Copyright, American Association of Insurance Services, Inc., 2015

AAIS
BP 0798 01 15
Page 1 of 1

This endorsement changes the Commercial
Liability Coverages provided by this policy
-- PLEASE READ CAREFULLY --

# EXCLUSION - DATA BREACH LIABILITY

The Commercial Liability Coverages are amended as follows. All other "terms" of the policy apply, except as amended by this endorsement.

## COMMERCIAL LIABILITY COVERAGES

1. Under Coverage L -- Bodily Injury Liability and Property Damage Liability, exclusion x. is deleted and replaced by the following:

   x.   "We" do not pay for:

   1) "bodily injury" or "property damage" arising out of disclosure of or access to private or confidential information belonging to any person or organization; or
   2) any loss, cost, expense, or "damages" arising out of damage to, corruption of, loss of use or function of, or inability to access, change, or manipulate "data records".

This exclusion also applies to "damages" for any expenses incurred by "you" or others arising out of 1) or 2) above, including expenses for credit monitoring, notification, forensic investigation, and legal research.

2. Under Coverage P -- Personal and Advertising Injury Liability, the following exclusion is added:

   "We" do not pay for "personal and advertising injury" arising out of disclosure of or access to private or confidential information belonging to any person or organization.

   This exclusion also applies to "damages" for any expenses incurred by "you" or others arising out of disclosure of or access to private or confidential information belonging to any person or organization, including expenses for credit monitoring, notification, forensic investigation, and legal research.

BP 0798 01 15

Copyright. American Association of Insurance Services, Inc. 2015

This endorsement changes
the policy
–PLEASE READ CAREFULLY –

# POLICY AMENDATORY ENDORSEMENT

The policy is amended as follows. All other "terms" of
the policy apply, except as amended by this
endorsement.

## PROPERTY COVERAGES

## ADDITIONAL DEFINITIONS

1.  Definition 3. is deleted and replaced by the following:

    3.  "Dependent locations" mean locations within the
        "basic territory" operated by others that "your"
        business relies upon as:

        a.  contributing locations. Contributing locations
            deliver materials or services to "your"
            business. However, contributing locations do
            not include water suppliers, communication
            suppliers, power suppliers, or wastewater
            removal services;

        b.  recipient locations. Recipient locations
            receive "your" products;
        c.  leader locations. Leader locations attract
            customers to "your" business; or

        d.  manufacturing locations. Manufacturing
            locations make products for delivery to
            "your" customers under contract of sale.

2.  Definition 4. is deleted and replaced by the following:

    4.  "Earth movement" --

a.  For the purposes of this definition, earth
    includes but is not limited to ground, soil,
    sediments, substrates, and strata.

b.  "Earth movement" means the movement of
    earth, including the following:

    1)  earthquake, earth tremor, or earth
        temblor, including any aftershocks,
        whether manifested in shaking, ground
        displacement, or otherwise;
    2)  soil liquefaction, whether or not caused
        by earthquake, earth tremor, or earth
        temblor;
    3)  eruption, explosion, or effusion of a
        volcano, including shaking or ground
        rupture before, during, or after a
        volcanic eruption, explosion, or effusion;
    4)  landslide, including the movement of
        material present in or carried or
        otherwise moved by landslide;
    5)  mine subsidence, whether or not the
        man-made mine is currently in use; or
    6)  any other movement of earth, including
        its sinking (other than "sinkhole
        collapse"), shifting, contracting, or rising,
        including, but not limited to:

        a)  erosion, expansion, or shrinking;
        b)  freezing or thawing;
        c)  soil compaction; and
        d)  movement caused by water under
            the surface of the ground;

    that causes cracking, settling, or shifting
    of covered property.

Copyright, American Association of Insurance Services, Inc. 2015

c. "Earth movement" also means the movement of earth resulting from any act, error, or omission, whether or not on the covered property. This includes, but is not limited to:

1) construction or excavation;
2) blasting or vibration from any source;
3) hydraulic fracturing, mining, drilling, geothermal energy extraction, or any other process for extracting gas, heat, minerals, oil, steam, water, or any other natural resource, substance, or material from under the surface of the ground;
4) injecting any natural resource, substance, or material, including but not limited to water and wastewater, under the surface of the ground;
5) storing any natural resource, substance, or material, including but not limited to carbon dioxide, under the surface of the ground; or
6) any combination of the activities described in items 1) through 5) above.

3. In the BP 0200 only, definition 12. is deleted and replaced by the following:

12. "Specified perils" means:

a. aircraft;

b. civil commotion;

c. explosion;

d. falling objects. However, falling objects does not include loss or damage to personal property in the open or to the interior of buildings or structures or personal property inside buildings or structures unless the exterior of the roof or walls are first damaged by a falling object;

e. fire;

f. hail;

g. leakage from fire extinguishing equipment;

h. lightning;

i. riot;

j. "sinkhole collapse";

k. smoke;

l. sonic boom;

m. vandalism;

n. vehicles;

o. "volcanic action";

p. water damage. Water damage means:

1) the sudden or accidental discharge or leakage of water or steam as the direct result of a breaking or cracking of a part of the system or appliance containing the water or steam; or
2) the sudden or accidental discharge or leakage of water or waterborne materials as the direct result of a breaking or cracking of a water or sewer pipe that is part of a municipal sanitary sewer system that is located off the described premises and is caused only by wear and tear.

To the extent that water damage is caused by the breaking or cracking described in p.1) or p.2) above, the exclusions for:

a) surface water; and
b) water below the surface of the ground;

set forth in the Water exclusion under Perils Excluded do not apply.

Copyright, American Association of Insurance Services, Inc. 2015

AAIS
BP 0816 01 15
Page 3 of 9

q.  weight of ice, snow, or sleet; or

r. windstorm;

all except as excluded or limited.

4.  The following definition is added:

"Secondary dependent locations" mean locations within the "basic territory" that are not owned or operated by a "dependent location" and that:

a.  supply services or materials to a "dependent location" that are used by the "dependent location" in supplying services or materials to "you"; or

b.  receive products from a "dependent location" that receives "your" products.

An airfield, bridge, pipeline, road, tunnel, waterway, or any other similar location is not a "secondary dependent location".

Any location that supplies any of the following services is not a "secondary dependent location" with respect to such services:

1)  water supply;
2)  wastewater removal;
3)  communication supply; or
4)  power supply.

## PROPERTY COVERED

The first paragraph under Coverage B -- Business Personal Property is deleted and replaced by the following:

This means "your" business personal property in or on the buildings and structures described on the "declarations" or in the open (or in vehicles) on or within 100 feet of the described premises and for which a "limit" is shown on the "declarations".

When the premises described on the "declarations" is only a portion of a building or structure, this also means "your" business personal property that is in the open (or in vehicles) within 100 feet of such building or structure and for which a "limit" is shown on the "declarations". This includes:

## PROPERTY NOT COVERED

1.  Item 5. is deleted and replaced by the following:

5.  **Data Records And Programs** -- "We" do not cover "data records", "programs and applications", or "proprietary programs".

This does not include:

a.  pre-packaged "software" that "you" hold for sale; or

b.  "data records", "programs and applications", or "proprietary programs" that are integrated in to operate or control the building's HVAC, lighting, elevator, or security system.

2.  Item 6.c. is amended to include the following:

This does not include lawns that are part of a vegetated roof.

3.  Item 9. is amended to include the following:

This does not include trees, shrubs, or plants that are part of a vegetated roof.

Copyright, American Association of Insurance Services, Inc. 2015

AAIS
BP 0816 01 15
Page 4 of 9

## ADDITIONAL PROPERTY EXCLUDED AND LIMITATIONS

1. In the BP 0200 only, item 5. is deleted and replaced by the following:

    5. **Interior Of Building Or Structure** -- "We" do not cover loss or damage to the interior of any building or structure, or to personal property located in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand, or dust, whether driven by wind or not.

        However, "we" do cover loss or damage to the interior of any building or structure, and to personal property located in the building or structure:

        a. caused by or resulting from:

            1) rain;
            2) snow;
            3) sleet;
            4) ice;
            5) sand; or
            6) dust;

            that enters through a roof or wall that has been damaged by a covered peril; or

        b. if the loss or damage is caused by or results from thawing of snow, sleet, or ice on the building or structure.

2. In the BP 0200 only, item 6. is deleted and replaced by the following:

    6. Jewelry, Watches, Jewels, Pearls, Precious Stones, Or Metals -- Unless a higher "limit" for this coverage is shown on the "declarations", "we" do not pay more than $2,500 total in any one occurrence for loss by theft of jewelry; watches; watch movements; jewels; pearls; precious or semi-precious stones; bullion, gold, silver, or other precious alloys or metals; or items consisting primarily of precious metals.

However, this limitation does not apply to jewelry or watches worth $100 or less per item.

3. In the BP 0200 only, the following is added:

    **Lawns, Trees, Shrubs, Or Plants That Are Part Of A Vegetated Roof** -- "We" do not cover loss or damage to lawns, trees, shrubs, or plants that are part of a vegetated roof caused by or resulting from:

    a. changes in or extremes of temperature;

    b. disease;

    c. dryness or dampness of atmosphere or vegetation soil; or

    d. rain, snow, sleet, ice, frost, or hail.

## ADDITIONAL COVERAGES

1. Debris Removal is deleted and replaced by the following:

    **Debris Removal** -- "We" pay the cost to remove the debris of covered property and other debris located on the described premises if the debris is caused by a covered peril that occurs during the policy period.

    a. **Restrictions** -- This coverage does not include costs to:

        1) extract "pollutants" from land or water;
        2) remove any property that is listed under Property Not Covered;
        3) remove any property addressed in item 3. Trees, Shrubs, And Plants under Extensions Of Coverage;
        4) remove property of others that would not be considered covered property under this policy;
        5) remove mud or earth deposits from the grounds located on the described premises; or
        6) remove, restore, or replace polluted land or water.

Copyright, American Association of Insurance Services, Inc. 2015

b. **Coverage Limits --**

1) When there is direct physical loss or damage to "your" covered property, "we" do not pay more under this coverage than 25% of the amount "we" pay for the direct physical loss or damage, plus 25% of the applicable deductible. "We" do not pay more for loss or damage to property and debris removal combined than the "limit" for the damaged property.

Unless a higher "limit" for this coverage is shown on the "declarations", "we" pay an additional amount of debris removal expense up to $25,000 when the debris removal expense exceeds 25% of the amount "we" pay for direct physical loss or damage plus 25% of the deductible or when the loss or damage to property and debris removal combined exceeds the "limit" for the damaged property.

2) When there is no direct physical loss or damage to "your" covered property, the most "we" pay to remove the debris of other property is $5,000 per premises.

c. **Time Limitation --** "We" do not pay any expenses unless they are reported to "us" in writing within 180 days from the date of direct physical loss or damage.

2. Fire Department Service Charges is deleted and replaced by the following:

**Fire Department Service Charges --** When the fire department is called to save or protect covered property from a covered peril, "we" pay fire department service charges for which "you" are liable under any local ordinance, or have assumed by contract or agreement prior to the loss.

Coverage Limit -- Unless a higher "limit" for this coverage is shown on the "declarations", the most "we" pay under this coverage for charges incurred at each described premises per occurrence is $2,500. The number of responding fire departments or the types of services performed does not increase the "limit" above. No deductible applies.

3. Under Limited Fungus And Related Perils, item a., Restriction is deleted and replaced by the following:

**Restrictions --**

a. This additional coverage applies only if all reasonable steps were taken to protect the property at and after the time of the occurrence.

b. This additional coverage does not apply to lawns, trees, shrubs, or plants that are part of a vegetated roof.

# EXTENSIONS OF COVERAGE

1. Under extensions of Coverage A -- Buildings, item 3. Trees, Shrubs, and Plants is deleted and replaced by the following:

3. **Trees, Shrubs, And Plants --** "We" pay for direct physical loss or damage to "your" outdoor trees, shrubs, and plants, including the cost of debris removal. This includes the cost to remove outdoor trees, shrubs, and plants belonging to others from the described premises.

**Restrictions --**

a. "We" only cover loss caused by aircraft, civil commotion, explosion, fire, lightning, or riot.

b. This coverage does not apply to trees, shrubs, and plants that are part of a vegetated roof.

Copyright, American Association of Insurance Services, Inc. 2015

c. If "you" are a tenant, this coverage does not include the expense of removing the debris of trees, shrubs, and plants that are owned by "your" landlord located on the described premises.

   **Coverage Limits** -- Unless a higher "limit" for this coverage is shown on the "declarations", the most "we" pay under this coverage is $2,500, subject to a $1,000 "limit" for any one tree, shrub, or plant.

2. Under extensions of Coverage B -- Business Personal Property, item 4., Restrictions, the following is added:

   "We" do not pay for loss or damage to:

   1) pre-packaged "software" that "you" hold for sale; or

   2) "data records", "programs and applications", or "proprietary programs" that are integrated in to operate or control the building's HVAC, lighting, elevator, or security system.

3. Under extensions of Coverage B -- Business Personal Property, the following is added:

   **Business Personal Property - Portable Storage Units** -- "We" pay for direct physical loss or damage to covered Business Personal Property stored temporarily in a portable storage unit or detached trailer located on or within 100 feet of the described premises or on or within 100 feet of the building or structure in which the described premises is located.

   **Restrictions** -- "We" do not pay for loss or damage:

   a. that occurs more than 90 days after the business personal property is first stored in the portable storage unit or detached trailer;

b. if the portable storage unit or detached trailer itself has been in use for more than 90 consecutive days on the described premises;

c. to business personal property stored temporarily in a portable storage unit or detached trailer caused by or resulting from rain, snow, sleet, ice, sand, or dust, whether driven by wind or not.

   However, "we" do cover direct physical loss or damage to personal property stored temporarily in a portable storage unit or detached trailer:

   1) caused by or resulting from:

      a) rain;
      b) snow;
      c) sleet;
      d) ice;
      e) sand; or
      f) dust;

      that enters through a roof or wall that has been damaged by a covered peril; or

   2) caused by or resulting from thawing of snow, sleet, or ice on the portable storage unit or detached trailer;

d. otherwise covered under this policy or endorsement to this policy; or

e. to the portable storage unit or detached trailer itself.

   **Coverage Limit** -- Unless a higher "limit" for this coverage is shown on the "declarations", the most "we" pay under this coverage per occurrence is $10,000, regardless of the number of portable storage units or detached trailers.

Copyright, American Association of Insurance Services, Inc. 2015

AAIS
BP 0816 01 15
Page 7 of 9

## COVERAGE C -- LOSS OF INCOME

1. Under Restrictions, item a. in the BP 0100 and item b. in the BP 0200 is deleted and replaced by the following:

   The Loss of Income coverages apply only when the loss or damage to real or personal property occurs at the described premises or in the open (or in vehicles) within 100 feet of the described premises.

   When "you" occupy only a portion of a building, "your" described premises is the portion of the building "you" rent, lease, or occupy and any area of the building or described premises that provides services or access to "your" described premises. With respect to personal property in the open (or in vehicles), "your" described premises also includes the area within 100 feet of the building.

2. Under Loss Of Income Coverage Extensions, item 4.a. is deleted and replaced by the following:

   a. the end of 60 consecutive days (unless otherwise shown on the "declarations"); or

3. Under Additional Loss Of Income Coverages, item 2. is deleted and replaced by the following:

   **2. Earnings From Dependent Locations** -- "We" pay "your" loss of Earnings and Extra Expenses due to direct physical loss or damage to real or personal property at a "dependent location" or "secondary dependent location" caused by a covered peril.

   **Restrictions** -- "We" do not pay for "your" loss of earnings and extra expenses when the only loss to property at the "dependent location" or "secondary dependent location" is loss or damage to "software". If the "dependent location" or "secondary dependent location" sustains loss or damage to "software" and other

property, loss of earnings and extra expenses coverage will not continue once the other property is repaired, rebuilt, or replaced.

"We" will reduce the amount of "your" loss, other than extra expenses, to the extent "you" can resume "your" business by using other available sources or materials or outlets for "your" products.

If "you" do not resume "your" business, or do not resume "your" business as soon as possible, "we" will pay based on the length of time it would have taken to resume "your" business as soon as possible.

**Coverage Period --**

a. This additional loss of income coverage:

   1) begins 72 hours after the time of direct physical loss or damage caused by a covered peril at the "dependent location" or "secondary dependent location"; and
   2) ends on the date that the property at the "dependent location" or "secondary dependent location" should be rebuilt, repaired, or replaced using reasonable speed and materials of similar quality.

b. The coverage period does not include any increase in time due to the enforcement of any code, ordinance, law, or decree that regulates or requires:

   1) the construction, use, repair, or demolition of any property; or
   2) that "you" or anyone else test for, abate, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of "pollutants" or "fungus or related perils".

Copyright, American Association of Insurance Services, Inc. 2015

AAIS
BP 0816 01 15
Page 8 of 9

The coverage period is not limited by the expiration date of the policy.

**Coverage Limit** -- Unless a higher "limit" for this coverage is shown on the "declarations", the most "we" pay under this coverage for any one loss is $5,000.

## PERILS COVERED

1.  In the BP 0100 only, the second paragraph is deleted and replaced by the following:

    "We" cover direct physical loss or damage caused by a peril that is shown below.

2.  In the BP 0200 only, the second paragraph is deleted and replaced by the following:

    "We" cover direct physical loss or damage unless the loss is limited or caused by a peril that is excluded.

3.  In the BP 0100 only, the following restriction is added to item 12.:

    "We" do not pay for loss or damage caused directly or indirectly by hail to lawns, trees, shrubs, or plants that are part of a vegetated roof.

## PERILS EXCLUDED

1.  The following is added to exclusion 2.:

    This exclusion applies whether or not:

    a.  the "earth movement" results from manmade or natural causes;

    b.  the cause of the "earth movement" originates on or under covered property; or

    c.  the "earth movement" results from activities being performed at "your" request or for "your" benefit.

2.  Exclusion 9.b.1) is deleted and replaced by the following:

    1)  applies whether the water or the material carried or moved by water described under items a.1) through a.5) above results from manmade or natural causes; and

## ADDITIONAL EXCLUSIONS

The last paragraph of exclusion 4. in the BP 0100 and the last paragraph of exclusion 5. in the BP 0200 is deleted and replaced by the following:

However, this exclusion does not apply to acts of destruction of property by "your" "employees" or authorized representatives, or to accounts receivable and "valuable papers and records" in the custody of carriers for hire. Theft by "employees" or authorized representatives is not covered.

## OPTIONAL PROPERTY COVERAGES

Under Employee Dishonesty, item c.2), the following is added:

g)  resulting from theft or any other dishonest act by an "employee", if "you" or any of "your" partners, directors, trustees, joint venturers, members, or managers, not in collusion with the "employee", discovered prior to the effective date of this policy that the "employee" had committed theft or any other dishonest act prior to the effective date of this policy.

Copyright, American Association of Insurance Services, Inc. 2015

## COMMERCIAL LIABILITY COVERAGES

Under Coverage L -- Bodily Injury Liability And Property Damage Liability, the following exclusions are revised:

1.  Exclusion i. is deleted and replaced by the following:

    i.   "We" do not pay for "bodily injury" or "property damage" for which any "insured" may be held liable by reason of:

         1)   causing or contributing to the intoxication of a person;
         2)   the furnishing of alcoholic beverages to a person under the influence of alcohol or under the legal drinking age;
         3)   a law or regulation relating to the sale, gift, distribution, or use of alcoholic beverages;
         4)   negligence or other wrongdoing in the supervision, hiring, retention, or training of another person, if the "bodily injury" or "property damage" is attributed, in whole or in part, to a reason set forth under 1), 2), or 3) above; or

         5)   any act or omission in furnishing or failing to furnish transportation for, detaining or failing to detain, or providing or failing to provide for the well-being of any person who is or who may be under the influence of alcohol, if the "bodily injury" or "property damage" is attributed, in whole or in part, to a reason set forth under 1), 2), or 3) above.

    This exclusion applies only if "you" are in the business of manufacturing, distributing, furnishing, selling, or serving alcoholic beverages. The practice of allowing a person to bring alcoholic beverages onto "your" premises for consumption there, in and of itself, does not mean that "you" are in the business of furnishing, selling, or serving alcoholic beverages, even if such practice involves charging a fee or requires obtaining a license.

2.  Exclusion x. is deleted and replaced by the following:

    x.   "We" do not pay for any loss, cost, expense, or "damages" arising out of damage to, corruption of, loss of use or function of, or inability to access, change, or manipulate "data records".

    However, this exclusion does not apply to any loss, cost, expense, or "damages" due to "bodily injury".

BP 0816 01 15

Copyright, American Association of Insurance Services, Inc. 2015

This endorsement changes the Commercial
Liability Coverages provided by this policy
— PLEASE READ THIS CAREFULLY —

# SILICA EXCLUSION

The Commercial Liability Coverages are
amended as follows:

## ADDITIONAL DEFINITIONS

The following definition is added:

"Silica" means silicon dioxide ($SiO_2$) including:

1. crystalline silica, silica dust, industrial sand, silica sand, quartz, quartz dust, cristobalite, tridymite, tripoli, and silica mixed with other compounds;

2. amorphous silica and silica gel; and

3. silica dust mixed with other dust particles.

## COMMERCIAL LIABILITY COVERAGES

1. The following is added to the exclusions under Coverage L - Bodily Injury Liability and Property Damage Liability:

   "We" do not pay for:

   a. "bodily injury" arising out of the actual, alleged, or threatened ingestion, inhalation, or absorption of "silica";

   b. "propery damage" arising out of the actual, alleged, or threatened contact with, existence of, exposure to, or presence of "silica"; or

   c. any loss, cost, or expense arising out of the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to or assessing the effects of "silica" by any "insured" or any other person or organization.

2. The following is added to the exclusions under Coverage P - Personal and Advertising Injury Liability:

   "We" do not pay for:

   a. "personal and advertising injury" arising out of the actual, alleged, or threatened ingestion of, inhalation of, absorption of, contact with, existence of, exposure to, or presence of "silica"; or

   b. any loss, cost, or expense arising out of the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to or assessing the effects of "silica" by any "insured" or any other person or organization.

**BP 0838 10 05**

Copyright, American Association of Insurance Services, Inc., 2005

AAIS
BP 0839 10 05
Page 1 of 1

This endorsement changes the Commercial
Liability Coverages provided by the policy
— PLEASE READ THIS CAREFULLY —

# ASBESTOS EXCLUSION

The Commercial Liability Coverages are amended as follows:

## COMMERCIAL LIABILITY COVERAGES

1.  The following is added to the exclusions under Coverage L -- Bodily Injury Liability and Property Damage Liability:

    "We" do not pay for:

    a.  "bodily injury" arising out of the actual, alleged, or threatened ingestion, inhalation, or absorption of asbestos, asbestos products, asbestos fibers, or asbestos dust;

    b.  "property damage" arising out of the actual, alleged, or threatened contact with, existence of, exposure to, or presence of asbestos, asbestos products, asbestos fibers, or asbestos dust; or

    c.  any loss, cost, or expense arising out of the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to or assessing the effects of asbestos, asbestos products, asbestos fibers, or asbestos dust by any "insured" or any other person or organization.

2.  The following is added to the exclusions under Coverage P -- Personal and Advertising Injury Liability:

    "We" do not pay for:

    a.  "personal and advertising injury" arising out of the actual, alleged, or threatened ingestion of, inhalation of, absorption of, contact with, existence of, exposure to, or presence of asbestos, asbestos products, asbestos fibers, or asbestos dust; or

    b.  any loss, cost, or expense arising out of the testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to or assessing the effects of asbestos, asbestos products, asbestos fibers, or asbestos dust by any "insured" or any other person or organization.

BP 0839 10 05

Copyright, American Association of Insurance Services, Inc., 2005

AAIS
BP 0867 04 11
Page 1 of 1

This endorsement changes the
Commercial Liability Coverages provided by this policy
— PLEASE READ THIS CAREFULLY —

# AMENDATORY ENDORSEMENT
## DEFENSE COSTS REIMBURSEMENT

### PENNSYLVANIA

The Commercial Liability Coverages are amended as follows. All other "terms" of the policy apply, except as amended by this endorsement.

## COMMERCIAL LIABILITY COVERAGES

The following is added to the Insuring Agreements under Coverage L -- Bodily Injury Liability and Property Damage Liability, Coverage O -- Fire Legal Liability, and Coverage P -- Personal and Advertising Injury Liability:

If "we" defend the "insured" against a "suit" or "we" pay for an "insured's" defense, and "we" later determine that the "suit" is not covered, "we" have the right to be reimbursed for the defense costs "we" have incurred.

However, under this provision, "our" right to be reimbursed for defense costs applies only to such costs that "we" incur after "we" give "you" written notice that the "suit" may not be covered and that "we" are reserving "our" rights to end the defense coverage and to seek reimbursement for defense costs.

BP 0867 04 11

Copyright, American Association of Insurance Services, Inc., 2011

**AAIS**
**BP 0868 06 12**
**Page 1 of 1**

This endorsement changes the Commercial
Liability Coverages provided by the policy
**— PLEASE READ THIS CAREFULLY —**

# CROSS LIABILITY EXCLUSION
## INJURY TO CERTAIN INSUREDS

The Commerical Liability Coverage is amended as follows:

### COMMERCIAL LIABILITY COVERAGES

1.  The following is added to the exclusions under Coverage L -- Bodily Injury Liability
    and Property Damage Liability:

    "We" do not pay for "bodily injury" to an "insured" as described under item a. of the
    definition of "insured".

2.  The following is added to the exclusions under Coverage P -- Personal and
    Advertising Injury Liability:

    "We" do not pay for "personal and advertising injury" sustained by an "insured" as
    described under item a. of the definition of "insured".

**BP 0868 06 12**

Copyright, American Association of Insurance Services, Inc., 2012

**AAIS**
**ML 0120 03 99**
**Page 1 of 1**

# INSURANCE CONSULTATION SERVICES
# EXEMPTION ACT - NOTICE

"We" may provide consultation services such as inspections or surveys of "your" property in accordance with the provisions of the policy. These services may reduce the likelihood of injury, death, or loss.

This notice is required to be provided to "you" by the Insurance Consultation Services Exemption Act of Pennsylvania. This act provides that "we", "our" agents, employees, or service contractors are not liable for damages from injury, death, or loss occurring as a result of an act or omission by a person in the course of such services.

The Act does not apply:

1. If the injury, death, or loss occurred during the actual performance of the consultation services and was caused by "our" negligence or the negligence of "our" agents, employees, or service contractors;

2. to consultation services performed under a written service contract not related to the policy; or

3. If an act or omission by "us", "our" agents, employees, or service contractors is determined by law to constitute a crime, actual malice, or gross negligence.

This notice must be attached to all new and renewal policies.

**ML 0120 03 99**

Copyright, American Association of Insurance Services, 1998

# UTICA FIRST INSURANCE COMPANY

P.O. Box 851, Utica, NY 13503-0851

## PROTECTIVE SAFEGUARD ENDORSEMENT

### PROTECTIVE SAFEGUARD LIST

1. Automatic Extinguishing System
2. Hood and Duct System

## AGREEMENT

It is hereby understood and agreed that **"we"** have issued the policy to which this endorsement is attached only because of **"our"** reliance on certain protective safeguard conditions stated below. **"We"** are relying upon the following protective safeguards and that if said safeguards were not correct **"we"** would not issue a policy.

## DEFINTIONS

**"Automatic Extinguishing System"** means any system installed over cooking areas to extinguish or prevent spread of a fire.

**"Hood and Duct System"** means any kitchen exhaust hoods, grease ducts, baffles, fans, or any other accessories installed or connected thereto; to remediate kitchen exhaust.

## CONDITIONS

The following condition is added:

**"You"** are required to maintain in complete working order the protective safeguards shown above if present at an insured location.

## EXCLUSIONS

**"We"** do not pay for loss or damage caused by fire, if prior to the fire, **"you"**

1. had knowledge of any suspension or impairment in any protective safeguard shown above, or

2. failed to maintain in complete working order any protective safeguard shown above.

UA-504B 02 17

Contains Copyrighted Material, American Association of Insurance Services, Inc., 2009

# UTICA FIRST INSURANCE COMPANY

P.O. Box 851, Utica, NY  13503-0851

## ENDORSEMENT
## ATTACHED TO AND FORM PART OF THE POLICY

| ENDORSEMENT DATE EFFECTIVE AS OF | POLICY NUMBER | ENDORSEMENT NO. |
|---|---|---|
| 09/03/19 | BOP 4466431 00 | |
| NAMED INSURED<br>ANTHRACITE CAFE<br>804 SCOTT STREET<br>WILKES BARRE, PA          18705 | ADDITIONAL PREMIUM<br>NIL | RETURN PREMIUM<br>NIL |

## ASSAULT & BATTERY EXCLUSION

"Not withstanding anything contained herein to the contrary, it is understood and agreed that this policy excludes any and all claims arising out of any assault, battery, fight, altercation, misconduct or any other similar incident or act of violence, including self defense, whether caused by or at the instigation of, or at the direction of the insured, his employees, customers, patrons, guests for any cause whatsoever, including, but not limited to claims of negligent or improper hiring practices, negligent improper or non-existent supervision of employees, patrons or guests and negligence in failing to protect customers, patrons or guests."

## ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

UA-506
Rev. 06/2009



# CYBER LIABILITY INSURANCE
## (Claims-Made and Reported Coverage)

POLICY NUMBER:   BOP 4466431 00

EFFECTIVE DATE FOR THIS ENDORSEMENT:   09/03/19

RETROACTIVE DATE:   09/03/19

The Cyber Liability limits of insurance are specified in the Schedule of Limits ("the Schedule") shown below. Such limits are in addition to, and will not reduce, the limits of liability provided elsewhere under the Policy.  Any **defense costs** paid under this Endorsement will reduce the available limits of insurance and may exhaust them completely.

### SCHEDULE OF LIMITS

| Coverage | Limits |
|---|---|
| Multimedia Liability Coverage | $100,000 each **claim** |
| Security and Privacy Liability Coverage | $100,000 each **claim** |
| Privacy Regulatory Defense and Penalties Coverage | $100,000 each **claim** |
| PCI DDS Assessment Coverage | $100,000 each **claim** |
| Privacy Breach Response Costs, Notification Expenses and Customer Support and Credit Monitoring Expenses Coverage | $100,000 each **claim** |
| Network Asset Protection Coverage | $100,000 each **claim** |
| Cyber Extortion Coverage | $100,000 each **claim** |
| Cyber Terrorism Coverage | $100,000 each **claim** |
| BrandGuard Coverage | $100,000 each **claim** |
| Business Owner ID Theft Recoverage Coverage | $100,000 each **claim** |
| Aggregate Limit | $100,000 |

Information to complete this Schedule, if not shown above, will be shown in the Cyber Liability Endorsement Supplemental Declarations.

This Endorsement ("Endorsement") amends your policy to provide Cyber Liability insurance on a Claims-Made and Reported basis. Various provisions in this Endorsement restrict coverage.  Read the entire Endorsement carefully to determine your rights and duties and what is and is not covered. The terms, conditions, exclusions, and limits of insurance set forth in this Endorsement apply only to the coverage provided by this Endorsement.

All words and phrases in this Endorsement that appear in bold print have the meanings set forth in Section V of this Endorsement.  To the extent any words or phrases used in this Endorsement are defined elsewhere in the Policy, such definitions provided elsewhere do not apply to give meaning to the words or phrases used in this Endorsement.

## SECTION I - CYBER LIABILITY COVERAGE AGREEMENTS

In consideration of the premium paid and subject to all terms, conditions, definitions, exclusions and other provisions of this Endorsement, the Company agrees as follows:

A.   MULTIMEDIA LIABILITY COVERAGE

Subject to the limits shown in the Schedule, the Company will pay **damages** which an **insured** becomes legally obligated to pay and **defense costs** resulting from a **claim** for an actual or alleged **multimedia peril(s)**, provided that:

(1)   Such **claim** is first made against the **insured** during the **endorsement period**;
(2)   The **insured** reports such **claim** in writing to the Company no later than sixty (60) days after the **claim** is first made against the **insured**; and
(3)   The **multimedia peril(s)** takes place or first commences on or after the **retroactive date**.

B.   SECURITY AND PRIVACY LIABILITY COVERAGE

Subject to the limits shown in the Schedule, the Company will pay **damages** which an **insured** becomes legally obligated to pay and **defense costs** resulting from a **claim** for an actual or alleged **security and privacy wrongful act**, provided that:

(1)   Such **claim** is first made against the **insured** during the **endorsement period**;
(2)   The **insured** reports such **claim** in writing to the Company no later than sixty (60) days after the **claim** is first made against the **insured**; and
(3)   The **security and privacy wrongful act** takes place or first commences on or after the **retroactive date**.

C.   PRIVACY REGULATORY DEFENSE AND PENALTIES COVERAGE

Subject to the limits shown in the Schedule, the Company will pay **regulatory fines and penalties** and/or any **regulatory compensatory award** which an **insured** becomes legally obligated to pay and **defense costs** resulting from a **claim** for an actual or alleged **security breach** or **privacy breach**, provided that:

(1)   Such **claim** is first made against the **insured** during the **endorsement period**;
(2)   The **insured** reports such **claim** in writing to the Company no later than sixty (60) days after the **claim** is first made against the **insured**; and
(3)   The **security breach** or **privacy breach** takes place or first commences on or after the **retroactive date**.

D.  PCI DSS ASSESSMENT COVERAGE

Subject to the limits shown in the Schedule, the Company will pay **PCI DSS assessments** which an **insured** becomes legally obligated to pay and **defense costs** resulting from a **claim** for an actual or alleged **security breach** or **privacy breach**, provided that:

(1)   Such **claim** is first made against the **insured** during the **endorsement period**;
(2)   The **insured** reports the **claim** in writing to the Company no later than sixty (60) days after the **claim** is first made against the **insured**; and

(3) The **security breach** or **privacy breach** takes places or first commences on or after the **retroactive date**.

E.  PRIVACY BREACH RESPONSE COSTS, NOTIFICATION EXPENSES, AND CUSTOMER SUPPORT AND CREDIT MONITORING EXPENSES COVERAGE

Subject to the limits shown in the Schedule, the Company will pay reasonable **privacy breach response costs, notification expenses,** and/or **customer support and credit monitoring expenses** which **you** incur during the **endorsement period** as a direct result of an **adverse media report, security breach** or **privacy breach,** provided that:

(1) The **adverse media report, security breach** or **privacy breach** takes place or first commences on or after the **retroactive date**; and

(2) **You** report the **adverse media report, security breach** or **privacy breach** in writing to the Company during the **endorsement period,** but no later than 60 days from the date an **insured** first discovers the **adverse media report, security breach** or **privacy breach.**

F.  NETWORK ASSET PROTECTION COVERAGE

(1) Loss of Digital Assets

Subject to the limits shown in the Schedule, the Company will reimburse **you** for **digital assets loss** and/or **special expenses** which **you** incur during the **endorsement period** as a direct result of damage, alteration, corruption, distortion, theft, misuse, or destruction of **digital assets,** provided that:

(a) Such damage, alteration, corruption, distortion, theft, misuse, or destruction of **digital assets** is directly caused by a **covered cause of loss;**

(b) The **covered cause of loss** takes place or first commences on or after the **retroactive date;**

(c) **You** report the **covered cause of loss** in writing to the Company during the **endorsement period,** but no later than 60 days from the date an **insured** first discovers the **covered cause of loss;** and

(d) **You** provide clear evidence that the **digital assets loss** and/or **special expenses** directly resulted from the **covered cause of loss.**

The Company will pay **digital assets loss** and/or **special expenses** for a period of up to twelve (12) months following the discovery of the damage, alteration, corruption, distortion, theft, misuse, or destruction of **digital assets.**

(2) Non-Physical Business Interruption and Extra Expense

Subject to the limits shown in the Schedule, the Company will reimburse **you** for **income loss, interruption expenses** and/or **special expenses** which **you** incur during the **period of restoration,** but after the **waiting period,** as a direct result of a total or partial interruption, degradation in service or failure of an **insured computer system,** provided that:

(a) Such total or partial interruption, degradation in service or failure of the **insured computer system** is directly caused by a **covered cause of loss;**

(b) The **covered cause of loss** takes place or first commences on or after the **retroactive date;**

    (c) **You** report the **covered cause of loss** in writing to the Company during the **endorsement period**, but no later than 60 days from the date an **insured** first discovers the **covered cause of loss**; and

    (d) **You** provide clear evidence that the **income loss, interruption expenses** and/or **special expenses** directly resulted from the **covered cause of loss**.

G.     CYBER EXTORTION COVERAGE

Subject to the limits shown in the Schedule, the Company will reimburse **you** for **cyber extortion expenses** and/or **cyber extortion monies** that **you** pay as a direct result of a **cyber extortion threat**, including a demand for **cyber extortion monies**, provided that:

(1)      Such **cyber extortion threat** is first made against an **insured** on or after the **retroactive date**;

(2)      **You** provide clear evidence that the **cyber extortion expenses** and/or **cyber extortion monies**    directly resulted from the **cyber extortion threat**; and

(3)      **You** report the **cyber extortion threat** in writing to the Company during the **endorsement period**, but no later than 60 days from the date the **cyber extortion threat** is made against an **insured**.

**Cyber extortion expenses** and/or **cyber extortion monies** shall not be paid without the Company's prior consultation and written authorization. **You** must make every reasonable effort to notify local law enforcement authorities and the Federal Bureau of Investigation, or similar equivalent foreign agency, before surrendering any **cyber extortion monies** in response to a **cyber extortion threat**.

H.  CYBER TERRORISM COVERAGE

Subject to the limits shown in the Schedule, the Company will reimburse **you** for **income loss, interruption expenses,** and/or **special expenses** which **you** incur during the **period of restoration**, but after the **waiting period**, as a direct result of a total or partial interruption, degradation in service, or failure of an **insured computer system**, provided that:

(1)      Such total or partial interruption, degradation in service, or failure of the **insured computer system** is directly caused by an act of **cyber terrorism**;

(2)      The **act of cyber terrorism** takes place or first commences on or after the **retroactive date**;

(3)      **You** report the **act of cyber terrorism** in writing to the Company during the **endorsement period**, but no later than 60 days from the date an **insured** first discovers the **act of cyber terrorism**; and

(4)      **You** provide clear evidence that the **income loss, interruption expenses** and/or **special expenses** directly resulted from the **act of cyber terrorism**.

I.  BRANDGUARD COVERAGE

Subject to the limits shown in the Schedule, the Company will reimburse **you** for **your** provable and ascertainable **brand loss**, which you sustain during the **period of indemnity**, but after the **waiting period**, as a direct result of an **adverse media report** or **notification**, provided that:

(1)      The **adverse media report** or **notification** results from a **privacy breach** or **security breach** that takes place or first commences on or after the **retroactive date**;

(2)      **You** report the **brand loss** in writing to the Company during the **endorsement period**, but no later than 60 days from the date **you** first discover the actual or potential **brand loss**; and

(3)      **You** provide clear evidence that the **brand loss** directly resulted from the **adverse media report** or **notification**.

J.   BUSINESS OWNER ID THEFT RECOVERY COVERAGE

Subject to the limits shown in the Schedule, the Company will reimburse **your key employees** for reasonable and necessary **identity theft expenses** incurred as a direct result of **identity theft**, provided that:

(1)   The **identity theft** takes place or first commences on or after the **retroactive date**;
(2)   **You** report the **identity theft** to law enforcement and obtain a police report; and
(3)   **You** first discover the **identity theft** during the **endorsement period** and report the **identity theft** in writing to the Company no later than 60 days from the date **you** first discover the **identity theft**.

## SECTION II - DEFENSE, INVESTIGATION, AND SETTLEMENT

The Company will have the right and duty to defend any **claim** under Coverage Agreement A, B, C, or D, even if the allegations of the **claim** are groundless, false or fraudulent. The Company has the right to appoint counsel to defend any such **claim**.

The Company may investigate or settle any **claim** at its sole discretion.  The applicable limits of insurance will be reduced and may be completely exhausted by payment of **defense costs**.  The Company will not be obligated to pay or defend any **claim** after the applicable limit of the Company's liability hereunder has been exhausted.

No **insured** will incur any **defense costs** or other expenses, or settle any **claim**, assume any contractual obligation, admit liability, voluntarily make any payment, or otherwise consent to any settlement or judgment with respect to any **claim** without the Company's prior written consent, which will not be unreasonably withheld.  The Company will not be liable for any **defense costs** or other expenses, settlement or judgment to which the Company has not consented.

## SECTION III - EXCLUSIONS

The insurance provided under this Endorsement does not apply to:

A.   Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving any **multimedia peril**, **security and privacy wrongful act**, **security breach**, **privacy breach**, **covered cause of loss**, **cyber extortion threat**, **act of cyber terrorism**, **adverse media report** or **identity theft**:

(1)   Which was the subject of written notice given to us or to any other insurer prior to **your** initial effective date of Cyber Liability coverage;
(2)   Which was the subject of any prior and/or pending written demand made against an **insured**, or a civil, administrative or arbitration proceeding commenced against an **insured**, prior to **your** initial effective date of Cyber Liability coverage, or that involved the same or substantially the same fact, circumstance, or situation underlying or alleged in such prior demand or proceeding;
(3)   Which an **insured** had knowledge of prior to **your** initial effective date of Cyber Liability coverage.

B.   Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving any actual, alleged or threatened discharge, dispersal, release or escape of pollutants, or any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, nuclear material or nuclear waste. For purposes of this exclusion, "pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, odors, noise, lead, oil or oil products, radiation, asbestos or asbestos-containing products and waste, and any electric, magnetic or electromagnetic field of any frequency.  "Waste" includes, but is not limited to, material that is or is to be recycled, reconditioned or reclaimed.

C.  Any **claim** for liability assumed by an **insured** under any oral or written contract or agreement, except where such liability would apply apart from such contract or agreement and is otherwise covered by this Endorsement. With respect to any **multimedia peril**, **security breach** or **privacy breach**, this exclusion does not apply to any **claim** alleging liability **assumed under contract**.

D.  Any **claim** for breach of any express, implied, actual or constructive contract, warranty, guarantee, or promise, except where such liability would apply apart from such contract, warranty, guarantee or promise and is otherwise covered by this Endorsement. This exclusion does not apply to any **claim** alleging breach of **your** privacy policy or liability **assumed by contract**.

E.  Any **claim** which is covered under any other coverage section of the Policy to which this endorsement attaches.

F.  Any **claim** for violations of the False Claims Act or any similar federal or state law, rule, or regulation concerning billing errors or fraudulent billing practices or abuse.

G.  Any **claim** for infringement of any patent or the misappropriation, theft, copying, display, or publication of any trade secret.

H.  Any **claim** for unfair competition, price fixing, deceptive trade practices, restraint of trade, or violation of any anti-trust laws.

I.  Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving:

    (1)  Any employment or employment-related matters, including, but not limited to, employer-Employee relations, policies, acts or omissions;
    (2)  Any actual or alleged refusal to employ any person or any other actual or alleged misconduct with respect to employees; or
    (3)  Any actual or alleged obligations of the **insured** under any workers' compensation, unemployment insurance, social security, disability benefits or other similar law.

    This exclusion does not apply to an otherwise covered **claim** under Coverage Agreement B, which is brought by **your** past, present or future employee alleging a **security and privacy wrongful act**.

J.  Any **claim** for **bodily injury** or **property damage**.

K.  Any **claim** for harassment or discrimination because of, or relating to, race, creed, color, age, sex, sexual orientation or preference, national origin, religion, handicap, disability, political affiliation, marital status, or any other basis prohibited by federal, state or local law.

L.  Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving:

    (1)  Satellite failures;
    (2)  Electrical or mechanical failures and/or interruption including, but not limited to, electrical disturbance, spike, brownout, or blackout; or
    (3)  Outages to gas, water, telephone, cable, telecommunications or other infrastructure, unless such infrastructure is under **your** direct operational control and such **claim** is otherwise covered under Coverage Agreement F or Coverage Agreement H.

M.  Any **claim** for violation of any of United States of America's economic or trade sanctions, including, but not limited to, sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

(1)    Any willful, deliberately dishonest, malicious, or fraudulent act or omission;
(2)    Any intentional violation of the law or of **your** privacy policy; or
(3)    The gaining in fact of any profit, remuneration or financial advantage to which an **insured** was not legally entitled,

if committed by any **insured**, whether acting alone or in collusion with other persons. Notwithstanding the foregoing, the insurance afforded by this Endorsement will apply to **defense costs** incurred in defending any such **claim** until such time as there is a judgment or other final adjudication adverse to the **insured** establishing such willful, dishonest, fraudulent, or malicious conduct. The Company will have the right to recover **defense costs** incurred in defending such **claim** from those parties found to have committed such willful, dishonest, fraudulent, or malicious conduct.

This exclusion does not apply to:

(1)    Any **insured** that did not commit, participate in, or have knowledge of any willful, dishonest, fraudulent, or malicious conduct described in this exclusion; or
(2)    A **claim** resulting from sabotage by your **employee**.

P.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving:

(1)    Any actual or alleged **multimedia peril, security and privacy wrongful act, security breach, privacy breach, covered cause of loss, cyber extortion threat, act of cyber terrorism, adverse media report** or **identity theft** that took place or first commenced prior to the **retroactive date**; or
(2)    Any actual or alleged **multimedia peril, security and privacy wrongful act, security breach, privacy breach, covered cause of loss, cyber extortion threat, act of cyber terrorism, adverse media report** or **identity theft** that took place on or after the **retroactive date**, which, together with an actual or alleged **multimedia peril, security and privacy wrongful act, security breach, privacy breach, covered cause of loss, cyber extortion threat, act of cyber terrorism, adverse media report** or **identity theft** that took place prior to the **retroactive date**, would constitute related **multimedia perils, security and privacy wrongful acts, security breaches, privacy breaches, covered causes of loss, cyber extortion threats, acts of cyber terrorism, adverse media reports** or **identity thefts**.

For purposes of this exclusion, **multimedia perils, security and privacy wrongful acts, security breaches, privacy breaches, covered causes of loss, cyber extortion threats, acts of cyber terrorism, adverse media reports** or **identity thefts** will be deemed related if we determine that they are logically or causally connected by any common fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

Q.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving any business, joint venture or enterprise not named on the Cyber Liability Declarations.

R.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving any conduct, act, error or omission of any individual serving in any capacity other than as **your** officer, director, partner, stockholder, trustee or employee.

S.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving an **insured's** insolvency or bankruptcy, the insolvency or bankruptcy of any other individual or entity, or

N.      Any **criminal proceeding**.

O.      Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving:

the failure, inability or unwillingness to make payments because of the insolvency, liquidation, or bankruptcy of any individual or entity.

T.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving the wear and tear, drop in performance, progressive deterioration, or aging of **your** electronic equipment or **computer hardware**.

U.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving the failure of overhead transmission and distribution lines.

V.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving the gradual deterioration of subterranean insulation.

W.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, force majeure or any other physical event, however caused.

X.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving the gradual deterioration or wear and tear of an **insured computer system**.

Y.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving the actual or alleged inaccurate, inadequate or incomplete description of the price of goods, products or services.

Z.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving cost guarantees, cost representations, contract price or cost estimates being exceeded.

AA.    Any **claim** brought by or on behalf of:

(1)    Any **insured** against another **insured**;
(2)    Any entity which is owned, in whole or in part, by an **insured**, or any entity directly or indirectly controlled, operated or managed by an **insured**;
(3)    Any entity which is a parent, affiliate or subsidiary of any entity or joint venture in which an **insured** is a partner; or
(4)    Any individual or entity who is a partner of any entity or joint venture in which an **insured** is also a partner.

This exclusion does not apply to an otherwise covered **claim** under Coverage Agreement B, which is brought by **your** past, present or future employee alleging a **security and privacy wrongful act**.

BB.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving unauthorized trading. For purposes of this exclusion, "unauthorized trading" means trading, which at the time of the trade is:

(1) In excess of permitted financial limits; or
(2) Outside of permitted product lines.

CC.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving:

(1)    The actual or alleged purchase or sale of securities, or an offer, or solicitation of an offer, to purchase or sell securities;
(2)    The actual or alleged loss of value of any securities; or
(3)    Any actual or alleged violation of any securities law such as the provisions of the Securities Act

of 1933, the Securities Exchange Act of 1934, the Sarbanes-Oxley Act of 2002 or any regulation promulgated under the foregoing statutes, or any federal, state, local, or foreign laws similar to the foregoing statutes, including "Blue Sky" laws, whether such law is statutory, regulatory or common law.

DD.    Any **claim** for violation of the Organized Crime Control Act of 1970 (commonly known as 'Racketeer Influenced And Corrupt Organizations Act' or 'RICO'), as amended, or any regulation promulgated under the foregoing statutes, or any similar federal, state, local or foreign laws, whether such law is statutory, regulatory or common law.

EE.    Any **claim** which is brought by the Federal Trade Commission, the Federal Communications Commission or any other federal, state or local governmental entity, in such entity's regulatory or official capacity. This exclusion does not apply to an otherwise covered **claim** under Coverage Agreement C.

FF.    Any **claim** alleging:

(1)    The violation of any pension, healthcare, welfare, profit sharing or mutual or investment plans, funds or trusts; or

(2)    The violation of any provision of the Employee Retirement Income Security Act of 1974 and its amendments and/or the Pension Protection Act of 2006 and its amendments, or any regulation, ruling or order issued pursuant thereto.

GG.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving:

(1)    Strikes or similar labor actions, war, invasion, act of foreign enemy, hostilities or warlike operations (whether declared or not), civil war, mutiny, civil commotion assuming the proportions of or amounting to a popular uprising, military uprising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against these actions;

(2)    The confiscation, nationalization, requisition or destruction of, or damage to, property by or under the order of any government or public or local authority; or

(3)    Any action taken in controlling, preventing, suppressing or in any way relating to GG(1) or GG(2) above.

This exclusion does not apply to an **act of cyber terrorism**.

HH.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving **your** commercial decision to cease providing a particular product or service, but only if **you** are contractually obligated to continue providing such products or services.

II.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving:

(1) Gambling or pornography;

(2) Prizes, awards or coupons; or

(3) The sale or provision of prohibited, restricted or regulated items such as alcoholic beverages, tobacco or drugs.

JJ.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving the use of programs that are not **operational programs** or **delivered programs**.

KK.    Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving any **insured's** intentional use illegal or unlicensed programs that are in violation of the provisions or laws

referring to software protection.

LL.   Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving the confiscation, commandeering, requisition, destruction of, or damage to **computer hardware** by order of a government de jure or de facto or by any public authority for whatever reason.

MM.   Any **claim** based upon, arising out of, resulting from, in consequence of, or in any way involving the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment or that affects the value, marketability, condition or use of any property.

NN.   With respect to Coverage Agreement F(1):

(1)   Any amount incurred in restoring, updating or replacing **digital assets** to a level beyond that which existed prior to the **covered cause of loss**;
(2)   Physical damage to the **computer hardware** or **data** center, other than accidental physical damage or destruction of **electronic media** so that stored **digital assets** are no longer machine-readable;
(3)   Contractual penalties or consequential damages;
(4)   Any liability to third parties for whatever reason, including legal costs and expenses of any type;
(5)   Fines or penalties imposed by law;
(6)   The economic or market value of **digital assets**;
(7)   Costs or expenses incurred to identify, patch or remediate software program errors or **computer system** vulnerabilities;
(8)   Costs to upgrade, redesign, reconfigure or maintain an **insured computer system** to a level of functionality beyond that which existed prior to the **covered cause of loss**; or
(9)   Any losses paid under Coverage Agreement F(2).

OO.   With respect to Coverage Agreement F(2):

(1)   Any loss arising out of updating or replacing **digital assets** to a level beyond that which existed prior to the **covered cause of loss**;
(2)   Contractual penalties or consequential damages;
(3)   Any liability to third parties for whatever reason, including legal costs and expenses of any type;
(4)   Fines or penalties imposed by law;
(5)   Costs or expenses incurred to identify, patch or remediate software program errors or **computer system** vulnerabilities;
(6)   Loss of goodwill and reputational harm;
(7)   Costs to upgrade, redesign, reconfigure or maintain an **insured computer system** to a level of functionality beyond that which existed prior to the **covered cause of loss**; or
(8)   Any losses paid under Coverage Agreement F(1).

PP.   With respect to Coverage Agreement I:

(1)   Any amounts incurred by **you** in an effort to re-establish **your reputation**, including **public relations expenses**;
(2)   Any amounts incurred in any **claim** that is insured by any other insurance, except excess insurance;
(3)   Any amounts incurred in connection with an **adverse media report** that also affects or refers in similar terms to a general security issue, an industry or **your** specific competitors without any specific allegations regarding a **privacy breach** or **security breach** by an **insured**, a **BPO**

(4)     **service provider**, an **outsourced IT service provider**, or by others acting on **your** behalf and for whom **you** are legally responsible;

(5)     Any civil or regulatory liability to third parties for whatever reason, including legal costs and expenses of any type;

(6)     Contractual penalties or consequential damages;

(7)     **Privacy breach response costs, notification expenses** or **customer support and credit monitoring expenses** paid under Coverage Agreement E; or

(8)     Fines or penalties imposed by law or regulation.

## SECTION IV - LIMITS OF LIABILITY

A.      The limit of insurance shown in the Schedule as applicable to "each **claim**" is the most the Company will pay for each **claim** under each Coverage Agreement of this Endorsement, including **defense costs** where applicable, regardless of the number of **insureds** involved or affected, the number of individuals or entities making a **claim**, or the number of **claims** made.

B.      Subject to the provisions respecting "each **claim**", the limit of insurance shown in Schedule as the "Aggregate Limit" is the most the Company will pay for all **claims** made during the **endorsement period** under all Coverage Agreements of this Endorsement combined. The "Aggregate Limit" includes **defense costs**.

C.      If the "Aggregate Limit'" is exhausted, then the Company's obligations under this Endorsement will be deemed completely fulfilled and extinguished.

D.      All **claims** made under any one Coverage Agreement which arise out of the same, related, or continuing acts, facts or circumstances, will be considered a single **claim** without regard to the number of **insureds**, **claims**, or persons or entities making a **claim**, and only one "each **claim**" limit will apply. Such **claim** will be deemed to have been first made on the date the earlier of the related **claims** was first made and will be deemed to have been first reported to the Company on the date the earlier of the related **claims** was first reported to the Company in writing. Appeals and any post-trial proceedings or consolidated proceedings approved by us will be considered to be part of the original **claim**.

E.      In the event that a **claim** is made and applies to more than one Coverage Agreement of this Endorsement, only one "each **claim**" limit will apply. The Company has the sole discretion to allocate amounts paid, if any, against the appropriate limit of liability.

F.      In the event two or more **claims** arising out of the same facts, circumstances, situations, events or transactions are covered under more than one Coverage Agreement of this Endorsement, only one "each **claim**" limit will apply to such **claims**. We have the discretion to allocate **claims** paid, if any, against the appropriate limit of insurance. All such **claims**, whenever first made, shall be considered as reported to the Company during the **endorsement period** in which the first of such **claims** is reported to the Company, and shall be subject to the limits of insurance applicable to that policy.

## SECTION V - DEFINITIONS

When used in this Endorsement:

A.      **Acquiring bank** means a bank or financial institution that accepts credit and/or debit card payments (including credit cards, debits cards, stored value cards and pre-paid cards) for products or services on behalf of a merchant, including processing and crediting those payments to a merchant's account.

B.      **Act of cyber terrorism** means the premeditated use of disruptive activities, or the threat thereof, against computers, computer systems, networks and/or public internet by any person or group(s) of persons,

whether acting alone or on behalf of, or in connection with, any organization(s) or government(s) with the intention to intimidate or cause destruction or harm and/or further social, ideological, religious, political or similar objectives. **Act of cyber terrorism** includes, but is not limited to, the use of information technology to organize and execute large-scale attacks against computer systems, networks and/or public internet, resulting in disabling and/or deleting critical infrastructure, data or information.

C.   **Adverse media report** means any unpredictable report or communication of an actual or potential **security breach** or **privacy breach**, which:

   (1)   Has been publicized through any media channel including, but not limited to, television, **print media**, radio or electronic networks, the **internet**, and/or electronic mail; and

   (2)   Threatens material damage to **your reputation** or **your** brands.

D.   **Assumed under contract** means liability for **damages** resulting from a **multimedia peril, security breach** or **privacy breach** where such liability has been assumed by **you** in the form of a written hold harmless or indemnity agreement, provided that such agreement was executed prior to the date the **multimedia peril**, **security breach**, or **privacy breach** occurred.

E.   **BPO service provider** means any third party independent contractor that provides business process outsourcing services for **your** benefit under a written contract with **you**, including, but not limited to, call center services, fulfillment services, and logistical support.

F.   **Bodily injury** means physical injury, sickness, disease, pain or death, and if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or emotional distress sustained by a person at any time.

G.   **Brand loss** means **your** revenue as could have been reasonably projected immediately prior to **notification** or, in the event of an **adverse media report**, immediately prior to the publication of an **adverse media report**, but which has been lost as a direct result of such **notification** or **adverse media report**. **Brand loss** will be determined in accordance with Section VII(C) of this Endorsement.

H.   **Card association** means Visa International, Mastercard, Discover, JCB American Express and any similar credit or debit card association that is a participating organization of the Payment Card Industry Security Standards Council.

I.   **Claim** means:

   (1)   With respect to Coverage Agreement A (Multimedia Liability) and Coverage Agreement B (Security and Privacy Liability):

      (a)   Any written demand for monetary or non-monetary relief made against an **insured**;
      (b)   Any civil proceeding or arbitration proceeding initiated against an **insured**, commenced by the service of a complaint or similar pleading or notice; or
      (c)   Any written request to toll or waive a statute of limitations relating to a potential **claim** against an **insured**, including any appeal therefrom;

      A **claim** under Coverage Agreement A or Coverage Agreement B will be deemed to be first made when an **insured** first receives notice of any of (1)(a) through (1)(c) above.

   (2)   With respect to Coverage Agreement C (Privacy Regulatory Defense and Penalties), a **government investigation** commenced against an **insured** by letter, notice, complaint, or order of investigation. A **claim** under Coverage Agreement C will be deemed to be first made when it is first received by an **insured**.

(3)   With respect to Coverage Agreement D (PCI DSS Assessment Coverage), any written demand made against an **insured** by an **acquiring bank or card association** for a **PCI DSS assessment** due to the **insured's** non-compliance with **PCI Data Security Standards**. A **claim** under Coverage Agreement D will be deemed to be first made when such written demand is received by an **insured**.

(4)   With respect to Coverage Agreement E (Privacy Breach Response Costs, Notification Expenses, and Customer Support and Credit Monitoring Expenses), **your** written report to the Company of an **adverse media report, security breach,** or **privacy breach**. A **claim** under Coverage Agreement E will be deemed to be first made when such written report is received by the Company.

(5)   With respect to Coverage Agreement F (Network Asset Protection), **your** written report to the Company of a **covered cause of loss**. A **claim** under Coverage Agreement F will be deemed to be first made when such written report is received by the Company.

(6)   With respect to Coverage Agreement G (Cyber Extortion), **your** written report to the Company of a **cyber extortion threat**. A **claim** under Coverage Agreement G will be deemed to be first made when such written report is received by the Company.

(7)   With respect to Coverage Agreement H (Cyber Terrorism), **your** written report to the Company of an **act of cyber terrorism**. A **claim** under Coverage Agreement H will be deemed to be first made when such written report is received by the Company.

(8)   With respect to Coverage Agreement I (BrandGuard), **your** written report to the Company of **brand loss** directly caused by an **adverse media report** or **notification**. A **claim** under Coverage Agreement I will be deemed to be first made when such written report is received by the Company.

(9)   With respect to Coverage Agreement J (Business Owner ID Theft Recovery Coverage), **your** written report to the Company of **identity theft**. A **claim** under Coverage Agreement J will be deemed to be first made when such written demand received by the Company.

J.   **Computer hardware** means the physical components of any computer system including CPUs, memory, storage devices, storage media, and input/output devices and other peripheral devices and components, including, but not limited to, cable, connectors, fiber optics, wire, power supply units, keyboards, display monitors, and audio speakers.

K.   **Computer program** means an organized set of instructions that, when executed, causes a computer to behave in a predetermined manner. **Computer program** includes, but is not limited to, communications, networking, operating system, and related **computer programs** used to create, maintain, process, retrieve, store, and/or transmit electronic **data**.

L.   **Computer system** means interconnected electronic, wireless, web, or similar systems (including all **computer hardware** and software) used to process and store **data** or information in an analogue, digital, electronic, or wireless format including, but not limited to, **computer programs**, electronic **data**, operating systems, **firmware**, servers, media libraries, associated input and output devices, mobile devices, networking equipment, websites, extranets, off line storage facilities (to the extent that they hold electronic **data**), and electronic backup equipment.

M.   **Computer virus** means a program that possesses the ability to create replicas of itself (commonly known as "auto-reproduction" program) within other programs or operating system areas or which is capable of spreading copies of itself wholly or partly to other **computer systems**.

N. **Covered cause of loss** means, and is limited to, the following:

(1) Accidental Damage or Destruction

    (a)    Accidental physical damage or destruction of **electronic media** so that stored **digital assets** are no longer machine-readable;

    (b)    Accidental damage or destruction of **computer hardware** so that stored **data** is no longer machine-readable;

    (c)    Failure in power supply or under/over voltage only if such power supply is under **your** direct operational control. "Direct operational control" includes back-up generators;

    (d)    **Programming error of delivered programs;** or

    (e)    Electrostatic build-up and static electricity.

(2) Administrative or Operational Mistakes

An accidental, unintentional, or negligent act, error or omission by **your** employee, a **BPO service provider,** or **outsourced IT service provider** in:

    (a)    The entry or modification of **your** electronic **data**, which causes damage to such **data**;

    (b)    The creation, handling, development, modification, or maintenance of **digital assets**; or

    (c)    The ongoing operation or maintenance of an **insured computer system** excluding the design, architecture, or configuration of an **insured computer system**.

(3) Computer Crime and Computer Attacks

An act, mistake or negligent error or omission in the operation of an **insured computer system** or in the handling of **digital assets** by **your** employee, a **BPO service provider,** or **outsourced IT service provider**, which fails to prevent or hinder any of the following attacks on an **insured computer system:**

    (a) A **denial of service attack;**

    (b) **Malicious code;**

    (c) **Unauthorized access**; or

    (d) **Unauthorized use.**

O.    **Criminal proceeding** means any governmental action for enforcement of criminal laws, including those offenses for which conviction could result in imprisonment and/or criminal fine.

P.    **Customer support and credit monitoring expenses** means those reasonable and necessary expenses which **you** incur, with the Company's prior written consent, for the provision of customer support activity in the event of a **privacy breach**, including the provision of credit file monitoring services and identity theft education and assistance for up to a period of twelve (12) months from the date of enrollment in such services.

Q.    **Cyber extortion expenses** means all reasonable and necessary costs and expenses which **you** incur, with the Company's prior written consent, as a direct result of a **cyber extortion threat**, other than **cyber extortion monies**.

R.    **Cyber extortion monies** means any funds or property which **you** pay, with the Company's prior written consent, to a person(s) or entity(ies) reasonably believed to be responsible for a **cyber extortion threat** insured under Coverage Agreement G, for the purpose of terminating such **cyber extortion threat**.

S.   **Cyber extortion threat** means a credible threat or series of related credible threats, including, but not limited to, a demand for **cyber extortion monies**, directed at **you** to:

   (1)   Release, divulge, disseminate, destroy or use the confidential information of a third party taken from **you** as a result of **unauthorized access** to, or **unauthorized use** of, an **insured computer system**;
   (2)   Introduce **malicious code** into an **insured computer system**;
   (3)   Corrupt, damage or destroy an **insured computer system**;
   (4)   Restrict or hinder access to an **insured computer system**, including, but not limited to the threat of a **denial of service attack**; or
   (5)   Electronically communicate with **your** customers and falsely claim to be **you** or to be acting under **your** direction in order to falsely obtain personal confidential information of **your** customers (also known as "pharming," "phishing," or other types of false communications).

T.   **Damages** means the amount of money which an **insured** is legally obligated to pay as a result of a covered **claim** under Coverage Agreement A or Coverage Agreement B, including judgments and any prejudgment or post-judgment interest awarded against the **insured** on that part of any judgment paid or to be paid by the Company, legal fees and costs awarded against an **insured** pursuant to such judgments, and settlements negotiated with the Company's consent.
**Damages** does not include:

   (1)   Taxes;
   (2)   Any amount for which an **insured** is absolved from legal responsibility to make payment to a third party;
   (3)   Amounts owed under contract;
   (4)   **Your** future profits or royalties or any return, withdrawal, restitution or reduction of **your** professional fees, profits or other charges;
   (5)   Punitive, liquidated or exemplary damages or the multiplied portion of multiplied damages;
   (6)   Fines, sanctions or penalties;
   (7)   Any matters that are deemed uninsurable under applicable law;
   (8)   The costs to comply with orders granting injunctive or non-monetary relief, including specific performance or any agreement to provide such relief;
   (9)   Disgorgement of any remuneration or financial advantage to which **you** were not legally entitled; or
   (10)  Settlements negotiated without the Company's consent.

U.   **Data** means any and all machine-readable information, including, but not limited to, ready-for-use programs, applications, account information, personal information, health and medical information, or electronic information subject to back-up procedures, irrespective of the way it is used and rendered.

V.   **Defense costs** means reasonable and necessary legal fees, costs and expenses incurred with the Company's consent in the investigation, defense and appeal of any covered **claim** under Coverage Agreement A, Coverage Agreement B, Coverage Agreement C, or Coverage Agreement D. **Defense costs** does not include any wages, salaries, fees, overhead or other charges incurred by, or paid to, any **insured** for any time spent in cooperating in the defense and investigation of any **claim** or potential **claim** under this Endorsement.

W.   **Delivered programs** means programs, applications, and software where the development stage has been finalized, having passed all test-runs, and been proven successful in a live environment.

X.   **Denial of service attack** means an event caused by unauthorized or unexpected interference or a malicious attack intended by the perpetrator to overwhelm the capacity of a **computer system**

by sending an excessive volume of electronic **data** to such **computer system** in order to prevent authorized access to such **computer system**.

Y. **Digital assets** means **data** and **computer programs** that exist in an **insured computer system**. **Digital assets** do not include **computer hardware**.

Z. **Digital assets loss** means reasonable and necessary expenses and costs which **you** incur to replace, recreate, or restore **digital assets** to the same state and with the same contents immediately before it was damaged, destroyed, altered, misused, or stolen, including expenses for materials and machine time. **Digital assets loss** also includes amounts representing employee work time to replace, recreate, or restore **digital assets**, which shall be determined on a predefined billable hours or per hour basis as based upon **your** schedule of employee billable hours.

AA. **Electronic media** means floppy disks, CD ROM's, hard drives, magnetic tapes, magnetic discs, or any other media on which electronic data is recorded or stored.

BB. **Endorsement period** means the period of coverage commencing on the effective date specified on this Endorsement and ending on the earlier of the termination, expiration or cancellation date of the policy to which this Endorsement attaches. **Endorsement period** does not include any extended reporting period.

CC. **Firmware** means the fixed programs that internally control basic low-level operations in a device.

DD. **Government investigation** means a formal investigation instituted against an **insured** by any federal, state or local government agency or authority, the subject matter of which is a **security breach** or **privacy breach**.

EE. **Identity theft** means the act of knowingly transferring or using, without lawful authority, a means of identification of any **key employee** or spouse of any **key employee**, with the intent to commit, or aid or abet another to commit, any unlawful activity that constitutes a violation of federal, state or local law.

FF. **Identity theft expenses** means, and is limited to, any of the following incurred by **your key employee** or by a spouse of **your key employee** as a result of **identity theft**:

    (1) The cost of notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors;
    (2) The cost of certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors;
    (3) Loan application fees for reapplying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information;
    (4) The cost of credit monitoring services and the cost of obtaining credit reports for up to 12 months from the date of **identity theft**; and
    (5) The cost of case management services for up to 12 months from the date of **identity theft**.

GG. **Income loss** means financial loss **you** sustain, as determined in accordance with the provisions of Coverage Agreement F(2) or Coverage Agreement H.

HH. **Insured** means the **named insured** and current executive officers, partners, directors, stockholders, trustees, or employees of the **named insured**, but only while such individuals are acting within the scope of their duties on behalf of the **named insured**.

II. **Insured computer system** means:

(1)     A **computer system** operated by and either owned by, or leased to, **you**;
(2)     With respect to Coverage Agreement B only, a **computer system** operated by a **BPO service provider** or **outsourced IT service provider** and used for the sole purpose of providing hosted computer application services to **you** or for processing, maintaining, hosting, or storing **your** electronic **data**, pursuant to a written contract with **you** for such services.

JJ.     **Internet** means the worldwide public network of computers which enables the transmission of electronic **data** between different users, including a private communications network existing within a shared or public network platform.

KK.     **Interruption expenses** means those expenses, excluding **special expenses**, which **you** incur in accordance with the provisions of Coverage Agreement F(2) or Coverage Agreement H, to:

(1)     Avoid or minimize the suspension of **your** business as a result of a total or partial interruption, degradation in service, or failure of an **insured computer system** caused directly by a **covered cause of loss** or an **act of cyber terrorism**, which **you** would not have incurred had no **covered cause of loss** or **act of cyber terrorism** occurred, including, but not limited to, the use of rented/leased external equipment, substitution of other work or production procedures, use of third party services, or additional staff expenditures or labor costs; and
(2)     Minimize or avoid a **covered cause of loss** or **act of cyber terrorism** and continue **your** business.

The amount of **interruption expenses** recoverable under paragraph (1) above shall in no case exceed the amount by which the covered **income loss** is reduced by such incurred expenses.

LL.     **Key employees** means **your** current directors, officers, or any natural person that possesses the exclusive right to hold, use, benefit from, enjoy, convey, transfer and otherwise dispose of **your** assets or properties

MM.     **Malicious code** means software intentionally designed to insert itself and damage a **computer system** without the owner's informed consent by a variety of forms including, but not limited to, virus, worm, Trojan horses, spyware, dishonest adware, and crimeware.

NN.     **Multimedia peril** means the release or display of any **electronic media** on **your internet** site or **print media** for which **you** are solely responsible, which directly results in any of the following:

(1)     Any form of defamation or other tort related to the disparagement or harm to the reputation or character of any person or organization, including libel, slander, product disparagement, or trade libel,
(2)     Invasion, infringement or interference with an individual's right of privacy including false light, intrusion upon seclusion, commercial misappropriation of name, person, or likeness, and public disclosure of private facts;
(3)     Plagiarism, piracy, or misappropriation of ideas under an implied contract;
(4)     Infringement of copyright, trademark, trade name, trade dress, title, slogan, service mark or service name; or
(5)     Domain name infringement or improper deep-linking or framing.

OO.     **Named insured** means the person or organization listed as such on the Cyber Liability Declarations.

PP.     **Notification** means **notification** to individuals in the event of a **security breach** or a **privacy breach**.

QQ. **Notification expenses** means those reasonable and necessary expenses which **you** incur, with the Company's prior written consent, to notify affected individuals in the event of a **security breach** or **privacy breach**. **Notification expenses** include, but is not limited to:

   (1) Legal expenses;
   (2) Computer forensic and investigation fees;
   (3) Public relations expenses;
   (4) Postage expenses; and
   (5) Related advertising expenses.

RR. **Operational programs** means programs and software which are ready for operational use, having been fully developed, tested, and accepted by **you**.

SS. **Outsourced IT service provider** means a third party independent contractor that provides information technology services for **your** benefit under a written contract with **you**. **Outsourced IT service provider** services includes, but is not limited to, hosting, security management, co-location, and **data** storage.

TT. **PCI Data Security Standards** (known as "PCI DSS") means the published data security standards in effect now, or as hereafter amended, which all merchants and processors must follow when storing, processing and transmitting cardholder data.

UU. **PCI DSS assessment** means a monetary fine or penalty assessed against an **insured** by an **acquiring bank** or **card association** as a result of a **security breach** or **privacy breach**.

VV. **Period of indemnity** means the period commencing with the earlier of the date of **notification** or the first publication of an **adverse media report** (whichever applies), and ending on the earlier of: (1) the date that gross revenues are restored to the level they had been prior to **notification** or the first **adverse media report** (whichever applies); or (2) One hundred and eighty (180) consecutive days after the notice of **claim** under Coverage Agreement I is received by the Company.

WW. **Period of restoration** means the period of time that commences on the date when the interruption, degradation, or failure of an **insured computer system** began and ends on the earlier of:

   (1)   The date when the **insured computer system** is restored or could have been repaired or restored to the same condition, functionality, and level of service that existed prior to the **covered cause of loss** or the **act of cyber terrorism** with reasonable diligence, plus up to thirty (30) additional consecutive days after the restoration of the **insured computer system** to allow for restoration of **your** business; or
   (2)   One hundred and twenty (120) consecutive days after the notice of **covered cause of loss** or **act of cyber terrorism** is received by the Company.

XX. **Print media** means newspapers, newsletters, magazines, books, and literary works in any form, brochures or other types of publications, and advertising materials, including packaging, photographs, and digital images.

YY. **Privacy breach** means any of the below, whether actual or alleged, but only if committed or allegedly committed by **you** or by others acting on **your** behalf for whom **you** are legally responsible, including **BPO service providers** and **outsourced IT service providers**:

   (1) A common law breach of confidentiality, infringement, or violation of any right to privacy, including, but not limited to, a breach of **your** privacy policy, false light, intrusion upon a person's seclusion, commercial misappropriation of name, person, or likeness, or public

disclose of a person's private information; or

(2) Any breach of privacy regulations, as they currently exist and as amended, associated with the confidentiality, access, control, and use of personally identifiable, non-public information, including, but not limited to:

    (a) Health Insurance Portability and Accountability Act of 1996 (Public Law 104- 191), known as HIPAA, and related state medical privacy laws;

    (b) Gramm-Leach-Bliley Act of 1999 (G-L-B), also known as the Financial Services Modernization Act of 1999;

    (c) State and federal statutes and regulations regarding the security and privacy of consumer information;

    (d) Governmental privacy protection regulations or laws associated with the control and use of personal information;

    (e) Privacy provisions of consumer protection laws, including the Federal Fair Credit Reporting Act (FCRA) and similar state laws;

    (f) Title XIII, the Health Information Technology for Economic and Clinical Health Act ("HITECH"), of the American Recovery and Reinvestment Act of 2009 ("ARRA").

A series of continuing **privacy breaches** or related or repeated **privacy breaches** will be considered a single **privacy breach** and will be deemed to have occurred when the first of such **privacy breaches** occurred.

ZZ. **Privacy breach response costs** means those reasonable and necessary fees and expenses which **you** incur, with the Company's prior written consent, for the employment of a public relations consultant prior to or following the publication of an **adverse media report**, if **you** reasonably consider such action is necessary in order to avert or mitigate any material damage to **your reputation** or brands, which results or reasonably will result from the **adverse media report**.

AAA. **Programming error** means an error which occurs during the development or encoding of a computer program, software, or application, which would, when in operation, result in a malfunction or incorrect operation of a **computer system**.

BBB. **Property damage** means injury to tangible property, including all resulting loss of use of that property, and loss of use of tangible property that is not physically injured. **Data** is not considered tangible property.

CCC. **Public relations expenses** means reasonable and necessary expenses incurred by **you** to re-establish **your reputation** which was damaged as a direct result of an **adverse media report**.

DDD. **Regulatory compensatory award** means a sum of money which an **insured** is legally obligated to pay as an award or fund for affected individuals, including a regulatory agency's monetary award to a third party, due to an adverse judgment or settlement arising out of a **government investigation**. **Regulatory compensatory award** does not include a criminal penalty or fine issued by a regulatory agency of any kind, including federal, state, or local governmental agencies.

EEE. **Regulatory fines and penalties** means any civil fines and penalties imposed against an **insured** as a result of a **government investigation**.

FFF. **Reputation** means the estimation of trust that patients, customers or clients have in doing business with **you** or in purchasing **your** products or services.

GGG. **Retroactive date** means the date specified as such on this Endorsement, on or after which any **multimedia peril, security and privacy wrongful act, security breach, privacy breach, covered**

cause of loss, **cyber extortion threat, act of cyber terrorism, adverse media report** or **identity theft** must have taken place in order to be considered for coverage under this Endorsement.

HHH. **Security and privacy wrongful act** means any of the following acts, whether actual or alleged, but only if committed or allegedly committed by an **insured**:

(1) Failure to prevent or hinder **a security breach** that in turn results in:

   (a) The alteration, copying, corruption, destruction, deletion, or damage to electronic **data** stored on an **insured computer system**;

   (b) Theft, loss or unauthorized disclosure of electronic and non-electronic confidential commercial, corporate, personally identifiable, or private information that is in **your** care, custody or control;

   (c) Theft, loss, or unauthorized disclosure of electronic and non-electronic confidential commercial, corporate, personally identifiable, or private information that is in the care, custody or control of a **BPO service provider** or **outsourced IT service provider** that is holding, processing, or transferring such information on **your** behalf; provided, however, that the theft, loss or unauthorized disclosure occurs while **your** written contract with such **BPO service provider** or **outsourced IT service provider** is in effect; or

   (d) **Unauthorized use** of, or **unauthorized access** to, a **computer system** other than an **insured computer system**.

(2) Failure to timely disclose a **security breach** affecting personally identifiable, nonpublic information or the failure to dispose of personally identifiable, nonpublic information within the required time period, in violation of privacy regulations in effect now or in the future;

(3) Failure to prevent the transmission of **malicious code** or **computer virus** from an **insured computer system** to the **computer system** of a third party;

(4) A **privacy breach**;

(5) Failure to prevent or hinder participation by an **insured computer system** in a **denial of service attack** directed against **internet** sites or the **computer system** of any third party; or

(6) Loss of employee information.

III. **Security breach** means:

(1) **Unauthorized access** to, or **unauthorized use** of, an **insured computer system**, including **unauthorized access** or **unauthorized use** resulting from the theft of a password from an **insured computer system** or from any **insured**;

(2) A **denial of service attack** against an **insured computer system**; or

(3) Infection of an **insured computer system** by **malicious code** or the transmission of **malicious code** from an **insured computer system**,

whether any of the foregoing is a specifically targeted attack or a generally distributed attack. A series of continuing **security breaches**, related or repeated **security breaches**, or multiple **security breaches** resulting from a continuing failure of computer security will be considered a single **security breach** and will be deemed to have occurred when the first of such **security breaches** occurred.

JJJ. **Special expenses** means reasonable and necessary costs and expenses which **you** incur to:

(1) Prevent, preserve, minimize, or mitigate any further damage to **digital assets**, including the reasonable and necessary fees and expenses of specialists, outside consultants, or forensic experts **you** retain;

(2) Preserve critical evidence of any criminal or malicious wrongdoing;

    (3)    Purchase replacement licenses for **computer programs** because the copy protection system and/or access control software was damaged or destroyed by a **covered cause of loss** or an **act of cyber terrorism**; or

    (4)    Notify customers of a total or partial interruption, degradation in service, or failure of an **insured computer system** resulting from a **covered cause of loss** or an **act of cyber terrorism.**

KKK.  **Unauthorized access** means the gaining of access to a **computer system** by an unauthorized person or persons.

LLL.  **Unauthorized use** means the use of a **computer system** by unauthorized persons or authorized persons in an unauthorized manner.

MMM. **Waiting period** means:

    (1)    With respect to Coverage Agreement F(2) and Coverage Agreement H, the 8 hour period which must elapse before **income loss, interruption expenses** and/or **special expenses** may be payable. The **waiting period** applies to each **period of restoration.**

    (2)    With respect to Coverage Agreement I, the two week period which must elapse after **notification**, or in the event of an **adverse media report**, after publication of the first **adverse media report**, before **brand loss** may be payable. The **waiting period** applies to each **period of indemnity.**

NNN.  **You** and **your** mean the **named insured.**

## SECTION VI - NOTICE PROVISIONS

A.    NOTICE OF A CLAIM

    (1)    As a condition precedent to coverage under Coverage Agreement A, B, C or D, the **insured** must give the Company written notice of any **claim** made against the **insured** no later than sixty (60) days after the **claim** is first made against the **insured.**

    (2)    As a condition precedent to coverage under Coverage Agreement E, F, G, H, I or J, **you** must give the Company written notice of **your claim** during the **endorsement period**, but no later than 60 days from the date any **insured** first discovers the event or incident giving rise to such **claim.**

    (3)    **You** must provide the Company with copies of all documentation comprising the **claim** as well as any authorization, cooperation, or assistance as the Company may require.

    (4)    The Company will not be obligated to pay any amounts incurred prior to notice of a **claim** to the Company or amounts incurred without the Company's prior written consent.

B.  NOTICE OF A POTENTIAL CLAIM

If, during the **endorsement period**, any **insured** first becomes aware of any facts or circumstances which could give rise to a **claim** covered under this Endorsement, and if the **insured** provides the Company with written notice during the **endorsement period** of:

(1) The details regarding such facts or circumstances;
(2) The nature of the loss incurred;
(3) The identity of the potential claimant(s) involved;
(4) The manner in which the **insured** first became aware of the facts or circumstances; and

(5) The consequences which have resulted or may result,

then any **claim** subsequently made arising out of such reported facts or circumstances will be deemed to be a **claim** first made on the date notice complying with the foregoing requirements was first received by the Company.

## SECTION VII - LOSS DETERMINATION

### A.  LOSS OF DIGITAL ASSETS

For any and all coverage provided under Coverage Agreement F(1), **digital assets loss** will be determined as follows:

(1)     If the impacted **digital asset** was purchased from a third party, the Company will pay only the lesser of the original purchase price of the **digital asset** or the reasonable and necessary **digital assets loss**.

(2)     If it is determined that the **digital assets** cannot be replaced, restored or recreated, then the Company will only reimburse the actual and necessary **digital assets loss** incurred up to such determination.

### B.     NON-PHYSICAL BUSINESS INTERRUPTION AND EXTRA EXPENSE AND CYBER TERRORISM

For any and all coverage provided under Coverage Agreement F(2) or Coverage Agreement H, **income loss** will be determined as the reduction of **your** income during the **period of restoration**, which is:

(1)     **Your** net income (net profit or loss before income taxes) that would have been reasonably projected, but which has been lost directly as a result of a total or partial interruption, degradation in service or failure of an **insured computer system** caused directly by a **covered cause of loss** or an **act of cyber terrorism**, whichever applies. The revenue projection will take into account the prior experience of **your** business preceding the date of the **covered cause of loss** or the **act of cyber terrorism** and the probable experience had no **covered cause of loss** or **act of cyber terrorism** occurred. Revenues include the amount of money paid or payable to **you** for goods, products or services sold, delivered or rendered in the normal course of **your** business. Revenue projection will be reduced by the extent to which **you** use substitute methods, facilities or personnel to maintain **your** revenue stream. The Company will take into consideration **your** documentation of the trends in **your** business and variations in, or other circumstances affecting, **your** business before or after the **covered cause of loss** or the **act of cyber terrorism**, which would have affected **your** business had no **covered cause of loss** or **act of cyber terrorism** occurred; and

(2)     Any fixed operating expenses (including ordinary payroll) incurred, but only to the extent that such operating expenses must continue during the **period of restoration**.

### C.     BRANDGUARD

For any and all coverage provided under Coverage Agreement I, **brand loss** will be determined as follows:

The revenue projection required to calculate **brand loss** will take into account the prior experience of **your** business preceding the date of the **adverse media report** or **notification**, whichever applies, and the probable experience had no **adverse media report** been published or **notification** occurred. Revenues include the amount of money paid or payable to **you** for goods, products or services sold, delivered or rendered in the normal course of **your** business. Revenue projection will be reduced by the

extent to which **you** use substitute methods, facilities, or personnel to maintain its revenue stream. The Company will take into consideration **your** documentation of the trends in **your** business and variations in, or other circumstances affecting, **your** business before or after the **adverse media report** or **notification**, which would have affected **your** business had no **adverse media report** been published or **notification** occurred. Any fixed operating expenses (including ordinary payroll) incurred will be considered in calculating **brand loss**, but only to the extent that such operating expenses must continue during the **period of indemnity**.

## SECTION VIII - EXTENDED REPORTING PERIOD

A.    AUTOMATIC EXTENDED REPORTING PERIOD

In the event of non-renewal or termination of this Policy for any reason other than non-payment of premium, the Company will provide an Automatic Extended Reporting Period of sixty (60) days in which **claims** otherwise covered by this Endorsement may be reported.  Such Automatic Extended Reporting Period will commence immediately upon termination or expiration of this Policy and will apply to:

(1)    A **claim** under Coverage Agreement A, B, C, or D which:

    (a)    Arises out of an actual or alleged **multimedia peril, security and privacy wrongful act, security breach** or **privacy breach**, whichever applies, that takes place or first commences on or after the **retroactive date**, but prior to the expiration or termination of the Policy; and

    (b)    Is first made against an **insured** during the Automatic Extended Reporting Period; and

    (c)    Is reported in writing to the Company during the Automatic Extended Reporting Period.

(2)    A **claim** under Coverage Agreement E, F, G, H, I or J which:

    (a)    Arises out of an **adverse media report, security breach, privacy breach, covered cause of loss, cyber extortion threat, act of cyber terrorism**, or **identity theft**, whichever applies, that takes place or first commences on or after the **retroactive date**, but prior to the expiration or termination of the Policy; and

    (b)    Is reported in writing to the Company during the Automatic Extended Reporting Period.

B.    SUPPLEMENTAL EXTENDED REPORTING PERIOD

(1)    **You** shall have the option, upon payment of the required additional premium, to purchase a Supplemental Extended Reporting Period following the effective date of non-renewal or termination of coverage. Within thirty (30) days of the effective date of non-renewal or termination of coverage, the Company will provide **you** with written notice of the option to purchase the Supplemental Extended Reporting Period. Such written notice will be mailed or delivered to **you** at the address listed on the Policy Declarations Page and will contain the duration of, and premium for, the Supplemental Extended Reporting Period.  The Supplemental Extended Reporting Period will extend the time during which **claims** otherwise covered by this Endorsement may be made and reported.  If the Supplemental Extended Reporting Period is purchased, the Automatic Extended Reporting Period will be included within the Supplemental Extended Reporting Period. Such Supplemental Extended Reporting Period will apply only to:

    (a)    A **claim** under Coverage Agreement A, B, C, or D which:

        (i)    Arises out of an actual or alleged **multimedia peril, security and privacy wrongful act, security breach** or **privacy breach**, whichever applies, that

takes place or first commences on or after the **retroactive date**, but prior to the expiration or termination of the Policy; and

 (ii) Is first made against an **insured** during the Supplemental Extended Reporting Period; and

 (iii) Is reported in writing to the Company no later than 60 days after the **claim** is first made against an **insured**.

 (b) A **claim** under Coverage Agreement E, F, G, H, I or J which:

  (i) Arises out of an **adverse media report**, **security breach**, **privacy breach**, **covered cause of loss**, **cyber extortion threat**, **act of cyber terrorism**, or **identity theft**, whichever applies, that takes place or first commences on or after the **retroactive date**, but prior to the expiration or termination of the Policy; and

  (ii) Is reported in writing to the Company during the Supplemental Extended Reporting Period, but no later than 60 days from the date any **insured** discovers the **adverse media report**, **security breach**, **privacy breach**, **covered cause of loss**, **cyber extortion threat**, **act of cyber terrorism**, or **identity theft**, whichever applies.

(2) The right to purchase the Supplemental Extended Reporting Period shall terminate unless written notice of such election, together with full payment of the required additional premium due, is received by us no later than the later of:

 (a) sixty (60) days after the effective date of non-renewal or termination of this Policy; or

 (b) thirty (30) days after the date of the Company's notice to **you** of the availability of, and premium for, the Supplemental Extended Reporting Period.

(3) The additional premium for the Supplemental Extended Reporting Period shall be a percentage of the rates for such coverage in effect on the date the Policy was issued or last renewed.

(4) If **you** do not elect to purchase a Supplemental Extended Reporting Period, then coverage under this Endorsement will terminate at the end of the Automatic Extended Reporting Period. If **you** elect to purchase a Supplemental Extended Reporting Period, coverage will terminate at the end of the Supplemental Extended Reporting Period.

(5) Once in effect, the Supplemental Extended Reporting Period may not be canceled, and the entire premium will be deemed fully earned. We will not be liable to return any portion of the premium to **you** for such Supplemental Extended Reporting Period. If **you** have not paid the required additional premium for the Supplemental Extended Reporting Period when due, then such Supplemental Extended Reporting Period shall be void.

C. All terms and conditions of this Endorsement, including the limits of insurance, will continue to apply during any extended reporting period.

D. The existence of any extended reporting period will not increase or reinstate the limits of insurance shown in the Schedule.

## SECTION IX - OTHER INSURANCE

The coverage provided by this Endorsement will be excess insurance over any other valid and collectible insurance available, including any self insured retention or deductible portion thereof, whether such insurance is

stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such insurance specifically applies as excess insurance over the insurance provided under this Endorsement.

## SECTION X - ARBITRATION

Notwithstanding any other provision of this Endorsement or the Policy, any irreconcilable dispute between the Company and an **insured** may be submitted to arbitration. The **insured** and the Company must mutually agree to arbitration and the arbitration procedure. Judgment upon the award may be entered in any court having jurisdiction. The arbitrator has the power to decide any dispute between the Company and the **insured** concerning the application or interpretation of this Endorsement. However, the arbitrator shall have no power to change or add to the provisions of this Endorsement. The **insured** and the Company will share equally in the cost of arbitration.


**UTICA FIRST**
INSURANCE COMPANY

**Policy Number:**   BOP 4466431 00

# CYBER LIABILITY INSURANCE
## SUPPLEMENTAL DECLARATIONS
### (Claims-Made and Reported Coverage)

## NOTICE TO POLICYHOLDERS REGARDING DEFENSE WITHIN LIMITS

**DEFENSE COSTS PAID UNDER YOUR CYBER LIABILITY INSURANCE WILL BE INCLUDED WITHIN, AND MAY COMPLETELY EXHAUST, THE LIMTIS OF LIAIBILITY SHOWN BELOW.**

**Named Insured:**

**Cyber Liability Coverage Period:**

From   09/03/19   to   09/03/20   , both days at 12:01 a.m. local standard time at your mailing address shown on the Declarations Page of this policy.

**Retroactive Date:**  09/03/19

**Cyber Liability Limits:**

The Cyber Liability limits of insurance are shown below. Such limits are in addition to, and will not erode, the limits of liability provided elsewhere under your Policy.

| Coverage | Limits | |
|---|---|---|
| Multimedia Liability Coverage | $100,000 | Each claim |
| Security and Privacy Liability Coverage | $100,000 | Each claim |
| Privacy Regulatory Defense and Penalties Coverage | $100,000 | Each claim |
| PCI DDS Assessment Coverage | $100,000 | Each claim |
| Privacy Breach Response Costs, Notification Expenses and Customer Support and Credit Monitoring Expenses Coverage | $100,000 | Each claim |
| Network Asset Protection Coverage | $100,000 | Each claim |
| Cyber Extortion Coverage | $100,000 | Each claim |
| Cyber Terrorism Coverage | $100,000 | Each claim |
| BrandGuard Coverage | $100,000 | Each claim |
| Business Owner ID Theft Recoverage Coverage | $100,000 | Each claim |
| Aggregate Limit | $100,000 | |

**UTICA FIRST**
INSURANCE COMPANY

*CONSTITUTED IN OHIO AS*
**UTICA FIRST INSURANCE COMPANY (MUTUAL)**
P.O. Box 851, Utica, NY 13503-0851

# Important Notice About Your Privacy

At Utica First our goal is to professionally and respectfully serve the personal and business insurance needs of our customers. Information that you provide or we collect about you when you apply for insurance or when you file a claim helps us to achieve that goal. You provide us with most of the information about you that we use in evaluating your application and servicing your insurance policy or your claim. This enables us to provide coverage to you at the best price or to service your claim promptly and fairly.

We know that the trust of our customers is our most important asset. This includes the trust that we will keep the information about you secure and treat it **only as permitted by law**. This disclosure and notice tells you about the privacy policy we have adopted and the practices we use in handling the information you furnished to us.

> **We do not disclose any non-public personal information about our customers or former customers to anyone, except as permitted by law.**

**What types of information does Utica First collect about you?**
We collect non-public personal information about you from the following sources:
* Information we receive from you on applications and other forms.
* Information about your transactions with us, our affiliates, or others.
* Information we receive from inspection or audit functions and, if applicable, state motor vehicle records.
* Information we receive from a consumer reporting agency.

**What information do we share with our affiliated companies?**
* We share non-public personal information about our customers or former customers with our affiliated companies only as permitted by law.
* In some cases, this may mean information can be disclosed to our affiliated companies without your authorization.

**What information do we disclose to nonaffiliated third parties?**
* We share non-public personal information about customers or former customers to nonaffiliated third parties only as permitted by law.
* We do not disclose your non-public personal information to nonaffiliated third parties for purposes of marketing the products or services of any third party.
* In some cases, this may mean information can be disclosed to nonaffiliated third parties without your authorization.

**What measures are taken by Utica First to protect your information?**
* We limit access to non-public personal information about you to those employees who need to know that information to provide you with products or to provide you benefits or services under them.
* We maintain physical, electronic, and procedural safeguards that comply with state and federal regulations to guard your non-public personal information.
* We limit the collection and disclosure of non-public information to information necessary and relevant to the conduct of our business.
* We collect information only by legitimate means.

> **You have the right to obtain access to certain items of information we have collected about you, and you have the further right to request correction of information if you feel it is inaccurate.**

> **We would be pleased to tell you more about our policies and procedures for the privacy of your information. Questions or requests about your privacy should be address to:**
> **Privacy Officer, Utica First Insurance Company, P.O. Box 851, Utica, NY 13503-0851**
> **Remember to include your name, address, policy number or claim number, and daytime phone number.**

**IMPORTANT NOTICE**
**IN COMPLIANCE WITH THE REQUIREMENTS OF THE FAIR CREDIT REPORTING ACT (PUBLIC LAW 91-508) UTICA FIRST INSURANCE COMPANY ADVISES THAT AS PART OF OUR ROUTINE PROCEDURE IN REVIEWING APPLICATIONS FOR INSURANCE OR RENEWALS OF INSURANCE POLICIES, WE MAY PROCURE A CONSUMER REPORT INCLUDING INFORMATION AS TO THE CONSUMER'S CHARACTER, GENERAL REPUTATION, PERSONAL CHARACTERISTICS OR MODE OF LIVING. IF SUCH INSURANCE IS FOR AN INDIVIDUAL AND IS PRIMARILY FOR PERSONAL, FAMILY, OR HOUSEHOLD PURPOSES, SUCH INFORMATION MAY BE OBTAINED THROUGH PERSONAL INTERVIEWS WITH NEIGHBORS, FRIENDS, OR OTHERS WITH WHOM THE CONSUMER IS ACQUAINTED.
UPON REQUEST TO UTICA FIRST INSURANCE COMPANY AS NOTED ABOVE, WE WILL PROVIDE IN WRITING A COMPLETE AND ACCURATE DISCLOSURE OF THE NATURE AND SCOPE OF THE CONSUMER REPORT REQUESTED OR ADVISE THAT NONE WAS REQUESTED.**

PRIV 0401



## PLEASE READ THE FOLLOWING INFORMATION
## REGARDING YOUR SYSTEMS BREAKDOWN COVERAGE

Thank you for purchasing your Business Owners Policy (BOP) or Package Policy (SMP - CPP) through Utica First Insurance Company.  If Boiler coverage is indicated in your Commercial Property policy by attachments BP001 or CP001, Systems Breakdown Coverage is a part of your policy.  An important benefit you receive from this coverage is operating certificate inspections for those objects requiring jurisdictional inspections.

Most states, and many cities, have laws that require operating certificates for certain types of boilers, pressure vessels, and refrigerating systems.  In order to obtain these certificates, the jurisdictional object must have a physical inspection.  In most jurisdictions we can make these inspections if we provide the Systems Breakdown Coverage.  We provide this service at No Additional Cost to our policyholders.

The following cities will not accept insurance company inspections.  You must contact the appropriate authority to get the necessary inspection.

*    **Chicago, Denver, Detroit, Miami, St. Louis, and Tulsa**

## IF YOU OWN OR OPERATE OBJECTS REQUIRING OPERATING CERTIFICATES,
## PLEASE COMPLETE THE FOLLOWING SECTION AND
## RETURN TO THE INDICATED ADDRESS

Date: _____

Named Insured: _____

Policy Number: _____

Location of Equipment:_____

Contact: _____

Telephone Number:  (____) _____

Please return to:      **Utica First Insurance Company
P.O. Box 851
Utica, NY  13503-0851**

# EXHIBIT B



**COMMONWEALTH OF PENNSYLVANIA**

OFFICE OF THE GOVERNOR

### ORDER OF

### THE GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA REGARDING THE CLOSURE OF ALL BUSINESSES THAT ARE NOT LIFE SUSTAINING

*WHEREAS, the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared a novel coronavirus ("COVID-19") a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and*

*WHEREAS, as of March 6, 2020, I proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa. C.S. § 7301(c); and*

*WHEREAS, I am charged with the responsibility to address dangers facing the Commonwealth of Pennsylvania that result from disasters. 35 Pa. C.S. § 7301(a); and*

*WHEREAS, in addition to general powers, during a disaster emergency I am authorized specifically to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein; and suspend or limit the sale, dispensing, or transportation of alcoholic beverages, firearms, and combustibles. 35 Pa. C.S. § 7301(f); and*

*WHEREAS, in executing the extraordinary powers outlined above, I am further authorized during a disaster emergency to issue, amend and rescind executive orders, proclamations and regulations and those directives shall have the force and effect of law. 35 Pa. C.S. § 7301(b); and*

*WHEREAS, in addition to my authority, my Secretary of Health has the authority to determine and employ the most efficient and practical means for the prevention and suppression of disease. 71 P.S. § 532(a), 71 P.S. 1403(a); and*

*WHEREAS, these means include isolation, quarantine, and any other control measure needed. 35 P.S. § 521.5.*

*NOW THEREFORE, pursuant to the authority vested in me and my Administration by the laws of the Commonwealth of Pennsylvania, I do hereby ORDER and PROCLAIM as follows:*

Section 1:     *Prohibition on Operation of Businesses that are not Life Sustaining*

*All prior orders and guidance regarding business closures are hereby superseded.*

*No person or entity shall operate a place of business in the Commonwealth that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work from home), so long as social distancing and other mitigation measures are followed in such operations.*

*Life sustaining businesses may remain open, but they must follow, at a minimum, the social distancing practices and other mitigation measures defined by the Centers for Disease Control to protect workers and patrons. A list of life sustaining businesses that may remain open is attached to and incorporated into this Order.*

*Enforcement actions will be taken against non-life sustaining businesses that are out of compliance effective March 21, 2020, at 12:01 a.m.*

*Section 2:    Prohibition on Dine-In Facilities including Restaurants and Bars*

*All restaurants and bars previously have been ordered to close their dine-in facilities to help stop the spread of COVID-19.*

*Businesses that offer carry-out, delivery, and drive-through food and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons. Enforcement actions will be taken against businesses that are out of compliance effective March 19, 2020, at 8 p.m.*

*Section 3:    Effective Date and Duration*

*This order is effective immediately and will remain in effect until further notice.*

*GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this nineteenth day of March two thousand twenty, the year of the commonwealth the two hundred and forty-fourth.*

*TOM WOLF*
*Governor*

# EXHIBIT C

**pennsylvania**
DEPARTMENT OF HEALTH

# Order of the Secretary of the Pennsylvania Department of Health Regarding the Closure of All Businesses That Are Not Life Sustaining

To protect the public from the spread of Coronavirus (COVID-19), it is necessary that no person or entity shall operate a place of business that is not a life sustaining business regardless of whether the business is open to members of the public. Therefore, under the authority granted to me by law, I hereby order:

1) No person or entity shall operate a place of business that is not a life sustaining business regardless of whether the business is open to members of the public. This prohibition does not apply to virtual or telework operations (e.g., work from home). Life sustaining businesses may remain open, but they must employ social distancing practices and other mitigation measures defined by the Centers for Disease Control to protect their workers and patrons. A list of life sustaining businesses that may remain open is attached to and incorporated into this Order.

   Enforcement actions will be taken against non-life-sustaining businesses that are out of compliance effective March 21, 2020, at 12:01 a.m.

2) All restaurants and bars are ordered to close their dine-in facilities to help stop the spread of COVID-19. Businesses that offer carry-out, delivery, and drive-through food and beverage service may continue, so long as social distancing and other mitigation measures are employed to protect workers and patrons.

   Enforcement actions will be taken against businesses that are out of compliance effective March 19, 2020, at 8 p.m.

COVID-19 is a contagious disease that is rapidly spreading from person-to-person. People infected are capable of exposing others to COVID-19 even if their symptoms are mild, such as a cough. Additionally, exposure is possible by touching a surface or object that has the virus on it and then touching one's mouth, nose, or eyes. Spread by persons who are asymptomatic has not been ruled out.

Multiple areas of the United States are experiencing "community spread" of COVID-19, which means that the illness is being transmitted through unknown sources, not from known areas of infection. Mass gatherings increase the risk of transmission and community spread. Case counts of COVID-19 are rapidly increasing in the urban areas of the Commonwealth and especially our eastern counties, and cases are beginning to appear in other counties suggesting that community spread is occurring.

Symptoms of COVID-19 may include fever, cough, and shortness of breath. Older adults and people who have serious chronic medical conditions are at a higher risk for serious illness. Early symptoms may also include chills, body aches, sore throat, headache, diarrhea, nausea/vomiting, and runny nose.

On March 6, 2020, the Governor issued a Proclamation of Disaster Emergency due to the emergence of COVID-19 in the United States and the Commonwealth of Pennsylvania. Since the Commonwealth of Pennsylvania confirmed its first case of COVID-19, positive cases have continued to rise. As of March 19, 2020, the Commonwealth of Pennsylvania has 185 positive cases.

Non-life sustaining businesses present the opportunity for unnecessary gatherings, personal contact and interaction that will increase the risk of transmission and the risk of community spread of COVID-19.

COVID-19 is a threat to the public's health, for which the Secretary of Health may order general control measures, including, but not limited to, closure, isolation, and quarantine. This authority is granted to the Secretary of Health pursuant to Pennsylvania law. *See* Section 5 of the Disease Prevention and Control Law, 35 P.S. §§ 521.1; 521.5, sections 2102(a) and 2106 of the Administrative Code of 1929, 71 P.S. § 532(a) and 536 and the Department of Health's (Department) regulations found at 28 Pa. Code §§ 27.60-27.68 (relating to disease control measures; isolation; quarantine; movement of persons subject to isolation or quarantine; and release from isolation and quarantine). Particularly, the Department has the authority to take any disease control measure appropriate to protect the public from the spread of infectious disease. *See* 35 P.S. §§ 521.5; 71 P.S. § 532(a); and 1402(a); 28 Pa. Code § 28.60. The Department determines that the appropriate disease control measure based upon COVID-19, the manner of its spread in the Commonwealth and in the world, and its danger to Pennsylvanians, is the closure of non-life sustaining businesses as outlined in this order to prevent and control the spread of disease.

Accordingly, the closure of non-life sustaining businesses is necessary to protect the public's health. This Order shall take effect immediately and remain in full force and effect until further notice.

Rachel Levine, MD
Secretary of Health

# EXHIBIT D

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| MACMILES, LLC D/B/A | : | |
| GRANT STREET TAVERN | : | |
| 310 Grant Street, Ste. 106 | : | |
| Pittsburgh, PA  15219-2213, | : | |
| | : | |
| Plaintiff, | : | No.: GD-20-7753 |
| | : | |
| vs. | : | |
| | : | Hon. Christine Ward |
| ERIE INSURANCE EXCHANGE | : | |
| 100 Erie Insurance Place | : | |
| Erie, PA  16530, | : | **Memorandum and Order of Court** |
| | : | |
| Defendant. | : | |

*Counsel for Plaintiff*:
John Goodrich
Lauren Nichols
429 Fourth Avenue, Suite 900
Pittsburgh PA, 15219

James Haggerty
1835 Market Street, Suite 2700
Philadelphia, PA 19103

Scott Cooper
209 State Street
Harrisburg, PA 17101

Jonathan Shub
Kevin Laukaitis
134 Kings Highway Wast, 2nd Floor
Haddonfeild, NJ 08033

Michael Boni
Joshua Snyder
15 St. Asaphs Road
Bala Cynwyd, PA 19004

*Counsel for Defendant*:
Richard DiBella
Tara Maczuzak
Jason Peck

20 Stanwix Street, 11th Floor
Pittsburgh, PA 15222

Robert Horst
Robert Runyon, III
Matthew Malamud
400 Maryland Drive
Fort Washington, PA 19304

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| MACMILES, LLC D/B/A<br>GRANT STREET TAVERN<br>310 Grant Street, Ste. 106<br>Pittsburgh, PA 15219-2213, | :<br>:<br>:<br>:<br>: |
| Plaintiff, | : No.: GD-20-7753 |
| vs. | :<br>: |
| ERIE INSURANCE EXCHANGE<br>100 Erie Insurance Place<br>Erie, PA 16530, | :<br>:<br>:<br>: |
| Defendant. | : |

## MEMORANDUM AND ORDER OF COURT

### I. The Parties

MacMiles, LLC d/b/a Grant Street Tavern (hereinafter "Plaintiff") is a restaurant and bar located in the Downtown neighborhood of Pittsburgh, Allegheny County, Pennsylvania.

Erie Insurance Exchange (hereinafter "Defendant") is a reciprocal insurance exchange organized under the laws of Pennsylvania with its principal place of business in Erie, Pennsylvania.

### II. Introduction

Defendant issued Plaintiff an Ultra Plus Commercial General Liability Policy for the policy period between September 12, 2019 to September 12, 2020 (hereinafter "the insurance contract"). The insurance contract is an all-risk policy, which provides coverage for any direct physical loss or direct physical damage unless the loss or damage is specifically excluded or limited by the insurance contract.

In March and April of 2020, in order to prevent and mitigate the spread of the coronavirus disease "COVID-19," Governor Tom Wolf ("Governor Wolf") issued a series of mandates restricting the operations of certain types of businesses throughout the Commonwealth of Pennsylvania (the "Governor's orders"). On March 6, 2020, Governor Wolf issued an order declaring a Proclamation of Disaster Emergency. On March 19, 2020, Governor Wolf issued an order requiring all non-life sustaining businesses in Pennsylvania to cease operations and close physical locations. On March 23, 2020, Governor Wolf issued an order directing Pennsylvania citizens in particular counties to stay at home except as needed to access life sustaining services. Then, on April 1, 2020, Governor Wolf extended the March 23, 2020 order, and directed all of Pennsylvania's citizens to stay at home. As of April 1, 2020, at least 5,805 citizens of Pennsylvania contracted COVID-19 in sixty counties across the Commonwealth, and seventy-four (74) citizens died.[1] Unfortunately, since April 1, 2020, the number of positive cases and deaths from COVID-19 has increased dramatically.[2]

As a result of the spread of COVID-19 and the Governor's orders, Plaintiff suspended its business operations. Plaintiff thereafter submitted a claim for coverage under its insurance contract with Defendant. Defendant denied Plaintiff's claim.

On September 29, 2020, Plaintiff filed a complaint in the Court of Common Pleas of Allegheny County. In its complaint, Plaintiff asserted the following counts: [a] count one is for declaratory judgment in regards to the business income protection provision of the insurance contract; [b] count two is for breach of contract in relation to the business income protection

---

[1] *See* Governor Tom Wolf, *Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home*, (April 1, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf.

[2] As of May 14, 2021, 993,915 citizens of Pennsylvania have contracted COVID-19 and 26,724 citizens have died. *See* Pennsylvania Department of Health, COVID-19 Data for Pennsylvania, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.

provision of the insurance contract; [c] count three is for declaratory judgment with regard the

civil authority provision of the insurance contract; [d] count four is for breach of contract in

regards to the civil authority provision of the insurance contract; [e] count five is for declaratory

judgment with regard to the extra expense provision of the insurance contract; and [f] count six is

for breach of contract in regards to the extra expense provision of the insurance contract.  All of

Plaintiff's claims require this Court's determination as to whether Plaintiff is entitled to coverage

under various provisions of the insurance contract with Defendant for losses Plaintiff sustained

in relation to the spread of COVID-19 and the Governor's orders.

On December 22, 2020, Plaintiff filed a Motion for Partial Summary Judgment as to

Plaintiff's claims for declaratory judgment with regard to the business income protection and

civil authority provisions of the insurance contract.  On March 10, 2021, Defendant filed a Cross

Motion for Judgment on the Pleadings.  On March 31, 2021, this Court heard oral argument on

Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross Motion for Judgment

on the Pleadings.  For the reasons set forth herein, this Court grants Plaintiff's Motion for Partial

Summary Judgment, in part, and denies Defendant's Cross Motion for Judgment on the

Pleadings.

**III. The Contract Provisions**

Plaintiff's and Defendant's dispute involves the following provisions regarding coverage

under the insurance contract.

**Section 1 - Coverages**

**Insuring Agreement**

We will pay for direct physical "loss" of or damage to Covered Property at the
premises described in the "Declarations" caused by or resulting from a peril
insured against.

Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 61, Exhibit A.

> **Section II – Perils Insured Against**
>
> * * * * *
>
> **Income Protection – Coverage 3**
>
> **Covered Cause of Loss**
>
> This policy insures against **direct physical "loss"**, except "loss" as excluded or limited in this policy.[3]

*Id.* at 64.

> **Income Protection – Coverage 3**
>
> **A. Income Protection**
>
> Income Protection means loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" or to your food truck or trailer when anywhere in the coverage territory from a peril insured against.[4]

---

[3] "Loss" means direct and accidental loss of or damage to covered property. Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A.

[4] The insurance contract defines "interruption of business" as "the period of time that your business is partially or totally suspended and it: 1. Begins with the date of direct "loss" to covered property caused by a peril insured against: and 2. Ends on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality." Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A. The insurance contract defines "income" as "the sum of net income (net profit or loss before income taxes) that would have been earned or incurred and necessary continuing operating expenses incurred by the business such as payroll expenses, taxes, interest, and rents." *Id.* The insurance contract defines "rental income" as the following:

    1. The rents from the tenant occupancy of the premises described in the "Declarations";

    2. Continuing operating expenses incurred by the business such as:
        a. Payroll; and
        b. All expenses for which the tenant is legally responsible and for which you would otherwise be responsible;

    3. Rental value of the property described in the "Declarations" and occupied by you; or

*Id.* at 63.

### C. Additional Coverages

### 1. Civil Authority

When a peril insured against causes damage to property other than property at the premises described in the : Declarations", we will pay for the actual loss of "income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" or access to your food truck or trailer anywhere in the coverage territory provided that both of the following apply:

> a. Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" or your food truck or trailer are within that area but are not more than one mile from the damaged property; and

> b. The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id.* at 64.

### Section III. Exclusions

### A. Coverages 1, 2, and 3

We do not cover under Building(s) – Coverage 1; Business Personal Property and Personal Property of others – Coverage 2; and Income Protection – Coverage 3 "loss" or damaged caused directly or indirectly by any of the following.  Such a "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss":

* * * * *

10. By the enforcement of or compliance with any law or ordinance regulating the construction, use, or repair of any property, or requiring the tearing down of any

---

4. Incidental income received from coin-operated laundries, hall rentals, or other facilities on the premises described in the "Declarations".

*Id.* at 97.  Finally, "Declarations" is defined as "the form which shows your coverages, limits of protection, premium charges, and other information."  *Id.* at 96.

> property, including the cost of removing its debris, except as provided in
> Extensions of Coverage – **B.3.**, **B.7.**, and **B.8.**

*Id.* at 66.

## IV. Standard of Review

It is well-settled that, after the relevant pleadings are closed, a party may move for

summary judgment, in whole or in part, as a matter of law. Pa. R.C.P. 1035.2.  Summary

judgment "may be entered only where the record demonstrates that there are no genuine issues of

material fact, and it is apparent that the moving party is entitled to judgment as a matter of law."

*City of Philadelphia v. Cumberland County Bd. of Assessment Appeals*, 81 A.3d 24, 44 (Pa.

2013).  Furthermore, appellate courts will only reverse a trial court's order granting summary

judgment where it is "established that the court committed an error of law or abused its

discretion." *Siciliano v. Mueller*, 149 A.3d 863, 864 (Pa. Super. 2016).

The interpretation of an insurance contract is a matter of law, which may be decided by

this Court on summary judgment. *Wagner. V. Erie Insurance Company*, 801 A.2d 1226, 1231

(Pa. Super. 2002).  When interpreting an insurance contract, this Court aims to effectuate the

intent of the parties as manifested by the language of the written instrument. *American and

Foreign Insurance Company v. Jerry's Sport Center*, 2 A.3d 526, 540 (Pa. 2010).  When

reviewing the language of the contract, words of common usage are read with their ordinary

meaning, and this Court may utilize dictionary definitions to inform its understanding. *Wagner*,

801 A.2d at 1231; *see also AAA Mid-Atlantic Insurance Company v. Ryan*, 84 A.3d 626, 633-34

(Pa. 2014).  If the terms of the contract are clear, this Court must give effect to the language.

*Madison Construction Company v. Harleysville Mutual Insurance Company*, 735 A.2d 100, 106

(Pa. 1999).  However, if the contractual terms are subject to more than one reasonable

interpretation, this Court must find that the contract is ambiguous.  *Id.*  "[W]hen a provision of

a[n insurance contract] is ambiguous, the [contract] provision is to be construed in favor of the [the insured] and against the insurer, as the insurer drafted the policy and selected the language which was used therein." *Kurach v. Truck Insurance Exchange*, 235 A.3d 1106, 1116 (Pa. 2020).

## V. Discussion

### a. Coverage Provisions

Plaintiff bears the initial burden to reasonably demonstrate that a claim falls within the policy's coverage provisions. *State Farm Cas. Co. v. Estates of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law). Then, provided that Plaintiff satisfies its initial burden, Defendant bears "the burden of proving the applicability of any exclusions or limitations on coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law). In order to prevail, Defendant must demonstrate that the language of the insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will be construed in favor of the insured." *Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange*, 771 A.2d 11, 13 (Pa. Super. 2001).

First, this Court will address whether Plaintiff is entitled to coverage under the Income Protection provision of the insurance contract for losses Plaintiff sustained in relation to the public health crises and the spread of the COVID-19 virus. With regard to Income Protection coverage, the insurance contract provides that:

**Section 1 - Coverages**

**Insuring Agreement**

We will pay for *direct physical "loss" of or damage to* Covered Property at the premises described in the "Declarations" caused by or resulting from a peril insured against.

Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 61, Exhibit A (emphasis added).

### Section II – Perils Insured Against

* * * * *

### Income Protection – Coverage 3

### Covered Cause of Loss

This policy insures against direct physical "loss", except "loss" as excluded or limited in this policy.[5]

*Id.* at 64.

### Income Protection – Coverage 3

### A. Income Protection

Income Protection means loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting *directly from "loss" or damage to property* on the premises described in the "Declarations" or to your food truck or trailer when anywhere in the coverage territory from a peril insured against.[6]

---

[5] "Loss" means direct and accidental loss of or damage to covered property.  Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A.

[6] The insurance contract defines "interruption of business" as "the period of time that your business is partially or totally suspended and it: 1. Begins with the date of direct "loss" to covered property caused by a peril insured against: and 2. Ends on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality."  Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A.  The insurance contract defines "income" as "the sum of net income (net profit or loss before income taxes) that would have been earned or incurred and necessary continuing operating expenses incurred by the business such as payroll expenses, taxes, interest, and rents."  *Id.*  The insurance contract defines "rental income" as the following:

    1. The rents from the tenant occupancy of the premises described in the "Declarations";

    2. Continuing operating expenses incurred by the business such as:
        a. Payroll; and
        b. All expenses for which the tenant is legally responsible and for which you would otherwise be responsible;

    3. Rental value of the property described in the "Declarations" and occupied by you; or

*Id.* at 63 (emphasis added).

In order to state a reasonable claim for coverage under the Income Protection provision of the insurance contract, Plaintiff must show that it suffered "direct physical loss of or damage to" its property.  The interpretation of the phrase "direct physical loss of or damage to" property is the key point of the parties' dispute.  Defendant contends that "direct physical loss of or damage to" property requires some physical alteration of or demonstrable harm to Plaintiff's property.  Plaintiff contends that the "direct physical loss of . . . property" is not limited to physical alteration of or damage to Plaintiff's property but includes the loss of use of Plaintiff's property.  Plaintiff further asserts that, because its interpretation is reasonable, this Court must find in Plaintiff's favor.

The insurance contract does not define every term in the phrase "direct physical loss of or damage to" property.[7]  As previously noted, Pennsylvania courts construe words of common usage in their "natural, plain, and ordinary sense . . . and [Pennsylvania courts] may inform [their] understanding of these terms by considering their dictionary definitions."  *Madison Construction Company,* 735 A.2d at 108.  Four words in particular are germane to the determination of this threshold issue: "direct," "physical," "loss," and "damage."  "Direct" is

---

4. Incidental income received from coin-operated laundries, hall rentals, or other facilities on the premises described in the "Declarations".

*Id.* at 97.  Finally, "Declarations" is defined as "the form which shows your coverages, limits of protection, premium charges, and other information."  *Id.* at 96.

[7] Although the insurance contract does define the term "loss" as meaning "direct and accidental loss of or damage to covered property," this definition is essentially meaningless because it is repetitive of the phrase "direct physical loss of or damage to."  Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A.  Accordingly, when interpreting the term "loss," this Court relies upon the term's ordinary dictionary definition as it does with the other terms in this phrase, which the insurance contract did not define.

defined as "proceeding from one point to another in time or space without deviation or

interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . .

."[8] "Physical" is defined as "of or relating to natural science . . . having a material existence . . .

[and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[9]

"Loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or]

DEPRIVATION . . . ."[10]   "Damage" is defined as "loss or harm resulting from injury to person,

property, or reputation . . . ."[11]

      Before analyzing the definitions of each of the above terms to determine whether

Plaintiff's interpretation is reasonable, it is important to note that the terms, in addition to their

ordinary, dictionary definitions, must be considered in the context of the insurance contract and

the specific facts of this case. *See Madison Construction Company*, 735 A.2d at 106 (clarifying

that issues of contract interpretation are not resolved in a vacuum). While some courts have

interpreted "direct physical loss of or damage to" property as requiring some form of physical

altercation and/or harm to property in order for the insured to be entitled to coverage, this Court

reasonably determined that any such interpretation improperly conflates "direct physical loss of"

with "direct physical . . . damage to" and ignores the fact that these two phrases are separated in

the contract by the disjunctive "or."[12]   It is axiomatic that courts must "not treat the words in the

---

[8] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[9] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

[10] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

[11] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

[12] *See Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange*, 771 A.2d 11, 15 (Pa. Super. 2001) (explaining that merely accepting the non-binding decisions of other courts "by the purely mechanical process of searching the nations courts for conflicting decisions" amounts to an abdication of this Court's judicial role).

[contract] as mere surplusage . . . [and] if at all possible, [this Court must] construe the [contract] in a manner that gives effect to all of the [contract's] language." *Indalex Inc. v. Nation Union Fire Ins. Co. Pittsburgh, PA*, 83 A.3d 418, 420-21 (Pa. Super. 2013). Based upon this vital principle of contract interpretation, this Court concluded that, due to the presence of the disjunctive "or," whatever "direct physical 'loss' of" means, it must mean something different than "direct physical . . . damage to."

In order to determine what the phrase "direct physical loss of . . . property" reasonably means, this Court looked to the ordinary, dictionary definitions of the terms "direct," "physical," "loss," and "damage." This Court began its analysis with the terms "damage" and "loss," as these terms are the crux of the disputed language. As noted above, "damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ,"[13] and "loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[14]

Based upon the above-provided definitions, it is clear that "damage" and "loss," in certain contexts, tend to overlap. This is evident because the definition of "damage" includes the term "loss," and at least one definition of "loss" includes the terms "destruction" and "ruin," both of which indicate some form of damage. However, as noted above, in the context of this insurance contract, the concepts of "loss" and "damage" are separated by the disjunctive "or," and, therefore, the terms must mean something different from each other. Accordingly, in this instance, the most reasonable definition of "loss" is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of

---

[13] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

[14] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

damage to property, i.e., destruction and ruin.  Applying this definition gives the term "loss"

meaning that is different from the term "damage."  Specifically, whereas the meaning of the term

"damage" encompasses all forms of harm to Plaintiff's property (complete or partial), this Court

concluded that the meaning of the term "loss" reasonably encompasses the act of losing

possession [and/or] deprivation, which includes the loss of use of property absent any harm to

property.

       In reaching its conclusion, this Court also considered the meaning and impact of the

terms "direct" and "physical."  Ultimately, this Court determined that the ordinary, dictionary

definitions of the terms "direct" and "physical" are consistent with the above interpretation of the

term "loss."  As noted previously, "direct" is defined as "proceeding from one point to another in

time or space without deviation or interruption . . . [and/or] characterized by close logical, causal,

or consequential relationship . . . ,"[15] and  "physical" is defined as "of or relating to natural

science . . . having a material existence . . . [and/or] perceptible especially through the senses and

subject to the laws of nature . . . ."[16]  Based upon these definitions it is certainly reasonable to

conclude that Plaintiff could suffer "direct" and "physical" loss of use of its property absent any

harm to property.

       Here, Plaintiff's loss of use of its property was both "direct" and "physical."  The spread

of COVID-19, and a desired limitation of the same, had a close logical, causal, and/or

consequential relationship to the ways in which Plaintiff materially utilized its property and

physical space.  *See* February 22, 2021 Court Order of the United States District Court, N.D.

Illinois, Eastern Division case *In re: Society Insurance Co. COVID-19 Business Interruption*

---

[15] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[16] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

*Protection Insurance Litigation*, Civil Case No. 1:20-CV-05965 at 21 (stating that government shutdown orders and COVID-19 *directly* impacted the way businesses used *physical* space) (emphasis added). Indeed, the spread of COVID-19 and social distancing measures (with or without the Governor's orders) caused Plaintiff, and many other businesses, to *physically* limit the use of property and the number of people that could inhabit *physical* buildings at any given time, if at all. Thus, the spread of COVID-19 did not, as Defendant contends, merely impose economic limitations. Any economic losses were secondary to the businesses' *physical* losses.

While the terms "direct" and "physical" modify the terms "loss" and "damage," this does not somehow necessarily mean that the entire phrase "direct physical loss of or damage to" property requires actual harm to Plaintiff's property in every instance. Any argument that the terms "direct" and "physical," when combined, presuppose that any request for coverage must stem from some actual impact and harm to Plaintiff's property suffers from the same flaw noted in this Court's above discussion regarding the difference between the terms "loss" and "damage:" such interpretations fail to give effect to all of the insurance contract's terms and, again, render the phrase "direct physical loss of" duplicative of the phrase "direct physical . . . damage to."

Defendant also contends that the insurance contract's Amount of Insurance provision supports the conclusion that the contract necessitates the existence of tangible damage in order for Plaintiff to be entitled to Income Protection coverage. According to Defendant, because the Amount of Insurance provision contemplates the existence of damaged or destroyed property, and the need to rebuild, repair, or replace property, Plaintiff's argument regarding loss of use in the absence of any tangible damage or destruction to property is untenable.

Although this Court agrees with Defendant on the general principle that the insurance contract's provisions must be read as a whole so that all of its parts fit together, this Court is not persuaded that the Amount of Insurance provision is inherently inconsistent with an interpretation of "direct physical loss of . . . property" that encompasses Plaintiff's loss of use of its property in the absence of tangible damage.  The insurance contract provides that:

> We will pay the actual income protection loss for only such length of time as would be required to resume normal business operations.  We will limit the time period to the shorter of the following periods:
>
> 1. The time period required to rebuild, repair, or replace such part of the Building or Building Personal Property that has been damaged or destroyed as a direct result of an insured peril; or
>
> 2. Twelve (12) consecutive months from the date of loss.

Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 64, Exhibit A.  Upon review of the above language, this Court determined that the Amount of Insurance provision does not limit coverage only to instances where Plaintiff needed to rebuild, repair, or replace damaged or destroyed property.  Indeed, the relevant part of the Amount of Insurance provision starts by generally stating that the insurer will pay for income protection loss for only such length of time as would be required to resume normal business operations.  Thereafter, the Amount of Insurance provision further explains that this time period for coverage will be limited to either (a) the length of time needed to rebuild, repair, or replace damaged or destroyed property; or (b) twelve (12) months from the initial date of loss.

Although Defendant is correct to point out that the Amount of Insurance provision expressly contemplates some circumstances in which Plaintiff's property is actually damaged or destroyed, this provision does not necessitate the existence of damaged or destroyed property,

and does not require repairs, rebuilding, or replacement of damaged or destroyed property in order for Plaintiff to be entitled to coverage. The Amount of Insurance provision merely imposes a time limit on available coverage, which ends whenever any required rebuilding, repairs, or replacements are completed to any damaged or destroyed property that might exist, *or* twelve (12) months after the initial date of the loss. To put this another way, the Amount of Insurance provision provides that coverage ends when Plaintiff's business is once again operating at normal capacity after damaged or destroyed property is fixed or replaced, *or* within twelve (12) months from the initial date of loss in circumstances where it is not necessary to fix or replace damaged or destroyed property, or it is not feasible to do so within a twelve (12) month time frame. The Amount of Insurance provision does not somehow redefine or place further substantive limits on types of available coverage.

As this Court determined that it is, at the very least, reasonable to interpret the phrase "direct physical loss of . . . property" to encompass the loss of use of Plaintiff's property due to the spread of COVID-19 absent any actual damage to property, and because Plaintiff established that there are no genuine issues of material fact regarding its right to coverage under the Income Protection provision of the insurance contract, this Court grants Plaintiff's Motion for Partial Summary Judgment in relation to Plaintiff's claim for declaratory judgment and the income protection provision of the insurance contract.

Second, this Court will address whether Plaintiff is entitled to coverage under the Civil Authority provision of the insurance contract for losses Plaintiff sustained in relation to the Governor's orders, which were issued to help mitigate the spread of the COVID-19 virus. With regard to Civil Authority coverage, the insurance contract provides that:

> When a peril insured against causes damage to property other than property at the premises described in the : Declarations", we will pay for the actual loss of

"income" and/or "rental income" you sustain and necessary "extra expense"
caused by action of civil authority that prohibits access to the premises described
in the "Declarations" or access to your food truck or trailer anywhere in the
coverage territory provided that both of the following apply:

>  a. Access to the area immediately surrounding the damaged property is
>  prohibited by civil authority as a result of the damage, and the premises
>  described in the "Declarations" or your food truck or trailer are within that
>  area but are not more than one mile from the damaged property; and

>  b. The action of civil authority is taken in response to dangerous physical
>  conditions resulting from the damage or continuation of the peril insured
>  against that caused the damage, or the action is taken to enable a civil
>  authority to have unimpeded access to the damaged property.

*Id.* at 64.

With regard to Civil Authority coverage, Plaintiff must, as a threshold matter,
demonstrate that COVID-19 caused damage to property other than Plaintiff's property. Unlike
the Income Protection provision, under the Civil Authority provision there is no coverage for the
loss of use of property other than Plaintiff's property. Accordingly, this Court's above analysis
with regard Income Protection coverage and loss of use is inapplicable, as it does not address
whether COVID-19 separately caused damage to property.

Again, as noted above, "damage" is defined as "loss or harm resulting from injury to
person, property, or reputation . . . ."[17] Based upon this definition, this Court determined that, at
the very least, in order for COVID-19 to damage property, COVID-19 must come into contact
with property and cause harm. Presently, it is contested whether COVID-19 can live on the
surfaces of property for some period of time. Additionally, while this might be one way by
which individuals contract COVID-19, it is not the primary means by which COVID-19 spreads.
*See Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 892 (Pa. 2020) (holding that COVID-19

---

[17] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

does not spread because the virus is present on any particular surface or at any particular location, rather COVID-19 spreads because of person-to-person contact). Indeed, person-to-person transmission of COVID-19, as opposed to property damage, was the primary reason for the Governor's orders, social distancing measures, and resultant changes in the ways business utilized property. With or without COVID-19 contacting the surface of any given property in the Commonwealth, businesses throughout the Commonwealth shutdown, at least partially, and suffered the loss of use of property due to the risk of person-to-person COVID-19 transmission. Thus, in the above discussion regarding the Income Protection provision, this Court determined that there are no genuine issues of material fact as to whether Plaintiff suffered the loss use of property due to COVID-19. The same is, however, not as clear with regard to the question of whether COVID-19 caused damaged to property throughout the Commonwealth.

Even if this Court were to accept that COVID-19 could and did cause damage to property under the theory presented by Plaintiff, whether Plaintiff is entitled to coverage under the Civil Authority provision depends upon whether Plaintiff can demonstrate that COVID-19 was actually present on property other than Plaintiff's property. Additionally, Plaintiff must show that any such damaged property was within one mile of Plaintiff's property, and that the actions of civil authority (in this case the Governor's orders) were "taken in response to dangerous physical conditions resulting from the *damage* or continuation of the peril insured against that caused the *damage*, or the action is taken to enable a civil authority to have unimpeded access to the *damaged* property." Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 64, Exhibit A (emphasis added). At this time, genuine issues of material fact remain in dispute as to the following: [a] whether COVID-19 caused damage to property; [b] whether COVID-19

was actually present at any particular property; and [c] the extent to which the Governor's orders were issued in response to property damaged by COVID-19. Accordingly, this Court denies Plaintiff's Motion for Partial Summary Judgment in relation to its claim for declaratory judgment and the Civil Authority provision of the insurance contract without prejudice.[18]

### b. Exclusions

Having determined that Plaintiff provided a reasonable interpretation demonstrating that Plaintiff is entitled to coverage under the Income Protection provision of the insurance contract, this Court turns to the question of whether Defendant demonstrated "the applicability of any exclusions or limitations on coverage." *Koppers Co.*, 98 F.3d at 1446 (applying Pennsylvania law). As discussed previously, in order to prevail, Defendant must show that the language of the insurance contract regarding an exclusion is "clear and unambiguous: otherwise, the provision will be construed in favor of the insured." *Fayette County Housing Authority*, 771 A.2d at 13.

Defendant argues that the insurance contract's exclusion regarding the enforcement of or compliance with laws and ordinances prevents coverage for income protection. The insurance contract states that the insurer will not pay for loss or damage caused "[b]y the enforcement of or compliance with any law or ordinance regulating the construction, use, or repair, of any property, or requiring the tearing down of any property, including the cost of removing its debris . . . ." Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 66, Exhibit A.

According to Defendant, coverage is precluded by the above exclusion because Plaintiff's alleged losses are due solely to the Governor's orders. This, however, is not the case. In its complaint, Plaintiff states that its claim for coverage is based upon losses and expenses Plaintiff

---

[18] As this Court is not convinced that, as a matter of law, Plaintiff cannot prevail on its damage theory, this Court also denies Defendant's Cross Motion for Judgment on the Pleadings.

suffered in relation to both "*the COVID-19 pandemic* . . . and the orders of civil authorities enacted in response to this natural disaster." Plaintiff's Complaint at 13 (emphasis added). As this Court explained earlier in this memorandum, COVID-19 and the related social distancing measures (with and without government orders) directly forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time. The Governor's orders only came into consideration in the context of Plaintiff's claim for coverage under the Civil Authority provision of the contract.[19] Accordingly, Defendant failed to demonstrate that the exclusion regarding the enforcement of or compliance with laws and ordinances clearly and unambiguously prevents coverage.

## VI. Conclusion

As this Court determined that [a] Plaintiff's interpretation of the Income Protection provision of the insurance contract is, at the very least, reasonable, [b] that there are no genuine issues of material fact regarding Plaintiff's loss of use, and [c] that none of the insurance contract's exclusions clearly and unambiguously prevent coverage, Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's claim for declaratory judgment with regard to Income Protection coverage is GRANTED. In contrast, because this Court determined that there are genuine issues of material fact remaining as to the Civil Authority provision and whether COVID-19 caused damage to property, Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's claim for declaratory judgment with regard to Civil Authority coverage is DENIED

---

[19] Certainly, the exclusion regarding the enforcement of or compliance with laws and ordinances could not have been intended to exclude coverage under the Civil Authority provision of the contract, as this would make any extended coverage for the actions of Civil Authority illusory. *See Heller v. Pennsylvania League of Cities and Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of an insurance contract operates to foreclose expected claims, such a provision is void as it renders coverage illusory).

without prejudice.  Finally, Defendant's Cross Motion for Judgement on the Pleadings is
DENIED.

By the Court:

*Christine Ward*, J.

Christine Ward, J.

Dated: 5/25/2021

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

MACMILES, LLC D/B/A          :
GRANT STREET TAVERN          :
310 Grant Street, Ste. 106   :
Pittsburgh, PA 15219-2213,   :
                             :
          Plaintiff,         :   No.: GD-20-7753
                             :
     vs.                     :
                             :
ERIE INSURANCE EXCHANGE      :
100 Erie Insurance Place     :
Erie, PA 16530,              :
                             :
          Defendant.         :

## ORDER OF COURT

And now, this 25 day of May, 2021 it is hereby ORDERED, ADJUDGED, and

DECREED that:

1. Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's claim for

   declaratory judgment with regard Income Protection coverage is GRANTED;

2. Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's claim for

   declaratory judgment with regard to Civil Authority coverage is DENIED without

   prejudice; and

3. Defendant's Cross Motion for Judgement on the Pleadings is DENIED.

By the Court:

*Christine Ward*, J.

Christine Ward, J.

Dated: 5/25/2021

# **EXHIBIT E**

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

TIMOTHY A. UNGAREAN, DMD d/b/a
SMILE SAVERS DENTISTRY, PC,
INDIVIDUALLY AND ON BEHALF OF
A CLASS OF SIMILARLY SITUATED
PERSONS,

               Plaintiff,

      v.

CNA and VALLEY FORGE INSURANCE
COMPANY,

               Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL DIVISION

No.: GD-20-006544

**OPINION**

*Counsel for Plaintiff:*
John P. Goodrich, Esquire
Lauren R. Nichols, Esquire
429 Fourth Ave.
Suite 900 Pittsburgh, PA 15219

Scott B. Cooper, Esquire
209 State Street
Harrisburg, PA 17101

James C. Haggerty, Esquire
1835 Market Street
Suite 2700 Philadelphia, PA 19103

Jonathan Shub, Esquire
Kevin Laukaitis, Esquire
134 Kings Highway East
2nd Floor Haddonfield, NJ 08033

*Counsel for Defendants:*
Robert M. Runyon III, Esquire
Daniel J. Grossman, Esquire
400 Maryland Drive
Fort Washington, PA 19034

William Pietragallo II, Esquire
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| TIMOTHY A. UNGAREAN, DMD d/b/a | : | CIVIL DIVISION |
| SMILE SAVERS DENTISTRY, PC, | : | |
| INDIVIDUALLY AND ON BEHALF OF | : | |
| A CLASS OF SIMILARLY SITUATED | : | No.: GD-20-006544 |
| PERSONS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | OPINION |
| | : | |
| CNA and VALLEY FORGE INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

## OPINION

### I.    The Parties

Timothy A. Ungarean, DMD, d/b/a Smile Savers Dentistry, PC is a dentist who owns and operates a dental practice with places of business located at 4701 Baptist Road, Pittsburgh, Allegheny County, Pennsylvania, 15227 and 3153 Brodhead Road, Suite A, Aliquippa, Beaver County, Pennsylvania, 15001.  Timothy A. Ungarean, DMD, is hereinafter referred to as "Ungarean" or "Plaintiff."

CNA is a property and casualty insurance company with a principal place of business at 151 North Franklin Street, Floor 9, Chicago, Illinois 60606.  Valley Forge Insurance Company is a wholly owned subsidiary company of CNA, and also provides property and casualty insurance. Both CNA and Valley Forge Insurance Company regularly and routinely conduct business in the Commonwealth of Pennsylvania.  CNA and Valley Forge Insurance Company are hereinafter collectively referred to as "Defendants."

## II.    Introduction

In March and April of 2020, in order to prevent and mitigate the spread of the coronavirus disease "COVID-19," Governor Tom Wolf ("Governor Wolf") issued a series of mandates restricting the operations of certain types of businesses throughout the Commonwealth of Pennsylvania (the "Governor's orders").  On March 6, 2020, Governor Wolf issued an order declaring a Proclamation of Disaster Emergency.  On March 19, 2020, Governor Wolf issued an order requiring all non-life sustaining businesses in Pennsylvania to cease operations and close physical locations.  On March 23, 2020, Governor Wolf issued an order directing Pennsylvania citizens in particular counties to stay at home except as needed to access life sustaining services. Then, on April 1, 2020, Governor Wolf extended the March 23, 2020 order, and directed all of Pennsylvania's citizens to stay at home.  As of April 1, 2020, at least 5,805 citizens of Pennsylvania contracted COVID-19 in sixty counties across the Commonwealth, and seventy-four (74) citizens died.[1]  Unfortunately, since April 1, 2020, the number of positive cases and deaths from COVID-19 has increased dramatically.[2]

As a result of the spread of COVID-19 and the Governor's orders, Plaintiff shutdown the majority of its business operations.  For a time, Plaintiff's dental practice remained open only to perform emergency dental procedures.  Not surprisingly, Plaintiff subsequently experienced a dramatic decrease in business income and furloughed some of its employees.  Plaintiff thereafter submitted a claim for coverage under its business insurance policy ("the insurance contract") with Defendants.  Defendants denied Plaintiff's claim.

---

[1] *See* Governor Tom Wolf, *Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home,* (April 1, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf.

[2] As of May 17, 2021, 997,127 citizens of Pennsylvania have contracted COVID-19 and 26,833 citizens have died. *See* Pennsylvania Department of Health, **COVID-19 Data for Pennsylvania,** https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.

3

On June 5, 2020, Plaintiff filed a complaint in the Court of Common Pleas of Allegheny County. In its complaint, Plaintiff asserted one count for declaratory judgment, by which it seeks this Court's determination as to whether Plaintiff is entitled to coverage under the insurance contract with Defendants for losses Plaintiff sustained in relation to the spread of COVID-19 and the Governor's orders. On October 5, 2020, Plaintiff filed a Motion for Summary Judgment. On December 2 and December 4, 2020, Defendants filed Cross Motions for Summary Judgment. On January 20, 2020, this Court heard oral argument on Plaintiff's Motion for Summary Judgment and Defendants' Cross Motions for Summary Judgment. On March 22, 2021, this Court granted Plaintiff's Motion for Summary Judgment and denied Defendants' Cross Motions for Summary Judgment. Then, on April 19, 2021 Defendants appealed this Court's March 22, 2021 Memorandum and Order of Court. For the reasons set forth herein, this Court's March 22, 2021 Memorandum and Order of Court should be affirmed.

### III.    Errors Complained of on Appeal

Defendants' 1925(b) statement complained of the following purported errors:

> 1. The Court's Memorandum and Order of March 22, 2021 ("Decision") erred in finding that, under the property insurance policy (the "Policy") issued by Valley Forge to Plaintiff Timothy A. Ungarean, DMD d/b/a Smile Savers Dentistry, PC ("Plaintiff"), Plaintiff was entitled to coverage for alleged economic losses stemming from the COVID-19 virus and pandemic and from orders issued by Pennsylvania Governor Tom Wolf intended to slow the spread of the virus. First, the Court incorrectly concluded that Plaintiff suffered "direct physical loss of or damage to" its property or a neighboring property, which is necessary to trigger coverage under the Business Income, Extra Expense, and Civil Authority provisions of the Policy. Second, the Court incorrectly found coverage triggered under the Policy's Civil Authority provision, which provides coverage only if an insured showed that the civil authority action was "due to" direct physical loss of or damage to property at other locations and that "an action of civil authority . . . prohibit[ed] access" to a covered property. Third, the Court misconstrued the Policy's exclusions for " Contamination," for "Fungi, Wet Rot, Dry Rot, and Microbes," for " Consequential Loss," and for "Ordinance or Law" – all of which would squarely apply in the event the coverage trigger had been met in the first

instance.  As such, Plaintiff also is not entitled to coverage by operation of the foregoing exclusions.

2. In its Decision, this Court erred in finding Business Income and Extra Expense coverage because Plaintiff did not show "direct physical loss of or damage to" its property.

    i. This Court misinterpreted the requirement of "direct physical loss of or damage to property" in the Policy's Business Income and Extra Expense provision to find that provision does not require "actual harm to Plaintiff's property," and rather could trigger coverage based on the mere "loss of use" of a covered property.

    ii. Instead, the requirement of "direct physical loss of or damage to property" requires some physical altercation [*sic*] of or demonstrable harm to Plaintiff's property."

    iii. This Court erred in interpreting the phrase "direct physical loss of or damage to property" by wresting each word in this phrase out of context and interpreting it in isolation.  Specifically, this Court erroneously concluded that, whereas "damage" requires physical harm to a covered property, "the term 'loss' reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to property."  This Court ignored the substantial body of persuasive authority, both within and outside this Commonwealth, interpreting "direct physical loss of or damage to property" in property insurance policies to mean actual, physical loss of, or harm to, property, not mere "loss of use."

    iv. The Court also erred in finding that the "spread of COVID-19" and Plaintiff's "desired limitation of the same" were sufficient to make the "loss" of its property "direct" and "physical."

3. In its Decision, this Court erred in finding that coverage was available under the Policy's Civil Authority provision.

    i. This Court erred in finding coverage available under the Policy's Civil Authority provision, because Plaintiff had not established "direct physical loss of or damage to" a neighboring property as required by the Policy.  In reaching this conclusion, the Court misconstrued the scope and applicability of *Friends of Danny DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020).

    ii. This Court also erred in finding that coverage under the Civil Authority provision because Plaintiff had not established that the civil authority action was "due to direct physical loss of or damage to property at locations" other than the covered premises.

iii. This Court also erred because, although the Policy by its terms only provides for coverage if "an action of civil authority . . . *prohibits* access to the described premises," the Court erroneously found that coverage was available where "Plaintiff's business . . . was technically permitted to remain open," but where access to the premises was no longer "normal." This was wrong to reject Defendants' argument that, in order to be entitled to Civil Authority coverage, a policyholder must be fully prohibited )as opposed to limited in certain circumstances) from accessing its covered property.

4. In its Decision, this Court Erred in finding that the Policy's "Contamination" exclusion was inapplicable.

i. This Court erroneously concluded that the contamination exclusion did not apply because Plaintiff's alleged loss of use was premised on the "risk of person-to-person transmission of COVID-19," and not the direct result of "contamination of property." In reaching this conclusion, the Court ignored that the Policy provides an insurer "will not pay for loss or damage caused *directly or indirectly* by . . . [c]ontamination by other than 'pollutants.'"

ii. The Court also erroneously held that, because the Policy did not contain an express "virus exclusion" provision, "contamination" should be read narrowly to exclude a virus such as COVID-19.

5. In its Decision, this Court erred in finding that the Policy's "Fungi, Wet Rot, Dry Rot and Microbes" exclusion was inapplicable, because – without any discovery or facts of record – it found the COVID-19 virus is not "clear[ly] and unambiguous[ly]" a "microbe" as the policy defines the term. This Court erroneously found that a microbe must be a "living being" and does not include a virus, which it found is not clearly alive. The Court erred in resolving this disputed question of fact, which is more properly the subject of expert analysis. Contrary to the Court's decision, the term "microbe" as used in the Policy exclusion encompasses the COVID-19 virus, and this Court should have found the exclusion applicable on that basis.

6. In its Decision, this Court also erred in finding that the Policy's "Consequential Loss" exclusion was inapplicable, since its application "would vitiate Business Income, Extra Expense, and Civil Authority Coverage in their entirety." That is not correct and is premised on the Court's incorrect interpretation of "direct physical loss of or damage to" property. Further, the Court failed to recognize that the point of a coverage exclusion is to exclude coverage in certain agreed-upon situations. In other words, all exclusions "vitiate" coverage in some circumstancces.

7. In its Decision, this Court erred in finding that the Policy's "Acts or Decisions" and "Ordinance or Law" exclusions were inapplicable.

8. The Court erred in finding that Plaintiff is entitled to Summary Judgment against Defendant "CNA" in particular, because disputed facts exist concerning CNA's involvement in the underlying policy and claim adjustment. "CNA" is not a legal entity properly named in this dispute. "CNA" does not issue, and has never issued, insurance policies in Pennsylvania or any other state; and it did not issue any policy to Plaintiff in the case.

## IV.    The Contract Provisions

Plaintiff's and Defendants' dispute involves the following provisions regarding coverage under the insurance contract.

**Business Income**

    a.  Business Income means:

        (1) Net Income (Net profit or Loss before Income taxes) that would have been earned or incurred, including:

            a.  "Rental Value;" and

            b.  "Maintenance Fees," if you are a condominium association; and

        (2) Continuing normal operating expenses incurred, including payroll, subject to 90 day limitation if indicated on the Declaration page.

    b.  We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.[3]

---

[3] The insurance contract defines "suspension" as the "partial or complete cessation of your [the insured's] business activities; or . . . that a part or all of the described premises is rendered untenantable." Plaintiff's Complaint at 55. The insurance contract defines "operations" as "the type of your [the insured's] business activities occurring at the described premises and tenantability of the described premises." Plaintiff's Complaint at 53. The insurance contract defines "period of restoration" as:

    the period of time that: [b]egins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and . . . [e]nds on the earlier of: (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) The date when business is resumed at a new permanent location.

Plaintiff's Complaint at 53. The insurance contract defines Covered Cause of Loss as "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations; or c. Limited or Excluded by other provision of this Policy. Plaintiff's Complaint at 37.

**Extra Expense**

a. Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

b. We will pay Extra Expense (other than the expense to repair or replace property) to:

    (1) Avoid or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or

    (2) Minimize the "suspension" of business if you cannot continue "operations."

c. We will also pay Extra Expense (including Expediting Expenses) to repair or replace the property, but only to the extent it reduces the amount of loss that otherwise would have been payable under Paragraph 1. Business Income above.

Plaintiff's Complaint, at 58-59, Exhibit B (emphasis added).

**Civil Authority**

1. When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by an action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

*Id*. at 84 (emphasis added).

Plaintiff's and Defendants' dispute also involves the following provisions regarding exclusions from coverage under the insurance contract:

**Exclusions**

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

8

**Ordinance or Law**

(1) The enforcement of any ordinance or law:
    (a) Regulating the construction, use or repair of any property; or
    (b) Requiring the tearing down of any property, including the cost of removing debris.

(2) This exclusion applies whether the loss results from:
    (a) An ordinance or law that is enforced even if the property has not been damaged; or
    (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition or property, or removal of its debris, following a physical loss to that property.

**Contamination**

Contamination by other than "pollutants."[4]

**Consequential Loss**

Delay, loss of use or loss of market.

**Acts or Decisions**

Acts or Decisions, including the failure to act or decide, of any person, group, organization or governmental body.

*Id.* at 38-42 (emphasis added).

**Fungi, Wet Rot, Dry Rot and Microbes[5]**

*Id.* at 118-19 (emphasis added).

---

[4] The insurance contract defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and any unhealthful or hazardous building materials (including but not limited to asbestos and lead products or materials containing lead). Waste includes materials to be recycled, reconditioned or reclaimed." Plaintiff's Complaint at 54.

[5] "Microbe(s)" is specifically defined in the following manner:

    "Microbe(s)" means any non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease. "Microbes" includes any spores, mycotoxins, odors, or any other substances, products, or by products produced by, or arising out of the current or past presence of "microbes."

*Id.* at 118-19 (emphasis added).

## V.    Standard of Review

It is well-settled that, after the relevant pleadings are closed, a party may move for summary judgment, in whole or in part, as a matter of law. Pa. R.C.P. 1035.2.  Summary judgment "may be entered only where the record demonstrates that there are no genuine issues of material fact, and it is apparent that the moving party is entitled to judgment as a matter of law." *City of Philadelphia v. Cumberland County Bd. of Assessment Appeals*, 81 A.3d 24, 44 (Pa. 2013).  Furthermore, appellate courts will only reverse a trial court's order granting summary judgment where it is "established that the court committed an error of law or abused its discretion." *Siciliano v. Mueller*, 149 A.3d 863, 864 (Pa. Super. 2016).

The interpretation of an insurance contract is a matter of law, which may be decided by this Court on summary judgment.  *Wagner. V. Erie Insurance Company*, 801 A.2d 1226, 1231 (Pa. Super. 2002).  When interpreting an insurance contract, this Court aims to effectuate the intent of the parties as manifested by the language of the written instrument.  *American and Foreign Insurance Company v. Jerry's Sport Center*, 2 A.3d 526, 540 (Pa. 2010).  When reviewing the language of the contract, words of common usage are read with their ordinary meaning, and this Court may utilize dictionary definitions to inform its understanding.  *Wagner*, 801 A.2d at 1231; *see also AAA Mid-Atlantic Insurance Company v. Ryan*, 84 A.3d 626, 633-34 (Pa. 2014).  If the terms of the contract are clear, this Court must give effect to the language. *Madison Construction Company v. Harleysville Mutual Insurance Company*, 735 A.2d 100, 106 (Pa. 1999).  However, if the contractual terms are subject to more than one reasonable interpretation, this Court must find that the contract is ambiguous.  *Id.*  "[W]hen a provision of a[n insurance contract] is ambiguous, the [contract] provision is to be construed in favor of the [the insured] and against the insurer, as the insurer drafted the policy and selected the language

10

which was used therein." *Kurach v. Truck Insurance Exchange*, 235 A.3d 1106, 1116 (Pa. 2020).

## VI.   Discussion

### a. Coverage Provisions

Plaintiff bears the initial burden to reasonably demonstrate that a claim falls within the policy's coverage provisions. *State Farm Cas. Co. v. Estates of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law). Then, provided that Plaintiff satisfies its initial burden, Defendants bear "the burden of proving the applicability of any exclusions or limitations on coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law). In order to prevail, Defendants must demonstrate that the language of the insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will be construed in favor of the insured." *Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange*, 771 A.2d 11, 13 (Pa. Super. 2001).

In their second matter complained of on appeal Defendants assert various arguments as to why this Court erred in finding that Plaintiff was entitled to Business Income and Extra Expense coverage.[6] Below this Court addresses all of Defendants arguments, and explains why Plaintiff is entitled to coverage under the Business Income and Extra Expense provisions of the insurance contract for losses Plaintiff sustained in relation to the public health crises and the spread of the COVID-19 virus.

With regard to Business Income and Extra Expense coverage, the insurance contract provides that:

a. Business Income means: (1) [n]et income (Net Profit or Loss before Income taxes) that would have been earned or incurred . . . and (2) [c]ontinuing normal

---

[6] Defendants' first matter complained of on appeal is merely a summary of its other seven matters complained of on appeal. As such, this Court will not address the first matter separately.

operating expenses incurred, including payroll, subject to 90 day limitation if
indicated on the Declaration page.

b. [the insurer] will pay for the actual loss of Business Income you [the insured]
sustain due to the necessary "suspension" of your "operations" during the "period
of restoration." The "suspension" must be caused by direct physical loss of or
damage to property at the described premises. The loss or damage must be
caused by or result from a Covered Cause of Loss.

Plaintiff's Complaint, at 58, Exhibit B.

* * * * *

a. Extra Expense means reasonable and necessary expenses you [the insured]
incur during the "period of restoration" that you would not have incurred if there
had been no direct physical loss of or damage to property caused by or resulting
from a Covered Cause of Loss.

b. [the insurer] will pay Extra Expense (other than to repair or replace property)
to: (1) [a]void or minimize the "suspension" of business and to continue
"operations" at the described premises or at replacement premises or temporary
locations, including relocation expenses and costs to equip and operate the
replacement premises or temporary locations; or (2) [m]inimize the "suspension"
of business if you cannot continue "operations."

c. [the insurer] will also pay any Extra Expense (including Expediting Expenses)
to repair or replace property, but only to the extent it reduces the amount of loss
that otherwise would have been payable under [the above Business Income
provision].

*Id.* at 59, Exhibit B.

The insurance contract defines "suspension" as the "partial or complete cessation of your

[the insured's] business activities; or . . . that a part or all of the described premises is rendered

untenantable," and "operations" means "the type of your [the insured's] business activities

occurring at the described premises and tenantability of the described premises." *Id.* at 53-55,

Exhibit B. The insurance contract defines "period of restoration" as:

the period of time that: [b]egins with the date of direct physical loss or damage
caused by or resulting from any Covered Cause of Loss at the described premises;
and . . . [e]nds on the earlier of: (1) [t]he date when the property at the described

premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) [t]he date when business is resumed at a new permanent location.

*Id.* at 53, Exhibit B. Additionally, "Covered Cause of Loss" is defined as "RISK OF DIRECT

PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in

paragraph A.4 Limitations; or c. Limited or Excluded by other provision of this Policy." *Id.* at

37, Exhibit B.

In order to state a reasonable claim for coverage under the Business Income and Extra

Expense provisions of the insurance contract, Plaintiff must show that it suffered "direct physical

loss of or damage to" its property. The interpretation of the phrase "direct physical loss of or

damage to property" is the key point of the parties' dispute.[7] Defendants contend that "direct

physical loss of or damage to property" requires some physical alteration of or demonstrable

harm to Plaintiff's property. Plaintiff contends that the "direct physical loss of . . . property" is

not limited to physical alteration of or damage to Plaintiff's property but includes the loss of use

of Plaintiff's property. Plaintiff further asserts that, because its interpretation is reasonable, this

Court must find in Plaintiff's favor.

The insurance contract does not define the phrase "direct physical loss of or damage to

property." As previously noted, Pennsylvania courts construe words of common usage in their

"natural, plain, and ordinary sense . . . and [Pennsylvania courts] may inform [their]

understanding of these terms by considering their dictionary definitions." *Madison Construction*

---

[7] The parties do not dispute whether Plaintiff's business operations were at least partially suspended or interfered with due to COVID-19 and/or the government orders. The parties mainly contend whether Plaintiff's loss of use of its property entitles Plaintiff to coverage. The dispositive question with regard to whether Plaintiff is entitled to coverage for Business Income and Extra Expense is whether Plaintiff suffered a "direct physical loss of or damage to" Plaintiff's property. To the extent the parties disagree as to the meaning of the "period of restoration," and the potential impact of this phrase on the meaning of "direct physical loss of or damage to" Plaintiff's property, this Court addresses this issue in the body of this memorandum, after this Court's discussion of the phrase "direct physical loss of or damage to property."

*Company,* 735 A.2d at 108. Four words in particular are germane to the determination of this threshold issue: "direct," "physical," "loss," and "damage." "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ."[8] "Physical" is defined as "of or relating to natural science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[9] "Loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[10] "Damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ."[11]

Before analyzing the definitions of each of the above terms to determine whether Plaintiff's interpretation is reasonable, it is important to note that the terms, in addition to their ordinary, dictionary definitions, must be considered in the context of the insurance contract and the specific facts of this case. *See Madison Construction Company,* 735 A.2d at 106 (clarifying that issues of contract interpretation are not resolved in a vacuum). While some courts have interpreted "direct physical loss of or damage to property" as requiring some form of physical alteration and/or harm to property in order for the insured to be entitled to coverage, this Court reasonably determined that any such interpretation improperly conflates "direct physical loss of" with "direct physical . . . damage to" and ignores the fact that these two phrases are separated in

---

[8] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[9] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

[10] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

[11] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

the contract by the disjunctive "or."[12]  It is axiomatic that courts must "not treat the words in the [contract] as mere surplusage . . . [and] if at all possible, [this Court must] construe the [contract] in a manner that gives effect to all of the [contract's] language." *Indalex Inc. v. Nation Union Fire Ins. Co. Pittsburgh, PA,* 83 A.3d 418, 420-21 (Pa. Super. 2013).  Based upon this vital principle of contract interpretation, this Court concluded that, due to the presence of the disjunctive "or," whatever "direct physical loss of" means, it must mean something different than "direct physical . . . damage to."

In order to determine what the phrase "direct physical loss of . . . property" reasonably means, this Court looked to the ordinary, dictionary definitions of the terms "direct," "physical," "loss," and "damage."  This Court began its analysis with the terms "damage" and "loss," as these terms are the crux of the disputed language.  As noted above, "damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ,"[13] and "loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[14]

Based upon the above-provided definitions, it is clear that "damage" and "loss," in certain contexts, tend to overlap.  This is evident because the definition of "damage" includes the term "loss," and at least one definition of "loss" includes the terms "destruction" and "ruin," both of which indicate some form of damage.  However, as noted above, in the context of this insurance contract, the concepts of "loss" and "damage" are separated by the disjunctive "or," and, therefore, the terms must mean something different from each other.  Accordingly, in this

---

[12] *See Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange,* 771 A.2d 11, 15 (Pa. Super. 2001) (explaining that merely accepting the non-binding decisions of other courts "by the purely mechanical process of searching the nations courts for conflicting decisions" amounts to an abdication of this Court's judicial role).

[13] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

[14] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

instance, the most reasonable definition of "loss" is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property, i.e., destruction and ruin.  Applying this definition gives the term "loss" meaning that is different from the term "damage."  Specifically, whereas the meaning of the term "damage" encompasses all forms of harm to Plaintiff's property (complete or partial), this Court concluded that the meaning of the term "loss" reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to property.

In reaching its conclusion, this Court also considered the meaning and impact of the terms "direct" and "physical."  Ultimately, this Court determined that the ordinary, dictionary definitions of the terms "direct" and "physical" are consistent with the above interpretation of the term "loss."  As noted previously, "direct" is defined as "proceeding from one point to another in time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ,"[15] and  "physical" is defined as "of or relating to natural science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[16]  Based upon these definitions it is certainly reasonable to conclude that Plaintiff could suffer "direct" and "physical" loss of use of its property absent any harm to property.

Here, Plaintiff's loss of use of its property was both "direct" and "physical."  The spread of COVID-19, and a desired limitation of the same, had a close logical, causal, and/or consequential relationship to the ways in which Plaintiff materially utilized its property and

---

[15] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[16] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

physical space. *See* February 22, 2021 Court Order of the United States District Court, N.D.

Illinois, Eastern Division case *In re: Society Insurance Co. COVID-19 Business Interruption*

*Protection Insurance Litigation*, Civil Case No. 1:20-CV-05965 at 21 (stating that government

shutdown orders and COVID-19 *directly* impacted the way businesses used *physical* space)

(emphasis added). Indeed, the spread of COVID-19 and social distancing measures (with or

without the Governor's orders) caused Plaintiff, and many other businesses, to *physically* limit

the use of property and the number of people that could inhabit *physical* buildings at any given

time. Thus, the spread of COVID-19 did not, as Defendant's contend, merely impose economic

limitations. Any economic losses were secondary to the businesses' *physical* losses.

    While Defendants are of course correct to point out that the terms "direct" and "physical"

modify the terms "loss" and "damage," this does not somehow necessarily mean that the entire

phrase "direct physical loss of or damage to property" requires actual harm to Plaintiff's property

in every instance. Any argument that the terms "direct" and "physical," when combined,

presuppose that any request for coverage must stem from some actual impact and harm to

Plaintiff's property suffers from the same flaw noted in this Court's above discussion regarding

the difference between the terms "loss" and "damage:" such interpretations fail to give effect to

all of the insurance contract's terms and, again, render the phrase " direct physical loss of"

duplicative of the phrase "direct physical . . . damage to."

    Defendants also contend that the insurance contract's definition for "period of

restoration" suggests that the contract expressly contemplates and necessitates the existence of

actual tangible damage in order for Plaintiff's to be entitled to Business Income and Extra

Expense coverage. The insurance contract states that the insurer "will pay for the actual loss of

Business Income [the insured] sustain[s] due to the necessary "suspension" of . . . "operations"

during the "period of restoration." Plaintiff's Complaint at 58, Exhibit B. The "period of restoration" begins at the time the direct physical loss of or damage to property occurs and ends on the date when the premises "should be repaired, rebuilt, or replaced with reasonable speed and similar quality . . . or . . . when the business is resumed at a new location." *Id.* at 53, Exhibit B. Specifically, Defendants argue that, without actual tangible damage, there is no period of restoration because there is no need for the property to be repaired, rebuilt, or replaced, and Plaintiff has no plans to resume the business at a new location.

Although this Court agrees with Defendants on the general principle that the insurance contract's provisions must be read as a whole so that all of its parts fit together, this Court is not persuaded that the definition for "period of restoration" is inherently inconsistent with an interpretation of "direct physical loss of . . . property" that encompasses Plaintiff's loss of use of its property in the absence of damage. Indeed, the threat of COVID-19 has necessitated many physical changes to business properties across the Commonwealth. Such changes include, but are not limited to, the installation of partitions, additional handwashing/sanitization stations, and the installations or renovation of ventilation systems. These changes would undoubtably constitute "repairs" or "rebuilding" of property. *See* February 22, 2021 Court Order of the United States District Court, N.D. Illinois, Eastern Division case *In re: Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation*, Civil Case No. 1:20-CV-05965 at 23 (stating that the installation of partitions and particular ventilations systems constitute "repairs" consistent with the period of restoration). Additionally, in order to "replace" or "rebuild" unused space due to social distancing protocols, businesses might choose to buildout new spaces, move to larger spaces, or rearrange existing spaces in order to increase the amount of business they can safely handle during these difficult times.

Whether or not Plaintiff in the instant matter actually undertook such changes, or resumed its business at a new location, is of no moment. The "period of restoration" does not require repairs, rebuilding, replacement, or relocation of Plaintiff's property in order for Plaintiff to be entitled to coverage. The "period of restoration" merely imposes a time limit on available coverage, which ends whenever such measures, if undertaken, would have been completed with reasonable speed and similar quality. To put this another way, the "period of restoration" ends when Plaintiff's business is once again operating at normal capacity, or reasonably could be operating at normal capacity. The "period of restoration" does not somehow redefine or place further substantive limits on types of available coverage. Defendants cannot avoid providing coverage that is otherwise available simply because the end point with regard to the "period of restoration" may be, at times, slightly more difficult to pinpoint in the context of the COVID-19 pandemic.[17]

As this Court determined that it is, at the very least, reasonable to interpret the phrase "direct physical loss of . . . property" to encompass the loss of use of Plaintiff's property due to the spread of COVID-19 absent any actual damage to property, Plaintiff reasonably established a right to coverage under the Business Income and Extra Expense provisions of the insurance contract.[18]

---

[17] In their statement of matters complained of on appeal, Defendants argue that this Court erred in interpreting the phrase "direct physical loss of or damage to property" by wresting each word in this phrase out of context and interpreting it in isolation. Defendants further claim that this Court erred because it ignored non-binding case law holding that "direct physical loss of or damage to property" does not encompass loss of use. Both of Defendants contentions lack merit. Indeed, this Court's above analysis demonstrates that this Court thoroughly considered the meaning of the phrase "direct physical loss of and damage to property" in context of the insurance contract as a whole. In doing so, this Court also considered the reasoning of other court's that reached different conclusions in similar cases. This Court simply found those other courts' non-binding opinions unpersuasive. This is primarily due to the fact that, if the contract's terms are subject to more than one reasonable interpretation, they are ambiguous, and Pennsylvania law directs this Court to find in favor of the insured.

[18] This Court is aware that the insurance contract provides that any "direct physical loss of or damage to property" must be caused by a Covered Cause of Loss. However, Covered Cause of Loss is defined as "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations;

In their third matter complained of on appeal Defendants assert various arguments as to why this Court erred in finding that Plaintiff was entitled to Civil Authority coverage. Below this Court addresses all of Defendants arguments, and explains why Plaintiff is entitled to coverage under the Civil Authority provision of the insurance contract for losses Plaintiff sustained in relation to the Governor's orders, which were issued to help mitigate the spread of the COVID-19 virus. With regard to Civil Authority coverage, the insurance contract provides that:

> 1. When the Declarations show that [the insured has] coverage for Business Income and Extra Expense, [the insured] may extend that insurance to apply to the actual loss of Business Income [the insured] sustain[s] and reasonable and necessary Extra Expense [the insured] incur[s] caused by an action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

Plaintiff's Complaint at 84, Exhibit B (emphasis added).

Thus, in order to state a reasonable claim of coverage under the Civil Authority provision of the insurance contract, Plaintiff must reasonably demonstrate both of the following: [1] there was "direct physical loss of or damage to property" other than Plaintiff's property; and [2] the

---

or c. Limited or Excluded by other provision of this Policy." *Id*. at 37, Exhibit B. Admittedly, this Court was somewhat perplexed by this definition. One would think that in defining Covered Causes of Loss the contract would state, either specifically or more generally, covered causes of loss, i.e. fire, tornado, hurricane, lightening, etc.. Here, the contract's language instead turns back on itself and states that "direct physical loss of or damage to property" must be caused by "RISK OF DIRECT PHYSICAL LOSS unless the loss is . . . Excluded . . . ." Given that this insurance contract is an "All Risk" insurance policy that is meant to cover any losses, damages, and expenses to the insured's premises unless specifically excluded, this Court determined it is reasonable to interpret Covered Cause of Loss in a manner that does not further limit the scope of coverage beyond any instance that amounts to a "direct physical loss of or damage to property," which is not otherwise excluded. Accordingly, this Court determined that as long as the spread of COVID-19 caused "direct physical loss of or damage to property," and does not fall within the ambit of one of the contract's exclusions, it is reasonable to interpret the contract as entitling Plaintiff to coverage. This same analysis regarding the term Covered Cause of Loss applies equally in the context of the contract's provision regarding Civil Authority coverage. Thus, this Court need not address Covered Cause of Loss again separately.

"direct physical loss of or damage to property" other than Plaintiff's property caused civil authorities to take action(s) that prohibited access to Plaintiff's property.

Defendants contend that Plaintiff is not entitled to coverage under the Civil Authority provision of the contract because the Governor's orders did not completely prohibit Plaintiff from accessing its property.  According to Defendants, although the Governor's orders closed Plaintiff's property to the majority of the general public, Plaintiff is nonetheless precluded from coverage under the Civil Authority provision of the insurance contract because Plaintiff and Plaintiff's employees were still able to access Plaintiff's property in order to conduct emergency procedures.  Defendants also argue, just as they did with regard to the Business Income and Extra Expense coverage provisions, that any actions taken by civil authorities in response to COVID-19 were not caused by "direct physical loss of or damage to" property at any location. In contrast, Plaintiff contends that, because the Governor's orders prohibited Plaintiff from operating its business except in cases of emergency, and because the Governor's orders directed citizens of the Commonwealth to stay at home, the Governor's orders effectively prohibited meaningful access to Plaintiff's property.  Additionally, Plaintiff argues that COVID-19 caused "direct physical loss of or damage to" property across the Commonwealth just as it did with regard to Plaintiff's property.

As to whether the spread of the COVID-19 virus caused "direct physical loss of or damage to" property, the same analysis that this Court applied with regard to Plaintiff's property also applies to other property as well.  Even absent any damage to property, the spread of COVID-19 has resulted in a serious public health crisis, which has directly and physically caused the loss of use of property all across the Commonwealth.  Again, this is evident because COVID-19 and the related social distancing measures (with and without government orders) directly

forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time in a safe and responsible manner. This Court's conclusion that other property was impacted by COVID-19 is supported by the Supreme Court of Pennsylvania. In *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 890 (Pa. 2020), our Supreme Court clarified that the COVID-19 virus qualifies as a natural disaster, and, given the nature of the manner in which COVID-19 spreads, Governor Wolf "had the authority under the Emergency Code to declare the entirety of the Commonwealth a disaster area."[19]

With regard to whether "an action of civil authority . . . prohibit[ed] access" to Plaintiff's property, this Court determined that the phrase "prohibits access" may reasonably be interpreted to encompass the instant situation. The term "prohibit" is defined as "to forbid by authority [and/or] to prevent from doing something . . . ."[20] Here, the Governor's emergency orders did exactly that. The Governor's orders directed individuals to stay home and required businesses to essentially close their doors absent emergencies and/or the need to conduct life sustaining operations. Although Plaintiff's business (a dental practice) was technically permitted to remain open to conduct certain limited emergency procedures, this does not change the fact that an action of civil authority effectively prevented, or forbade by authority, citizens of the Commonwealth from accessing Plaintiff's business in any meaningful way for normal, non-emergency procedures; procedures that likely yield a significant portion of Plaintiff's business income.

---

[19] In its opinion upholding the Governor Wolf's use of the Emergency Code to shutdown businesses throughout the Commonwealth, the Supreme Court of Pennsylvania explained that, as of April 8, 2020, confirmed cases of COVID-19 had been reported in every single county in the Commonwealth, and "*any location where two or more people can congregate is within the disaster area*." *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889-90 (Pa. 2020) (emphasis added). The Supreme Court of Pennsylvania reached this conclusion because "[t]he virus spreads *primarily through person-to-person contact*, has an incubation period of up to fourteen days, one in four carriers are asymptomatic, and the virus can live on surfaces for up to four days." *Id*. at 889 (emphasis added).

[20] Prohibit, Merriam-Webster, https://www.merriam-webster.com/dictionary/prohibit.

This Court is not persuaded by Defendant's argument that, in order to be entitled to Civil Authority coverage, the action of civil authority must be a complete and total prohibition of all access to Plaintiff's property by *any* person for *any* reason. If this Court were to accept Defendant's cramped interpretation of the phrase "prohibits access," it would result in businesses being precluded from coverage in nearly every instance where an action of civil authority effectively closes the business to the vast majority of the general public, but does not necessarily preclude employees, or certain other individuals, from entering the premises to clean, maintain the building, obtain important documents, or to perform other similar functions, which, while important, remain secondary to the activities that actually generate business income.

Once again this Court notes the importance of reading the insurance contract's provisions as a whole so that all of its parts fit together. In so doing, this Court recognizes that the insurance contract provisions at issue are generally designed to provide business owners with coverage for lost busines *income* in the event that their business' operations are suspended. Accordingly, this Court's primary focus when interpreting the phrase "prohibits access," at least in the context of this insurance contract, is the extent to which the action of civil authority prevented the insured from accessing its premises in a manner that would normally produce actual and regular business income. Given this understanding of the insurance contract, the fact that some employees, and even some limited number of patients, were still permitted to go to Plaintiff's property for emergency procedures does not necessarily mean that Plaintiff is altogether precluded from coverage under the Civil Authority provision. The contract merely requires that "an action of civil authority . . . prohibits access to" Plaintiff's property. It does not clearly and unambiguously state that any such prohibition must completely and totally bar *all* persons from *any* form of access to Plaintiff's property whatsoever.

23

As this Court determined that Plaintiff provided a reasonable interpretation that: [1] there was "direct physical loss of or damage to property" other than Plaintiff's property; and [2] the "direct physical loss of or damage to property" other than Plaintiff's property caused civil authorities to take action(s) that prohibited access to Plaintiff's property, this Court concluded that Plaintiff established a right to coverage under the Civil Authority provision of the contract.

### b. Exclusions

Having determined that Plaintiff provided reasonable interpretations demonstrating that there is coverage under the Business Income, Extra Expense, and Civil Authority provisions of the insurance contract, this Court turns to the question of whether Defendants demonstrated "the applicability of any exclusions or limitations on coverage." *Koppers Co.*, 98 F.3d at 1446 (applying Pennsylvania law). As discussed previously, in order to prevail, Defendants must show that the language of the insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will be construed in favor of the insured." *Fayette County Housing Authority*, 771 A.2d at 13.

In their fourth matter complained of on appeal, Defendants argue that this Court erred in finding that the insurance contract's "Contamination" exclusion was inapplicable. With regard to this exclusion, the insurance contract provides that "[the insurer] will not pay for loss or damage caused directly or indirectly by any of the following . . . [c]ontamination by other than "pollutants." Plaintiff's Complaint at 41, Exhibit B. Because the insurance contract does not define the term contamination, this Court looks to the word's natural, plain, and ordinary meaning, and informs its understanding of this term by considering its dictionary definition. *Madison Construction Company*, 735 A.2d at 108.

Merriam-Webster defines contamination as "the process of contaminating [and/or] the state of being contaminated."[21]    Additionally, in *Raybestos-Manhattan, Inc. v. Industrial Risk Insurers*, 433 A.2d 906, 907 (Pa. Super. 1981), the Superior Court of Pennsylvania clarified that:

> Contamination connotes a condition of impurity resulting from mixture or contact with a foreign substance . . . [and] the word contaminate is defined as . . . to render unfit for use by the introduction of unwholesome or undesirable elements . . . . Contaminate implies an action by something external to an object which by entering into or coming in contact with the object destroys its purity.

This Court recognizes that the above-described common and ordinary definitions of the terms contamination and contaminate are considerably broad.  However, in determining whether the contamination exclusion applies clearly and unambiguously to the loss of use of property due to social distancing measures designed to prevent the spread of COVID-19, this Court acknowledges that the question is not whether the definition of contamination is so broad that virtually anything could come within its ambit.  *Madison Construction Co.*, 735 A.2d at 607.  Instead, this Court is "guided by the principle that ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts."  *Id.*

Based upon the above dictionary definitions, the contamination exclusion only applies, in the broadest sense, when something external comes into contact with an object, i.e., property, and destroys the object's purity.  Accordingly, if the specific cause of the loss of use of property was COVID-19 contacting objects, and destroying the objects' purity, then the insurance contract's contamination exclusion might prevent coverage.  However, based upon the particular facts of this case, and considering the primary means by which COVID-19 spreads, the cause for the loss of use of property was *not* the contamination of property.  Rather, the cause of the loss of use of property was the risk of person-to-person transmission of COVID-19, which necessitated

---

[21] Contamination, Merriam-Webster, https://www.merriam-webster.com/dictionary/contamination.

social distancing measures and fundamentally changed the way businesses utilized physical space (property).

The Supreme Court's recent decision in *Friends of Danny DeVito* supports the above conclusion. In rejecting the argument that actual contamination of specific property was necessary in order to justify Governor Wolf's orders restricting business operations throughout the Commonwealth, the Supreme Court of Pennsylvania elucidated that arguments regarding the dangers of COVID-19 contaminating property misunderstand the primary means by which COVID-19 spreads. *Id.* at 892. Specifically, the Supreme Court of Pennsylvania clarified that "COVID-19 does not spread because the virus is *at* a particular location . . . [i]nstead it spreads because of person-to-person contact, as it has an incubation period of up to fourteen days and that one in four carriers are asymptomatic." *Id.* (emphasis in original).

Although it is contested whether COVID-19 can live on the surfaces of property for some period of time, and while this might be one way by which individuals contract COVID-19, it is not the primary means nor is it the only means by which COVID-19 spreads. *Id.* Indeed, with or without actual COVID-19 contamination at any given property in the Commonwealth, businesses suffered the loss of use of property due to the risk of person-to-person COVID-19 transmission. Thus, the risk of person-to-person transmission of COVID-19, and the social distancing measures necessary to mitigate the spread of the COVID-19, together constitute a cause that is both *separate and distinct* from any possible or actual contamination of property.[22]

---

[22] In their statement of matters complained of on appeal, Defendants argue that, in reaching the conclusion that the "Contamination" exclusion did not preclude coverage, this Court ignored the fact that the insurance contract provides that the insurer "will not pay for loss or damage caused *directly* or *indirectly* by . . . [c]ontamination by other than 'pollutants.'" The problem with this argument is that it misunderstands this Court's reasoning with regard to the "Contamination" exclusion. Importantly, Defendants seem to be under the impression that this Court held that Plaintiff's loss of use, which was due to the risk of person-to-person transmission, was somehow also indirectly the result of "contamination." However, this Court could not have been more clear when it stated that the risk of person-to-person transmission of COVID-19, and the social distancing measures necessary to mitigate the spread of the COVID-19, together constitute a cause that is both *separate and distinct* from any possible or actual

It is important to note that, although the contamination exclusion might, at times, cover viruses when viruses actually contaminate property, the contamination exclusion does *not* altogether exclude loss of use of property caused by viruses in any manner whatsoever.  If Defendants wanted to exclude coverage for any loss caused by viruses in any manner whatsoever, Defendants could have easily included such a provision clearly and unambiguously in the contract.  However, Defendants did not include a virus exclusion.

In sum, because it is reasonable to conclude that the loss of use of property due to the risk of person-to person transmission of COVID-19 is not clearly and unambiguously encompassed by the contamination exclusion, Defendants failed to show that the contamination exclusion prevents coverage in this instance.[23]

In their fifth matter complained of on appeal, Defendants argue that this Court erred in finding that the exclusion for Fungi, Wet Rot, Dry Rot and Microbes was inapplicable.  With regard to this exclusion, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by the "[p]resence, growth, proliferation, spread or any activity of fungi, wet or dry rot, or microbes."  Plaintiff's Complaint at 118, Exhibit B.  The insurance contract provides the following definition for the term "Microbes:"

> "Microbe(s)" means any non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease.  "Microbes" includes any spores, mycotoxins, odors, or any other substances, products, or by products produced by, or arising out of the current or past presence of "microbes."

---

contamination of property.  Thus, the risk of person-to-person transmission is neither directly or indirectly related to "contamination by other than pollutants."

[23] While this Court's above analysis is not dependent upon whether COVID-19 was in fact at Plaintiff's premises, Defendants' Cross Motions for Summary Judgment acknowledge that "Plaintiff neither alleged nor produced evidence that the virus was present at its dental offices . . . ."  Valley Forge Insurance Company 's Cross Motion for Summary Judgment at 10; *see also* CNA's Cross Motion for Summary Judgment at 10.  This fact provides further support that the contamination exclusion does not prevent coverage in this instance.  Defendants cannot, at the same time, contend that the virus was not present at Plaintiff's property and that the exclusion contamination exclusion applies.

27

*Id*. at 19, Exhibit B.

Without any elaboration and explanation, Defendants contend that COVID-19 is excluded because viruses fall within the insurance contract's definition of the term "Microbe." This Court is, however, not persuaded that Defendants' interpretation of the term "Microbe" is clear and unambiguous.

Naturally, upon its initial review, the contract's use of the word "Microbe" caused this Court to pause and generally wonder what is a "Microbe," and more specifically with regard to this case, does a virus qualify as a "Microbe?"  Again, this begs the question: If Defendants wanted to exclude viruses, why not simply use the word virus explicitly in the insurance contract?  Regardless, even assuming that a virus could technically be considered a "Microbe" in the most general sense of the word, this Court recognizes that, in this instance, it is of course not the general sense of the term "Microbe" that is controlling.  Rather, because the insurance contract provides a specific definition of the term "Microbe," it is this definition that necessarily dictates what a "Microbe" is, and whether viruses fall within the ambit of the contract's "Microbe" exclusion.

Upon reading the insurance contract's definition of the term "Microbe," this Court determined that, in order to fall within the "Microbe" exclusion, COVID-19 must qualify as a "micro-organism" and/or an "organism."  Because the contract does not define the terms "micro-organism" or "organism," this Court looked to the words' natural, plain, and ordinary meaning, and informed its understanding of these terms by considering their dictionary definitions. *Madison Construction Company*, 735 A.2d at 108.

Merriam-Webster defines "microorganism" as "an organism (such as a bacterium or protozoan) of microscopic or ultramicroscopic size."[24]  Merriam-Webster defines "organism" in relevant part as "an individual constituted to carry on the activities of life by means of parts or organs more or less separate in function but mutually dependent [and/or] *a living being*."[25]

In contrast, Merriam-Webster defines a virus as "any large group of submicroscopic infectious agents that are usually regarded as *nonliving* extremely complex molecules . . . that are capable of growth and multiplication only in living cells, and that cause various important diseases in humans, animals, and plants."[26]  In fact, "outside a host viruses are dormant . . . [they] have none of the traditional trappings of life [and their] zombielike existence . . . makes them easy to catch and hard to kill."[27]

Based upon the ordinary, dictionary definitions of the terms "microorganism," "organism," and "virus," this Court concluded that: [1] the term "Microbe" generally includes things that carry on the activities of life, i.e., things that are alive; and [2] a virus is generally regarded as something that is non-living, and is capable of growth and multiplication only when it attaches to, or gets inside of, other living host cells.  Accordingly, given the insurance contract's specific definition of the term "Microbe," it is reasonable to conclude that the "Microbe" exclusion does not actually encompass viruses, as viruses are generally not considered living things.  Consequently, this Court determined that Defendants failed to

---

[24] Microorganism, Merriam-Webster, https://www.merriam-webster.com/dictionary/microorganism.

[25] Organism, Merriam-Webster, https://www.merriam-webster.com/dictionary/organism (emphasis added).

[26] Virus, Merriam-Webster, https://www.merriam-webster.com/dictionary/virus (emphasis added).

[27] Sarah Kaplan et al., *The coronavirus isn't alive. That's why it's so hard to kill.*, The Washington Post, March 23, 2020 https://www.washingtonpost.com/health/2020/03/23/coronavirus-isnt-alive-thats-why-its-so-hard-kill/.

demonstrate that the exclusion for Fungi, Wet Rot, Dry Rot and Microbes clearly and unambiguously prevents coverage.

In reaching these conclusions, this Court of law does not masquerade as an expert in the complex intricacies of science, nor does it presume to wholly realize the subtle considerations by which trained scientists define and classify things in the natural world. This Court acknowledges that, in certain contexts, the terms "microorganism" and/or "organism" might refer to things that are not traditionally considered living entities.[28] This Court also understands that there are some in the scientific community who might classify viruses as a kind of semi-living, zombie-like thing.[29] However, this Court need not wade into the mire of such sophisticated considerations. The question before this Court on summary judgment is not so complicated. The question is simply whether the insurance contract provisions at issue are subject to more than one reasonable interpretation. If the contract's terms are subject to more than one reasonable interpretation, they are ambiguous, and Pennsylvania law directs this Court to find in favor of the insured.[30] Again,

---

[28] Merriam-Webster also defines "organism" in the most general sense as "a complex structure of interdependent and subordinate elements whose relations and properties are largely determined by their function in the whole." Organism , Merriam-Webster, https://www.merriam-webster.com/dictionary/organism. Merriam-Webster elaborates on this particular use of the word organism by providing the following quotation from Joseph Rossi: "the nation is not merely the sum of individual citizens at any given time, but it is a living organism, a mystical body . . . of which the individual is an ephemeral part." *Id.* Based upon this quotation, and the context in which the terms "microorganism" and "organism" appear in the insurance contract, this Court concluded that more scientific definition is most relevant to this Court's discussion.

[29] While there is some argument over whether viruses are living organisms, "[m]ost virologists consider them non-living, as they do not meet all the criteria of the generally accepted definition of life." *What are microorganisms?* Centre for Geobiology, University of Bergen, November 1, 2010 https://www.uib.no/en/geobio/56846/what-are-microorganisms.

[30] In their statement of matters complained of on appeal, Defendants argue that there remains a disputed issues of fact as to whether there is more than one reasonable interpretation of the term "Microbe," and that this issue is more properly the subject of expert analysis. This Court disagrees. "[T]he task of interpreting [an insurance] contract is generally performed by a court . . . ." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999). Additionally, this Court may inform its understanding of the contract's terms using ordinary, dictionary definitions. *Id.* at 108. This Court's analysis regarding the term "Microbe" thoroughly explains that "Microbe" is subject to more than one reasonable interpretation. As such, as already explained ad nauseum throughout this opinion, this Court must find in favor of the insured.

this Court may inform its understanding of the contract's terms using ordinary, dictionary definitions. *See Madison Construction Company*, 735 A.2d at 108. Based upon the above definitions, this Court determined that it is reasonable to interpret the "Microbe" exclusion as applying only to *living* microscopic things such as bacterium, and *not non-living* viruses.[31]

In their sixth matter complained of on appeal, Defendants argue that this Court erred in finding that the exclusion for Consequential Loss was inapplicable. With regard to this exclusion, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by "[d]elay, loss of use or loss of market." Plaintiff's Complaint at 41, Exhibit B. Defendants argue that even if Plaintiff had shown a basis for coverage under the insurance contract, this exclusion clearly and unambiguously excludes coverage.

The problem with this exclusion is not so much that it is unclear or ambiguous. Rather, the problem is that, based upon a plain reading of the Consequential Loss exclusion, this exclusion would vitiate Business Income, Extra Expense, and Civil Authority coverage in their entirety. *See* January 19, 2021 Court Order of the United States District Court, N.D. Ohio, Eastern Division case *Henderson Road Restaurant Systems, Inc. v. Zurich American Insurance Company*, Civil Case No. 1:20-cv-01239-DAP (holding that "the Loss of Use exclusion *would* vitiate the Loss of Business Income coverage"). This evident because, even if this Court accepted Defendants' more limited interpretation of the scope of coverage and the phrase "direct physical loss of or damage to property" to only include coverage in instances where Plaintiff's

---

[31] Bacterium is defined to include to following:

> any of a domain (Bacteria) . . . of chiefly round, spiral, or rod-shaped single-celled prokaryotic microorganisms that typically *live* in soil, water, organic matter, or the bodies of plants and animals, that make their own food especially from sunlight or are saprophytic or parasitic, are often motile by means of flagella, reproduce especially by binary fission, and include many important pathogens.

Bacterium, Merriam-Webster, https://www.merriam-webster.com/dictionary/bacterium (emphasis added).

property was physically altered or damaged, this exclusion would effectively eliminate coverage for any kind of loss and/or damage caused by any covered peril, which closes Plaintiff's business while it is being repaired. *Id.* In other words, if this Court were to find the exclusion for Consequential Loss to be valid, this exclusion would make all Business Income, Extra Expense, and Civil Authority coverage illusory. *See Heller v. Pennsylvania League of Cities and Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of an insurance contract operates to foreclose the majority of expected claims, such a provision is void as it renders coverage illusory). Because this Court must read the insurance contract in its entirety, and in a manner calculated to give the agreement its intended effect, this Court concludes that the exclusion for Consequential Loss does not prevent coverage.[32]

In their seventh matter complained of on appeal, Defendants argue that this Court erred in finding that the exclusions for Acts or Decisions and Ordinance or Law were inapplicable. With regard to the exclusion for Acts or Decisions, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by "Acts or Decisions, including the failure to act or decide, of any person, group, organization or governmental body." Plaintiff's Complaint at 42, Exhibit B. With regard to the exclusion for Ordinance or Law, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by the following:

> (1) The enforcement of any ordinance or law:
> (a) Regulating the construction, use or repair of any property; or
> (b) Requiring the tearing down of any property, including the cost of removing debris.

---

[32] In their statement of matters complained of in appeal, Defendants argue that this Court failed to recognize that the point of a coverage exclusion is the exclude coverage in certain agreed-upon situations, which necessarily vitiates coverage in some circumstances. Once again Defendants misunderstand this Court's analysis. This Court is not concerned that the Consequential Loss exclusion might vitiate coverage in certain limited circumstances. Rather, this Court determined that the problem with the Consequential Loss exclusion is that it makes coverage for all Business Income, Extra Expense, and Civil Authority coverage illusory.

(2) This exclusion applies whether the loss results from:
    (a) An ordinance or law that is enforced even if the property has not been
    damaged; or
    (b) The increased costs incurred to comply with an ordinance or law in the
    course of construction, repair, renovation, remodeling or demolition or
    property, or removal of its debris, following a physical loss to that
    property.

Defendants argue that coverage is precluded by both of the above exclusions because

Plaintiff's claim for "direct physical loss of or damage to property" is solely due to the

Governor's orders. This, however, is not the case. In its complaint, Plaintiff states that its claim

for coverage is based upon losses and expenses Plaintiff suffered in relation to both *"the COVID-*

*19 pandemic* and the actions of the government in response thereto." Plaintiff's Complaint at 4

(emphasis added). As this Court explained earlier in this memorandum, COVID-19 and the

related social distancing measures (with and without government orders) directly forced

businesses everywhere to physically limit the use of property and the number of people that

could inhabit physical buildings at any given time. The Governor's orders only came into

consideration in the context of Plaintiff's claim for coverage under the Civil Authority provision

of the contract.[33] Accordingly, Defendants failed to demonstrate that the exclusions for Acts or

Decisions and Ordinance or Law preclude coverage.

Finally, in their eighth matter complained of on appeal, Defendants argue that this Court

erred in finding that Plaintiff is entitled to Summary Judgment against Defendant CNA in

particular. Defendants argue that CNA is not a proper party in this action. This Court disagrees.

It is undisputed that, after Plaintiff filed its claim with Valley Forge Insurance Company,

---

[33] Certainly, the exclusions for Acts or Decisions and Ordinance or Law could not have been intended to exclude coverage under the Civil Authority provision of the contract, as this would make any extended coverage for the actions of Civil Authority illusory. *See Heller v. Pennsylvania League of Cities and Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of an insurance contract operates to foreclose expected claims, such a provision is void as it renders coverage illusory).

Plaintiff received a letter stating that Plaintiff is not entitled to coverage. Plaintiff's Complaint at 174, Exhibit C. Importantly, the letter is written by a Mark Chancellor, who identifies himself as a Claims Representative with CNA. In the letter, Mark Chancellor speaks on behalf of Valley Forge Insurance Company and specifically states that "*[w]e* have evaluated the claim under a CNA Connect Policy issued to Timothy A. Ungarean by VFIC . . . Policy No. 6025183026 (the "Policy")." *Id.* at 175, Exhibit C (emphasis added). Accordingly, despite the fact that Valley Forge Insurance Company is a subsidiary company of CNA, because that the initial denial letter came from a CNA Claims Representative, this Court determined that CNA is also a proper party in this declaratory judgment action. *See Good v. Holstein,* 787 A.2d 426, 430 (Pa. Super. 2001) (holding that "the corporate form will be disregarded only when the entity is *used to defeat public convenience*, justify wrong, protect fraud or defend a crime") (emphasis added).

## VII.   Conclusion

In Pennsylvania, "where there is doubt or uncertainty about the meaning of ambiguous language used in a policy of insurance, the policy must be construed in favor of the insured in order to not defeat the protection which [the insured] reasonably expected from the policy [the insured] purchased." *Raybestos-Manhattan, Inc.,* 433 A.2d at 483. This Court determined that Plaintiff's interpretations of the Business Income, Extra Expense, and Civil Authority provisions of the insurance contract were, at the very least, reasonable. Additionally, this Court concluded that Defendants failed to demonstrate that any of the insurance contract's exclusions clearly and unambiguously prevent coverage. Accordingly, because there are no genuine issues of material fact, this Court's March 22, 2021 Memorandum and Order of Court, which granted Plaintiff's Motion for Summary Judgment and denied Defendants' Cross Motions for Summary Judgement, should be affirmed.

By the Court:

*Christine Ward*, J.

Christine Ward, J.

Dated: 6/1/2021

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| TIMOTHY A. UNGAREAN, DMD d/b/a | : | CIVIL DIVISION |
| SMILE SAVERS DENTISTRY, PC, | : | |
| INDIVIDUALLY AND ON BEHALF OF | : | |
| A CLASS OF SIMILARLY SITUATED | : | No.: GD-20-006544 |
| PERSONS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Memorandum and Order of Court** |
| | : | |
| CNA and VALLEY FORGE INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

*Counsel for Plaintiff:*
John P. Goodrich, Esquire
Lauren R. Nichols, Esquire
429 Fourth Ave.
Suite 900 Pittsburgh, PA 15219

Scott B. Cooper, Esquire
209 State Street
Harrisburg, PA 17101

James C. Haggerty, Esquire
1835 Market Street
Suite 2700 Philadelphia, PA 19103

Jonathan Shub, Esquire
Kevin Laukaitis, Esquire
134 Kings Highway East
2nd Floor Haddonfield, NJ 08033

*Counsel for Defendants:*
Robert M. Runyon III, Esquire
Daniel J. Grossman, Esquire
400 Maryland Drive
Fort Washington, PA 19034

William Pietragallo II, Esquire
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| TIMOTHY A. UNGAREAN, DMD d/b/a SMILE SAVERS DENTISTRY, PC, INDIVIDUALLY AND ON BEHALF OF A CLASS OF SIMILARLY SITUATED PERSONS, | : : : : : : | CIVIL DIVISION<br><br>No.: GD-20-006544 |
| Plaintiff, | : : | |
| v. | : : | **Memorandum and Order of Court** |
| CNA and VALLEY FORGE INSURANCE COMPANY, | : : : | |
| Defendants. | : : | |

## MEMORANDUM AND ORDER OF COURT

**I.    The Parties**

Timothy A. Ungarean, DMD, d/b/a Smile Savers Dentistry, PC is a dentist who owns and operates a dental practice with places of business located at 4701 Baptist Road, Pittsburgh, Allegheny County, Pennsylvania, 15227 and 3153 Brodhead Road, Suite A, Aliquippa, Beaver County, Pennsylvania, 15001.  Timothy A. Ungarean, DMD, is hereinafter referred to as "Ungarean" or "Plaintiff."

CNA is a property and casualty insurance company with a principal place of business at 151 North Franklin Street, Floor 9, Chicago, Illinois 60606.[1]  Valley Forge Insurance Company

---

[1] In their Cross Motions for Summary Judgment, both Valley Forge Insurance Company and CNA argue that CNA is not a proper party in this action. This Court disagrees. After Plaintiff filed its claim with Valley Forge Insurance Company, Plaintiff received a letter that Plaintiff is not entitled to coverage. Plaintiff's Complaint at 174, Exhibit C. Importantly, the letter is written by a Mark Chancellor, who identifies himself as a Claims Representative with CNA. In the letter, Mark Chancellor speaks on behalf of Valley Forge Insurance Company and specifically states that "*[w]e* have evaluated the claim under a CNA Connect Policy issued to Timothy A Ungarean by VFIC . . . Policy No. 6025183026 (the "Policy")." *Id.* at 175, Exhibit C (emphasis added). Given that the initial denial letter came from a CNA Claims Representative, this Court determined that CNA is a proper party in this declaratory judgment action. *See Shared Communications Services of 1800-80 JFK Blvd. Inc. v. Bell Atlantic Properties Inc.*, 692 A.2d 570, 573 (Pa. Super. 1997) (holding that "courts will disregard the corporate entity only in the limited

2

is a wholly owned subsidiary company of CNA, and also provides property and casualty

insurance.  Both CNA and Valley Forge Insurance Company regularly and routinely conduct

business in the Commonwealth of Pennsylvania.  CNA and Valley Forge Insurance Company are

hereinafter collectively referred to as "Defendants."

**II.      Introduction**

         In March and April of 2020, in order to prevent and mitigate the spread of the

coronavirus disease "COVID-19," Governor Tom Wolf ("Governor Wolf") issued a series of

mandates restricting the operations of certain types of businesses throughout the Commonwealth

of Pennsylvania (the "Governor's orders").  On March 6, 2020, Governor Wolf issued an order

declaring a Proclamation of Disaster Emergency.  On March 19, 2020, Governor Wolf issued an

order requiring all non-life sustaining businesses in Pennsylvania to cease operations and close

physical locations.  On March 23, 2020, Governor Wolf issued an order directing Pennsylvania

citizens in particular counties to stay at home except as needed to access life sustaining services.

Then, on April 1, 2020, Governor Wolf extended the March 23, 2020 order, and directed all of

Pennsylvania's citizens to stay at home.  As of April 1, 2020, at least 5,805 citizens of

Pennsylvania contracted COVID-19 in sixty counties across the Commonwealth, and seventy-

four (74) citizens died.[2]  Unfortunately, since April 1, 2020, the number of positive cases and

deaths from COVID-19 has increased dramatically.[3]

---

circumstances when *used to defeat public convenience*, justify wrong, protect fraud or defend a crime") (emphasis added).

[2] *See* Governor Tom Wolf, *Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home*, (April 1, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf.

[3] As of March 21, 2021, 843,135 citizens of Pennsylvania have contracted COVID-19 and 24,788 citizens have died. *See* Pennsylvania Department of Health, COVID-19 Data for Pennsylvania, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.

As a result of the spread of COVID-19 and the Governor's orders, Plaintiff shutdown the majority of its business operations. For a time, Plaintiff's dental practice remained open only to perform emergency dental procedures. Not surprisingly, Plaintiff subsequently experienced a dramatic decrease in business income and furloughed some of its employees. Plaintiff thereafter submitted a claim for coverage under its business insurance policy ("the insurance contract") with Defendants. Defendants denied Plaintiff's claim.

On June 5, 2020, Plaintiff filed a complaint in the Court of Common Pleas of Allegheny County. In its complaint, Plaintiff asserted one count for declaratory judgment, by which it seeks this Court's determination as to whether Plaintiff is entitled to coverage under the insurance contract with Defendants for losses Plaintiff sustained in relation to the spread of COVID-19 and the Governor's orders. On October 5, 2020, Plaintiff filed a Motion for Summary Judgment. On December 2 and December 4, 2020, Defendants filed Cross Motions for Summary Judgment. On January 20, 2020, this Court heard oral argument on Plaintiff's Motion for Summary Judgment and Defendants' Cross Motions for Summary Judgment. For the reasons set forth herein, this Court grants Plaintiff's Motion for Summary Judgment and denies Defendants' Cross Motions for Summary Judgment.

### III.    The Contract Provisions

Plaintiff's and Defendants' dispute involves the following provisions regarding coverage under the insurance contract.

**Business Income**

a.  Business Income means:
    (1) Net Income (Net profit or Loss before Income taxes) that would have been earned or incurred, including:
        a.  "Rental Value;" and
        b.  "Maintenance Fees," if you are a condominium association; and

4

(2) Continuing normal operating expenses incurred, including payroll, subject to 90 day limitation if indicated on the Declaration page.

b.  We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.[4]

**Extra Expense**

a.  Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

b.  We will pay Extra Expense (other than the expense to repair or replace property) to:

(1) Avoid or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or

(2) Minimize the "suspension" of business if you cannot continue "operations."

c.  We will also pay Extra Expense (including Expediting Expenses) to repair or replace the property, but only to the extent it reduces the amount of loss that otherwise would have been payable under Paragraph 1. Business Income above.

Plaintiff's Complaint, at 58-59, Exhibit B (emphasis added).

---

[4] The insurance contract defines "suspension" as the "partial or complete cessation of your [the insured's] business activities; or . . . that a part or all of the described premises is rendered untenantable." Plaintiff's Complaint at 55. The insurance contract defines "operations" as "the type of your [the insured's] business activities occurring at the described premises and tenantability of the described premises." Plaintiff's Complaint at 53. The insurance contract defines "period of restoration" as:

the period of time that: [b]egins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and . . . [e]nds on the earlier of: (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) The date when business is resumed at a new permanent location.

Plaintiff's Complaint at 53. The insurance contract defines Covered Cause of Loss as "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations; or c. Limited or Excluded by other provision of this Policy. Plaintiff's Complaint at 37.

**Civil Authority**

1. When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by an action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

*Id.* at 84 (emphasis added).

Plaintiff's and Defendants' dispute also involves the following provisions regarding exclusions from coverage under the insurance contract:

**Exclusions**

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

**Ordinance or Law**

(1) The enforcement of any ordinance or law:
(a) Regulating the construction, use or repair of any property; or
(b) Requiring the tearing down of any property, including the cost of removing debris.

(2) This exclusion applies whether the loss results from:
(a) An ordinance or law that is enforced even if the property has not been damaged; or
(b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition or property, or removal of its debris, following a physical loss to that property.

**Contamination**

Contamination by other than "pollutants."[5]

---

[5] The insurance contract defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and any unhealthful or hazardous building materials (including but not limited to asbestos and lead products or materials containing lead). Waste includes materials to be recycled, reconditioned or reclaimed." Plaintiff's Complaint at 54.

6

**Consequential Loss**

Delay, loss of use or loss of market.

**Acts or Decisions**

Acts or Decisions, including the failure to act or decide, of any person, group, organization or governmental body.

*Id.* at 38-42 (emphasis added).

**Fungi, Wet Rot, Dry Rot and Microbes[6]**

*Id.* at 118-19 (emphasis added).

IV.     **Standard of Review**

It is well-settled that, after the relevant pleadings are closed, a party may move for summary judgment, in whole or in part, as a matter of law. Pa. R.C.P. 1035.2.  Summary judgment "may be entered only where the record demonstrates that there are no genuine issues of material fact, and it is apparent that the moving party is entitled to judgment as a matter of law." *City of Philadelphia v. Cumberland County Bd. of Assessment Appeals*, 81 A.3d 24, 44 (Pa. 2013).  Furthermore, appellate courts will only reverse a trial court's order granting summary judgment where it is "established that the court committed an error of law or abused its discretion." *Siciliano v. Mueller*, 149 A.3d 863, 864 (Pa. Super. 2016).

The interpretation of an insurance contract is a matter of law, which may be decided by this Court on summary judgment.  *Wagner. V. Erie Insurance Company*, 801 A.2d 1226, 1231

---

[6] "Microbe(s)" is specifically defined in the following manner:

"Microbe(s)" means any non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease. "Microbes" includes any spores, mycotoxins, odors, or any other substances, products, or by products produced by, or arising out of the current or past presence of "microbes."

*Id.* at 118-19 (emphasis added).

(Pa. Super. 2002).  When interpreting an insurance contract, this Court aims to effectuate the

intent of the parties as manifested by the language of the written instrument.  *American and*

*Foreign Insurance Company v. Jerry's Sport Center*, 2 A.3d 526, 540 (Pa. 2010).  When

reviewing the language of the contract, words of common usage are read with their ordinary

meaning, and this Court may utilize dictionary definitions to inform its understanding.  *Wagner*,

801 A.2d at 1231; *see also AAA Mid-Atlantic Insurance Company v. Ryan*, 84 A.3d 626, 633-34

(Pa. 2014).  If the terms of the contract are clear, this Court must give effect to the language.

*Madison Construction Company v. Harleysville Mutual Insurance Company*, 735 A.2d 100, 106

(Pa. 1999).  However, if the contractual terms are subject to more than one reasonable

interpretation, this Court must find that the contract is ambiguous.  *Id.*  "[W]hen a provision of

a[n insurance contract] is ambiguous, the [contract] provision is to be construed in favor of the

[the insured] and against the insurer, as the insurer drafted the policy and selected the language

which was used therein."  *Kurach v. Truck Insurance Exchange*, 235 A.3d 1106, 1116 (Pa.

2020).

V.      **Discussion**

        **a. Coverage Provisions**

        Plaintiff bears the initial burden to reasonably demonstrate that a claim falls within the

policy's coverage provisions.  *State Farm Cas. Co. v. Estates of Mehlman*, 589 F.3d 105, 111 (3d

Cir. 2009) (applying Pennsylvania law).  Then, provided that Plaintiff satisfies its initial burden,

Defendants bear "the burden of proving the applicability of any exclusions or limitations on

coverage."  *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying

Pennsylvania law).  In order to prevail, Defendants must demonstrate that the language of the

insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will

be construed in favor of the insured." *Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange*, 771 A.2d 11, 13 (Pa. Super. 2001).

First, this Court will address whether Plaintiff is entitled to coverage under the Business Income and Extra Expense provisions of the insurance contract for losses Plaintiff sustained in relation to the public health crises and the spread of the COVID-19 virus. With regard to Business Income and Extra Expense coverage, the insurance contract provides that:

> a. Business Income means: (1) [n]et income (Net Profit or Loss before Income taxes) that would have been earned or incurred . . . and (2) [c]ontinuing normal operating expenses incurred, including payroll, subject to 90 day limitation if indicated on the Declaration page.

> b. [the insurer] will pay for the actual loss of Business Income you [the insured] sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.

Plaintiff's Complaint, at 58, Exhibit B.

* * * * *

> a. Extra Expense means reasonable and necessary expenses you [the insured] incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

> b. [the insurer] will pay Extra Expense (other than to repair or replace property) to: (1) [a]void or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or (2) [m]inimize the "suspension" of business if you cannot continue "operations."

> c. [the insurer] will also pay any Extra Expense (including Expediting Expenses) to repair or replace property, but only to the extent it reduces the amount of loss

9

that otherwise would have been payable under [the above Business Income provision].

*Id*. at 59, Exhibit B.

The insurance contract defines "suspension" as the "partial or complete cessation of your [the insured's] business activities; or . . . that a part or all of the described premises is rendered untenantable," and "operations" means "the type of your [the insured's] business activities occurring at the described premises and tenantability of the described premises." *Id*. at 53-55, Exhibit B. The insurance contract defines "period of restoration" as:

> the period of time that: [b]egins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and . . . [e]nds on the earlier of: (1) [t]he date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or (2) [t]he date when business is resumed at a new permanent location.

*Id*. at 53, Exhibit B. Additionally, "Covered Cause of Loss" is defined as "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations; or c. Limited or Excluded by other provision of this Policy." *Id*. at 37, Exhibit B.

In order to state a reasonable claim for coverage under the Business Income and Extra Expense provisions of the insurance contract, Plaintiff must show that it suffered "direct physical loss of or damage to" its property. The interpretation of the phrase "direct physical loss of or damage to property" is the key point of the parties' dispute.[7] Defendants contend that "direct

---

[7] The parties do not dispute whether Plaintiff's business operations were at least partially suspended or interfered with due to COVID-19 and/or the government orders. The parties mainly contend whether Plaintiff's loss of use of its property entitles Plaintiff to coverage. The dispositive question with regard to whether Plaintiff is entitled to coverage for Business Income and Extra Expense is whether Plaintiff suffered a "direct physical loss of or damage to" Plaintiff's property. To the extent the parties disagree as to the meaning of the "period of restoration," and the potential impact of this phrase on the meaning of "direct physical loss of or damage to" Plaintiff's property, this Court addresses this issue in the body of this memorandum, after this Court's discussion of the phrase "direct physical loss of or damage to property."

physical loss of or damage to property" requires some physical alteration of or demonstrable harm to Plaintiff's property. Plaintiff contends that the "direct physical loss of . . . property" is not limited to physical alteration of or damage to Plaintiff's property but includes the loss of use of Plaintiff's property. Plaintiff further asserts that, because its interpretation is reasonable, this Court must find in Plaintiff's favor.

The insurance contract does not define the phrase "direct physical loss of or damage to property." As previously noted, Pennsylvania courts construe words of common usage in their "natural, plain, and ordinary sense . . . and [Pennsylvania courts] may inform [their] understanding of these terms by considering their dictionary definitions." *Madison Construction Company,* 735 A.2d at 108. Four words in particular are germane to the determination of this threshold issue: "direct," "physical," "loss," and "damage." "Direct" is defined as "proceeding from one point to another in time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ."[8] "Physical" is defined as "of or relating to natural science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[9] "Loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[10] "Damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ."[11]

Before analyzing the definitions of each of the above terms to determine whether Plaintiff's interpretation is reasonable, it is important to note that the terms, in addition to their

---

[8] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[9] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

[10] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

[11] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

ordinary, dictionary definitions, must be considered in the context of the insurance contract and the specific facts of this case. *See Madison Construction Company,* 735 A.2d at 106 (clarifying that issues of contract interpretation are not resolved in a vacuum). While some courts have interpreted "direct physical loss of or damage to property" as requiring some form of physical altercation and/or harm to property in order for the insured to be entitled to coverage, this Court reasonably determined that any such interpretation improperly conflates "direct physical loss of" with "direct physical . . . damage to" and ignores the fact that these two phrases are separated in the contract by the disjunctive "or."[12] It is axiomatic that courts must "not treat the words in the [contract] as mere surplusage . . . [and] if at all possible, [this Court must] construe the [contract] in a manner that gives effect to all of the [contract's] language." *Indalex Inc. v. Nation Union Fire Ins. Co. Pittsburgh, PA,* 83 A.3d 418, 420-21 (Pa. Super. 2013). Based upon this vital principle of contract interpretation, this Court concluded that, due to the presence of the disjunctive "or," whatever "direct physical loss of" means, it must mean something different than "direct physical . . . damage to."

In order to determine what the phrase "direct physical loss of . . . property" reasonably means, this Court looked to the ordinary, dictionary definitions of the terms "direct," "physical," "loss," and "damage." This Court began its analysis with the terms "damage" and "loss," as these terms are the crux of the disputed language. As noted above, "damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ,"[13] and "loss" is defined as

---

[12] *See Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange,* 771 A.2d 11, 15 (Pa. Super. 2001) (explaining that merely accepting the non-binding decisions of other courts "by the purely mechanical process of searching the nations courts for conflicting decisions" amounts to an abdication of this Court's judicial role).

[13] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

"DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[14]

Based upon the above-provided definitions, it is clear that "damage" and "loss," in certain contexts, tend to overlap. This is evident because the definition of "damage" includes the term "loss," and at least one definition of "loss" includes the terms "destruction" and "ruin," both of which indicate some form of damage. However, as noted above, in the context of this insurance contract, the concepts of "loss" and "damage" are separated by the disjunctive "or," and, therefore, the terms must mean something different from each other. Accordingly, in this instance, the most reasonable definition of "loss" is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property, i.e., destruction and ruin. Applying this definition gives the term "loss" meaning that is different from the term "damage." Specifically, whereas the meaning of the term "damage" encompasses all forms of harm to Plaintiff's property (complete or partial), this Court concluded that the meaning of the term "loss" reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to property.

In reaching its conclusion, this Court also considered the meaning and impact of the terms "direct" and "physical." Ultimately, this Court determined that the ordinary, dictionary definitions of the terms "direct" and "physical" are consistent with the above interpretation of the term "loss." As noted previously, "direct" is defined as "proceeding from one point to another in time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ,"[15] and "physical" is defined as "of or relating to natural

---

[14] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.
[15] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[16]  Based upon these definitions it is certainly reasonable to conclude that Plaintiff could suffer "direct" and "physical" loss of use of its property absent any harm to property.

Here, Plaintiff's loss of use of its property was both "direct" and "physical."  The spread of COVID-19, and a desired limitation of the same, had a close logical, causal, and/or consequential relationship to the ways in which Plaintiff materially utilized its property and physical space.  *See* February 22, 2021 Court Order of the United States District Court, N.D. Illinois, Eastern Division case *In re: Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation*, Civil Case No. 1:20-CV-05965 at 21 (stating that government shutdown orders and COVID-19 *directly* impacted the way businesses used *physical* space) (emphasis added).  Indeed, the spread of COVID-19 and social distancing measures (with or without the Governor's orders) caused Plaintiff, and many other businesses, to *physically* limit the use of property and the number of people that could inhabit *physical* buildings at any given time.  Thus, thehe spread of COVID-19 did not, as Defendant's contend, merely impose economic limitations.  Any economic losses were secondary to the businesses' *physical* losses.

While Defendants are of course correct to point out that the terms "direct" and "physical" modify the terms "loss" and "damage," this does not somehow necessarily mean that the entire phrase "direct physical loss of or damage to property" requires actual harm to Plaintiff's property in every instance.  Any argument that the terms "direct" and "physical," when combined, presuppose that any request for coverage must stem from some actual impact and harm to Plaintiff's property suffers from the same flaw noted in this Court's above discussion regarding

---

[16] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

the difference between the terms "loss" and "damage:" such interpretations fail to give effect to all of the insurance contract's terms and, again, render the phrase " direct physical loss of" duplicative of the phrase "direct physical . . . damage to."

Defendants also contend that the insurance contract's definition for "period of restoration" suggests that the contract expressly contemplates and necessitates the existence of actual tangible damage in order for Plaintiff's to be entitled to Business Income and Extra Expense coverage. The insurance contract states that the insurer "will pay for the actual loss of Business Income [the insured] sustain[s] due to the necessary "suspension" of . . . "operations" during the "period of restoration." Plaintiff's Complaint at 58, Exhibit B. The "period of restoration" begins at the time the direct physical loss of or damage to property occurs and ends on the date when the premises "should be repaired, rebuilt, or replaced with reasonable speed and similar quality . . . or . . . when the business is resumed at a new location." *Id*. at 53, Exhibit B. Specifically, Defendants argue that, without actual tangible damage, there is no period of restoration because there is no need for the property to be repaired, rebuilt, or replaced, and Plaintiff has no plans to resume the business at a new location.

Although this Court agrees with Defendants on the general principle that the insurance contract's provisions must be read as a whole so that all of its parts fit together, this Court is not persuaded that the definition for "period of restoration" is inherently inconsistent with an interpretation of "direct physical loss of . . . property" that encompasses Plaintiff's loss of use of its property in the absence of damage. Indeed, the threat of COVID-19 has necessitated many physical changes to business properties across the Commonwealth. Such changes include, but are not limited to, the installation of partitions, additional handwashing/sanitization stations, and the installations or renovation of ventilation systems. These changes would undoubtably

15

constitute "repairs" or "rebuilding" of property.  *See* February 22, 2021 Court Order of the

United States District Court, N.D. Illinois, Eastern Division case *In re: Society Insurance Co.*

*COVID-19 Business Interruption Protection Insurance Litigation*, Civil Case No. 1:20-CV-

05965 at 23 (stating that the installation of partitions and particular ventilations systems

constitute "repairs" consistent with the period of restoration).  Additionally, in order to "replace"

or "rebuild" unused space due to social distancing protocols, businesses might choose to buildout

new spaces, move to larger spaces, or rearrange existing spaces in order to increase the amount

of business they can safely handle during these difficult times.

     Whether or not Plaintiff in the instant matter actually undertook such changes, or

resumed its business at a new location, is of no moment.  The "period of restoration" does not

require repairs, rebuilding, replacement, or relocation of Plaintiff's property in order for Plaintiff

to be entitled to coverage.  The "period of restoration" merely imposes a time limit on available

coverage, which ends whenever such measures, if undertaken, would have been completed with

reasonable speed and similar quality.  To put this another way, the "period of restoration" ends

when Plaintiff's business is once again operating at normal capacity, or reasonably could be

operating at normal capacity.  The "period of restoration" does not somehow redefine or place

further substantive limits on types of available coverage.  Defendants cannot avoid providing

coverage that is otherwise available simply because the end point with regard to the "period of

restoration" may be, at times, slightly more difficult to pinpoint in the context of the COVID-19

pandemic.

     As this Court determined that it is, at the very least, reasonable to interpret the phrase

"direct physical loss of . . . property" to encompass the loss of use of Plaintiff's property due to

the spread of COVID-19 absent any actual damage to property, Plaintiff reasonably established a

right to coverage under the Business Income and Extra Expense provisions of the insurance

contract.[17]

Second, this Court will address whether Plaintiff is entitled to coverage under the Civil

Authority provision of the insurance contract for losses Plaintiff sustained in relation to the

Governor's orders, which were issued to help mitigate the spread of the COVID-19 virus.  With

regard to Civil Authority coverage, the insurance contract provides that:

> 1. When the Declarations show that [the insured has] coverage for Business
> Income and Extra Expense, [the insured] may extend that insurance to apply to
> the actual loss of Business Income [the insured] sustain[s] and reasonable and
> necessary Extra Expense [the insured] incur[s] caused by an action of civil
> authority that prohibits access to the described premises.  The civil authority
> action must be due to direct physical loss of or damage to property at locations,
> other than described premises, caused by or resulting from a Covered Cause of
> Loss.

Plaintiff's Complaint at 84, Exhibit B (emphasis added).

Thus, in order to state a reasonable claim of coverage under the Civil Authority provision

of the insurance contract, Plaintiff must reasonably demonstrate both of the following: [1] there

was "direct physical loss of or damage to property" other than Plaintiff's property; and [2] the

---

[17] This Court is aware that the insurance contract provides that any "direct physical loss of or damage to property" must be caused by a Covered Cause of Loss.  However, Covered Cause of Loss is defined as "RISK OF DIRECT PHYSICAL LOSS unless the loss is: a. Excluded in Section B. Exclusions; b. Limited in paragraph A.4 Limitations; or c. Limited or Excluded by other provision of this Policy." *Id.* at 37, Exhibit B.  Admittedly, this Court was somewhat perplexed by this definition.  One would think that in defining Covered Causes of Loss the contract would state, either specifically or more generally, covered causes of loss, i.e. fire, tornado, hurricane, lightening, etc..  Here, the contract's language instead turns back on itself and states that "direct physical loss of or damage to property" must be caused by "RISK OF DIRECT PHYSICAL LOSS unless the loss is . . . Excluded . . . ."  Given that this insurance contract is an "All Risk" insurance policy that is meant to cover any losses, damages, and expenses to the insured's premises unless specifically excluded, this Court determined it is reasonable to interpret Covered Cause of Loss in a manner that does not further limit the scope of coverage beyond any instance that amounts to a "direct physical loss of or damage to property," which is not otherwise excluded.  Accordingly, this Court determined that as long as the spread of COVID-19 caused "direct physical loss of or damage to property," and does not fall within the ambit of one of the contract's exclusions, it is reasonable to interpret the contract as entitling Plaintiff to coverage.  This same analysis regarding the term Covered Cause of Loss applies equally in the context of the contract's provision regarding Civil Authority coverage.  Thus, this Court need not address Covered Cause of Loss again separately.

"direct physical loss of or damage to property" other than Plaintiff's property caused civil authorities to take action(s) that prohibited access to Plaintiff's property.

Defendants contend that Plaintiff is not entitled to coverage under the Civil Authority provision of the contract because the Governor's orders did not completely prohibit Plaintiff from accessing its property. According to Defendants, although the Governor's orders closed Plaintiff's property to the majority of the general public, Plaintiff is nonetheless precluded from coverage under the Civil Authority provision of the insurance contract because Plaintiff and Plaintiff's employees were still able to access Plaintiff's property in order to conduct emergency procedures. Defendants also argue, just as they did with regard to the Business Income and Extra Expense coverage provisions, that any actions taken by civil authorities in response to COVID-19 were not caused by "direct physical loss of or damage to" property at any location. In contrast, Plaintiff contends that, because the Governor's orders prohibited Plaintiff from operating its business except in cases of emergency, and because the Governor's orders directed citizens of the Commonwealth to stay at home, the Governor's orders effectively prohibited meaningful access to Plaintiff's property. Additionally, Plaintiff argues that COVID-19 caused "direct physical loss of or damage to" property across the Commonwealth just as it did with regard to Plaintiff's property.

As to whether the spread of the COVID-19 virus caused "direct physical loss of or damage to" property, the same analysis that this Court applied with regard to Plaintiff's property also applies to other property as well. Even absent any damage to property, the spread of COVID-19 has resulted in a serious public health crisis, which has directly and physically caused the loss of use of property all across the Commonwealth. Again, this is evident because COVID-19 and the related social distancing measures (with and without government orders) directly

18

forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time in a safe and responsible manner. This Court's conclusion that other property was impacted by COVID-19 is supported by the Supreme Court of Pennsylvania. In *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 890 (Pa. 2020), our Supreme Court clarified that the COVID-19 virus qualifies as a natural disaster, and, given the nature of the manner in which COVID-19 spreads, Governor Wolf "had the authority under the Emergency Code to declare the entirety of the Commonwealth a disaster area."[18]

With regard to whether "an action of civil authority . . . prohibit[ed] access" to Plaintiff's property, this Court determined that the phrase "prohibits access" may reasonably be interpreted to encompass the instant situation. The term "prohibit" is defined as "to forbid by authority [and/or] to prevent from doing something . . . ."[19] Here, the Governor's emergency orders did exactly that. The Governor's orders directed individuals to stay home and required businesses to essentially close their doors absent emergencies and/or the need to conduct life sustaining operations. Although Plaintiff's business (a dental practice) was technically permitted to remain open to conduct certain limited emergency procedures, this does not change the fact that an action of civil authority effectively prevented, or forbade by authority, citizens of the Commonwealth from accessing Plaintiff's business in any meaningful way for normal, non-emergency procedures; procedures that likely yeild a significant portion of Plaintiff's business income.

---

[18] In its opinion upholding the Governor Wolf's use of the Emergency Code to shutdown businesses throughout the Commonwealth, the Supreme Court of Pennsylvania explained that, as of April 8, 2020, confirmed cases of COVID-19 had been reported in every single county in the Commonwealth, and "*any location where two or more people can congregate is within the disaster area.*" *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 889-90 (Pa. 2020) (emphasis added). The Supreme Court of Pennsylvania reached this conclusion because "[t]he virus spreads *primarily through person-to-person contact*, has an incubation period of up to fourteen days, one in four carriers are asymptomatic, and the virus can live on surfaces for up to four days." *Id.* at 889 (emphasis added).

[19] Prohibit, Merriam-Webster, https://www.merriam-webster.com/dictionary/prohibit.

This Court is not persuaded by Defendant's argument that, in order to be entitled to Civil Authority coverage, the action of civil authority must be a complete and total prohibition of all access to Plaintiff's property by any person for any reason. If this Court were to accept Defendant's cramped interpretation of the phrase "prohibits access," it would result in businesses being precluded from coverage in nearly every instance where an action of civil authority effectively closes the business to the vast majority of the general public, but does not necessarily preclude employees, or certain other individuals, from entering the premises to clean, maintain the building, obtain important documents, or to perform other similar functions, which, while important, remain secondary to the activities that actually generate business income.

Once again this Court notes the importance of reading the insurance contract's provisions as a whole so that all of its parts fit together. In so doing, this Court recognizes that the insurance contract provisions at issue are generally designed to provide business owners with coverage for lost busines *income* in the event that their business' operations are suspended. Accordingly, this Court's primary focus when interpreting the phrase "prohibits access," at least in the context of this insurance contract, is the extent to which the action of civil authority prevented the insured from accessing its premises in a manner that would normally produce actual and regular business income. Given this understanding of the insurance contract, the fact that some employees, and even some limited number of patients, were still permitted to go to Plaintiff's property for emergency procedures does not necessarily mean that Plaintiff is altogether precluded from coverage under the Civil Authority provision. The contract merely requires that "an action of civil authority . . . prohibits access to" Plaintiff's property. It does not clearly and unambiguously state that any such prohibition must completely and totally bar *all* persons from *any* form of access to Plaintiff's property whatsoever.

20

As this Court determined that Plaintiff provided a reasonable interpretation that: [1] there was "direct physical loss of or damage to property" other than Plaintiff's property; and [2] the "direct physical loss of or damage to property" other than Plaintiff's property caused civil authorities to take action(s) that prohibited access to Plaintiff's property, this Court concluded that Plaintiff established a right to coverage under the Civil Authority provision of the contract.

**b. Exclusions**

Having determined that Plaintiff provided reasonable interpretations demonstrating that there is coverage under the Business Income, Extra Expense, and Civil Authority provisions of the insurance contract, this Court turns to the question of whether Defendants demonstrated "the applicability of any exclusions or limitations on coverage." *Koppers Co.*, 98 F.3d at 1446 (applying Pennsylvania law). As discussed previously, in order to prevail, Defendants must show that the language of the insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will be construed in favor of the insured." *Fayette County Housing Authority*, 771 A.2d at 13.

This Court starts by addressing the exclusion for Contamination. With regard to this exclusion, the insurance contract provides that "[the insurer] will not pay for loss or damage caused directly or indirectly by any of the following . . . [c]ontamination by other than "pollutants." Plaintiff's Complaint at 41, Exhibit B. Because the insurance contract does not define the term contamination, this Court looks to the word's natural, plain, and ordinary meaning, and informs its understanding of this term by considering its dictionary definition. *Madison Construction Company,* 735 A.2d at 108.

Merriam-Webster defines contamination as "the process of contaminating [and/or] the state of being contaminated."[20] Additionally, in *Raybestos-Manhattan, Inc. v. Industrial Risk Insurers*, 433 A.2d 906, 907 (Pa. Super. 1981), the Superior Court of Pennsylvania clarified that:

> Contamination connotes a condition of impurity resulting from mixture or contact with a foreign substance . . . [and] the word contaminate is defined as . . . to render unfit for use by the introduction of unwholesome or undesirable elements . . . . Contaminate implies an action by something external to an object which by entering into or coming in contact with the object destroys its purity.

This Court recognizes that the above-described common and ordinary definitions of the terms contamination and contaminate are considerably broad. However, in determining whether the contamination exclusion applies clearly and unambiguously to the loss of use of property due to social distancing measures designed to prevent the spread of COVID-19, this Court acknowledges that the question is not whether the definition of contamination is so broad that virtually anything could come within its ambit. *Madison Construction Co.*, 735 A.2d at 607. Instead, this Court is "guided by the principle that ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts." *Id.*

Based upon the above dictionary definitions, the contamination exclusion only applies, in the broadest sense, when something external comes into contact with an object, i.e., property, and destroys the object's purity. Accordingly, if the specific cause of the loss of use of property was COVID-19 contacting objects, and destroying the objects' purity, then the insurance contract's contamination exclusion might prevent coverage. However, based upon the particular facts of this case, and considering the primary means by which COVID-19 spreads, the cause for the loss of use of property was *not* the contamination of property. Rather, the cause of the loss of use of property was the risk of person-to-person transmission of COVID-19, which necessitated

---

[20] Contamination, Merriam-Webster, https://www.merriam-webster.com/dictionary/contamination.

social distancing measures and fundamentally changed the way businesses utilized physical space (property).

The Supreme Court's recent decision in *Friends of Danny DeVito* supports the above conclusion. In rejecting the argument that actual contamination of specific property was necessary in order to justify Governor Wolf's orders restricting business operations throughout the Commonwealth, the Supreme Court of Pennsylvania elucidated that arguments regarding the dangers of COVID-19 contaminating property misunderstand the primary means by which COVID-19 spreads. *Id.* at 892. Specifically, the Supreme Court of Pennsylvania clarified that "COVID-19 does not spread because the virus is *at* a particular location . . . [i]nstead it spreads because of person-to-person contact, as it has an incubation period of up to fourteen days and that one in four carriers are asymptomatic. *Id.* (emphasis in original).

Although it is contested whether COVID-19 can live on the surfaces of property for some period of time, and while this might be one way by which individuals contract COVID-19, it is not the primary means nor is it the only means by which COVID-19 spreads. *Id.* Indeed, with or without actual COVID-19 contamination at any given property in the Commonwealth, businesses suffered the loss of use of property due to the risk of person-to-person COVID-19 transmission. Thus, the risk of person-to-person transmission of COVID-19, and the social distancing measures necessary to mitigate the spread of the COVID-19, together constitute a cause that is both *separate and distinct* from any possible or actual contamination of property.

It is important to note that, although the contamination exclusion might, at times, cover viruses when viruses actually contaminate property, the contamination exclusion does *not* altogether exclude loss of use of property caused by viruses in any manner whatsoever. If Defendants wanted to exclude coverage for any loss caused by viruses in any manner

whatsoever, Defendants could have easily included such a provision clearly and unambiguously in the contract. However, Defendants did not include a virus exclusion.

In sum, because it is reasonable to conclude that the loss of use of property due to the risk of person-to person transmission of COVID-19 is not clearly and unambiguously encompassed by the contamination exclusion, Defendants failed to show that the contamination exclusion prevents coverage in this instance.[21]

Next, this Court will address the exclusion for Fungi, Wet Rot, Dry Rot and Microbes. With regard to this exclusion, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by the "[p]resence, growth, proliferation, spread or any activity of fungi, wet or dry rot, or microbes." Plaintiff's Complaint at 118, Exhibit B. The insurance contract provides the following definition for the term "Microbes:"

> "Microbe(s)" means any non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease. "Microbes" includes any spores, mycotoxins, odors, or any other substances, products, or by products produced by, or arising out of the current or past presence of "microbes."

*Id.* at 19, Exhibit B.

Without any elaboration and explanation, Defendants contend that COVID-19 is excluded because viruses fall within the insurance contract's definition of the term "Microbe." This Court is, however, not persuaded that Defendants' interpretation of the term "Microbe" is clear and unambiguous.

---

[21] While this Court's above analysis is not dependent upon whether COVID-19 was in fact at Plaintiff's premises, Defendants' Cross Motions for Summary Judgment acknowledge that "Plaintiff neither alleged nor produced evidence that the virus was present at its dental offices . . . ." Valley Forge Insurance Company 's Cross Motion for Summary Judgment at 10; *see also* CNA's Cross Motion for Summary Judgment at 10. This fact provides further support that the contamination exclusion does not prevent coverage in this instance. Defendants cannot, at the same time, contend that the virus was not present at Plaintiff's property and that the exclusion contamination exclusion applies.

Naturally, upon its initial review, the contract's use of the word "Microbe" caused this Court to pause and generally wonder what is a "Microbe," and more specifically with regard to this case, does a virus qualify as a "Microbe?" Again, this begs the question: If Defendants wanted to exclude viruses, why not simply use the word virus explicitly in the insurance contract? Regardless, even assuming that a virus could technically be considered a "Microbe" in the most general sense of the word, this Court recognizes that, in this instance, it is of course not the general sense of the term "Microbe" that is controlling. Rather, because the insurance contract provides a specific definition of the term "Microbe," it is this definition that necessarily dictates what a "Microbe" is, and whether viruses fall within the ambit of the contract's "Microbe" exclusion.

Upon reading the insurance contract's definition of the term "Microbe," this Court determined that, in order to fall within the "Microbe" exclusion, COVID-19 must qualify as a "micro-organism" and/or an "organism." Because the contract does not define the terms "micro-organism" or "organism," this Court looked to the words' natural, plain, and ordinary meaning, and informed its understanding of these terms by considering their dictionary definitions. *Madison Construction Company,* 735 A.2d at 108.

Merriam-Webster defines "microorganism" as "an organism (such as a bacterium or protozoan) of microscopic or ultramicroscopic size."[22] Merriam-Webster defines "organism" in relevant part as "an individual constituted to carry on the activities of life by means of parts or organs more or less separate in function but mutually dependent [and/or] *a living being.*"[23]

---

[22] Microorganism, Merriam-Webster, https://www.merriam-webster.com/dictionary/microorganism.

[23] Organism, Merriam-Webster, https://www.merriam-webster.com/dictionary/organism (emphasis added).

In contrast, Merriam-Webster defines a virus as "any large group of submicroscopic infectious agents that are usually regarded as *nonliving* extremely complex molecules . . . that are capable of growth and multiplication only in living cells, and that cause various important diseases in humans, animals, and plants."[24]  In fact, "outside a host viruses are dormant . . . [they] have none of the traditional trappings of life [and their] zombielike existence . . . makes them easy to catch and hard to kill."[25]

Based upon the ordinary, dictionary definitions of the terms "microorganism," "organism," and "virus," this Court concluded that: [1] the term "Microbe" generally includes things that carry on the activities of life, i.e., things that are alive; and [2] a virus is generally regarded as something that is non-living, and is capable of growth and multiplication only when it attaches to, or gets inside of, other living host cells.  Accordingly, given the insurance contract's specific definition of the term "Microbe," it is reasonable to conclude that the "Microbe" exclusion does not actually encompass viruses, as viruses are generally not considered living things.  Consequently, this Court determined that Defendants failed to demonstrate that the exclusion for Fungi, Wet Rot, Dry Rot and Microbes clearly and unambiguously prevents coverage.

In reaching these conclusions, this Court of law does not masquerade as an expert in the complex intricacies of science, nor does it presume to wholly realize the subtle considerations by which trained scientists define and classify things in the natural world.  This Court acknowledges that, in certain contexts, the terms "microorganism" and/or "organism" might refer to things that

---

[24] Virus, Merriam-Webster, https://www.merriam-webster.com/dictionary/virus (emphasis added).

[25] Sarah Kaplan et al., *The coronavirus isn't alive. That's why it's so hard to kill.*, The Washington Post, March 23, 2020 https://www.washingtonpost.com/health/2020/03/23/coronavirus-isnt-alive-thats-why-its-so-hard-kill/.

are not traditionally considered living entities. [26] This Court also understands that there are some in the scientific community who might classify viruses as a kind of semi-living, zombie-like thing.[27] However, this Court need not wade into the mire of such sophisticated considerations. The question before this Court on summary judgment is not so complicated. The question is simply whether the insurance contract provisions at issue are subject to more than one reasonable interpretation. If the contract's terms are subject to more than one reasonable interpretation, they are ambiguous, and Pennsylvania law directs this Court to find in favor of the insured. Again, this Court may inform its understanding of the contract's terms using ordinary, dictionary definitions. *See Madison Construction Company*, 735 A.2d at 108. Based upon the above definitions, this Court determined that it is reasonable to interpret the "Microbe" exclusion as applying only to *living* microscopic things such as bacterium, and *not non-living* viruses.[28]

Next, this Court will address the exclusion for Consequential Loss. With regard to this exclusion, the insurance contract provides that the insurer will not pay for loss or damage caused

---

[26] Merriam-Webster also defines "organism" in the most general sense as "a complex structure of interdependent and subordinate elements whose relations and properties are largely determined by their function in the whole." Organism , Merriam-Webster, https://www.merriam-webster.com/dictionary/organism. Merriam-Webster elaborates on this particular use of the word organism by providing the following quotation from Joseph Rossi: "the nation is not merely the sum of individual citizens at any given time, but it is a living organism, a mystical body . . . of which the individual is an ephemeral part." *Id.* Based upon this quotation, and the context in which the terms "microorganism" and "organism" appear in the insurance contract, this Court concluded that more scientific definition is most relevant to this Court's discussion.

[27] While there is some argument over whether viruses are living organisms, "[m]ost virologists consider them non-living, as they do not meet all the criteria of the generally accepted definition of life." *What are microorganisms?* Centre for Geobiology, University of Bergen, November 1, 2010 https://www.uib.no/en/geobio/56846/what-are-microorganisms.

[28] Bacterium is defined to include to following:

> any of a domain (Bacteria) . . . of chiefly round, spiral, or rod-shaped single-celled prokaryotic microorganisms that typically *live* in soil, water, organic matter, or the bodies of plants and animals, that make their own food especially from sunlight or are saprophytic or parasitic, are often motile by means of flagella, reproduce especially by binary fission, and include many important pathogens.

Bacterium, Merriam-Webster, https://www.merriam-webster.com/dictionary/bacterium (emphasis added).

directly or indirectly by "[d]elay, loss of use or loss of market." Plaintiff's Complaint at 41,

Exhibit B. Defendants argue that even if Plaintiff had shown a basis for coverage under the

insurance contract, this exclusion clearly and unambiguously excludes coverage.

The problem with this exclusion is not so much that it is unclear or ambiguous. Rather,

the problem is that, based upon a plain reading of the Consequential Loss exclusion, this

exclusion would vitiate Business Income, Extra Expense, and Civil Authority coverage in their

entirety. *See* January 19, 2021 Court Order of the United States District Court, N.D. Ohio,

Eastern Division case *Henderson Road Restaurant Systems, Inc. v. Zurich American Insurance*

*Company*, Civil Case No. 1:20-cv-01239-DAP (holding that "the Loss of Use exclusion *would*

vitiate the Loss of Business Income coverage"). This evident because, even if this Court

accepted Defendants' more limited interpretation of the scope of coverage and the phrase "direct

physical loss of or damage to property" to only include coverage in instances where Plaintiff's

property was physically altered or damaged, this exclusion would effectively eliminate coverage

for any kind of loss and/or damage caused by any covered peril, which closes Plaintiff's business

while it is being repaired. *Id.* In other words, if this Court were to find the exclusion for

Consequential Loss to be valid, this exclusion would make all Business Income, Extra Expense,

and Civil Authority coverage illusory. *See Heller v. Pennsylvania League of Cities and*

*Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of

an insurance contract operates to foreclose the majority of expected claims, such a provision is

void as it renders coverage illusory). Because this Court must read the insurance contract in its

entirety, and in a manner calculated to give the agreement its intended effect, this Court

concludes that the exclusion for Consequential Loss does not prevent coverage.

Finally, this Court will address the exclusions for Acts or Decisions and Ordinance or Law. With regard to the exclusion for Acts or Decisions, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by "Acts or Decisions, including the failure to act or decide, of any person, group, organization or governmental body." Plaintiff's Complaint at 42, Exhibit B. With regard to the exclusion for Ordinance or Law, the insurance contract provides that the insurer will not pay for loss or damage caused directly or indirectly by the following:

> (1) The enforcement of any ordinance or law:
> (a) Regulating the construction, use or repair of any property; or
> (b) Requiring the tearing down of any property, including the cost of removing debris.
>
> (2) This exclusion applies whether the loss results from:
> (a) An ordinance or law that is enforced even if the property has not been damaged; or
> (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition or property, or removal of its debris, following a physical loss to that property.

Defendants argue that coverage is precluded by both of the above exclusions because Plaintiff's claim for "direct physical loss of or damage to property" is solely due to the Governor's orders. This, however, is not the case. In its complaint, Plaintiff states that its claim for coverage is based upon losses and expenses Plaintiff suffered in relation to both "*the COVID-19 pandemic and the actions of the government in response thereto*." Plaintiff's Complaint at 4 (emphasis added). As this Court explained earlier in this memorandum, COVID-19 and the related social distancing measures (with and without government orders) directly forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time. The Governor's orders only came into consideration in the context of Plaintiff's claim for coverage under the Civil Authority provision

of the contract.[29]  Accordingly, Defendants failed to demonstrate that the exclusions for Acts or Decisions and Ordinance or Law preclude coverage.

## VI.    Conclusion

In Pennsylvania, "where there is doubt or uncertainty about the meaning of ambiguous language used in a policy of insurance, the policy must be construed in favor of the insured in order to not defeat the protection which [the insured] reasonably expected from the policy [the insured] purchased." *Raybestos-Manhattan, Inc.*, 433 A.2d at 483.  This Court determined that Plaintiff's interpretations of the Business Income, Extra Expense, and Civil Authority provisions of the insurance contract were, at the very least, reasonable.  Additionally, this Court concluded that Defendants failed to demonstrate that any of the insurance contract's exclusions clearly and unambiguously prevent coverage.  Accordingly, because there are no genuine issues of material fact, Plaintiff's Motion for Summary Judgment is GRANTED, and Defendants' Cross Motions for Summary Judgement are DENIED.

By the Court:

*Christine Ward*, J.

Christine Ward, J.

Dated: 3/22/21

---

[29] Certainly, the exclusions for Acts or Decisions and Ordinance or Law could not have been intended to exclude coverage under the Civil Authority provision of the contract, as this would make any extended coverage for the actions of Civil Authority illusory. *See Heller v. Pennsylvania League of Cities and Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of an insurance contract operates to foreclose expected claims, such a provision is void as it renders coverage illusory).

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

| | | |
|---|---|---|
| TIMOTHY A. UNGAREAN, DMD d/b/a | : | CIVIL DIVISION |
| SMILE SAVERS DENTISTRY, PC, | : | |
| INDIVIDUALLY AND ON BEHALF OF | : | |
| A CLASS OF SIMILARLY SITUATED | : | No.: GD-20-006544 |
| PERSONS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Order of Court** |
| | : | |
| CNA and VALLEY FORGE INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER OF COURT</u>

And Now, this **22** day of March, **2021**, upon consideration of Timothy A. Ungarean,

DMD's Motion for Summary Judgment, **Valley Forge Insurance** Company's Cross Motion for

Summary Judgment, and CNA's Cross Motion for Summary Judgment, and the parties' oral

arguments thereto, it is hereby ORDER, ADJUDGED, and DECREED that Timothy A.

Ungarean, DMD's Motion for Summary Judgment is GRANTED, and Valley Forge Insurance

Company's and CNA's Cross Motions for Summary Judgment are DENIED.

By the Court:

*Christine Ward*, J.

Christine Ward, J.

31

**EXHIBIT F**

BROWN'S GYM, INC.,                          :   IN THE COURT OF COMMON PLEAS
                                            :      OF LACKAWANNA COUNTY
                                            :
                           Plaintiff        :
                                            :
            vs.                             :       CIVIL ACTION - LAW
                                            :
                                            :
THE CINCINNATI INSURANCE                    :
COMPANY and C.C. YOUNG and                  :
HENKELMAN INSURANCE,                        :
                                            :
                           Defendants       :       NO. 20 CV 3115

## MEMORANDUM AND ORDER

NEALON, J.

  A gym and fitness center, which was required to close its premises and cease all

business operations in compliance with state government closure orders issued in response

to the COVID-19 pandemic, has commenced this action against its insurer seeking to

recover damages under the business income, extra expense, and civil authority coverages

contained in its commercial policy for the revenues lost and additional costs incurred due

to the coronavirus public health crisis and resulting closure orders.  Unlike The Scranton

Club v. Tuscarora Wayne Mut. Group, Inc., 2021 WL 454498 (Lacka. Co. 2021), app.

pending, No. 238 MDA 2021 (Pa. Super.), the insurance policy in this case does not

contain an exclusion in its business interruption insurance coverages for losses caused by

a virus or pandemic, and the gym has specifically alleged that the COVID-19 virus was

actually present on its covered premises and the neighboring properties, and that all public

access to the insured property was prohibited as a result.  The insurer has filed preliminary objections seeking to dismiss the gym's claims for a declaratory judgment that its coronavirus-related losses are covered by the policy, compensatory damages for breach of the insurance agreement, and extra-contractual damages for insurer bad faith under 42 Pa.C.S. § 8371, and asserts that the gym's declaratory judgment and breach of contract claims are insufficient as a matter of law due to the gym's failure to allege any "direct physical loss or damage" to its property, which is a condition to business income, extra expense, and civil authority coverages.  In addition, the insurer seeks to dismiss the gym's bad faith liability claim on the ground that the insurer's denial of coverages was proper as a matter of law.

Prior to the COVID-19 pandemic, appellate and state courts in this Commonwealth established a "reasonable and realistic standard for identifying physical loss or damage" to property in cases "where sources unnoticeable to the naked eye" substantially reduced the use of the property, and held that an insured may satisfy the "direct physical loss  or damage" requirement for insurance coverage if the infectious pathogen, disease-causing agent, or contaminant renders the property "useless or uninhabitable," or the property's functionality is "nearly eliminated or destroyed" by that invisible source.  Under this "physical contamination" theory, courts concluded that ammonia fumes, e-coli bacteria, carbon-monoxide, gas vapors, lead intrusion, and odor from cat urine or methamphetamine cooking, which made covered premises unusable, unsafe, or unfit for their intended use, constituted "physical loss or damage" for purposes of insurance coverage.  In the wake of the coronavirus pandemic and the accompanying government closure orders, better reasoned decisions across the country have applied the "physical

contamination" theory in recognizing the applicability of business interruption insurance coverage only if the insured asserts that (a) the COVID-19 virus was actually present on or attached to surfaces on the covered property, and (b) its presence caused the insured premises to become uninhabitable, unusable, inaccessible, or unduly dangerous to use.

Based upon the gym's specific averments regarding the "continuous presence" of the COVID-19 virus on its property that rendered it unusable, unsafe, inaccessible, and unfit for its intended use, the gym has sufficiently alleged "direct physical loss or damage" to its property under the "physical contamination" theory as a necessary condition to business interruption insurance coverage. Although the policy drafted by the insurer does not include a virus exclusion among the 26 stated exclusions from business interruption insurance coverage, it does contain a comprehensive "communicable disease or virus" exclusion for other "crisis event response communication expense" coverage in the policy, thereby creating a reasonable expectation on the part of the gym that coronavirus-related damages would be covered by the policy's business interruption insurance coverage, but excluded from crisis event response communication expense coverage. Furthermore, inasmuch as the gym has averred that the COVID-19 virus was also present on nearby properties and that public access to the covered premises was completely prohibited as a result, it has stated an alternate claim for "business income" and "extra expense" recovery under its "civil authority" coverage. Finally, in light of the gym's assertions that the insurer misrepresented the policy terms and monetary limits to the gym and denied the gym's coverage request based upon the insurer's own economic considerations, rather than the merits of the claim, the insurer's demurrer to the gym's declaratory judgment, breach of contract, and bad faith claims will be overruled.

- 3 -

## I.  FACTUAL BACKGROUND

Plaintiff, Brown's Gym, Inc. ("Brown's"), owns and operates a gym and fitness center for which it "sought commercial property insurance" coverage through an insurance broker, defendant, C.C. Young and Henkelman Insurance ("C.C. Young"). (Docket Entry No. 1 at ¶¶ 1, 3-4, 6, 10, 14).  It is alleged that in exchange for Brown's payment of "substantial premiums," it purchased an "all risk" commercial property insurance policy from defendant, Cincinnati Insurance Company ("Cincinnati"), that was procured by C.C. Young.  (Id. at ¶¶ 2, 5-8, 15, 32).  Brown's maintains that "unlike many commercial property policies available in the market, the policy sold by [Cincinnati and C.C. Young] does not include an exclusion for any loss caused by a virus," as a result of which Brown's "reasonably expected that the insurance it purchased . . . included coverage for property damage and business interruption losses caused by viruses like the COVID-19 coronavirus."  (Id. at ¶ 26).

According to Brown's policy no. ETD 053 56 56 that is attached to the complaint, Brown's purchased commercial property insurance coverage from Cincinnati for the period from May 5, 2019, to May 5, 2020.  (Id. at p. 33).  The "Building and Personal Property Coverage" states that Cincinnati "will pay for direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss."  (Id. at p. 52). A "Covered Cause of Loss" is defined as "mean[ing] direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part."  (Id. at p. 54).  Per the policy's general definitions, the term "'[l]oss' means accidental physical loss or accidental physical damage."  (Id. at p. 87).  The policy does not define the words "direct," "physical," or "damage."  (Id. at pp. 87-89).

- 4 -

Cincinnati's policy contains 26 exclusions from its building and property coverage for any loss, "regardless of any other cause or event that contributes concurrently or in any sequence," that is caused directly or indirectly by ordinance, earth movement, government seizure or destruction, nuclear hazard, utility services, war and military action, water, fungi, wet rot, dry rot, and bacteria, electrical current, delay, smoke, vapor, gas, wear and tear, rust or corrosion, smog, settling or cracking, nesting or infestation by insects, birds, rodents, or other animals, mechanical breakdown, marring or scratching, explosion of steam apparatus, water seepage, freezing of plumbing, dishonest or criminal acts, voluntary parting under false pretense, exposure to weather, collapse, pollutants, damage to product, neglect, weather conditions, acts or decisions by any organization, defects in design, errors in zoning, or omissions in maintenance, or any additional "special exclusions." (Id. at pp. 54-60). However, the policy does not exclude or otherwise limit building and personal property coverage for any loss caused by a virus "regardless of any other cause or event that contributes concurrently or in any sequence to the 'loss.'" (Id. at p. 54).

Cincinnati's policy does provide coverage for "Business Income and Extra Expense" and "Extended Business Income." Under the business income coverage, Cincinnati is obligated to pay Brown's "for the actual loss of 'Business Income' and 'Rental Value' [Brown's] sustain[ed] due to the necessary 'suspension' of your 'operations' during the 'period of restoration'" if the suspension was "caused by direct 'loss' to property at a 'premises' caused by or resulting from any Covered Cause of Loss." (Id. at p. 67). The "Extra Expense" coverage requires Cincinnati to pay Brown's for "necessary expenses" it incurred "during the 'period of restoration' that [Brown's] would

- 5 -

not have sustained if there had been no direct 'loss' to property caused by or resulting from a Covered Cause of Loss." (Id. at p. 68).  Those "necessary expenses" include costs incurred by Brown's to "[a]void or minimize the 'suspension' of business and to continue 'operations'" and to "repair or replace" the insured property.  (Id.).

Cincinnati's policy also affords an alternate basis for the payment of "Business Income" and "Extra Expense" losses under its "Civil Authority" coverage.  The civil authority provisions state that "[w]hen a Covered Cause of Loss causes damage to property other than Covered Property at a 'premises,' [Cincinnati] will pay for the actual loss of 'Business Income' and necessary Extra Expense [Brown's] sustain[s] caused by action of civil authority that prohibits access to the 'premises.'" (Id.).  The civil authority coverage is applicable if "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage," and "[t]he action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage . . . ." (Id.).

Brown's policy with Cincinnati contains supplemental endorsements for "Fitness and Recreation Property," "Equipment Breakdown," and "Crisis Event Expense" coverages.  (Id. at pp. 90-102, 263).  The "Crisis Event Expense" coverage requires Cincinnati to "pay [Brown's] 'crisis event response communication expense' resulting from a 'covered crisis event' at "[Brown's] 'covered location' for sixty (60) consecutive days after a 'covered crisis event' occurs." (Id. at p. 95).  A "covered crisis event" on Brown's premises is defined as including a fire or explosion, construction accident, equipment failure, or workplace accident "causing significant regional or national news medial coverage" of Brown's or its operations, the criminal "use of a firearm or device

- 6 -

designed to cause harm," a felonious sexual assault or "attempt or threat of sexual

assault," a felonious stalking or "attempt or threat by a person directed at one or more of

[Brown's] employees or customers," a child abduction or kidnap or "attempt or threat to

unlawfully seize and detain a person under the age of sixteen (16)," the "necessary

closure" of Brown's property "by a Board of Health or any other governmental authority

as a result of the discovery or belief that contaminated food or drink has been served to

patrons," or a "malicious act, attempt or threat committed on [Brown's] 'premises' against

any person that results in physical injury or death to such person or an innocent

bystander." (Id. at pp. 100-101). In contrast to the business income, extra expense, and

civil authority coverage provisions of the policy, the "Crisis Event Expense Coverage"

contains a specific virus exclusion which states that the "Crisis Event Expense Coverage"

endorsement "does not apply to any loss directly or indirectly caused by or resulting from

any virus . . . that induces or is capable of inducing physical distress, illness or disease."

(Id. at p. 97). That "Communicable Disease or Virus" exclusion further provides:

> This Exclusion applies to, but is not limited to, any loss directly or
> indirectly attributable to Anthrax, Avian Influenza, Crimean-Congo
> Hemorrhagic Fever, Dengue Hemorrhagic Fever, Ebola Hemorrhagic
> Fever, Francisella Tularensis, Influenza, Lassa Fever, Marburg
> Hemorrhagic Fever, Meningococcal Disease, Plague, Rift Valley Fever,
> Severe Acute Respiratory Syndrome, Smallpox, Tularemia, Yellow Fever
> *or any pandemic or similar influenza which is defined by the United
> States Center for Disease Control as virulent human influenza that may
> cause global outbreak, or pandemic, or serious illness.*

(Id.)(emphasis added).

Brown's avers that "there was a business arrangement between [Cincinnati] and

[C.C. Young] to their mutual pecuniary benefit," that C.C. Young "was authorized by

[Cincinnati] to bind coverage and did bind coverage behalf of [Cincinnati]," that C.C.

- 7 -

Young "was an agent, servant and/or employee" of Cincinnati, that Brown's "sought

commercial property insurance" through C.C. Young, and that Cincinnati and C.C. Young

"directed and controlled the activities" relative to Brown's insurance coverages. (Docket

Entry No. 1 at ¶¶ 7-11). It claims that it specifically requested "as broad as possible

Business Income, Contingent Business Income, Extra Expense and Civil Authority

coverages," and that C.C. Young "undertook to secure" that coverage on its behalf. (Id. at

¶ 117). Brown's maintains that it purchased the foregoing insurance coverages based

upon C.C. Young's representations "regarding the amounts and applicability of the

Business Income, Contingent Business Income, Extra Expense, and Civil Authority

coverages under the policy," which representations C.C. Young made as the authorized

agent of Cincinnati. (Id. at ¶ 123).

Brown's states that in response to the COVID-19 public health crisis, Governor

Tom Wolf issued a "Proclamation of Disaster Emergency" on March 6, 2020, and

together with the Secretary of the Pennsylvania Department of Health, issued orders on

March 19, 2020, mandating the closure to the public of all businesses, such as Brown's

gym and fitness center, that were not "life sustaining" businesses. (Id. at ¶¶ 18-23, 43, 45-

47). It avers that "[e]merging research on the virus and recent reports from the Centers

for Disease Control and Prevention ('CDC') indicate that the COVID-19 strains

physically infect and can stay alive on surfaces for at least 17 days, a characteristic that

renders property exposed to the contagion potentially unsafe and dangerous." (Id. at ¶

44). Brown's further asserts that "[o]ther research indicates that the virus may linger on

surfaces for up to four weeks in low temperatures." (Id.). On March 19, 2020, the

Secretary of the Department of Health allegedly "issued an Order highlighting how

exposure to COVID-19 is possible by touching a surface or object that has the virus on it." (Id. at ¶ 48).

Brown's has specifically represented that the COVID-19 virus was physically present on its insured property, as well as the neighboring properties.  It expressly states that "[t]he continuous presence of the coronavirus on or around [Brown's] premises has rendered the premises unsafe and unfit for its intended use and therefore caused property damage or loss under [Cincinnati's] policy."  (Id. at ¶ 50).  Brown's maintains that the COVID-19 virus "causes damages to property, particularly in places of business such as that of [Brown's], . . . where the operation of the business requires interaction, gatherings, and contact in areas where there exists a heightened risk of the COVID-19 virus."  (Id. at ¶ 54).  It also claims that the coronavirus was present on neighboring properties immediately surrounding its insured premises, and asserts that the closure orders were "made in direct response to the continued and increasing presence of the coronavirus on property, including property around [Brown's] premises."  (Id. at ¶ 52).

Brown's submits that its commercial insurance policy with Cincinnati provides business interruption coverage which obligates Cincinnati to "pay for the actual loss of business income sustained by [Brown's] due to the necessary suspension of [its] operations during the period of business interruption caused by direct loss to property at the insured's premises."  (Id. at ¶ 35).  The policy reportedly defines the term "suspension" as meaning the "slowdown or cessation of your business activities" or "that a part or all of the premises is untenantable."  (Id. at ¶ 36).  It likewise affords extra expense coverage for "necessary expenses [Brown's] sustains during the 'period of restoration' that [Brown's] would not have sustained if there had been no direct 'loss' to

property caused by or resulting from a Covered Cause of Loss." (Id. at ¶¶ 34, 40). Brown's avers that Cincinnati's policy separately "includes 'Civil Authority' coverage, pursuant to which [Cincinnati] promised to pay for the loss of Business Income and Necessary Extra Expense sustained by [Brown's] 'caused by action of civil authority that prohibits access' to [Brown's] insured premises" if "access to the area immediately surrounding the damaged property is prohibited by Civil Authority as a result of the damage" and the action "is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage." (Id. at ¶¶ 41-42). Based upon the lack of a virus exclusion for the business income, extra expense, and civil authority coverages under the policy, and in light of the policy language employed by Cincinnati in connection with those coverages, Brown's states that it "reasonably expected that the insurance it purchased from [Cincinnati] and [C.C. Young] included coverage for property damage and business interruption losses caused by viruses like the COVID-19 virus." (Id. at ¶ 26).

After Brown's allegedly "suffered substantial business income losses and incurred extra expense" due to the presence of the coronavirus on its insured premises and the neighboring properties, and the resulting closure orders, it submitted a claim to Cincinnati on March 16, 2020, "requesting coverage for its business interruption losses" pursuant to the business income, extra expense, and civil authority coverages "promised under the policy." (Id. at ¶¶ 55-56). According to Brown's, Cincinnati replied via a letter dated March 23, 2020, which "misrepresented the law applicable to [Brown's] claims, mislead [Brown's] regarding the coverage limits that were available to it, and misrepresented the terms of the policy." (Id. at ¶ 58). For instance, Cincinnati allegedly stated that the limits

- 10 -

of insurance for business income, extra expense, and civil authority coverages were $25,000.00, even though the policy declarations page identifies those limits as $200,000.00. (Id. at ¶¶ 64-74 and p. 263). In addition, Cincinnati reportedly "sought to shift its statutory obligations" to promptly investigate and evaluate claims to Brown's by demanding that Brown's "provide an analysis as to the reasons [it] believes there is coverage for [its] claim." (Id. at ¶¶ 75-76).

On April 16, 2020, Cincinnati formally denied Brown's coverage claims on the grounds that Brown's did not suffer "direct physical loss or direct physical damage" to its property, and that Brown's claims were barred by "the pollutant exclusion." (Id. at ¶¶ 78-79, 83). Brown's contends that "any reasonable investigation" of its claim would have revealed that Brown's "sustained direct physical loss or direct physical damage to the insured premises," and "that the pollutant exclusion is inapplicable to the claim." (Id. at ¶¶ 80, 84). It asserts that Cincinnati's denial of the claim was motivated by "Cincinnati's desire to preempt its own financial exposure to the economic fallout resulting from the COVID-19 crisis, rather than to initiate, as Cincinnati is obligated to do, a full and fair investigation of the claim and a careful review of the policy it sold to [Brown's] in exchange for valuable premiums." (Id. at ¶ 28). In paragraph 89 of the complaint, Brown's itemizes 57 instances in which Cincinnati allegedly breached its statutory, regulatory, and common law duties that it owed to Brown's as its insured. (Id. at ¶ 89(a)-(eee)).

Brown's advances three causes of action against Cincinnati. Count I of the complaint seeks a declaratory judgment that Brown's business interruption losses "are insured losses under the policy," and that "Cincinnati is obligated to pay [Brown's] for the

full amount of the losses incurred and to be incurred" as a result of the presence of the coronavirus on its premises and the government closure orders. (Id. at ¶¶ 95-99). Count II asserts a claim against Cincinnati for breach of the insurance contract and "the policy's implied covenant of good faith and fair dealing," and demands the recovery of "actual and consequential damages." (Id. at ¶¶ 101-107). Brown's also alleges bad faith liability on the part of Cincinnati under 42 Pa.C.S. § 8371, for which it seeks to recover statutory interest, counsel fees, and punitive damages.[1] (Id. at ¶¶ 109-113).

Cincinnati has filed preliminary objections in the nature of a demurrer seeking to dismiss Brown's declaratory judgment, breach of contract, and bad faith liability claims. (Docket Entry No. 17 at ¶¶ 7, 49). It contends that the business income, extra expense, and civil authority coverages require direct physical loss or damage to the insured premises, and argues that Brown's "has not alleged a direct physical loss to property in the complaint in order to trigger coverage under the policy." (Id. at ¶¶ 17-26). Specifically, Cincinnati represents that "[t]here is no allegation that the virus was in fact ever found to be physically present at the premises, let alone that it caused a loss of property." (Id. at ¶ 28).

Cincinnati alleges in its demurrer that Brown's "is not entitled to coverage for business interruption because there was no physical loss to property," and claims that the "Complaint fails to identify any damage to property, much less physical damage, including outside of the insured premises." (Id. at ¶¶ 32, 36). It posits that "[i]n the

---

[1] In Counts IV, V, and VI, Brown's asserts claims against C.C. Young for negligence and negligent misrepresentation. (Id. at ¶¶ 115-120, 122-126, 128-132). C.C. Young filed preliminary objections to those claims, but its demurrers were overruled by Memorandum and Order dated December 18, 2020. See Brown's Gym, Inc. v. the Cincinnati Ins. Co., 2020 WL 7646364 (Lacka. Co. 2020).

absence of direct physical loss, there can be no coverage and exclusions do not come into play." (Id. at ¶ 43).  In addition to seeking the dismissal of Brown's declaratory judgment and breach of contract claims on that basis, Cincinnati argues that Brown's bad faith claim must also be dismissed since its "denial of coverage was proper" as a matter of law.  (Id. at ¶¶ 47-49).

On June 1, 2021, Cincinnati filed a "Praecipe to Amend and Attach" in which it seeks to supplement its preliminary objections.  (Docket Entry No. 30).  Through that filing, it attempts to submit 227 pages of additional exhibits in support of its demurrer. (Id. at pp. 3-229).  Those exhibits include CDC publications on cleaning and disinfecting public spaces, workplaces, businesses, schools, and homes, (Id. at pp. 209-223), as well as the government closure orders that were previously attached to Brown's complaint.  (Id. at pp. 225-226, 228-229).

In its supporting brief, Cincinnati cites a legion of federal district court rulings throughout the country, as well as our holding in The Scranton Club, for the proposition that "there cannot be coverage under the policy when there was no physical loss or damage to the insured property."  (Docket Entry No. 27 at pp. 9-20, 33-34).  It states that "courts have uniformly held that the mere presence of the coronavirus on property is insufficient to establish the requisite for first party coverage: physical damage or loss to property."  (Id. at p. 21).  Cincinnati asserts that "[r]eading the policy as a whole, including the 'period of restoration' requirement, confirms that physical alteration of property must take place" in order for there to be a "demonstrable alteration of the property" triggering coverage.  (Id. at pp. 28, 31).

- 13 -

Cincinnati further contends that the civil authority coverage is likewise inapplicable since "no direct physical loss to other property is alleged" and "access to [Brown's] premises was not prohibited." (Id. at pp. 34-37). On that basis, it demurs to Brown's declaratory judgment and breach of contract claims premised upon the business income, extra expense, and civil authority coverages. (Id. at p. 38). It also seeks to dismiss Brown's bad faith claim on the grounds that "Cincinnati's position is legally correct" and Brown's "does not even allege facts to show the virus was present at the premises." (Id. at p. 39).

Although Brown's acknowledges that the policy's "business income, extra expense, and civil authority coverages requires physical loss or damage to the subject premises," it asserts that "the policy does not define the phrase 'physical loss or physical damage,'" and relying upon Ungarean v. CNA, 2021 WL 1164836 (Alleg. Co. 2021), *app. pending*, No. 490 WDA 2021 (Pa. Super.), argues that "[t]he phrase 'accidental physical loss or accidental physical damage' is not limited to physical alter[]ation of or damage to [Brown's] property but includes the loss of use of [Brown's] property." (Docket Entry No. 28 at pp. 12-13). Referencing pre-coronavirus decisions from other jurisdictions which concluded that the release of ammonia, emission of toxic gases, release of carbon monoxide, and presence of mold, arsenic, or lead established the necessary "physical loss or damage to property" for insurance coverage, Brown's alternatively submits "that contamination and suspected contamination making property dangerous to use can constitute 'physical loss or damage.'" (Id. at pp. 17-20). It argues in that regard that the physical existence of COVID-19 on its premises, coupled with the resulting closure orders that "prohibited the public from accessing [Brown's] gym and fitness center" and caused

"substantial business income losses and incurred extra expenses," adequately

demonstrates physical loss or damage to its property "triggering business interruption,

extra expense, and civil authority coverages under the policy." (Id. at pp. 13-14).

Citing the reasoning in Ungarean, Brown's maintains that "[t]he 'period of

restoration' merely imposes a time limit upon available coverage," which ceases once the

indicated remedial measures have been completed and the "business is once again

operating at normal capacity, or reasonably could be operating at normal capacity." (Id. at

p. 16). It identifies those measures as including "the installation of partitions, additional

handwashing/sanitization stations, and the installation or renovation of ventilation

systems." (Id. at p. 17). Brown's asserts that Cincinnati has not established that it is clear

and free from doubt that its business income, extra expense, or civil authority coverage

claims are insufficient as a matter of law. (Id. at pp. 22-23). As for its bad faith claim,

Brown's maintains that Cincinnati improperly denied coverage on faulty grounds,

including "the pollutant exclusion," and posits "that any reasonable evaluation of

[Brown's] claim would reveal that coverage exists." (Id. at p. 25). Following the

completion of oral argument on June 9, 2021, Cincinnati's preliminary objections became

ripe for resolution. (Docket Entry No. 25).

## II. DISCUSSION

### (A) STANDARD AND SCOPE OF REVIEW

"'Standard of review' and 'scope of review,' although distinct, are not concepts

that are considered in isolation from one another." Bowling v. Office of Open Records,

621 Pa. 133, 170, 75 A.3d 453, 475 (2013); KMC Shamrock, Inc. v. LNR Transportation,

Inc., 50 Pa. D. & C. 5th 259, 268 (Lacka. Co. 2015). "Scope of review" refers to the

- 15 -

confines within which a reviewing court must conduct its examination, "or to the matters (or 'what') the [reviewing] court is permitted to examine." Samuel-Bassett v. Kia Motors America, Inc., 613 Pa. 371, 407, 34 A.3d 1, 21 (2011), *cert. denied*, 567 U.S. 935 (2012); Mid Valley School District v. Warshawer, 33 Pa. D. & C. 5th 272, 281 (Lacka. Co. 2013). "Standard of review" concerns the manner in which (or "how") that examination is to be conducted. Holt v. 2011 Legislative Reapportionment Commission, 614 Pa. 364, 392, 38 A.3d 711, 728 (2012); Brian T. Kelly & Associates v. Northeastern Educational Intermediate Unit, 36 Pa. D. & C. 5th 300, 310 (Lacka. Co. 2014).

"Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint." Sayers v. Heritage Valley Medical Group, Inc., 247 A.3d 1155, 1161 (Pa. Super. 2021). When considering preliminary objections under Pa.R.C.P. 1028(a)(4), the standard of review dictates that all well-pleaded, material, and relevant facts must be accepted as true, as well as every inference that is fairly deducible from those facts. Raynor v. D'Annunzio, 243 A.3d 41, 52 (Pa. 2020). But a court need not accept as true the pleader's conclusions of law, unwarranted inferences from facts, argumentative allegations, or expressions of opinion. Mercer v. Newell, 2021 WL 1916957, at *3 (Pa. Super. 2021). Nevertheless "[p]reliminary objections should be sustained only in cases that are clear and free from doubt," Pennsylvania Independent Oil & Gas Association v. Pennsylvania One Call System, 245 A.3d 362, 365 (Pa. Cmwlth. 2021), and to be clear and free from doubt, the law must state "with certainty that no recovery is possible" based upon the facts averred. Vacula v. Chapman, 230 A.3d 431, 436 (Pa. Super. 2020). "Where a doubt exists as to whether a demurrer should be sustained, this doubt should be

resolved in favor of overruling it." <u>Com. by Shapiro v. UPMC</u>, 652 Pa. 322, 340, 208 A.3d 898, 909 (2019).

The scope of review governing demurrers requires the reviewing court to address the preliminary objections based solely upon the averments set forth in the complaint and any exhibits attached to that contested pleading. <u>Buchan v. Milton Hershey School</u>, 208 A.3d 1081, 1086 (Pa. Super. 2019), *app. denied*, 223 A.3d 238 (Pa. 2020); <u>Foster v. UPMC South Side Hospital</u>, 2 A.3d 655, 662 (Pa. Super. 2010), *app. denied*, 608 Pa. 647, 12 A.3d 371 (2010). No evidence "outside the complaint" may be adduced or considered when disposing of legal issues presented by a demurrer. <u>Catanzaro v. Pennel</u>, 238 A.3d 504, 508 (Pa. Super. 2020); <u>Estate of Rothberg</u>, 166 A.3d 378, 381 (Pa. Super. 2017), *app. denied*, 644 Pa. 342, 176 A.3d 840 (2017); <u>Hill v. Ofalt</u>, 85 A.3d 540, 547 (Pa. Super. 2014). Therefore, the supplemental exhibits that Cincinnati filed on June 1, 2021, may not be considered when determining the legal sufficiency of the allegations of Brown's complaint.

### (B) INSURANCE POLICY INTERPRETATION

Cincinnati contends that Brown's declaratory judgment and breach of contract claims are insufficient as a matter of law since its business income, extra expense, and civil authority coverages clearly are not applicable based upon the plain language of the policy and the allegations of the complaint. "The interpretation of an insurance contract regarding the existence or nonexistence of coverage is generally performed by the court." <u>Donegal Mut. Ins. Co. v. Baumhammers</u>, 595 Pa. 147, 154-155, 938 A.2d 286, 290 (2007); <u>Brogan v. Rosenn, Jenkins & Greenwald, LLP.</u>, 35 Pa. D. & C. 5th 500, 520 (Lacka. Co. 2014). When construing insurance policies, courts "are guided by the

polestar principle that insurance policies are contracts between an insurer and a policyholder" and must "apply traditional principles of contract interpretation in ascertaining the meaning of the terms used therein." Kurach v. Truck Insurance Exchange, 235 A.3d 1106, 1116 (Pa. 2020). "In so doing, we must 'ascertain the intent of the parties as manifested by the terms used in the written insurance policy.'" Gallagher v. GEICO Indemnity Co., 650 Pa. 600, 622, 201 A.3d 131, 137 (2010) (quoting 401 Fourth Street, Inc. v. Investors Ins. Group, 583 Pa. 445, 879 A.2d 166, 171 (2005)); Evans v. Travelers Ins. Co., 226 A.3d 96, 100 (Pa. Super. 2020) (same).

"The proper focus regarding issues of coverage under insurance contracts is the reasonable expectations of the insured," and "[i]n determining the reasonable expectations of the insured, courts must examine the totality of the insurance transaction involved." Consolidated Rail Corporation v. ACE Property & Casualty Ins. Co., 182 A.3d 1011, 1026 (Pa. Super. 2018), app. denied, 648 Pa. 165, 191 A.3d 1288  (2018). But, if the policy terms are clear and unambiguous, courts are required to give effect to the language of the contract and the plain and ordinary meaning of those terms. Kurach, supra; Penn Psychiatric Center v. United States Liability Ins. Co., 2021 WL 2460789, at * 4 (Pa. Super. 2021); Tuscarora Wayne Ins. Co. v. Hebron, Inc., 197 A.3d 267, 272 (Pa. Super. 2018), app. denied, 651 Pa. 358, 205 A.3d 273 (2019). "[W]hile reasonable expectations of the insured are focal points in interpreting the contract language of insurance policies, an insured may not complain that its reasonable expectations were

frustrated by policy limitations which are clear and unambiguous."[2] <u>Consolidated Rail Corporation, supra</u>. However, when a provision of a policy is ambiguous, it must be construed in favor of the insured and against the insurer as the drafter of the policy which selected the language used. <u>Kurach, supra; Penn Psychiatric Center, supra; Gemini Ins. Co. v. Meyer Jabara Hotels, LLC</u>, 231 A.3d 839, 847-848 (Pa. Super. 2020).

Insurance policy terms "are ambiguous 'if they are subject to more than one reasonable interpretation when applied to a particular set of facts.'" <u>Erie Insurance Exchange v. Moore</u>, 228 A.3d 258, 267 (Pa. 2020) (quoting <u>Madison Construction Co. v. Harleysville Mut. Ins.</u>, 557 Pa. 595, 606, 735 A.2d 100, 106 (1999)); <u>Pass v. Palmiero Automotive of Butler, Inc.</u>, 229 A.3d 1, 5 (Pa. Super. 2020) (quoting <u>Murphy v. Duquesne University of the Holy Ghost</u>, 565 Pa. 571, 591, 777 A.2d 418, 430 (2001)). "However, the lack of a definition for an operative term in an insurance policy does not necessarily render the policy ambiguous." <u>Gemini Ins. Co.</u>, 231 A.3d at 848. Moreover, a particular policy provision will not be deemed ambiguous "simply because the parties

---

[2]The Supreme Court of Pennsylvania has applied the "reasonable expectations" approach in insurance coverage disputes involving non-commercial insureds. *See, e.g.,* <u>Tonkovic v. State Farm Mutual Automobile Ins. Co.,</u> 513 Pa. 445, 455, 521 A.2d 920, 925 (1987); <u>Collister v. Nationwide Life Ins. Co.,</u> 479 Pa. 579, 594, 388 A.2d 1346, 1353 (1978). The United States Court of Appeals for the Third Circuit has "predicted that Pennsylvania courts would apply that doctrine even where the insured is a sophisticated purchaser of insurance - - i.e., 'a large commercial enterprise that has substantial economic strength, desirability as a customer, and an understanding of insurance matters, or readily available assistance in understanding and procuring insurance.'" <u>UPMC Health System v. Metropolitan Life Ins. Co.,</u> 391 F.3d 497, 503 (3d Cir. 2004) (quoting <u>Reliance Ins. Co. v. Moessner,</u> 121 F.3d 895, 904-905 n.8 (3d Cir. 1997)). The federal district courts in Pennsylvania have likewise concluded that the reasonable expectations doctrine may apply to commercial entities and sophisticated purchasers of insurance. *See* <u>Downey v. First Indemnity Insurance,</u> 214 F.Supp.3d 414, 424 (E.D. Pa. 2016); <u>Austin James Associates, Inc. v. American International Specialty Lines Ins. Co.,</u> 2012 WL 4755394, at * 5 (M.D. Pa. 2012); <u>Whole Enchilada, Inc. v. Travelers Property Casualty Company of America,</u> 581 F.Supp.2d 677, 690 (W.D. Pa. 2008). Although the Superior Court of Pennsylvania originally left "for another day" the issue of "whether the 'reasonable expectations' doctrine can be invoked by a 'sophisticated' commercial enterprise," <u>Millers Capital Ins. Co. v. Gambone Brothers Development Co.,</u> 941 A.2d 706, 717, n. 10 (Pa. Super. 2007), *app. denied,* 600 Pa. 734, 963 A.2d 471 (2008), it has more recently applied the doctrine in insurance coverage litigation involving the interpretation of commercial insurance policies issued to business enterprises. *See* <u>Consolidated Rail Corporation, supra</u> (commercial policy insuring railroad company); <u>Good v. Frankie & Eddie's Hanover Inn, LLP,</u> 171 A.3d 792, 797 (Pa. Super. 2017) (commercial policy issued to a hotel).

disagree" on the meaning or proper construction of certain words.  Van Divner v.

Sweger, 2021 WL 2584114, at * 3 (Pa. Super. 2021); State Farm Automobile Ins. Co. v.

Dooner, 189 A. 3d 479, 482-483 (Pa. Super. 2018).  "While courts are responsible for

deciding whether, as a matter of law, written contract terms are either clear or

ambiguous; it is for the fact-finder to resolve ambiguities and find the parties' intent."

Windows v. Erie Insurance Exchange, 161 A.3d 953, 957 (Pa. Super. 2017).

### (C) COVID-19 BUSINESS INTERRUPTION INSURANCE LITIGATION IN PENNSYLVANIA

As we noted in The Scranton Club,  "[t]he onset of the novel coronavirus pandemic

and the resulting government orders closing businesses predictably generated claims by

those businesses against their commercial property insurers based upon the business

income, extra expense, and civil authority provisions of their policies."  The Scranton

Club, supra, at *9.  According to the "COVID Coverage Litigation Tracker" maintained

by the University of Pennsylvania Law School, 1,937 lawsuits challenging insurers'

denials of such claims have been filed in federal and state courts as of June 28, 2021. See

https://cclt.law.upenn.edu.  Rulings made in those lawsuits involve the interpretation and

application of the virus exclusion, the "physical loss or damage" requirement for business

income and extra expense coverages, and the availability of civil authority coverage, and

are based upon the language of the applicable insurance policies, the laws of the forum

states, and the allegations set forth in the complaints.  See John K. DiMugno,

"Implications of COVID-19 for the Insurance Industry and its Customers: An Update,"

Insurance Litigation Reporter, Vol. 42, No. 18 at pp. 514-531 (Nov. 6, 2020).  Although

several common pleas courts in this Commonwealth have issued decisions in business

interruption coverage disputes arising from the coronavirus pandemic and government closure orders, and even more federal district courts in Pennsylvania have had occasion to consider similar insurance coverage issues, no appellate court in Pennsylvania has yet had an opportunity to address these insurance coverage questions. *See* The Scranton Club, supra, at *9-10; Samuel W. Braver & Deborah A. Little, "Insurance Coverage for Businesses' Economic Losses Due to COVID-19," *The Pennsylvania Lawyer*, Vol. 43, No. 4 at p. 41 (July/August 2021).

### (1)   Federal Court Rulings

To date, the federal holdings regarding business interruption insurance claims resulting from coronavirus-related closure orders are based, in part, upon the "physical loss or damage" standard established by the United States Court of Appeals for the Third Circuit in two decisions that predated the COVID-19 pandemic.  In Port Authority of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226 (3d Cir. 2002), the owners of "numerous facilities in New York and New Jersey that incorporated asbestos products in their construction" brought an action against their commercial insurers to recover the cost of asbestos abatement, and "contend[ed] that physical damage ha[d] occurred in these structures as a result of the 'presence of asbestos,' 'threat of release and reintrainment of asbestos fibers,' and the 'actual release and reintrainment of asbestos fibers.'" Id. at 230. The trial court granted the insurers' motion for summary judgment, finding "that unless asbestos in a building was of such quantity and condition as to make the structure unusable, the expense of correcting the situation was not within the scope of a first party insurance policy covering 'physical loss or damage.'" Id.

- 21 -

On appeal, the Third Circuit examined the insurance laws of New York and New Jersey where the insured facilities were located, and remarked that it was confronted "with a diversity case in which applicable state law provides no guidance and the parties rely upon appellate decisions from jurisdictions having no relationship with the entities involved in this dispute." Id. at 235. It stated that in common parlance, "physical damage to property" ordinarily means "a distinct, demonstrable, and physical alteration of a structure," and reasoned that "[p]hysical damage to a building as an entity by sources unnoticeable to the naked eye must meet a higher threshold." Id. at 235. In support of that test, it cited the seminal contamination decision in Western Fire Ins. Co. v. First Presbyterian Church, 165 Colo. 34, 437 P.2d 52 (1968), which is discussed in Section II(D) below, where the Colorado Supreme Court "concluded that coverage was triggered when authorities ordered a building closed after gasoline fumes seeped into a building's structure and made its use unsafe," even though "neither the building nor its elements were demonstrably altered," but "its function was eliminated." Id.

Applying that standard, Port Authority held that "[w]hen the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct loss to its owner." Id. at 236. It posited that "[t]he requirement that the contamination reach such a level in order to come within coverage limitation establishes a reasonable and realistic standard for identifying physical loss or damage," and that "[a] less demanding standard would require compensation for repairs caused by the inevitable deterioration of materials used in the construction of the building." Id. In affirming the lower court ruling, it observed that "[a]lthough the

- 22 -

plaintiffs demonstrated that many of its structures used asbestos-containing substances, those buildings had continuous and uninterrupted usage for many years." Id.

Three years later, the Third Circuit considered the application of the Port Authority standard in an insurance coverage dispute involving property whose "well was contaminated with e-coli bacteria" and a policy that required "direct physical loss" as a condition to coverage.  In Motorists Mutual Ins. Co. v. Hardinger, 131 Fed.Appx. 823 (3d Cir. 2005), the district court granted the insurer's "motion for summary judgment on the basis that the Hardingers failed to establish a physical loss, a prerequisite for coverage under the policy." Id. at 825.  "While the bacteria allegedly made the house uninhabitable, the [trial] court deemed this a 'constructive loss,' and held it insufficient to satisfy the policy's requirement of 'physical loss.'" Id.

The federal appellate court noted on appeal that "[n]o Pennsylvania Supreme Court case . . . directly addresses whether loss of use may constitute a physical loss." Id. at 826. Nevertheless, it deemed "[i]nstructive" the ruling by Cumberland County Judge Kevin Hess in Hetrick v. Valley Mutual Ins. Co., 15 Pa. D. & C. 4th 271 (Cumb. Co. 1992), which is also discussed in greater detail in Section II(D) below, where "the court gave substantial attention and approval to Western Fire Insurance Co. v. First Presbyterian Church, 165 Colo. 34, 38-39, 437 P.2d 52 (1968)." Id. at n.4. With regard to the district court's conclusion that "Port Authority is inapplicable," the Third Circuit declared "[w]e find nothing, however, in New York, New Jersey, or Pennsylvania law that would cause us to disregard Port Authority under Pennsylvania law," and that it did not "appear that there is any substantive law in Pennsylvania at odds with Port Authority." Id. at 826.

- 23 -

Based upon that reasoning, <u>Hardinger</u> determined that <u>Port Authority</u> is "instructive in a case where sources unnoticeable to the naked eye have allegedly reduced the use of the property to a substantial degree." <u>Id.</u> Thus, it held:

> We predict that the Pennsylvania Supreme Court would adopt a similar principle as we did in <u>Port Authority</u>. Applying <u>Port Authority</u>'s standard here, we believe there is a genuine issue of fact whether the functionality of the <u>Hardinger</u>'s property was nearly eliminated or destroyed, or whether their property was made useless or uninhabitable.

<u>Id.</u> at 826-827.  In reversing the trial court's finding that bacteria contamination did not satisfy the "direct physical loss" requirement for coverage, the Third Circuit stated that "[s]ummary judgment was not proper because there is a genuine issue of material fact whether there was a physical loss." <u>Id.</u> at 828.

Relying upon the "physical loss or damage" analysis articulated in <u>Port Authority</u> and <u>Hardinger</u>, those federal district courts in Pennsylvania which have addressed the merits of COVID-19 business interruption insurance claims under Pennsylvania law have uniformly denied coverage on the ground that the insureds were unable to satisfy the "physical loss or damage" requirement in their insurance policies.[3]  The only four federal courts in the Middle District and Western District which have considered coronavirus-

---

[3]Because of the uncertainty surrounding COVID-19 business interruption insurance claims under Pennsylvania law, and the public policy interest in having those state law claims decided by Pennsylvania courts, at least seven federal judges in this state have declined to exercise jurisdiction pursuant to <u>Reifer v. Westport Ins. Co.</u>, 751 F.3d 129, 146 (3d Cir. 2014), and have either dismissed insurance coverage disputes without prejudice to the right to refile the actions in state court, or have remanded to state court any proceedings that were removed to federal court.  <u>See, e.g.</u>, <u>Commercial Office Furniture Co., Inc. v. Charter Oak Fire Ins. Co.</u>, 2021 WL 1837412, at *5 (E.D. Pa. 2021) (Padova, J.); <u>Amos Inc. v. Firstline Nat'l Ins. Co.</u>, 2021 WL 1375472, at *1 (W.D. Pa. 2021) (Wiegand, J); <u>Schwartz Law Firm, LLC v. Selective Ins. Co. of South Carolina</u>, 2021 WL 698189, at *3 (E.D. Pa. 2021) (Pappert, J.); <u>V & S Elmwood Lanes, Inc. v. Everest National Ins. Co.</u>, 2021 WL 84066, at *4 (E.D. Pa. 2021) (DuBois, J.); <u>Venezie Sporting Goods, Inc. LLC v. Allied Ins. Co. of America</u>, 2020 WL 5651598, at *5 (W.D. Pa. 2020) (Hornak, C.J.); <u>Dianoia's Eatery, LLC v. Motorist Mut. Ins. Co.</u>, 2020 WL 5051459, at *4 (W.D. Pa. 2020) (Fischer, J.); <u>Greg Prosmushkin, P.C. v. Hanover Ins. Group</u>, 2020 WL 4735498, at *5 (E.D. Pa. 2020) (Jones, J.).

- 24 -

related business income loss claims have found that the "physical loss or damage"

provisions in the policies were unambiguous and barred coverage based upon the facts

alleged. *See* <u>44 Hummelstown Associates, LLC v. American Select Ins. Co.</u>, 2021 WL

2312778, at *7-8 (M.D. Pa. 2021) (Kane, J.); <u>1 S.A.N.T., Inc. v. Berkshire Hathaway,</u>

<u>Inc.</u>, 2021 WL 147139, at * 5 (W.D. Pa. 2021) (Stickman, J.); <u>Windber Hospital v.</u>

<u>Travelers Property Cas. Co.</u>, 2021 WL 1061849, at *4-5 (W.D. Pa. 2021) (Gibson, J.);

<u>Kahn v. Pennsylvania Nat. Mut. Ins. Co.</u>, 2021 WL 422607, at *5-8 (M.D. Pa 2021)

(Jones, C.J.).  Fifteen of the sixteen federal judges in the Eastern District have also

determined that business losses caused by government closure orders stemming from the

COVID-19 pandemic cannot satisfy the "physical loss or damage" requirement for

coverage. *See* <u>Boscov's Department Store, Inc. v. American Guarantee and Liability Ins.</u>

<u>Co.</u>, 2021 WL 2681591, at *5-6 (E.D. Pa. 2021) (Gallagher, J.); <u>RDS Vending, LLC v.</u>

<u>Union Ins. Co.</u>, 2021 WL 1923024, at *4 (E.D. Pa. 2021) (Rufe, J.); <u>Mareik Inc. v. State</u>

<u>Farm Fire & Casualty Co.</u>, 2021 WL 1940647, at * 4-5 (E.D. Pa. 2021) (Alejandro, J.);

<u>Lansdale 329 Prop LLC v. Hartford Underwriters Ins. Co.</u>, 2021 WL 1667424, at *5-10

(E.D. Pa. 2021) (Goldberg, J.); <u>SSN Hotel Management, LLC v. Hartford Mut. Ins. Co.</u>,

2021 WL 1339993, at *4-5 (E.D. Pa. 2021) (Kenney, J.); <u>Eric R. Shantzer, D.D.S. v.</u>

<u>Travelers Cas. Ins. Co.</u>, 2021 WL 1209845, at *4-5 (E.D. Pa. 2021) (Sanchez, C.J.);

<u>Chester County Sports Arena v. Cincinnati Specialties Underwriters Ins. Co.</u>, 2021 WL

1200444, at * 6-7 (E.D. Pa. 2021) (Baylson, J.); <u>Tria WS, LLC v. Allianz Global Risks</u>

<u>U.S. Ins. Co.</u>, 2021 WL 1193370, at *4-5 (E.D. Pa. 2021) (Beetlestone, J.); <u>Fuel Recharge</u>

<u>Yourself, Inc. v. AMCO Ins. Co.</u>, 2021 WL 510170, at *5 (E.D. Pa. 2021) (McHugh, J.);

<u>Frank Van's Auto Tag, LLC v. Selective Ins. Co.</u>, 2021 WL 289547, at *4-7 (E.D. Pa.

2021) (Pratter, J.); <u>Humans & Resources, LLC v. First Line National Ins. Co.</u>, 2021 WL

75775, at *7 (E.D. Pa. 2021) (Joyner, J.); <u>Newchops Restaurant Comcast v. Admiral</u>

<u>Indemnity Co.</u>, 2020 WL 7395153, at *5 (E.D. Pa. 2020) (Savage, J.); <u>Kessler Dental</u>

<u>Associates, P.C. v. Dentist Ins. Co.</u>, 2020 WL 7181057, at *4 (E.D. Pa. 2020) (Wolson, J.)

<u>4431, Inc. v. Cincinnati Ins. Companies</u>, 2020 WL 7075318, at *10 (E.D. Pa.2020)

(Leeson, J.); <u>Brian Handel, D.M.D., P.C. v. Allstate Ins. Co.</u>, 2020 WL6545893, at *3

(E.D. Pa. 2020) (Bartle, J.).  In <u>Susan Spath Hegedus, Inc. v.  ACE Fire Underwriters Ins.</u>

<u>Co.</u>, 2021 WL 1837479 (E.D. Pa. 2021) (Schiller, J.), the court "conclude[d] that the

phrase 'direct physical loss of or damage to property at the described premises' in the

context of Business Income and Extra Expense insurance is ambiguous," and found that

"[t]he allegations in Plaintiff's Complaint regarding its suspension of operations could

plausibly constitute a 'direct physical loss of . . . property at the described premises,' in

that Plaintiff lost the ability to physically operate its business at the described premises."

<u>Id.</u> at *9.  However, <u>Susan Spath Hegedus</u> denied the insurer's motion to dismiss based

upon its interpretation and application of California law, not Pennsylvania law.  <u>Id.</u> at *3,

8-10.

### (2)　　State Court Rulings

The first reported reference to a business interruption insurance ruling by a state

court judge is found in an order that was issued by Philadelphia County Judge Gary

Glazer on August 31, 2020, in <u>Ridley Park Fitness, LLC v. Philadelphia Indemnity Ins.</u>

<u>Co.</u>, 2020 WL 8613467 (Phila. Co. 2020), *reconsideration denied*, 2020 WL 8613466

(Phila. Co. 2020).  In addressing the insurer's preliminary objections asserting "that

- 26 -

certain clauses including a virus exclusion and 'direct physical loss' bar coverage," he

stated in a footnote.

> At this very early stage, it would be premature for this court [to] resolve the
> factual determinations put forth by defendants to dismiss plaintiff's claims.
> Taking the factual allegations made in plaintiff's complaint as true, as this
> court must at this time, plaintiff has successfully pled to survive this stage
> of the proceedings.  As such, the preliminary objections are overruled.

Id. at *1 n.1.  On October 26, 2020, Judge Glazier entered an essentially identical one-

sentence order in a separate case, which included the same footnote as Ridley Part Fitness,

but added the sentence "[m]oreover, the law and facts are rapidly evolving in the area of

COVID-19 business losses."  Taps & Bourbon on Terrace, LLC v. Underwriters at Lloyds

London, 2020 WL 6380449, at *1 n.1 (Phila. Co. 2020).  Neither order identifies the

specific policy language at issue in those cases or the legal authority relied upon by the

court.

On January 25, 2021, we issued a Memorandum and Order in The Scranton Club

sustaining the insurer's demurrer based upon the failure of a private social club to allege

"any facts which may arguably satisfy the 'direct physical loss or damage' requirement

for business income and extra expense coverage under the policy."  The Scranton Club,

supra, at *16.  In contradistinction to Brown's averments in this case, the insured in The

Scranton Club affirmatively alleged that "'[t]here is no evidence that the COVID-19 virus

was present within The Scranton Club's premises at the time that it closed its business,'"

and even asserted that "its 'loss of business income was not caused by a virus within its

premises' but was 'due to the Governor's and Pennsylvania Department of Health

Secretary's orders that were issued in response to the pandemic.'"  Id. at *4.  Hence, after

reviewing the "physical loss or damage" test formulated in <u>Port Authority</u> and <u>Hardinger</u>, we stated:

> Per the Scranton Club's binding judicial admissions, the coronavirus was never present on its premises, nor did any occupant of its property ever test positive for COVID-19. In short, there has never been an allegation by the Scranton Club that the presence of the novel coronavirus on its property caused some form of physical damage to its premises that rendered it uninhabitable or unusable.

<u>Id.</u> at *15. For that reason, we sustained the insurer's demurrer after concluding that "[t]he Scranton Club is mistaken that <u>Studio 417 [Inc. v. Cincinnati Insurance Company,</u> 478 F.Supp.3d 794 (W.D. Mo. 2020)] warrants a contrary conclusion since, unlike the instant case, the business in <u>Studio 417</u> specifically alleged that the 'physical substance' of COVID-19 'lived on,' was 'active on,' and 'attached to' the 'physical surfaces' on its property, 'making it unsafe and unusable,' and 'causing it to cease or suspend operations.'"[4] <u>Id.</u> at *16 (quoting <u>Studio 417</u>, 478 F.Supp.3d at 798, 802).

Lancaster County Judge Thomas Sponaugle filed an order on March 2, 2021, granting the insurer's motion for judgment on the pleadings in a business interruption insurance action that was commenced by a restaurant, and citing <u>Hardinger</u>, he found that "Plaintiff suffered no direct physical loss or damage to its premises." <u>Isaac's at Spring Ridge, LLP v. MMG Ins. Co.</u>, 2021 WL 1650789, at *1 n.1 (Lanc. Co. 2021), *app. pending*, No. 455 MDA 2021 (Pa. Super.) After the insured filed an appeal, Judge

---

[4]It is presumed that the Scranton Club asserted that COVID-19 was never present on its premises in order to avoid the application of the policy's virus exclusion, which it succeeded in doing so. <u>Id.</u> at *11-13. One commentator has described such a strategy as a "pleading Catch-22" in which an insured's allegation that the virus did not exist on its covered premises forestalls the application of the virus exclusion, while simultaneously operating to prevent satisfaction of the "physical damage" requirement for business income and extra expense coverage. *See* John K. DiMugno, "The Implications of COVID-19 for the Insurance Industry and Its Customers: 2021 Developments," *Insurance Litigation Reporter*, Vol. 43, No. 3 at pp. 63-65 (Mar. 12, 2021) (discussing The Scranton Club, <u>supra</u>).

- 28 -

Sponaugle issued an opinion pursuant to Pa.R.A.P. 1925(a). Issacs's at Spring Ridge, LLP v. MMG Ins. Co., No. CI-20-03613, Sponaugle, J. (Lanc. Co. June 11, 2021). In that Opinion, he stated that "[t]he losses were the result of the virus which is specifically excluded as a covered loss under the policy," and that "Plaintiff sustained no distinct, demonstrable, and physical alteration of its property, and therefore has no physical loss and no coverage." Id. at p. 6. As further support for the dismissal, he noted that "at no point was Plaintiff prohibited from access to its premises" since it "continued to employ individuals to take orders, make and package food, receive payment, and deliver food" and "patrons were permitted to enter upon the property for delivery of their ordered food." Id. at p. 7.

The Ungarean decision on March 25, 2021, represents the first instance in which a Pennsylvania court determined, as a matter of law, that an insured was entitled to business income, extra expense, and civil authority coverage, and granted the insured's motion for summary judgment seeking declaratory judgment relief on that basis. Allegheny County Judge Christine Ward reasoned that "[w]hile some courts have interpreted 'direct physical loss of or damage to property' as requiring some form of physical alteration and/or harm to property in order for the insured to be entitled to coverage, this Court reasonably determines that any such interpretation improperly conflates 'direct physical loss of' with 'direct physical . . . damage to' and ignores the fact that these two phrases are separated in the contract by the disjunctive 'or.'" Ungarean, supra, at *6. After she "looked to the ordinary, dictionary definitions of the terms 'direct,' 'physical,' 'loss,' and 'damage,'" she concluded:

> Accordingly, in this instance, the most reasonable definition of 'loss' is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property, i.e., destruction and ruin.  Applying this definition gives the term 'loss' meaning that is different from the term 'damage.'  Specifically, whereas the meaning of the term 'damage' encompasses all forms of harm to Plaintiff's property (complete or partial), this Court concludes that the meaning of the term 'loss' reasonably encompasses the act of losing possession and/or deprivation, which includes the loss of use of property absent any harm to property.

Id.  To that end, she remarked that "the spread of COVID-19 and social distancing measures (with or without the Governor's orders) caused plaintiff, and many other businesses, to *physically* limit the use of property and the number of people that could inhabit *physical* buildings at any given time," such that "the spread of COVID-19 did not, as [the insurers] contend, merely impose economic limitations" in that the "economic losses were secondary to the businesses' *physical* losses." Id. at *7 (emphasis in original).

Judge Ward also addressed the insurers' contention "that the insurance contract's definition for 'period of restoration' suggests that the contract expressly contemplates and necessitates the existence of actual tangible damage in order for Plaintiff to be entitled to business income and extra expense coverage" Id.  She observed that "the threat of COVID-19 has necessitated many physical changes to business properties across the Commonwealth," including "the installation of partitions, additional handwashing /sanitizations stations, and the installation or renovation of ventilation systems," and stated that "[t]hese changes would undoubtedly constitute 'repairs' or 'rebuilding' of property." Id. at *8 (citing In re Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation, 2021 WL 679109, at *9 (N.D. Ill. 2021) (finding that "the 'Period of Restoration' describes a *time* period during which loss of business income will

- 30 -

be covered, rather than an explicit definition of coverage," noting the policy's use of the

words "repaired" and "replaced" and stating that if "the coronavirus risk could be

minimized by the installation of partitions and a particular ventilation system, then the

restaurants would be expected to 'repair' the space by installing those safety features,"

and holding  that "the definition of the Period of Restoration is consistent with interpreting

direct physical loss of property to include the loss of physical use of the covered property

imposed by the shutdown orders."). Ergo, she held:

> Whether or not Plaintiff in the instant matter actually undertook such
> changes, or resumed its business at a new location, is of no moment. The
> "period of restoration" does not require repairs, rebuilding, replacement, or
> relocation of Plaintiff's property in order for Plaintiff to be entitled to
> coverage. The "period of restoration" merely imposes a time limit on
> available coverage, which ends when such measures, if undertaken, would
> have been completed with reasonable speed and similar quality. To put this
> another way, the "period of restoration" ends when Plaintiff's business is
> once again operating at normal capacity, or reasonably could be operating
> at normal capacity. The "period of restoration" does not somehow redefine
> or place substantive limits on types of available coverage. Defendants
> cannot avoid providing coverage that is otherwise available simply because
> the end point with regard to the "period of restoration" may be, at times,
> slightly more difficult to pinpoint in the context of the COVID-19
> pandemic.

Id. Judge Ward later issued a comparable ruling in granting an insured's motion for

partial summary judgment seeking declaratory judgment relief with regard to business

income loss coverage. See, MacMiles, LLC v. Erie Insurance Exchange, No. GD-20-

7753, Ward, J., at pp. 11-15 (Alleg. Co. May 25, 2021), app. pending, No. 740 WDA

2021 (Pa. Super.).

On May 20, 2021, Lawrence County Judge J. Craig Cox reached a contrary result

in Venezie Sporting Goods, LLC v. Allied Ins. Co. of America, No. 10397 of 2020, Cox,

J. (Lawrence Co. 2021), and sustained the insurer's preliminary objections based upon the

- 31 -

"direct physical loss of or damage to property" provision and virus exclusion in the policy. After reviewing the foregoing decisions in The Scranton Club and Ungarean, Id. at pp. 9-17, he stated that "the Court finds the approach adopted by The Scranton Club Court and the United States District Courts for the Eastern, Middle and Western Districts of Pennsylvania to be persuasive and consistent with the language contained within the subject insurance policy." Id. at p. 19. Judge Cox determined that "the analysis provided in Ungarean is not consistent with the language contained within the current insurance policy as closure of the facility to a majority portion of the public does not render the premises uninhabitable or rendered useless." Id. He affirmed the denial of coverage on the basis that "[i]t is apparent the COVID-19 pandemic did not demonstrably alter the components of Plaintiff's building nor did it cause any other form of physical damage to the property." Id. Moreover, he also rejected the availability of civil authority coverage since "Plaintiff's employees and staff were still permitted to access the property despite the orders, much in the same way as the dental practice in Brian Handel D.M.D. and the private social club in The Scranton Club." Id. at p. 20.

Within the past month, two members of the Court of Common Pleas of Philadelphia County issued decisions in business interruption insurance coverage cases on June 17, 2021. In Lehigh Valley Baseball, L.P. v. Philadelphia Indemnity Ins. Co., No. 0958, December Term 2020, Glazer, J. (Phila. Co. 2021), Judge Gary Glazer, who authored the 2020 orders in the Ridley Park Fitness and Taps & Bourbon overruling the insurers' preliminary objections, sustained the insurer's demurrer and dismissed the insurance coverage action filed by the owner of Minor League Baseball teams. Referencing the "direct physical loss" requirement in the policy and the holdings in Port

- 32 -

Authority and Hardinger, he stated that "[n]either the fact that the Major League Baseball teams failed to supply players for the 2020 season, nor the governmental stay-at-home-orders and other governmental responses to the pandemic, caused any physical alteration or impact to the [Minor League Baseball] insureds' real or personal property, nor to nearby real or personal property, nor did those events render real or personal property completely uninhabitable or unusable." Id. at p. 8.  After emphasizing that the insureds had merely alleged that "the virus likely was physically present at their stadiums," Judge Glazer held that "[e]ven if such contamination constituted physical loss or damage, coverage for such loss or damage, and the resulting loss of business income, is clearly barred by the policies' virus exclusion because such 'loss or damage was caused by or resulted from a virus, bacterium, or other micro-organism that induces or is capable of inducing physical distress, illness, or disease.'"[5]  Id. at p. 9.

On the same day, Philadelphia County Judge Nina Wright Padilla filed an Opinion in Spector Gadon Rosen Vinci P. C. v. Valley Forge Insurance Company, No. 1636, May Term 2020, Padilla, J. (Phila. Co. 2021) granting the insurer's motion for summary judgment and dismissing a law firm's claim for business income, extra expense, and civil authority coverage.  The law firm "argue[d] that 'physical loss of . . . property does not require physical alteration to property, but instead solely requires a 'loss of use' of property," but she rejected that argument and "found that 'loss of use' of the property alone . . . is not enough to trigger coverage." Id. at p. 5 & n.10.  Judge Padilla

---

[5]In a footnote, Judge Glazer also stated that "[t]o the extent that this ruling appears inconsistent with any prior ruling of this court in any similar coverage case, the court welcomes further motion practice in that case." Id. at p. 10 n.1.

underscored that "there is no allegation or evidence that the virus was actually present at the [law firm's] building or that the threat of the virus spreading made the property 'uninhabitable and unusable,'" and held that "the absence of direct physical loss of or damage to the property as described by Port Authority fails to trigger coverage under the business income and extra expense coverage of Valley Forge's policy." Id. at p. 7.  She likewise found the civil authority coverage inapplicable since "[t]here [wa]s no evidence that the virus was present at the property necessitating the issuance of the government shutdown orders or that the virus was present at a property locating within five miles of [the insured's] law office." Id. at p. 8.

What may be gleaned from the foregoing state courts' application of Port Authority and Hardinger is that, in cases claiming "physical damage" to property caused by "sources unnoticeable to the naked eye," the contaminant, pathogen, or other offending microorganism must render the insured structure uninhabitable or unusable, or nearly destroy its functionality, in order to constitute "physical damage" for purposes of business interruption insurance coverage.  An insured's failure to allege that the coronavirus was present on the covered premises is fatal to a claim for business income or extra expense coverage.  Furthermore, the fact that the insured still enjoys limited or modified use of the property, notwithstanding a government closure order, generally makes civil authority coverage inapplicable.  Additionally, Ungarean stands for the minority proposition that the phrase "direct physical loss" encompasses "the act of losing possession and/or deprivation" of property, "which includes the loss of use of property absent any harm to property."  With the benefit of that decisional guidance, the merits of the parties' insurance coverage arguments will be considered.

- 34 -

### (D)   PHYSICAL DAMAGE FROM CORONAVIRUS CONTAMINATION OF PROPERTY

Cincinnati seeks to dismiss Brown's claims for business income, extra expense, and civil authority coverage on the ground that Brown's has not alleged direct "physical damage" or "physical loss" to its property. As a general rule, "it is a necessary prerequisite to recovery upon a policy for the insured to show a claim within the coverage provided by the policy." McEwing v. Lititz Mut. Ins. Co., 77 A.3d 639, 646 (Pa. Super. 2013); Brogan, 35 Pa. D. & C. 5th at 525. It is noteworthy that Brown's purchased an "all risk," as opposed to a "named perils" or "specific perils," policy from Cincinnati. "Named perils" or "specific perils" policies provide coverage only for those specific risks that are enumerated in the policy, and exclude all other risks that are not expressly identified in the policies. Western Metal Bed Co., Inc. v. Lexington Ins. Co., 2007 WL 5479851, at *4 n.19 (Phila. Co. 2007), aff'd, 963 A.2d 581 (Pa. Super. 2008); 7 Couch On Insurance § 101: 7 (3d ed.). In contrast, "the policy in this case is an 'all risk' policy, meaning that all losses to the [building] and its contents are covered except for those specifically excluded." Spece v. Erie Ins. Group, 850 A.2d 679, 683 (Pa. Super. 2004).

Brown's advances two arguments in support of its claim that it has averred the requisite physical damage or loss. First, referencing its specific averments that COVID-19 virus droplets or particles were present on its covered property, Browns maintains that contamination caused by invisible sources such as ammonia, toxic gases, and the like can constitute "physical damage" to property. (Docket Entry No. 28, at pp. 13-14, 17-20). In that regard, it punctuates its factual allegations that the highly contagious "COVID-19 strains physically infect and can stay alive on surfaces" for days or weeks. (Docket Entry

- 35 -

No. 1 at ¶¶ 44, 48). *See also*, Friends of Danny DeVito v. Wolf, 227 A.3d 872, 880 n. 3 (Pa. 2020) (noting that "the virus has an incubation period of up to fourteen days" and "can remain on surfaces for days and can spread through the air within confined areas and structures."), *cert. denied*, 141 S. Ct. 239 (U.S. 2020). Second, Browns advocates the interpretation of "physical loss" adopted in Ungarean, which construed that requirement as including the mere loss of use or possession of property absent any physical harm to it. (Docket Entry No. 28 at pp. 12-13).

Under the physical contamination theory proposed by Brown's in its first argument, "[t]he presence of bacteria, odor, smoke or noxious gases may constitute physical loss or damage where insured property has been rendered uninhabitable or unusable for its intended purpose." Scott G. Johnson, "What Constitutes Physical Loss or Damage in a Property Insurance Policy?," 54 Tort Trial & Ins. Prac. L. J. 95, 114 (Winter 2019). Prior to the decision by the Supreme Court of Colorado in Western Fire Ins. Co., other courts had "suggest[ed] that physical loss or damage requires a demonstrable physical change to insured property." Id. at 100. In Western Fire Ins. Co., gasoline had infiltrated "the soil under and around the [church] building" that was insured, and gasoline vapors throughout the "hall and rooms of the church building" made "the same uninhabitable" and rendered "the use of the building dangerous." Western Fire Ins. Co., 165 Colo. at 36-37, 437 P.2d at 54. Rejecting the property insurer's contention "that the insured sustained no 'direct physical loss,'" the court reasoned that gasoline infiltration on other property and the resulting vapors caused the building to become "uninhabitable" and made "further use of the building highly dangerous," as a result of which "the insured

established that there was a direct physical loss occasioned to the church building within the policy period of the insurance contract." Id. at 39-40, 437 P.2d at 55.

As mentioned above, the Cumberland County court later adopted the reasoning in Western Fire Ins. Co. in deciding whether property damage coverage was applicable after a "fuel oil tank ruptured, spilling approximately 250 gallons of oil into the ground causing the pollution of ground water." Hetrick, 15 Pa. D. & C. 4th at 271. Relying upon the rationale in Western Fire Ins. Co., that "direct physical loss" can be established where contamination makes "the building uninhabitable and highly dangerous to use," Hetrick "conclude[d] that an oil spill which pollutes the ground water may make a building uninhabitable," and that "if the building is uninhabitable, then there is a direct loss to that building." Id. at 273-274 (citing Gibson v. Secretary of U. S. Dept. of Housing, 479 F.Supp.3 (M.D. Pa. 1978)).

The Third Circuit Court of Appeals has likewise cited Western Fire Ins. Co. with approval, see Port Authority, 311 F.3d at 235, and subsequently described Hetrick as "instructive." Hardinger, 131 Fed. Appx. at 826 n.4. Prior to the onset of the COVID-19 pandemic, courts throughout the country adopted the contamination theory in recognizing that the existence of odors, bacteria, and other imperceptible agents such as ammonia, salmonella, lead, e-coli bacteria, and carbon-monoxide, may constitute physical damage or loss to a property if its presence renders the structure uninhabitable or unusable, or essentially destroys its functionality. See Mellin v. Northern Security Ins. Co., Inc., 167 N.H. 544, 548, 550, 115 A.3d 799, 803, 805 (2015) (finding that the pervasive odor of cat urine was "physical loss to the property," "conclud[ing] that 'physical loss' need not be read to include only tangible changes to the property that can be seen or touched, but can

- 37 -

also encompass changes that are perceived by the sense of smell," and "hold[ing] that physical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell and that exist in the absence of structural damage."); Netherlands Ins. Co. v. Main Street Ingredients, LLC, 745 F.3d 909, 916-917 (8th Cir. 2014) (insured sustained physical damage under its commercial insurance policy when its dried milk and instant oatmeal became  contaminated with salmonella); Widder v. Louisiana Citizens Prop.  Ins. Corp., 82 So. 3d 294, 296 (La. App. 4 Cir. 2011) (reversing trial court ruling that lead contamination in a home was not a "direct physical loss" for which there was coverage, and "find[ing] that the intrusion of the lead to be a direct physical loss that has rendered the home unusable and uninhabitable."), *cert. denied*, 76 So. 3d 1179 (La. 2011); Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 406 (1st Cir. 2009) ("[W]e are persuaded both that odor can constitute physical injury to property under Massachusetts law, and also that allegations that an unwanted odor permeated the building and resulted in a loss of use of the building are reasonably susceptible to an interpretation that physical injury to property has been claimed."); General Mills, Inc. v. Gold Medal Ins. Co., 622 N.W.2d 147, 152 (Minn. Ct. App. 2001) (concluding that a food manufacturer sustained direct physical damage to its cereal product after the oats were treated with an unapproved pesticide, and reasoning "that direct physical loss can exist without actual destruction of property or structural damage to property; it is sufficient to show that insured property is injured in some way."); Azalea, Ltd. v. American States Ins. Co., 656 So.2d 600, 602 (Fla. Ct. App. 1995) (reversing trial court and finding that a direct physical loss had been established after an unseen contaminant entered the insured's sewage treatment system and destroyed the

bacteria colony that was integral to its operation); Farmers Ins. Co. of Oregon v.

Trutanich, 123 Or. App. 6, 10-11, 858 P.2d 1332, 1335-36 (1993) (rejecting insurer's

contention that the trial "court erred in ruling that [the insured's] losses caused by odor

from the methamphetamine 'cooking' constituted 'direct physical loss,'" and holding that

damages caused by odor from methamphetamine cooking represented direct physical loss

covered by the policy); Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of America,

2014 WL 6675 934, at *6 (D.N.J. 2014) (stating that "non-structural property damage

claims have found that buildings rendered uninhabitable by dangerous gases or bacteria

suffered direct physical loss or damage," and finding "that the ammonia release physically

transformed the air within Gregory Packaging's facility so that it contained an unsafe

amount of ammonia or that the heightened ammonia levels rendered the facility unfit for

occupancy until the ammonia could be dissipated," such "that the ammonia discharge

inflicted 'direct physical loss of or damage to' Gregory Packaging's facility.");

Association of Apartment Owners of Imperial Plaza v. Fireman's Fund Insurance

Company,939 F.Supp.2d 1059, 1068-69 (D. Haw. 2013) (concluding that the invisible

release of arsenic and resulting contamination of the building's carpet, concrete, and

interior objects established "direct physical damage" to the building); TRAVCO Ins. Co.

v. Ward, 715 F.Supp.2d 699, 709 (E.D. Va. 2010) (toxic gas released by defective

drywall, which rendered the home uninhabitable, satisfied the "direct physical loss or

damage" requirement), aff'd, 504 Fed. Appx. 251 (4th Cir. 2013); Stack Metallurgical

Services, Inc. v. Travelers Indemnity Co. of Connecticut, 2007 WL 464715, at *8 (D. Or.

2007) (finding that the release of lead, which prevented the use of a furnace for its

expected purpose, was "fairly characterized as 'direct physical damage'" to the furnace);

- 39 -

Cooper v. Travelers Indemnity Co. of Illinois, 2002 WL 32775680, at *5 (N.D. Cal. 2002) (concluding that the suspension of a tavern's operations "resulted from direct physical damage to the property" since it was caused by e-coli bacteria in well water); Yale University v. Cigna Ins.Co., 224 F.Supp.2d 402, 413-414 (D. Conn. 2002) (presence of lead contamination constituted physical loss or damage to property); Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts, 2002 WL 31495830, at *8-9 (D. Or. 2002) (stating "that physical damage can occur at the molecular level and can be undetectable in a cursory inspection," and finding that "[b]ecause mold may be a 'direct' and 'physical' loss covered by the policy in this case, Prudential is not entitled to summary judgment."); Matzner v. Seaco Ins. Co., 1998 WL 566658, at *4 (Mass. Super. 1998) (concluding "that carbon-monoxide contamination constitutes 'direct physical loss of or damage to' property, namely the insured building, 'caused by or resulting from any covered cause of loss,' namely the *risk* of carbon monoxide contamination.")(emphasis in original); Arbeiter v. Cambridge Mut. Fire Ins. Co., 1996 WL 1250616, at *2 (Mass. Super. 1996) ("The existence of fumes may be a physical loss. The plaintiffs argue persuasively that fumes are a physical loss which attaches to the property.").

At the outset of the novel coronavirus public health crisis, and in anticipation of insurers' arguments that insureds could not satisfy the "physical damage" requirement for business interruption insurance coverage, insurance law commentators opined:

> Business owners should argue that the mere presence of the coronavirus constitutes "physical damage" to business premises because the coronavirus attaches to surfaces and is capable of causing potentially fatal infection upon contact and prevents business owners from using and enjoying their property.

Charles S. LiMandri, Milan L. Brandon and Noel J. Meza, "Business Interruption Coverage for the COVID-19 Pandemic: Insurance Industry Fights Biggest Battle Ever Against Difficult Odds," *Insurance Litigation Reporter*, Vol. 42, No. 10 at p. 285 (June 19, 2020). They indicated that "scientific research confirms that the coronavirus can linger on surfaces for days and that it can be transmitted through 'fomites' (objects or materials likely to carry infection, such as furniture)." Id. (citing Neetjle van Dormalen et al., "Aerosol and Surface Stability of SARS-CoV-2 as compared with SARS-CoV-1," 382 New Eng. J. Med. 1564 (2020)). As for any resulting repairs to restore the property in the wake of COVID-19, those commentators stated that "a strong argument can be advanced that 'there was a physical deposit of hazardous biological material (coronavirus particles) upon property, such that disinfection was reasonably required before the property could be used again." Id. at 286 (quoting Nick Bond and Mark Maclean, "Is Coronavirus Contamination Considered Property Damage in the Context of Business Interruption Insurance?," *Kennedys Law* (Mar. 26, 2020)).

Studio 417, Inc. v. Cincinnati Ins. Co., 478 F.Supp.3d 794 (W.D. Mo. 2020) is the first reported case that employed such a rationale in addressing Cincinnati's denial of a coronavirus-related business interruption insurance claim on the basis that "direct physical loss requires actual, tangible, permanent, physical alteration of property." Id. at 800. The hair salons in that case had alleged "that COVID-19 'is a physical substance,' that it 'lives on' and is "active on inert physical surfaces," and "attached to and deprived [them] of their property, making it 'unsafe and unusable, resulting in a direct physical loss to the premises and property.'" Not unlike Brown's policy, Cincinnati's policy in Studio 417 did not define the words "direct," "physical," "loss," or "damage." Id. Citing Port

- 41 -

Authority, the federal district court stated that "[o]ther courts have similarly recognized that even absent a physical alteration, a physical loss may occur when the property is uninhabitable or unusable for its intended purpose." Id. at 801.  In finding that the salons had adequately alleged that they suffered direct physical loss or damage, Studio 417 stressed that they had averred "that COVID-19 particles attached to and damaged their property, which made their premises unsafe and useable." Id. at 802. *Accord* NeCo, Inc. v. Owners Ins. Co., 2021 WL 601501, at *4 (W.D. Mo. 2021) (holding that "Plaintiff has adequately alleged a claim for direct physical loss" by asserting "that COVID-19 was present on Plaintiff's premises" and that "the presence of COVID-19 on property impairs its value, usefulness, and/or normal function."); Blue Springs Dental Care, LLC v. Owners Ins. Co., 488 F.Supp.3d 867, 874 (W.D. Mo. 2020) (denying motion to dismiss for failure to allege physical damage in light of dental clinics' allegations that it "suspended operations due to COVID-19 to prevent physical damages to the premises by the presence or proliferation of the virus" and "that COVID-19 physically attached itself to their dental clinics, thereby depriving them of the possession and use of those insured properties.").

Elegant Massage, LLC v. State Farm Mutual Auto. Ins. Co., 506 F.Supp.3d 360 (E.D. Va. 2020) utilized similar reasoning in treating COVID-19 contamination of insured premises like contamination by ammonia, toxic gas, or noxious odors when determining whether the direct physical loss or damage threshold for coverage was met.  The trial court in that action deemed it "plausible that a fortuitous 'direct physical loss' could mean that the property is uninhabitable, inaccessible, or dangerous to use because of intangible,

or non-structural, sources." Id. at 376.  In denying the insurer's motion to dismiss,

Elegant Massage stated:

> Here, while the Light Stream Spa was not structurally damaged, it is
> plausible that Plaintiff experienced a direct physical loss when the property
> was deemed uninhabitable, inaccessible, or dangerous to use by the
> Executive Orders because of its high risk for spreading COVID-19, an
> invisible but highly lethal virus.  That is, the facts of this case are similar to
> those where courts found that asbestos, ammonia, odor from
> methamphetamine lab, or toxic gasses from drywall, which caused
> properties to become uninhabitable, inaccessible, and dangerous to use,
> constituted a direct physical loss.

Id.  See also Cibus, LLC v. Eagle West Ins. Co., 2021 WL 1566306, at *5 (D. Ariz. 2021)

(following Studio 417 and holding that plaintiff "sufficiently alleged that [it] suffered a

direct physical loss of or damage to its property when COVID-19 contaminated the

property and that this physical loss caused the business disruption and extra expenses.").

Earlier this month, the United States Court of Appeals for the Eighth Circuit

considered an appeal involving the "physical loss" or "physical damage" requirement

under Iowa law.  The oral and maxillofacial surgery group in Oral Surgeons, P.C. v.

Cincinnati Ins. Co., 491 F.Supp.3d 455 (S.D. Iowa 2020) did not allege that the

coronavirus was present in its offices, and "instead contend[ed] its loss was caused by the

COVID-19 coronavirus and the government actions to suspend temporarily non-

emergency dental procedures."  Id. at 456.  On appeal, the Eighth Circuit considered "only

the question whether the COVID-19 pandemic and the related-government imposed

restrictions constitute direct 'accidental physical loss or accidental physical damage'

under the policy" and Iowa law.  Oral Surgeons, P.C. v. Cincinnati Ins. Co., 2021 WL

2753874, at *3 n. 2 (8th Cir. 2021).  Although the appellate court affirmed the lower court

dismissal and rejected the "conten[tion] that 'physical loss' occurs whenever the insured is

physically deprived of the insured property," Id. at *1, it reasoned that "there must be some physicality to the loss or damage of property – *e.g.*, a physical alteration, *physical contamination,* or physical destruction." Id. at *2 (emphasis added).

In order for an insured to sustain a claim of physical loss or damage based upon the contamination theory recognized in Studio 417, the insured must expressly aver that the coronavirus was present on its covered property. *See* Hair Studio 1208, LLC v. Hartford Underwriters Ins. Co., 2021 WL 1945712, at *8 (E.D. Pa. 2021) ("Unlike in [Hardinger] where there were specific allegations of bacteria in the insured property, Plaintiff does not assert the presence of COVID-19 on its property."); Muriel's New Orleans, LLC v. State Farm Fire and Cas. Co., 2021 WL 1614812, at *8 (E.D. La. 2021) ("find[ing] the reasoning in Studio 417 inapplicable here" because "Muriel's does not allege that COVID-19 physically infiltrated the premises; rather, Muriel's alleges that 'the shutdown orders issued by the City of New Orleans and the State of Louisiana, and their effects on Muriel's business, property, and operations, constitute a direct physical loss to covered property.'"); Goodwill Industries of Central Oklahoma, Inc. v. Philadelphia Indemnity Ins. Co., 499 F.Supp.3d 1098, 1104 (W.D. Ok. 2020) ("Here, however, Goodwill only states that the government's mandated closures rendered it unusable, not that COVID-19 attached to or deprived it of its property."). In fact, we found Studio 417 to be inapplicable in The Scranton Club because there had "never been an allegation by the Scranton Club that the presence of the novel coronavirus on its property" rendered "it uninhabitable or unusable," and to the contrary, the Scranton Club had distinctly alleged that "its 'loss of business income was not caused by a virus within its premises.'" The Scranton Club, supra, at *4, 15. The federal district court in Mudpie, Inc. v. Travelers

- 44 -

Casualty Ins. Co. of America, 487 F.Supp.3d 834 (N.D. Cal. 2020) also found "that

Mudpie has failed to establish a 'direct physical loss of property' under its insurance

policy," but further explained:

> Had Mudpie alleged the presence of COVID-19 in its store, the Court's
> conclusion about an intervening physical force would be different.  SARS-
> CoV-2 - - the coronavirus responsible for the COVID-19 pandemic, which
> is transmitted either through respiratory droplets or through aerosols which
> can remain suspended in the air for prolonged periods of time - - is no less a
> "physical force" than the "accumulation of gasoline" in Western Fire
> Insurance or the "ammonia release which physically transformed the air" in
> Gregory Packaging.

Id. at 841 & n.7.  *Accord* Cinemark Holdings, Inc. v. Factory Mutual Ins. Co., 500

F.Supp.3d 565, 569 (E.D. Tex. 2021) ("Unlike Selery [Fullfillment, Inc. v. Colony Ins.

Co., 2021 WL 963742 (E.D.Tex. 2021)], Cinemark alleges that COVID-19 was actually

present and actually damaged the property by changing the content of the air."); Derek

Scott Williams PLLC v. Cincinnati Ins. Co., 2021 WL 767617, at *2, 4 (N.D. Ill. 2021)

(addressing Cincinnati's contentions "that physical *alteration* to the property is required"

and that coronavirus contamination "does not constitute damage to an insured's property

because it can be removed by cleaning," and concluding "that a reasonable factfinder

could find that the term 'physical loss' is broad enough to cover, as Williams argues, a

deprivation of the use of its business premises.")(emphasis in original); Henderson Road

Restaurant Systems, Inc. v. Zurich American Ins. Co., 2021 WL 168422, at *13 (N.D. Oh.

2021) ("After considering the ordinary definitions of the undefined words in the policy,

the Court finds that the Plaintiffs have shown that their business operations were

suspended by direct physical loss of or damage to property at the premises" due to the

presence of the coronavirus there.).

State trial courts throughout the nation have agreed with the foregoing rationale

articulated in the federal case law in denying insurers' attempts to dismiss business

interruption insurance claims filed by insureds who assert that COVID-19 was present on

their covered property.[6] *See, e.g.*, McKinley Development Leasing Co. Ltd. v. Westfield

Ins. Co., 2021 WL 506266, at *4 (Stark Co. Oh. 2021) (following Henderson Road

Restaurant and holding that "McKinley has adequately stated a claim for direct physical

loss" from the presence of the coronavirus); Goodwill Industries of Orange Co. v.

Philadelphia Indemnity Ins. Co., 2021 WL 476268, at *3 (Orange Co. Calif. 2021) (citing

Studio 417, noting that the insured alleged "that coronavirus and COVID-19 were present

at its properties at the time of the State and County closure orders," and declining to hold

"as a matter of law that the coronavirus and COVID-19 have not, in some manner, caused

physical damage to property."); Cherokee Nation v. Lexington Ins. Co., 2021 WL 506271,

at *4-5, 9 (Cherokee Co. Okl. 2021) (finding that an averment that the existence of the

coronavirus on its covered property "rendered it unusable for its intended purpose"

established "direct physical loss or damage."); North State Deli, LLC v. The Cincinnati

Ins. Co., 2020 WL 6281507, at *3 (N.C. Super. 2020) (stating "that the ordinary meaning

of the phrase 'direct physical loss' includes the inability to utilize or possess something in

the real, material, or bodily world," finding that "Plaintiffs were expressly forbidden by

government decree from accessing or putting their property to use for the income-

generating purposes for which the property was insured," and concluding that "this loss is

---

[6]Cincinnati's assertion, that "courts have uniformly held that the mere presence of the coronavirus on property is insufficient to establish the requisite for first party coverage: physical damage or loss to property," is incorrect. (Docket Entry No. 27 at p. 21).

unambiguously a 'direct physical loss,' and the policies afford coverage."). In addition, the federal district court in <u>Legacy Sports Barbershop, LLC v. Continental Casualty Co.</u>, 2021 WL 2206161 (N.D. Ill. 2021) fashioned an alternative test for determining whether the COVID-19 virus caused a "distinct, demonstrable, physical alteration" of the covered premises. <u>Id.</u> at *2. It noted that the insureds not only alleged "that COVID-19 was present on their properties," but further averred that they were required to "install social distancing barriers" and other measures "to promote proper social distancing." <u>Id.</u> at *3. In denying the insurer's motion to dismiss, <u>Legacy Sports Barbershop</u> reasoned that the insured "sufficiently alleged that the properties underwent a 'distinct, demonstrable, physical alteration' and therefore suffered 'physical loss of or damage to' the properties" as a result of the presence of the coronavirus and the resulting installation of social distancing protections. <u>Id.</u>

The policy that Cincinnati issued to Brown's does not define the words "direct," "physical," "loss," or "damage." "Words of 'common usage' in an insurance policy are to be construed in their natural, plain, and ordinary sense, and a court may inform its understanding of these terms by considering their dictionary definitions." <u>Allstate Fire and Cas. Ins. Co. v. Hymes</u>, 29 A.3d 1169, 1172 (Pa. Super. 2011), <i>app. denied</i>, 616 Pa. 625, 46 A.3d 715 (2012). Dictionaries define "the adjective 'direct' as 'stemming immediately from a source' and 'characterized by close logical, causal, or consequential relationship.'" <u>DiFabio v. Centaur Ins. Co.</u>, 366 Pa. Super. 590, 595, 531 A.2d 1141, 1143 (1987). "'Physical' is defined as 'having material existence: perceptible especially through the senses and subject to the laws of nature.'" <u>Tria WS LLC</u>, <u>supra</u>, at *4. Damage means "loss or harm resulting from injury to person, property, or reputation."

- 47 -

Com v. White, 2017 WL 5187751, at *4 (Pa. Super. 2017); 44 Hummelstown Associates, supra, at *7.  "Loss" refers to "destruction, ruin" and "the act of losing possession" or "deprivation."  44 Hummelstown Associates, supra; Ungarean, supra, at *6.

Under the "reasonable and realistic standard for identifying physical loss or damage" established in Port Authority and Hardinger for cases "where sources unnoticeable to the naked eye" substantially reduce the use of property, an insured may satisfy the "direct physical loss or damage" prerequisite for coverage if the invisible agent renders the property "useless or uninhabitable," or the property's functionality is "nearly eliminated or destroyed" by that source.  In pre-COVID-19 case law, including the Western Fire Insurance decision cited by Port Authority and Hardinger, the requisite "physical loss or damage" was established when vapors, odors, fumes, and other contaminants from ammonia, carbon-monoxide, arsenic, salmonella, lead, and other non-visual sources made property uninhabitable or unusable, or nearly destroyed or eliminated its functionality.  Thus, in instances where the insured avers that the COVID-19 virus was present on the insured premises and caused the covered property to become uninhabitable or unusable, or nearly eliminated or destroyed its functionality, the conclusion in Studio 417 and its progeny that "physical loss or damage" is sufficiently alleged is consistent with the physical contamination theory formulated in Port Authority and Hardinger.  Such "loss or harm" to property "stem[s] immediately from a [coronavirus] source," and is perceptible "through the senses and subject to the laws of nature."[7]  Based upon Brown's

---

[7] Our Supreme Court has stated "[w]e have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster."  Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345, 370 (Pa. 2020), cert. denied sub nom., Republican Party of Pennsylvania v. Degraffenreid, 141 S.Ct. 732 (U.S. 2021).  In support of their argument that the coronavirus causes physical damage to property, some insureds have quoted the

- 48 -

averments regarding the "continuous presence" of the coronavirus on its covered premises that rendered its property unusable, unsafe, and "unfit for its intended use," Brown's has adequately alleged "physical loss or damage" to its property under the contamination theory for purposes of business income, extra expense, and civil authority coverage.

Such a conclusion is supported by well-established principles of insurance contract construction and the specific language of Cincinnati's policy. "An insurance policy must be read as whole, and not 'in discrete units.'" Clarke v. MMG Ins. Co., 100 A.3d 271, 276 (Pa. Super. 2014) (quoting Luko v. Lloyd's London, 393 Pa. Super. 165, 573 A.2d 1139, 1142 (1990)), *app. denied*, 632 Pa. 666, 117 A.3d 294 (2015). It is axiomatic that in interpreting an insurance contract, the court must give effect to all of the policy's language and not treat any of its provisions "as mere surplusage." Penn Psychiatric Center, supra, at *5; Indalex, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA, 83 A.3d 418, 421 (Pa. Super. 2013), *app. denied*, 627 Pa. 759, 99 A.3d 926 (2014); Millers Capital Ins. Co. v. Gambone Bros. Development Co, Inc., 941 A.2d 706, 715 (Pa. Super. 2007), *app. denied*, 600 Pa. 734, 963 A.2d 471 (2008). "Indeed, if the court is 'forced to choose between two competing interpretations of an insurance policy, we are bound, as a matter of law, to choose the interpretation which allows us to give effect to all of the

---

following language used by the Supreme Court in first holding that the COVID-19 pandemic qualified as a "natural disaster" under the Emergency Management Services Code, 35 Pa.C.S. §§ 7101-79a31:

> First, the specific disasters in the definition of "natural disaster" themselves lack commonality, as while some are weather related (*e.g.*, hurricane, tornado, storm), several others are not (tidal wave, earthquake, fire, explosion). To the contrary, the only commonality among the disparate types of specific disasters referenced is that *they all involve "substantial damage to property,* hardship, suffering or possible loss of life." In this respect, *the COVID-19 pandemic is of the "same general nature or class as those specifically enumerated,"* and thus is included, rather than excluded, as a type of "natural disaster."

Friends of Danny DeVito, 227 A.3d at 888-889(emphasis added).

- 49 -

policy's language.'" Clarke, 100 A.3d at 276 (quoting Millers Capital Ins. Co., 941 A.2d at 716).

The terms contained in Brown's policy with Cincinnati appear to manifest an intent to provide business interpretation insurance coverage based upon a finding that the presence of the COVID-19 virus on Brown's premises constitutes "physical damage" to that covered property. As mentioned above, the business income and extra expense provisions of the "all-risk" policy contain 26 exclusions from coverage, including exclusions for damage caused by "bacteria," "vapor," "gas," and "pollutants." By virtue of those detailed exclusions, coverage under Cincinnati's policy would not be applicable for the e-coli "bacteria" in Hardinger, the ammonia "vapor" in Gregory Packaging, the "gas" seepage and fumes in Western Fire Insurance and TRAVCO Ins., or the "pollutants" in General Mills and Azalea Limited Ltd. However, no virus exclusion is included among the multitude of stated exclusions for business income and extra expense coverage. As the sole drafter of the policy, Cincinnati had the power to bar business income and extra expense coverage for losses caused by viruses by simply including a virus exclusion among its many exclusions, but it failed to do so. See Housing and Redevelopment Ins. Exchange v. Lycoming County Housing County, 58 Pa. D. & C. 4th 321, 346-347 (Lacka. Co. 2001) ("We are mindful that [the insurer], as the drafter of the insurance policy, had the ability to control its exposure and indemnity obligations by inserting language that expressly excluded liability for constitutional torts, or by defining the phrase 'wrongful act' more narrowly so as to eliminate coverage for claims involving violations of the First Amendment, Due Process Clause, or Whistleblower Law."), aff'd, 809 A.2d 1096 (Pa. Cmwlth. 2002).

"The maxim *expressio unius est exclusio alterius* is applicable to insurance policy exclusions." Slate Construction Co. v. Bituminous Cas. Corp., 228 Pa. Super. 1, 8 n.9, 323 A.2d 141, 145 n.9 (1974) (*en banc*). Under that interpretive rule, the expression of one thing in an insurance contract implies the exclusion of another matter. TIG Specialty Ins. Co. v. Koken, 855 A.2d 900, 914 (Pa. Cmwlth. 2004), *aff'd*, 586 Pa. 84, 890 A.2d 1045 (2005). Hence, the fact that Cincinnati's business income and extra expense provisions identify 26 exclusions from coverage, but not a virus exclusion, implies that virus-related damages are not intended to be similarly excluded from that same coverage. *See* Mutual of Omaha Ins. Co. v. Bosses, 428 Pa. 250, 252, 237 A.2d 218, 219 (1968) ("When . . . the insurer declared that undisclosed sickness would not be covered by the policy, it excluded rescission. *Expressio unius est exclusio alterius*.").

Furthermore, the "all-risk" policy's divergent treatment of virus-related damages in the business income/extra expense/civil authority provisions and the "Crisis Event Expense Coverage" also supports the applicability of business income and extra expense coverage for Brown's. Cincinnati's "Crisis Event Expense Coverage" contains a comprehensive virus exclusion which bars coverage for "any loss directly or indirectly caused by or resulting from any virus, . . . or any pandemic or similar influenza which is defined by the [CDC] as virulent human influenza that may cause global outbreak or pandemic, or serious illness." (Docket Entry No. 1 at p. 97). But, as noted above, its business income, extra expense, and civil authority coverages do not include any such virus exclusion in their coverage provisions, and "[a] principle frequently applied as an aid in arriving at the policy's intention is that the mention of one thing implies the exclusion of another thing." Clarke, 100 A.3d at 276. When "read as a whole, and not in

discrete units," the foregoing policy language reflects an intent to exclude "Crisis Event Expense Coverage" for losses resulting from any virus, while not likewise excluding business income, extra expense, and civil authority protection for damage caused by a virus. Id. at 278 ("Further, under the contractual interpretation maxim that the 'mention of one thing implies the exclusion of another,' a court may not add language to a provision, particularly where the language was contained in a separate provision but excluded from the provision at hand.").

Finally, the applicability of Brown's business interruption coverage for physical contamination caused by the coronavirus is consonant with "the reasonable expectations of the insured" based upon "the totality of the insurance transaction involved." Consolidated Rail Corp., 182 A.3d at 1026. Brown's avers that Cincinnati and C.C. Young "directed and controlled" its purchase of the commercial insurance policy, and submits that since the policy "does not include an exclusion for loss caused by a virus" in its business interruption coverage, Brown's "reasonably expected that the insurance it purchased . . . included coverage for property damage and business interruption losses caused by viruses like the COVID-19 virus." (Docket Entry No. at ¶¶ 11, 26). It further asserts that it "had a reasonable expectation in purchasing" its civil authority coverage, "that such coverage would apply in the event that a civil authority issued an order effectively closing [its] business because of a public health emergency, such as the COVID-19 pandemic." (Id. at ¶ 118). Based upon the totality of the circumstances alleged, Brown's had a reasonable expectation that business interruption coverage would be provided for losses caused by the presence of the COVID-19 virus on its insured premises.

Brown's purchased an "all-risk" policy from Cincinnati, which "by definition 'covers every kind of insurable loss except what is specifically excluded.'" Betz v. Erie Insurance Exchange, 957 A.2d 1244, 1255-56 (Pa. Super. 2008) (quoting Black's Law Dictionary 815 (8th ed. 2004)), *app. denied*, 606 Pa. 659, 995 A.2d 350 (2010). Giving effect to all the policy's language, including the listing and placement of its exclusions, Brown's has sufficiently alleged a claim for business interruption insurance coverage based upon "physical damage" from the COVID-19 virus under the physical contamination theory recognized in Port Authority/Hardinger. The "period of restoration" provision set forth in the "extra expense" coverage, (Docket Entry No. 1 at pp. 68, 87-88) was arguably satisfied by Brown's repairs and remedial measures in the form of "the installation of partitions" and "handwashing/sanitation stations" and other actions undertaken to renovate the premises in order to make the property safe for public use. *See* Legacy Sports Barbershop, supra, at *3. Accordingly, Cincinnati has not established that it is clear and free from doubt that, based upon the facts alleged in the complaint and all inferences fairly deducible from those facts, Brown's is unable to satisfy the "physical damage" requirement for business interruption coverage under the physical contamination theory.[8]

---

[8]In light of the denial of Cincinnati's demurrer based upon the contamination theory, it is unnecessary to address Brown's alternate argument premised upon Ungarean, to wit, that physical loss or damage to property includes the mere "loss of use" of the covered property. *See* Seifert v. IMT Ins. Co., 2021 WL 2228158, at *5 (D. Minn. 2021) ("In sum, the Court concludes that a plaintiff would plausibly demonstrate a direct physical loss of property by alleging that executive orders forced a business to close because the property was deemed dangerous to use and its owner was thereby deprived of lawfully occupying and controlling the premises to provide services within it."); In re Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation, supra, at *9 (holding "a reasonable jury can find that the Plaintiffs did suffer a direct 'physical' loss of property on their premises" since "the pandemic-caused shutdown orders do impose a *physical* limit: the restaurants are limited from using much of their physical space.")(emphasis in original). Nor is it necessary to consider Cincinnati's vicarious liability for the actions of C.C. Young based upon Brown's allegation that C.C. Young acted as the actual or ostensible agent of Cincinnati. (Docket Entry No. 1 at ¶ 9).

### (E)   CIVIL AUTHORITY COVERAGE

Cincinnati's policy provides an alternate ground for business interruption insurance under its "Civil Authority" coverage, (Docket Entry No. 1 at p. 67), and Cincinnati contends that the civil authority coverage cannot possibly apply since "no direct physical loss to other property is alleged" and access to Brown's property "was not prohibited" by any civil authority. (Docket Entry No. at pp. 34-37). Based upon the factual averments set forth in the complaint, Cincinnati's demurrer to Brown's civil authority coverage claim may be overruled summarily.

Cincinnati's policy affords "business income" and "extra expense" coverage as a result of "damage to property other than Covered Property" if access to Brown's premises was "prohibited by civil authority" due "to dangerous physical conditions" at another property. (Docket Entry No. 1 at p. 68). Brown's alleges that in addition to the COVID-19 virus existing on its own premises, the coronavirus was continuously present on other property "around [Brown's] premises," that it "rendered the premises unsafe and unfit for its intended use," and that it caused Brown's property to be closed as a "non-essential" business. (Docket Entry No. 1 at ¶¶ 50, 52). Unlike restaurants and other business that were allowed to remain open to offer limited services, public access to Brown's "gym and fitness center" was wholly prohibited (Id. at ¶¶ 51, 53). *See also*, Derek Scott Williams, supra, at *5 (dismissing civil authority coverage claim by insured "given their concession that access to their property by employees and others was permitted for limited ongoing operations.").

Therefore, Brown's has averred that it was denied access to its premises due to closure orders stemming from the coronavirus on nearby properties. Accepting those

allegations as true, Brown's has alleged a viable claim for civil authority coverage, and Brown's demurrer to that claim will be overruled.

### (F)   BAD FAITH CLAIM

Although Pennsylvania has recognized a cause of action for third party bad faith since Cowden v. Aetna Casualty and Surety Co., 389 Pa. 459, 134 A.2d 223 (1957), a claim for first party bad faith did not exist in this Commonwealth until 42 Pa.C.S. § 8371 was enacted in 1990.[9]  Olsofsky v. Progressive Ins. Co., 52 Pa. D. & C. 4th 449, 457-458 (Lacka. Co. 2001).  Section 8371 of the Judicial Code, 42 Pa.C.S., "authorizes courts, which find that an insurer has acted in bad faith towards its insured, to award punitive damages, attorneys' fees, interest and costs."  Birth Center v. St. Paul Companies, Inc., 567 Pa. 386, 402-403, 787 A.2d 376, 386 (2001); Brogan, 35 Pa. D. & C. 5th at 526-527. That statute provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1)  Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2)  Award punitive damages against the insurer.
>
> (3)  Assess court costs and attorney fees against the insurer.

42 Pa.C.S. § 8371.  Because Section 8371 states that "the court may" award punitive damages, counsel fees, interest, and costs, "the decision to award attorneys' fees and costs

---

[9]"First party insurance applies 'where the insured is seeking coverage against loss or damage sustained by the insured,' such as 'damage to his own property,' while third party insurance is applicable if 'the insured is seeking coverage against liability of the insured to another.'"  Penn National Sec. Ins. Co. v. Kapinus, 2017 WL 2989245, at * 6 (Lacka. Co. 2017) (quoting Sean W. Gallagher, "The Public Policy Exclusion and Insurance for Intentional Employment Discrimination," 92 Mich. L. Rev. 1256, 1263 n.31 (March 1994)).

'upon a finding of bad faith is wholly within the discretion of the trial court.'" Clemens v.
New York Central Mut. Fire Ins. Co., 903 F.3d 396, 399 (3d Cir. 2018) (quoting Polselli
v. Nationwide Mut. Fire Ins. Co., 126 F.3d 524, 534 (3d Cir. 1997)).

"Section 8371 does not define 'bad faith,' set forth the manner in which plaintiffs
must prove bad faith, or distinguish the manner of proof for punitive damages from other
bad faith damages." Rancosky v. Washington National Ins. Co., 642 Pa. 153, 168, 170
A.3d 364, 372 (2017). Our "courts generally have defined the term as 'any frivolous or
unfounded refusal to pay proceeds of a policy.'" Wenk v. State Farm Fire & Cas. Co.,
228 A.3d 540, 547 (Pa. Super. 2020) (quoting Terletsky, 437 Pa. Super. at 125, 649 A.2d
at 688), *app. denied*, 242 A.3d 309 (Pa. 2020). However, "mere negligence or bad
judgment" is not bad faith. Grossi v. Travelers Personal Ins. Co., 79 A.3d 1141, 1149 (Pa.
Super. 2013), *app. denied*, 627 Pa. 766, 101 A.3d 103 (2014); Rutkowski v. Allstate Ins.
Co., 69 Pa. D. & C. 4th 10, 37 (Lacka. Co. 2004).

In light of "the insurer's status as fiduciary for its insured under the insurance
contract, which gives the insurer the right, *inter alia*, to handle and process claims," every
"insurer must act with the utmost good faith towards its insured." Berg v. Nationwide Mutual
Insurance Company, Inc., 189 A.3d 1030, 1037 (Pa. Super. 2018), *app. dismissed*, 235 A.3d
1223 (Pa. 2020). "[T]o prevail in a bad faith insurance claim pursuant to Section 8371, a
plaintiff must demonstrate, by clear and convincing evidence, (1) that the insurer did not
have a reasonable basis for denying benefits under the policy and (2) that the insurer knew
or recklessly disregarded its lack of a reasonable basis in denying the claim." Rancosky,
642 Pa. at 175-176, 170 A.3d at 377. Under the first prong of the Rancosky/Terletsky
test, the question of "whether the insurer had a reasonable basis for denying benefits is an

objective inquiry into whether a reasonable insurer would have denied payment of the claim under the facts and circumstances presented." Id. at 170, 170 A.3d at 374. *Accord* Kunji Harrisburg, LLC v. Axis Surplus Ins. Co., 447 F.Supp.3d 303, 309 (E.D. Pa. 2020). "[P]roof of the insurer's knowledge or reckless disregard for its lack of reasonable basis in denying the claim is sufficient for demonstrating bad faith under the second prong" of the Rancosky/Terletsky framework, and evidence of "the insurer's subjective motive of self-interest or ill-will, while perhaps probative of the second prong of the above test, is not a necessary prerequisite to succeeding in a bad faith claim." Rancosky, 642 Pa. at 176, 170 A.3d at 377.

"Claims of bad faith are fact specific and depend on the conduct of the insurer toward its insured." Wenk, 228 A.3d at 547. Brown's generally claims that Cincinnati acted in bad faith by "[a]sserting defenses in coverage which [it] knew or should have known have no foundation in fact or law," "[i]gnored clear legal precedent," and "unreasonably and unfairly withheld policy benefits justly due and owed to [Brown's]." (Docket Entry No. 1 at ¶ 89(f), (o), (bb)). It asserts that Cincinnati misrepresented the terms and monetary limits of the business interruption insurance coverages, and misled Brown's regarding the coverages available and the true language of the policy. (Id. at ¶¶ 50, 64-74, 89(b), (i), (x), (ff), (pp), (uu)). Brown's also maintains that Cincinnati denied coverage based upon a "pollutant" exclusion that is clearly inapplicable. (Id. at ¶¶ 78-80, 83-84). Last, Brown's contends that Cincinnati's alleged violations of the Uniform Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1 to 201-9.3, serve as grounds for bad faith liability. (Id. at ¶ 89(zz)-(ddd)).

Notwithstanding the contamination theory decisional precedent which predated the COVID-19 pandemic, the issue of what type of damage or loss related to the coronavirus and accompanying closure orders constitutes "physical loss or damage" was an open question as of March 23, 2020, when Cincinnati denied Brown's claim, in part, on that basis. However, its alleged misrepresentations as to the policy limits and coverage terms are far more problematic. An insurer's "investigation must be 'honest, intelligent and objective,'" and "misrepresentations constitute evidence that [its] investigation was neither honest nor objective." Mohney v. American General Life Ins. Co., 116 A.3d 1123, 1135-36 (Pa. Super. 2015), *app. denied*, 634 Pa. 749, 130 A.3d 1291 (2015). Based upon Brown's averments concerning Cincinnati's misrepresentations as to policy terms and limits, a cognizable claim for bad faith has been alleged under Section 8371. *See* Hayes v. Harleysville Mut. Ins. Co., 841 A.2d 121, 127 (Pa. Super. 2004), *app. denied*, 582 Pa. 686, 870 A.2d 322 (2005).

Moreover, Brown's assertion that Cincinnati invoked an irrelevant "pollutant exclusion," which Cincinnati has not even raised as a basis for dismissal in its pending demurrer, further supports a possible finding of bad faith. Equally troubling is Brown's contention that, instead of investigating and evaluating its claims based upon the facts and governing law, Cincinnati's denial of coverage was motivated by its "desire to preempt its own financial exposure to the economic fallout resulting from the COVID-19 crisis." (Docket Entry No. 1 at ¶ 28). It is well-settled that an insurance "claim must be evaluated on its merits alone, by examining the particular situation and the injury for which recovery is sought," and that "[a]n insurance company may not look to its own economic considerations, seek to limit its potential liability, and operate in a fashion designed to

'send a message.'" <u>Bonenberger v. Nationwide Mut. Ins. Co.</u>, 791 A.2d 378, 382 (Pa. Super. 2002); <u>Rutkowski</u>, 69 Pa. D. & C. 4th at 37. Thus, Brown's has stated a claim for bad faith liability on that independent basis as well.[10]

Cincinnati seeks to dismiss Brown's bad faith claim on the grounds that Cincinnati's "denial of coverage was proper" and Brown's purported failure to "even allege facts to show the virus was present at the premises." Cincinnati has not demonstrated its entitlement to judgment in its favor on those bases, and for the reasons set forth above, Brown's has stated a claim for bad faith under Pennsylvania law. Accordingly, Cincinnati's demurrer will be overruled in its entirety. An appropriate Order follows.

---

[10]Since the UTPCPL "applies to the sale of an insurance policy," rather than "to the handling of insurance claims," and 42 Pa.C.S. § 8371 "provides the exclusive statutory remedy applicable to claims handling," Brown's allegations of UTPCPL violations cannot serve as the basis for bad faith liability under Section 8371. <u>Wenk</u>, 228 A.3d at 550; <u>Dunleavy v. Mid-Century Ins. Co.</u>, 460 F.Supp.3d 602, 612 (W.D. Pa. 2020), *aff'd*, 848 Fed. Appx. 528 (3d Cir. 2021).

BROWN'S GYM, INC.,                          :   IN THE COURT OF COMMON PLEAS
                                            :      OF LACKAWANNA COUNTY
                                            :
                    Plaintiff               :
                                            :
           vs.                              :         CIVIL ACTION - LAW
                                            :
                                            :
THE CINCINNATI INSURANCE                    :
COMPANY and C.C. YOUNG and                  :
HENKELMAN INSURANCE,                        :
                                            :
                                            :
                    Defendants              :         NO. 20 CV 3113

### ORDER

AND NOW, this 13th day of July, 2021, upon consideration of the "Preliminary

Objections of Defendant The Cincinnati Insurance Company," the memoranda of law

submitted by the parties, and the oral argument of counsel, and based upon the reasoning

set forth in the foregoing Memorandum, it is hereby ORDERED and DECREED that:

    1.      The preliminary objections in the nature of a demurrer filed by defendant,

The Cincinnati Insurance Company, are OVERRULED; and

    2.      Within the next twenty (20) days, defendant, The Cincinnati Insurance

Company, shall file a responsive pleading to the complaint.

BY THE COURT:

_Terrence R. Nealon_ J.

Terrence R. Nealon

cc:    *Written notice of the entry of the foregoing Memorandum and Order has been provided to each party pursuant to Pa. R. C. P. 236 (a)(2) and (d) by transmitting time-stamped copies via electronic mail to:*

John M. Mulcahey, Esquire                     jmulcahey@munley.com
Munley Law, P.C.
227 Penn Avenue
Scranton, PA 28503
        Counsel for Plaintiff

Lawrence M. Silverman, Esquire                silverman@litchfieldcavo.com
Daniel G. Litchfield, Esquire                 litchfield@litchfieldcavo.com
Litchfield Cavo LLP
Suite 1220, 1515 Market Street
Philadelphia, PA  19102
        Counsel for Defendant, The Cincinnati Insurance Company

Charles E. Haddick, Jr., Esquire              chaddick@dmclaw.com
Anthony D. Cox, Jr., Esquire                  acox@dmclaw.com
Dickie, McCamey & Chilcote, P.C.
Suite 105, 2578 Interstate Drive
Harrisburg, PA  17110
        Counsel for Defendant, C.C. Young and Henkelman Insurance

- 61 -

**EXHIBIT G**

**IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA**

MACMILES, LLC D/B/A
GRANT STREET TAVERN
310 Grant Street, Ste. 106
Pittsburgh, PA  15219-2213,

        Plaintiff,

        vs.

ERIE INSURANCE EXCHANGE
100 Erie Insurance Place
Erie, PA  16530,

        Defendant.

:
:
:
:
:
:   No.: GD-20-7753
:
:
:   Hon. Christine Ward
:
:
:   **OPINION**
:
:

*Counsel for Plaintiff*:
John Goodrich
Lauren Nichols
429 Fourth Avenue, Suite 900
Pittsburgh PA, 15219

James Haggerty
1835 Market Street, Suite 2700
Philadelphia, PA 19103

Scott Cooper
209 State Street
Harrisburg, PA 17101

Jonathan Shub
Kevin Laukaitis
134 Kings Highway Wast, 2nd Floor
Haddonfeild, NJ 08033

Michael Boni
Joshua Snyder
15 St. Asaphs Road
Bala Cynwyd, PA 19004

*Counsel for Defendant*:
Richard DiBella
Tara Maczuzak
Jason Peck

20 Stanwix Street, 11th Floor
Pittsburgh, PA 15222

Robert Horst
Robert Runyon, III
Matthew Malamud
400 Maryland Drive
Fort Washington, PA 19304

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

MACMILES, LLC D/B/A       :
GRANT STREET TAVERN      :
310 Grant Street, Ste. 106       :
Pittsburgh, PA 15219-2213,     :
                                :
       Plaintiff,             :   No.: GD-20-7753
                                :
       vs.                        :
                                :
ERIE INSURANCE EXCHANGE    :
100 Erie Insurance Place        :
Erie, PA 16530,              :
                                :
       Defendant.          :

## OPINION

### I. The Parties

       MacMiles, LLC d/b/a Grant Street Tavern (hereinafter "Plaintiff") is a restaurant and bar located in the Downtown neighborhood of Pittsburgh, Allegheny County, Pennsylvania.

       Erie Insurance Exchange (hereinafter "Defendant") is a reciprocal insurance exchange organized under the laws of Pennsylvania with its principal place of business in Erie, Pennsylvania.

### II. Introduction

       Defendant issued Plaintiff an Ultra Plus Commercial General Liability Policy for the policy period between September 12, 2019 to September 12, 2020 (hereinafter "the insurance contract"). The insurance contract is an all-risk policy, which provides coverage for any direct physical loss or direct physical damage unless the loss or damage is specifically excluded or limited by the insurance contract.

In March and April of 2020, in order to prevent and mitigate the spread of the coronavirus disease "COVID-19," Governor Tom Wolf ("Governor Wolf") issued a series of mandates restricting the operations of certain types of businesses throughout the Commonwealth of Pennsylvania (the "Governor's orders"). On March 6, 2020, Governor Wolf issued an order declaring a Proclamation of Disaster Emergency. On March 19, 2020, Governor Wolf issued an order requiring all non-life sustaining businesses in Pennsylvania to cease operations and close physical locations. On March 23, 2020, Governor Wolf issued an order directing Pennsylvania citizens in particular counties to stay at home except as needed to access life sustaining services. Then, on April 1, 2020, Governor Wolf extended the March 23, 2020 order, and directed all of Pennsylvania's citizens to stay at home. As of April 1, 2020, at least 5,805 citizens of Pennsylvania contracted COVID-19 in sixty counties across the Commonwealth, and seventy-four (74) citizens died.[1] Unfortunately, since April 1, 2020, the number of positive cases and deaths from COVID-19 has increased dramatically.[2]

As a result of the spread of COVID-19 and the Governor's orders, Plaintiff suspended its business operations. Plaintiff thereafter submitted a claim for coverage under its insurance contract with Defendant. Defendant denied Plaintiff's claim.

On September 29, 2020, Plaintiff filed a complaint in the Court of Common Pleas of Allegheny County. In its complaint, Plaintiff asserted the following counts: [a] count one is for declaratory judgment in regards to the business income protection provision of the insurance contract; [b] count two is for breach of contract in relation to the business income protection

---

[1] *See* Governor Tom Wolf, *Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home,* (April 1, 2020), https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf.

[2] As of May 14, 2021, 993,915 citizens of Pennsylvania have contracted COVID-19 and 26,724 citizens have died. *See* Pennsylvania Department of Health, COVID-19 Data for Pennsylvania, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx.

provision of the insurance contract; [c] count three is for declaratory judgment with regard the civil authority provision of the insurance contract; [d] count four is for breach of contract in regards to the civil authority provision of the insurance contract; [e] count five is for declaratory judgment with regard to the extra expense provision of the insurance contract; and [f] count six is for breach of contract in regards to the extra expense provision of the insurance contract. All of Plaintiff's claims require this Court's determination as to whether Plaintiff is entitled to coverage under various provisions of the insurance contract with Defendant for losses Plaintiff sustained in relation to the spread of COVID-19 and the Governor's orders.

On December 22, 2020, Plaintiff filed a Motion for Partial Summary Judgment as to Plaintiff's claims for declaratory judgment with regard to the business income protection and civil authority provisions of the insurance contract. On March 10, 2021, Defendant filed a Cross Motion for Judgment on the Pleadings. On March 31, 2021, this Court heard oral argument on Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross Motion for Judgment on the Pleadings. On May 25, 2021, this Court issued a memorandum and order that granted Plaintiff's Motion for Partial Summary Judgment, in part, and denied Defendant's Cross Motion for Judgment on the Pleadings. Thereafter, on June 23, 2021, Defendant appealed this Court's May 25, 2021 memorandum and order.

## III. Errors Complained of on Appeal

In its statement of matters complain of on appeal, Defendant asserted the following:

1. The Trial Court erred in partially granting Plaintiff MacMiles, LLC d/b/a Grant Street Tavern's Motion for Summary Judgment and denying Erie's Motion for Judgment on the Pleadings for the following reasons:

a. The Trial Court erred in concluding on this record that the policy language requiring that an insured show "direct physical 'loss' of or damage to" covered property is satisfied, and coverage triggered, by a mere "loss of use," absent any harm to property.

    b. The Trial Court erred in finding that the Policy's Ordinance or Law
Exclusion did not apply to Plaintiff's claims.

Defendant's Concise Statement of Errors Complained of on Appeal, at 1.

## IV. The Contract Provisions

    Plaintiff's and Defendant's dispute involves the following provisions regarding coverage

under the insurance contract.

### Section 1 - Coverages

### Insuring Agreement

We will pay for direct physical "loss" of or damage to Covered Property at the
premises described in the "Declarations" caused by or resulting from a peril
insured against.

Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in

Opposition to Plaintiff's Motion for Summary Judgment, at 61, Exhibit A.

### Section II – Perils Insured Against

* * * * *

### Income Protection – Coverage 3

### Covered Cause of Loss

This policy insures against direct physical "loss", except "loss" as excluded or
limited in this policy.[3]

*Id.* at 64.

### Income Protection – Coverage 3

### A. Income Protection

---

[3] "Loss" means direct and accidental loss of or damage to covered property.  Omnibus Memorandum in
Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for
Summary Judgment, at 96, Exhibit A.

Income Protection means loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting directly from "loss" or damage to property on the premises described in the "Declarations" or to your food truck or trailer when anywhere in the coverage territory from a peril insured against.[4]

*Id.* at 63.

### C. Additional Coverages

### 1. Civil Authority

When a peril insured against causes damage to property other than property at the premises described in the : Declarations", we will pay for the actual loss of "income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" or access to your food truck or trailer anywhere in the coverage territory provided that both of the following apply:

> a. Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" or your food truck or trailer are within that area but are not more than one mile from the damaged property; and

> b. The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured

---

[4] The insurance contract defines "interruption of business" as "the period of time that your business is partially or totally suspended and it: 1. Begins with the date of direct "loss" to covered property caused by a peril insured against: and 2. Ends on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality."  Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A.  The insurance contract defines "income" as "the sum of net income (net profit or loss before income taxes) that would have been earned or incurred and necessary continuing operating expenses incurred by the business such as payroll expenses, taxes, interest, and rents."  *Id.*  The insurance contract defines "rental income" as the following:

> 1. The rents from the tenant occupancy of the premises described in the "Declarations";
>
> 2. Continuing operating expenses incurred by the business such as:
>     a. Payroll; and
>     b. All expenses for which the tenant is legally responsible and for which you would otherwise be responsible;
>
> 3. Rental value of the property described in the "Declarations" and occupied by you; or
>
> 4. Incidental income received from coin-operated laundries, hall rentals, or other facilities on the premises described in the "Declarations".

*Id.* at 97.  Finally, "Declarations" is defined as "the form which shows your coverages, limits of protection, premium charges, and other information."  *Id.* at 96.

against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id.* at 64.

### Section III. Exclusions

### A. Coverages 1, 2, and 3

We do not cover under Building(s) – Coverage 1; Business Personal Property and Personal Property of others – Coverage 2; and Income Protection – Coverage 3 "loss" or damaged caused directly or indirectly by any of the following.  Such a "loss" or damage is excluded regardless of any cause or event that contributes concurrently or in any sequence to the "loss":

\* \* \* \* \*

10. By the enforcement of or compliance with any law or ordinance regulating the construction, use, or repair of any property, or requiring the tearing down of any property, including the cost of removing its debris, except as provided in Extensions of Coverage – **B.3., B.7.,** and **B.8.**

*Id.* at 66.

## V. Standard of Review

It is well-settled that, after the relevant pleadings are closed, a party may move for summary judgment, in whole or in part, as a matter of law. Pa. R.C.P. 1035.2.  Summary judgment "may be entered only where the record demonstrates that there are no genuine issues of material fact, and it is apparent that the moving party is entitled to judgment as a matter of law." *City of Philadelphia v. Cumberland County Bd. of Assessment Appeals*, 81 A.3d 24, 44 (Pa. 2013).  Furthermore, appellate courts will only reverse a trial court's order granting summary judgment where it is "established that the court committed an error of law or abused its discretion." *Siciliano v. Mueller*, 149 A.3d 863, 864 (Pa. Super. 2016).

The interpretation of an insurance contract is a matter of law, which may be decided by this Court on summary judgment.  *Wagner. V. Erie Insurance Company*, 801 A.2d 1226, 1231

(Pa. Super. 2002). When interpreting an insurance contract, this Court aims to effectuate the intent of the parties as manifested by the language of the written instrument. *American and Foreign Insurance Company v. Jerry's Sport Center*, 2 A.3d 526, 540 (Pa. 2010). When reviewing the language of the contract, words of common usage are read with their ordinary meaning, and this Court may utilize dictionary definitions to inform its understanding. *Wagner*, 801 A.2d at 1231; *see also AAA Mid-Atlantic Insurance Company v. Ryan*, 84 A.3d 626, 633-34 (Pa. 2014). If the terms of the contract are clear, this Court must give effect to the language. *Madison Construction Company v. Harleysville Mutual Insurance Company*, 735 A.2d 100, 106 (Pa. 1999). However, if the contractual terms are subject to more than one reasonable interpretation, this Court must find that the contract is ambiguous. *Id.* "[W]hen a provision of a[n insurance contract] is ambiguous, the [contract] provision is to be construed in favor of the [the insured] and against the insurer, as the insurer drafted the policy and selected the language which was used therein." *Kurach v. Truck Insurance Exchange*, 235 A.3d 1106, 1116 (Pa. 2020).

## VI. Discussion

### a. Coverage Provisions

Plaintiff bears the initial burden to reasonably demonstrate that a claim falls within the policy's coverage provisions. *State Farm Cas. Co. v. Estates of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law). Then, provided that Plaintiff satisfies its initial burden, Defendant bears "the burden of proving the applicability of any exclusions or limitations on coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law). In order to prevail, Defendant must demonstrate that the language of the insurance contract regarding exclusions is "clear and unambiguous: otherwise, the provision will

be construed in favor of the insured." *Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange*, 771 A.2d 11, 13 (Pa. Super. 2001).

First, this Court will address whether Plaintiff is entitled to coverage under the Income Protection provision of the insurance contract for losses Plaintiff sustained in relation to the public health crises and the spread of the COVID-19 virus. With regard to Income Protection coverage, the insurance contract provides that:

**Section 1 - Coverages**

**Insuring Agreement**

We will pay for *direct physical "loss" of or damage to* Covered Property at the premises described in the "Declarations" caused by or resulting from a peril insured against.

Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 61, Exhibit A (emphasis added).

**Section II – Perils Insured Against**

*  *  *  *  *

**Income Protection – Coverage 3**

**Covered Cause of Loss**

This policy insures against direct physical "loss", except "loss" as excluded or limited in this policy.[5]

*Id.* at 64.

**Income Protection – Coverage 3**

**A. Income Protection**

---

[5] "Loss" means direct and accidental loss of or damage to covered property. Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A.

Income Protection means loss of "income" and/or "rental income" you sustain due to partial or total "interruption of business" resulting *directly from "loss" or damage to property* on the premises described in the "Declarations" or to your food truck or trailer when anywhere in the coverage territory from a peril insured against.[6]

*Id.* at 63 (emphasis added).

In order to state a reasonable claim for coverage under the Income Protection provision of the insurance contract, Plaintiff must show that it suffered "direct physical loss of or damage to" its property. The interpretation of the phrase "direct physical loss of or damage to" property is the key point of the parties' dispute. Defendant contends that "direct physical loss of or damage to" property requires some physical alteration of or demonstrable harm to Plaintiff's property. Plaintiff contends that the "direct physical loss of . . . property" is not limited to physical alteration of or damage to Plaintiff's

---

[6] The insurance contract defines "interruption of business" as "the period of time that your business is partially or totally suspended and it: 1. Begins with the date of direct "loss" to covered property caused by a peril insured against: and 2. Ends on the date when the covered property should be repaired, rebuilt, or replaced with reasonable speed and similar quality." Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A. The insurance contract defines "income" as "the sum of net income (net profit or loss before income taxes) that would have been earned or incurred and necessary continuing operating expenses incurred by the business such as payroll expenses, taxes, interest, and rents." *Id.* The insurance contract defines "rental income" as the following:

> 1. The rents from the tenant occupancy of the premises described in the "Declarations";

> 2. Continuing operating expenses incurred by the business such as:
>     a. Payroll; and
>     b. All expenses for which the tenant is legally responsible and for which you would otherwise be responsible;

> 3. Rental value of the property described in the "Declarations" and occupied by you; or

> 4. Incidental income received from coin-operated laundries, hall rentals, or other facilities on the premises described in the "Declarations".

*Id.* at 97. Finally, "Declarations" is defined as "the form which shows your coverages, limits of protection, premium charges, and other information." *Id.* at 96.

property but includes the loss of use of Plaintiff's property.  Plaintiff further asserts that,

because its interpretation is reasonable, this Court must find in Plaintiff's favor.

The insurance contract does not define every term in the phrase "direct physical loss of or

damage to" property.[7]  As previously noted, Pennsylvania courts construe words of common

usage in their "natural, plain, and ordinary sense . . . and [Pennsylvania courts] may inform

[their] understanding of these terms by considering their dictionary definitions." *Madison*

*Construction Company,* 735 A.2d at 108.  Four words in particular are germane to the

determination of this threshold issue:  "direct," "physical," "loss," and "damage."  "Direct" is

defined as "proceeding from one point to another in time or space without deviation or

interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . .

."[8]  "Physical" is defined as "of or relating to natural science . . . having a material existence . . .

[and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[9]

"Loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or]

DEPRIVATION . . . ."[10]  "Damage" is defined as "loss or harm resulting from injury to person,

property, or reputation . . . ."[11]

---

[7] Although the insurance contract does define the term "loss" as meaning "direct and accidental loss of or damage to covered property," this definition is essentially meaningless because it is repetitive of the phrase "direct physical loss of or damage to." Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 96, Exhibit A.  Accordingly, when interpreting the term "loss," this Court relies upon the term's the ordinary dictionary definition as it does with the other terms in this phrase, which the insurance contract did not define.

[8] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[9] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

[10] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

[11] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

Before analyzing the definitions of each of the above terms to determine whether Plaintiff's interpretation is reasonable, it is important to note that the terms, in addition to their ordinary, dictionary definitions, must be considered in the context of the insurance contract and the specific facts of this case. *See Madison Construction Company*, 735 A.2d at 106 (clarifying that issues of contract interpretation are not resolved in a vacuum). While some courts have interpreted "direct physical loss of or damage to" property as requiring some form of physical altercation and/or harm to property in order for the insured to be entitled to coverage, this Court reasonably determined that any such interpretation improperly conflates "direct physical loss of" with "direct physical . . . damage to" and ignores the fact that these two phrases are separated in the contract by the disjunctive "or."[12]  It is axiomatic that courts must "not treat the words in the [contract] as mere surplusage . . . [and] if at all possible, [this Court must] construe the [contract] in a manner that gives effect to all of the [contract's] language." *Indalex Inc. v. Nation Union Fire Ins. Co. Pittsburgh, PA*, 83 A.3d 418, 420-21 (Pa. Super. 2013).  Based upon this vital principle of contract interpretation, this Court concluded that, due to the presence of the disjunctive "or," whatever "direct physical 'loss' of" means, it must mean something different than "direct physical . . . damage to."

In order to determine what the phrase "direct physical loss of . . . property" reasonably means, this Court looked to the ordinary, dictionary definitions of the terms "direct," "physical," "loss," and "damage."  This Court began its analysis with the terms "damage" and "loss," as these terms are the crux of the disputed language.  As noted above, "damage" is defined as "loss

---

[12] *See Fayette County Housing Authority v. Housing and Redevelopment Ins. Exchange*, 771 A.2d 11, 15 (Pa. Super. 2001) (explaining that merely accepting the non-binding decisions of other courts "by the purely mechanical process of searching the nations courts for conflicting decisions" amounts to an abdication of this Court's judicial role).

or harm resulting from injury to person, property, or reputation . . . ,"[13] and "loss" is defined as "DESTRUCTION, RUIN . . . [and/or] the act of losing possession [and/or] DEPRIVATION . . . ."[14]

Based upon the above-provided definitions, it is clear that "damage" and "loss," in certain contexts, tend to overlap.  This is evident because the definition of "damage" includes the term "loss," and at least one definition of "loss" includes the terms "destruction" and "ruin," both of which indicate some form of damage.  However, as noted above, in the context of this insurance contract, the concepts of "loss" and "damage" are separated by the disjunctive "or," and, therefore, the terms must mean something different from each other.  Accordingly, in this instance, the most reasonable definition of "loss" is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property, i.e., destruction and ruin.  Applying this definition gives the term "loss" meaning that is different from the term "damage."  Specifically, whereas the meaning of the term "damage" encompasses all forms of harm to Plaintiff's property (complete or partial), this Court concluded that the meaning of the term "loss" reasonably encompasses the act of losing possession [and/or] deprivation, which includes the loss of use of property absent any harm to property.

In reaching its conclusion, this Court also considered the meaning and impact of the terms "direct" and "physical."  Ultimately, this Court determined that the ordinary, dictionary definitions of the terms "direct" and "physical" are consistent with the above interpretation of the term "loss."  As noted previously, "direct" is defined as "proceeding from one point to another in

---

[13] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

[14] Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss.

time or space without deviation or interruption . . . [and/or] characterized by close logical, causal, or consequential relationship . . . ,"[15] and "physical" is defined as "of or relating to natural science . . . having a material existence . . . [and/or] perceptible especially through the senses and subject to the laws of nature . . . ."[16]  Based upon these definitions it is certainly reasonable to conclude that Plaintiff could suffer "direct" and "physical" loss of use of its property absent any harm to property.

Here, Plaintiff's loss of use of its property was both "direct" and "physical."  The spread of COVID-19, and a desired limitation of the same, had a close logical, causal, and/or consequential relationship to the ways in which Plaintiff materially utilized its property and physical space.  *See* February 22, 2021 Court Order of the United States District Court, N.D. Illinois, Eastern Division case *In re: Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation*, Civil Case No. 1:20-CV-05965 at 21 (stating that government shutdown orders and COVID-19 *directly* impacted the way businesses used *physical* space) (emphasis added).  Indeed, the spread of COVID-19 and social distancing measures (with or without the Governor's orders) caused Plaintiff, and many other businesses, to *physically* limit the use of property and the number of people that could inhabit *physical* buildings at any given time, if at all.  Thus, the spread of COVID-19 did not, as Defendant contends, merely impose economic limitations.  Any economic losses were secondary to the businesses' *physical* losses.

While the terms "direct" and "physical" modify the terms "loss" and "damage," this does not somehow necessarily mean that the entire phrase "direct physical loss of or damage to" property requires actual harm to Plaintiff's property in every instance.  Any argument that the

---

[15] Direct, Merriam-Webster, https://www.merriam-webster.com/dictionary/direct.

[16] Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical.

terms "direct" and "physical," when combined, presuppose that any request for coverage must stem from some actual impact and harm to Plaintiff's property suffers from the same flaw noted in this Court's above discussion regarding the difference between the terms "loss" and "damage:" such interpretations fail to give effect to all of the insurance contract's terms and, again, render the phrase "direct physical loss of" duplicative of the phrase "direct physical . . . damage to."

Defendant also contends that the insurance contract's Amount of Insurance provision supports the conclusion that the contract necessitates the existence of tangible damage in order for Plaintiff to be entitled to Income Protection coverage. According to Defendant, because the Amount of Insurance provision contemplates the existence of damaged or destroyed property, and the need to rebuild, repair, or replace property, Plaintiff's argument regarding loss of use in the absence of any tangible damage or destruction to property is untenable.

Although this Court agrees with Defendant on the general principle that the insurance contract's provisions must be read as a whole so that all of its parts fit together, this Court is not persuaded that the Amount of Insurance provision is inherently inconsistent with an interpretation of "direct physical loss of . . . property" that encompasses Plaintiff's loss of use of its property in the absence of tangible damage. The insurance contract provides that:

> We will pay the actual income protection loss for only such length of time as would be required to resume normal business operations. We will limit the time period to the shorter of the following periods:
>
> 1. The time period required to rebuild, repair, or replace such part of the Building or Building Personal Property that has been damaged or destroyed as a direct result of an insured peril; or
>
> 2. Twelve (12) consecutive months from the date of loss.

Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 64, Exhibit A. Upon review of the above language, this Court determined that the Amount of Insurance provision does not limit coverage only to instances where Plaintiff needed to rebuild, repair, or replace damaged or destroyed property. Indeed, the relevant part of the Amount of Insurance provision starts by generally stating that the insurer will pay for income protection loss for only such length of time as would be required to resume normal business operations. Thereafter, the Amount of Insurance provision further explains that this time period for coverage will be limited to either (a) the length of time needed to rebuild, repair, or replace damaged or destroyed property; *or* (b) twelve (12) months from the initial date of loss.

Although Defendant is correct to point out that the Amount of Insurance provision expressly contemplates some circumstances in which Plaintiff's property is actually damaged or destroyed, this provision does not necessitate the existence of damaged or destroyed property, and does not require repairs, rebuilding, or replacement of damaged or destroyed property in order for Plaintiff to be entitled to coverage. The Amount of Insurance provision merely imposes a time limit on available coverage, which ends whenever any required rebuilding, repairs, or replacements are completed to any damaged or destroyed property that might exist, *or* twelve (12) months after the initial date of the loss. To put this another way, the Amount of Insurance provision provides that coverage ends when Plaintiff's business is once again operating at normal capacity after damaged or destroyed property is fixed or replaced, *or* within twelve (12) months from the initial date of loss in circumstances where it is not necessary to fix or replace damaged or destroyed property, or it is not feasible to do so within a twelve (12)

month time frame.  The Amount of Insurance provision does not somehow redefine or place further substantive limits on types of available coverage.

As this Court determined that it is, at the very least, reasonable to interpret the phrase "direct physical loss of . . . property" to encompass the loss of use of Plaintiff's property due to the spread of COVID-19 absent any actual damage to property, and because Plaintiff established that there are no genuine issues of material fact regarding its right to coverage under the Income Protection provision of the insurance contract, this Court grants Plaintiff's Motion for Partial Summary Judgment in relation to Plaintiff's claim for declaratory judgment and the income protection provision of the insurance contract.

Second, this Court will address whether Plaintiff is entitled to coverage under the Civil Authority provision of the insurance contract for losses Plaintiff sustained in relation to the Governor's orders, which were issued to help mitigate the spread of the COVID-19 virus.  With regard to Civil Authority coverage, the insurance contract provides that:

> When a peril insured against causes damage to property other than property at the premises described in the : Declarations", we will pay for the actual loss of "income" and/or "rental income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the premises described in the "Declarations" or access to your food truck or trailer anywhere in the coverage territory provided that both of the following apply:
>
> a. Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the premises described in the "Declarations" or your food truck or trailer are within that area but are not more than one mile from the damaged property; and
>
> b. The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the peril insured against that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

*Id*. at 64.

With regard to Civil Authority coverage, Plaintiff must, as a threshold matter, demonstrate that COVID-19 caused damage to property other than Plaintiff's property. Unlike the Income Protection provision, under the Civil Authority provision there is no coverage for the loss of use of property other than Plaintiff's property. Accordingly, this Court's above analysis with regard Income Protection coverage and loss of use is inapplicable, as it does not address whether COVID-19 separately caused damage to property.

Again, as noted above, "damage" is defined as "loss or harm resulting from injury to person, property, or reputation . . . ."[17] Based upon this definition, this Court determined that, at the very least, in order for COVID-19 to damage property, COVID-19 must come into contact with property and cause harm. Presently, it is contested whether COVID-19 can live on the surfaces of property for some period of time. Additionally, while this might be one way by which individuals contract COVID-19, it is not the primary means by which COVID-19 spreads. *See Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 892 (Pa. 2020) (holding that COVID-19 does not spread because the virus is present on any particular surface or at any particular location, rather COVID-19 spreads because of person-to-person contact). Indeed, person-to-person transmission of COVID-19, as opposed to property damage, was the primary reason for the Governor's orders, social distancing measures, and resultant changes in the ways business utilized property. With or without COVID-19 contacting the surface of any given property in the Commonwealth, businesses throughout the Commonwealth shutdown, at least partially, and suffered the loss of use of property due to the risk of person-to-person COVID-19 transmission. Thus, in the above discussion regarding the Income Protection provision, this Court determined that there are no genuine issues of material fact as to whether Plaintiff suffered the loss use of

---

[17] Damage, Merriam Webster, https://www.merriam-webster.com/dictionary/damage.

property due to COVID-19. The same is, however, not as clear with regard to the question of whether COVID-19 caused damaged to property throughout the Commonwealth.

Even if this Court were to accept that COVID-19 could and did cause damage to property under the theory presented by Plaintiff, whether Plaintiff is entitled to coverage under the Civil Authority provision depends upon whether Plaintiff can demonstrate that COVID-19 was actually present on property other than Plaintiff's property. Additionally, Plaintiff must show that any such damaged property was within one mile of Plaintiff's property, and that the actions of civil authority (in this case the Governor's orders) were "taken in response to dangerous physical conditions resulting from the *damage* or continuation of the peril insured against that caused the *damage*, or the action is taken to enable a civil authority to have unimpeded access to the *damaged* property." Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 64, Exhibit A (emphasis added). At this time, genuine issues of material fact remain in dispute as to the following: [a] whether COVID-19 caused damage to property; [b] whether COVID-19 was actually present at any particular property; and [c] the extent to which the Governor's orders were issued in response to property damaged by COVID-19. Accordingly, this Court denies Plaintiff's Motion for Partial Summary Judgment in relation to its claim for declaratory judgment and the Civil Authority provision of the insurance contract without prejudice.[18]

**b. Exclusions**

Having determined that Plaintiff provided a reasonable interpretation demonstrating that Plaintiff is entitled to coverage under the Income Protection provision of the insurance contract, this Court turns to the question of whether Defendant demonstrated "the applicability of any

---

[18] As this Court is not convinced that, as a matter of law, Plaintiff cannot prevail on its damage theory, this Court also denies Defendant's Cross Motion for Judgment on the Pleadings.

exclusions or limitations on coverage." *Koppers Co.*, 98 F.3d at 1446 (applying Pennsylvania law). As discussed previously, in order to prevail, Defendant must show that the language of the insurance contract regarding an exclusion is "clear and unambiguous: otherwise, the provision will be construed in favor of the insured." *Fayette County Housing Authority*, 771 A.2d at 13.

Defendant argues that the insurance contract's exclusion regarding the enforcement of or compliance with laws and ordinances prevents coverage for income protection. The insurance contract states that the insurer will not pay for loss or damage caused "[b]y the enforcement of or compliance with any law or ordinance regulating the construction, use, or repair, of any property, or requiring the tearing down of any property, including the cost of removing its debris . . . ." Omnibus Memorandum in Support of Erie's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Summary Judgment, at 66, Exhibit A.

According to Defendant, coverage is precluded by the above exclusion because Plaintiff's alleged losses are due solely to the Governor's orders. This, however, is not the case. In its complaint, Plaintiff states that its claim for coverage is based upon losses and expenses Plaintiff suffered in relation to both "*the COVID-19 pandemic . . . and the orders of civil authorities enacted in response to this natural disaster.*" Plaintiff's Complaint at 13 (emphasis added). As this Court explained earlier in this memorandum, COVID-19 and the related social distancing measures (with and without government orders) directly forced businesses everywhere to physically limit the use of property and the number of people that could inhabit physical buildings at any given time. The Governor's orders only came into consideration in the context of Plaintiff's claim for coverage under the Civil Authority provision of the contract.[19]

---

[19] Certainly, the exclusion regarding the enforcement of or compliance with laws and ordinances could not have been intended to exclude coverage under the Civil Authority provision of the contract, as this would make any extended coverage for the actions of Civil Authority illusory. *See Heller v. Pennsylvania League of Cities and*

Accordingly, Defendant failed to demonstrate that the exclusion regarding the enforcement of or compliance with laws and ordinances clearly and unambiguously prevents coverage.

**VII. Conclusion**

As this Court determined that [a] Plaintiff's interpretation of the Income Protection provision of the insurance contract is, at the very least, reasonable, [b] that there are no genuine issues of material fact regarding Plaintiff's loss of use, and [c] that none of the insurance contract's exclusions clearly and unambiguously prevent coverage, this Court granted Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's claim for declaratory judgment with regard to Income Protection coverage.  In contrast, because this Court determined that there are genuine issues of material fact remaining as to the Civil Authority provision and whether COVID-19 caused damage to property, this Court denied Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's claim for declaratory judgment with regard to Civil Authority coverage without prejudice.  Finally, this Court denied Defendant's Cross Motion for Judgement on the Pleadings.

By the Court:

*Christine Ward*, J.

Christine Ward, J.

Dated: 8/2/2021

---

*Municipalities*, 32 A.3d 1213, 1228 (Pa. 2011) (holding that where an exclusionary provision of an insurance contract operates to foreclose expected claims, such a provision is void as it renders coverage illusory).

# EXHIBIT H

SWB YANKEES, LLC,

               Plaintiff

               vs.

CNA FINANCIAL CORPORATION, THE
CONTINENTIAL INSURANCE COMPANY,
and CONTINENTIAL CASUALTY
COMPANY,

               Defendants

        IN THE COURT OF COMMON PLEAS
          OF LACKAWANNA COUNTY

            CIVIL ACTION - LAW

         NO. CV 2155

## MEMORANDUM AND ORDER

### NEALON, J.

      The owner of a minor league baseball team contends that its 2020 regular season home games and the Triple-A all-star game it was scheduled to host were cancelled due "to the dangerous physical conditions" existing in its stadium as a result of the "continuous presence of the coronavirus" on that insured property. It has instituted this action against its commercial insurers seeking to recover under the business interruption and civil authority coverages contained in its "all-risk" policy for the revenues lost and expenses incurred due to the presence of the SARS-CoV-2 virus on its covered premises and the resulting cancellation of the games scheduled to be played at that stadium.[1] In

---

[1] The novel coronavirus, or SARS-CoV-2, is a virus that causes the serious respiratory disease known as COVID-19. *See* Calvary Chapel of Bangor v. Mills, 984 F.3d 21, 25 (1st Cir. 2020); U.S. v. Babbitt, 496 F.Supp.3d 903, 909 (E.D. Pa. 2020).

contrast to The Scranton Club v. Tuscarora Wayne Mut. Group, Inc., 2021 WL 454498 (Lacka. Co. 2021), *app. pending*, No. 238 MDA 2021 (Pa. Super.), but like Brown's Gym, Inc. v. The Cincinnati Ins. Co., 2021 WL 2953039 (Lacka. Co. 2021), the insurance policy in this case does not contain an exclusion in its business interruption coverage for losses caused by a virus or pandemic, and the insured has expressly averred that the coronavirus was actually present on its covered premises.  Following the insurers' denial of coverage, the insured initiated this suit seeking (a) a declaratory judgment that its coronavirus-related losses are covered by the policy, (b) compensatory damages for breach of the insurance contract, and (c) extra-contractual damages under 42 Pa.C.S. § 8371 based upon the insurers' alleged bad faith.  The insurers have filed a motion for judgment on the pleadings requesting the dismissal of those claims on the grounds that: (1) the insured cannot state a claim for business interruption coverage since it has not alleged any "direct physical loss of or damage to" its property, which is a prerequisite to coverage; (2) the claimed losses are excluded from business interruption coverage by the "Time Element Exclusion" in the policy; (3) the lost revenues claims are not covered by the policy's "civil authority" coverage since the baseball season was cancelled by Minor League Baseball, rather than a "civil authority;" (4) the bad faith liability claim is insufficient as a matter of law since the coverage claims were "properly denied" based upon a "reasonable and correct" interpretation of the policy; and (5) privity of contract and an actual case or controversy does not exist as to two named defendants.

Long before the COVID-19 pandemic, federal and state courts in Pennsylvania established a "reasonable and realistic standard for identifying physical loss or damage" to property in cases "where sources unnoticeable to the naked eye" substantially reduce the

use of covered property, and declared that an insured may satisfy the "direct physical loss or damage" requirement for insurance coverage if the infectious pathogen, disease-causing agent, or contaminant rendered the property "useless or uninhabitable," or the property's functionality is "nearly eliminated or destroyed" by that invisible source. Based upon this "physical contamination" theory, other courts concluded that ammonia fumes, e-coli bacteria, carbon-monoxide, gas vapors, lead intrusion, and odor from cat urine or methamphetamine cooking, which made insured premises unusable, unsafe, or unfit for their intended use, constituted "physical loss or damage" for purposes of insurance coverage. During the COVID-19 pandemic, better reasoned decisions across the country have applied the "physical contamination" theory in finding business interruption coverage applicable if the insured asserts that the coronavirus was actually present on the covered property, and that its presence caused the premises to become uninhabitable, unusable, inaccessible, or unduly dangerous.

In light of the insured's specific averments regarding the "continuous presence of the coronavirus" on its property that "rendered [it] unsafe and unfit for its intended use," the insured has sufficiently alleged "direct physical loss or damage" to its property under the "physical contamination" theory as a necessary condition to business interruption coverage. The policy drafted and sold by the insurers does not include a virus exclusion among the 30 identified exclusions from business interruption coverage, and its absence arguably created a reasonable expectation on the part of the insured that its coronavirus-related losses and expenses would be covered by the policy's business interruption coverage. Therefore, the insurers have not established their right to judgment in their favor based upon the "direct physical loss of or damage to" property requirement.

Unlike other exclusions in the policy which preclude coverage for "loss or damage directly or indirectly caused" by an excluded peril regardless of "other causes of the loss" or "any other causes or events . . . which may have contributed concurrently or in any sequence with the excluded event to produce the loss," the Time Element exclusion does not contain any such "anti-concurrent causation" language, and, as a result, that exclusion is governed by the "efficient proximate cause" or "concurrent causation" doctrine. Under that proximate cause analysis, an excluded peril and a covered risk may combine to concurrently cause a loss, with coverage being afforded for the resulting damage as long as the proximate cause of the loss is covered by the policy, which proximate cause determination is typically reserved for the fact-finder. Based upon the insured's factual admissions and averments, it cannot be declared as a matter of law that an event or cause other than the SARS-CoV-2 virus was the efficient proximate cause of the claimed losses.

However, inasmuch as the insured has not alleged that a "civil authority" denied it access to its covered premises as a result of "physical loss or damage" to, or the presence of the coronavirus on, property "in the immediate vicinity" of the insured property, its claim for civil authority coverage is insufficient as a matter of law and will be dismissed. In addition, based upon the insured's assertions that the insurers misrepresented the policy terms, asserted frivolous defenses, and denied the request for coverage due to their own economic considerations, rather than the merits of the insured's claim, the motion seeking to dismiss the bad faith claims will be denied. Last, accepting as true the insured's factual admissions and averments, the motion for judgment on the pleadings as to two insurers will be denied, subject to their right to later seek their dismissal by way of a motion for summary judgment following the completion of relevant discovery.

## I.  FACTUAL BACKGROUND

Plaintiff, SWB Yankees, LLC ("SWB"), owns a Triple-A "minor league professional baseball team known as the Scranton/Wilkes-Barre RailRiders" (the "RailRiders"), which is based at PNC Field in Moosic, Lackawanna County.[2]  (Docket Entry No. 1 at ¶ 10).  The RailRiders have "a Player Development Contract (PDC) with the New York Yankees whereby players are contracted by the major league team and play for the [RailRiders], generally either in development of their careers, or in rehabilitation assignment after injury at the major league level."  (Id. at ¶ 12).  Prior to the start of the regular season, "players for the [RailRiders] join with players of the New York Yankees and other Yankee-affiliated minor league teams at a Yankee-owned facility in Tampa, Florida for Spring Training."  (Id. at ¶ 13).

In exchange for SWB's payment of an insurance premium in the amount of $61,900.00, SWB purchased a "CNA Property Policy" (No. 6014607266) for the policy period from November 19, 2019, to November 19, 2020.  (Id. at pp. 32-33).  The top portion of the policy bears the name "CNA Insurance," whereas a lower block entry indicates that the insurance is being provided by "a stock insurance company" known as

---

[2]In 1985, the Lackawanna County Commissioners created the Multi-Purpose Stadium Authority of Lackawanna County to build and operate "a multi-purpose stadium," and following the ruling in Triple-A Baseball Club v. Northeastern Baseball, Inc., 832 F.2d 214 (1st Cir. 1987), the Stadium Authority acquired a Triple-A Baseball team that it "renamed the Scranton/Wilkes-Barre Red Barons, which became affiliated with the Philadelphia Phillies of Major League Baseball's National League."  SWB Yankees LLC v. Wintermantel, 615 Pa. 640, 642-643, 45 A.3d 1029, 1030 (2012).  From 1989 to 2006, the Red Barons played their home games at "the Lackawanna County Stadium, now known as PNC Field," but "in 2006, the Phillies ended their affiliation with the Red Barons; a new one with the New York Yankees ensued; and the Red Barons became the Scranton/Wilkes-Barre Yankees."  Id. at 643, 45 A.3d at 1030-31.  In November 2010, the Stadium Authority sold the Triple-A franchise to Mandalay Baseball Properties, LLC, Id. at 643, 45 A.3d at 1031, which later sold it to SWB Yankees, LLC.  See SWB Yankees, LLC v. CNA Financial Corporation, 492 F.Supp.3d 412, 414 (M.D. Pa. 2020).  The Triple-A team continued to be known as the Scranton/Wilkes-Barre RailRiders until November 2012, when it changed its name to the Scranton/Wilkes-Barre RailRiders.  See Christian H. Brill & Howard W. Brill, "Baseball Mascots and the Law," 65 U. Kan. L. Rev. 105, 134 & n.239 (Nov. 2016).

"Continental Casualty Company." (Id. at p. 32). The "Declarations" pages for the policy identify the "Policy Limits" as $51,970,220.00, which is further itemized as $46,770,220.00 in "Blanket Real and Personal Property" protection and $5,200,000.00 in "Blanket Business Interruption (Gross Earnings)" coverage. (Id. at p. 39). The policy separately identifies a coverage limit of $1,000,000.00 for "Denial of Access by Civil Authority," and in the provisions setting forth "Time Limits" for covered losses, it imposes a temporal limitation of "Thirty (30) Days" for "Denial of Access by Civil Authority" damages, but an "Unlimited" period for losses under the "Business Interruption Period of Indemnity." (Id. at pp. 40, 42).

The policy states that "[e]xcept as hereafter excluded," it "insures against *risks* of direct physical loss of or damage to property and/or interests described herein at covered Locations." (Id. at p. 45)(emphasis added). Section II(A)(2) lists 14 categories of real or personal property that are "not covered" under the policy. (Id. at pp. 45-46). Section (B)(1) sets forth the "Business Interruption (Gross Earnings)" coverage, and states, in relevant part:

> This policy covers against loss resulting from necessary interruption of business caused by direct physical loss of or damage to covered property . . . by the peril(s) insured against and occurring during the term of this policy at covered Locations occupied by the Insured . . . .

> In the event of such physical loss or damage, the [insurer] shall be liable for the actual loss sustained by the Insured resulting directly from such interruption of business, but not exceeding the reduction in Gross Earnings as set forth below less charges and expenses which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy, but in no

event to exceed the number of months specified in Section I.5. Time Limits
if a Business Interruption Period of Indemnity limit is specified.

(Id. at p. 46).

Under Section (C) of the policy outlining "Additional Coverages" and "Coverage
Extensions," coverage is afforded for "Denial of Access by Civil Authority," pursuant to
which the insurer agrees to pay for "the actual loss sustained" by SWB during the period
of time "while access to [its] Location is prohibited by order of civil authority," but only if
such access is denied as a direct result of physical loss or damage to property "in the
immediate vicinity" of its covered premises, or "when as a direct result of physical loss or
damage to property of the type insured from a peril insured against, ingress to or egress
from [its] Location is thereby physically prevented." (Id. at pp. 47, 49). Section (C)(15)
provides additional "Extra Expense" coverage which obligates the insurer to "pay for the
reasonable and necessary extra expense" that is "incurred by [SWB] in order to continue
as nearly as practicable, the _normal_ operation of [its] business following direct physical
loss of or damage to covered property by peril(s) insured against." (Id. at p. 50)(emphasis
in original). With respect to any coverage exclusions, Section (D)(1) and (2) delineate the
"Group 1" and "Group 2" exclusions from coverage, and identify 25 possible causes of
loss or damage that are expressly excluded from business interruption insurance coverage.
(Id. at pp. 57-60). Furthermore, Section (D)(3) identifies five "Time Element Exclusions"
from coverage, one of which is "[a]ny loss during a period during which business would
not or could not have been conducted for any reason other than physical damage of the
type insured against herein." (Id. at p. 60).

SWB maintains that its regular season was scheduled to commence "on Thursday, April 9, 2020, with four home games against the Buffalo Bisons followed by four home games against the Lehigh Valley Iron Pigs." (Docket Entry No. 1 at ¶ 21). It also "was scheduled to host the 2020 AAA All-Star game, an annual exhibition game featuring the best players from the International League against the best players from the Pacific Coast League." (Id. at ¶ 26). The All-Star game "was to be played on July 15, 2020," and the scheduled "[f]estivities, including a banquet, celebrity softball game, home run derby, and the all-star contest were to span July 13-15, 2020." (Id. at ¶ 27).

SWB notes that "[o]n March 11, 2020, the World Health Organization declared that the emerging threat from the novel coronavirus - - otherwise known as COVID-19 - - constituted a global pandemic." (Id. at ¶ 47). It submits that "emerging research" on the virus "from the Centers for Disease Control and Prevention ('CDC') indicate that the COVID-19 strains physically infect and can stay alive on surfaces for at least 17 days, a characteristic that renders property exposed to the contagion potentially unsafe and dangerous." (Id. at ¶ 48). SWB alleges that "[o]ther research indicates that the virus may linger on surfaces for up to four weeks in low temperatures." (Id.). Of particular significance, SWB distinctly avers that "[t]he continuous presence of the coronavirus on and around [its] premises rendered the premises unsafe and unfit for its intended use, and therefore caused property damage or loss under the Policy." (Id. at ¶ 49). It asserts that the "COVID-19 virus causes damages to property, particularly in places of business such as that of [SWB] . . . where the operation of the business requires interaction, gatherings, and contact in areas where there exists a heightened risk of the COVID-19 virus." (Id. at ¶ 56).

SWB states that on March 12, 2020, the owners of all the Major League Baseball ("MLB") teams cancelled spring training and sent their baseball players "home pending further decisions and announcements by MLB." (Id. at ¶¶ 15-18, 50). On that same date, the President and Chief Executive Officer of Minor League Baseball ("MiLB") cancelled the MiLB games scheduled for April-May 2020 and postponed the 2020 season indefinitely. (Id. at ¶¶ 19-20, 22-23, 51-52). According to SWB, it "has lost significant revenue" from the cancellation of its home games, and "has lost significant income from the loss of sponsorships, concession sales, ticket sales, and advertising revenue." (Id. at ¶¶ 24-25). It avers that "[t]he MiLB postponements and cancellations were issued in direct response to the dangerous physical conditions [on SWB's premises]; and in effect rendered [SWB's] insured premises unusable and unfit for its intended use, thereby causing the necessary interruption of its business and triggering the business interruption insurance coverage under the policy." (Id. at ¶ 54).

SWB contends that it "submitted a claim" to defendants, CNA Financial Corporation ("CNA"), The Continental Insurance Company ("Continental Insurance"), and Continental Casualty Company ("Continental Casualty"), "on April 7, 2020, requesting coverage for its business interruption losses promised under the policy." (Id. at ¶ 58). It states that they denied SWB's coverage request on May 4, 2020, claiming that SWB's business interruption losses did not involve "direct physical loss of or damage to" its property, nor was access to SWB's premises prohibited. (Id. at ¶ 32, 59). SWB submits that, despite the fact that the policy "does not include an exclusion for loss caused by a virus," the insurers also rejected SWB's claim for coronavirus-related damages on the ground that it is barred by the policy exclusion for "contaminants or pollutants." (Id.

-9-

at ¶¶ 32-33, 41, 72-75).  In addition, the insurers reportedly denied coverage on the alternate basis that the business interruption losses were caused solely by "governmental closure orders" in Pennsylvania, notwithstanding the fact that those losses were allegedly the product of the presence of the coronavirus on the stadium property and the "MiLB postponements and cancellations." (Id. at ¶¶ 61-63).  Based upon the insurers' actions, SWB maintains that their denial of coverage, even though "there exists no applicable exclusion in the policy for pandemic-related losses," was motivated by their "desire to preempt [their] own financial exposure to the economic fallout resulting from the COVID-19 crisis, rather than to initiate . . . a full and fair investigation of the claims." (Id. at ¶¶ 34-35).

On May 21, 2020, SWB initiated this litigation against CNA, Continental Insurance, and Continental Casualty. (Docket Entry No. 1).  It avers that "[i]n exchange for substantial premiums," those insurers "promised to indemnify [SWB] for losses resulting from 'necessary interruption of business' at the insured location caused by MiLB postponements and cancellations." (Id. at ¶ 6).  SWB notes that its "all-risk" policy "does not exclude losses from viruses or pandemics" or "MiLB postponements and cancellations," as a result of which it clearly "covers losses caused by viruses, such as COVID-19," and "by postponements and cancellations of the MiLB season." (Id. at ¶¶ 39, 41-42).  It asserts that "[i]n blatant breach of [their] insurance obligations that [they] voluntarily undertook in exchange for [SWB's] premium payments," CNA, Continental Insurance, and Continental Casualty "have denied [SWB's] claims arising from the MiLB-ordered interruption of its business." (Id. at ¶ 29).

SWB alleges that those insurers "never intended to fairly and objectively evaluate [its] business interruption claim," and charges them with bad faith conduct in "misrepresenting the coverage available," "failing to investigate and process [SWB's] claim," "asserting frivolous defenses" that "have no foundation in fact or law," "misleading [SWB] as to the coverage and policy information," "misrepresenting the applicable coverage," and engaging in actions that violate the Unfair Trade Practices and Consumer Protection Law (UTPCPL), 73 P.S. §§ 201-1 – 201-9.3. (Id. at ¶¶ 81, 84(b), (c), (e), (f), (i), (x), (yy) – (ddd)). In Count I of the complaint, it requests the issuance of a declaratory judgment that its "losses incurred in connection with the MiLB postponements and cancellations and the necessary interruption of its business stemming from the COVID-19 pandemic are insured losses under the policy." (Id. at p. 19). Count II advances a claim for breach of contract based upon the insurers' failure to pay "business losses incurred as a result of the MiLB postponements and cancellations which have forced [SWB] to close its business." (Id. at ¶ 96). Finally, SWB asserts claims for insurer bad faith liability under 42 Pa.C.S. § 8371. (Id. at ¶¶ 104-108).

CNA, Continental Insurance, and Continental Casualty removed this action to the United States District Court for the Middle District of Pennsylvania, (Docket Entry No. 6), but on October 1, 2020, U. S. District Judge John E. Jones, III granted SWB's motion to remand this matter back to the Court of Common Pleas of Lackawanna County. CNA Financial Corporation, 492 F.Supp.3d at 417. On November 4, 2020, the insurers filed an answer to the complaint which also asserted new matter pursuant to Pa.R.C.P. 1030. (Docket Entry No. 8). The new matter quotes the foregoing policy provisions and contends that coverage was properly denied since SWB did not sustain any "direct

physical loss of or damage to" covered property. It further asserts that coverage is specifically excluded by the "contaminants or pollutants" exclusion, the "fungi, wet rot, dry rot and microbes" exclusion, the exclusion for "[l]osses which are eligible for coverage under any government or national program or scheme," and the exclusion for "[a]ny loss during a period during which business would not or could not have been conducted for any reason other than physical damage of the type insured against herein." (Id. at ¶¶ 111 - 127). Moreover, the new matter alleges that the policy in question was issued by Continental Casualty alone, and contends that CNA and Continental Insurance are not properly named defendants in this case. (Id. at ¶¶ 128-164).

SWB filed a reply to the insurers' new matter, and in compliance with Pa.R.C.P. 1029(a), specifically denied the allegations contained in paragraphs 112, 118, 123-126, and 128-129 of the new matter. (Docket Entry No. 9 at ¶¶ 112; 118, 123-126, 128-129). Pursuant to Pa.R.C.P. 1029(d), it denied the averments set for in paragraphs 109-111, 113-117, 119-122; 127, and 163-177 as conclusion of law to which no responsive pleading was required. (Id. at ¶¶ 109-111, 113-117, 119-122, 127; 163-177). The allegations in paragraphs 131 to 162 of the new matter were denied under Pa.R.C.P. 1029(c) on the ground that, after reasonable investigation, SWB was without knowledge or information sufficient to form a belief as to the truth or falsity of those averments. (Id. at ¶¶ 131-162). The sole factual averment expressly admitted by SWB is that CNA "maintains its principal place of business in Chicago, Illinois." (Docket Entry No. 8 at ¶ 130; Docket Entry No. 9 at ¶ 130).

Following the close of the pleadings, CNA, Continental Insurance, and Continental Casualty filed a motion for judgment on the pleadings asserting five arguments. First,

they assert that SWB "has failed to allege sufficient facts to state a claim under the policy's business interruption coverage" since "the Complaint does not allege any direct physical loss of or damage to the property," which is "necessary to satisfy the threshold trigger for coverage." (Docket Entry No. 14 at ¶¶ 24-27). Second, albeit in a single sentence in their motion, CNA, Continental Insurance, and Continental Casualty allege that SWB's "losses are precluded by the policy's Time Element Exclusion, which precludes coverage for losses that occur during a period which business would not or could not have been conducted for any reason other than physical damage to [SWB's] property." (Id. at ¶ 28).   Third, the insurers contend that civil authority coverage is available only if the insured is denied access by a "civil authority," which is limited to "civil officers in whom a portion of the sovereignty is vested and in whom the enforcement of municipal regulations or control of the general interest of society is confided." (Id. at ¶¶ 29-30). Inasmuch as SWB "repeatedly alleges that its losses resulted from MiLB's postponements and cancellations, and not any Executive Orders issued by Governor Tom Wolf," CNA, Continental Insurance, and Continental Casualty submit that SWB's civil authority coverage claim "fails as a matter of law because MiLB is not a civil authority." (Id. at ¶ 31). Fourth, the insurers likewise seek to dismiss SWB's bad faith claim on the basis that they "properly denied" SWB's coverage claims as a matter of law. (Id. at ¶¶ 32-36). Last, they seek to dismiss any claims against CNA and Continental Insurance on the ground that the policy was issued solely by Continental Casualty, such that no privity of contract or actual case or controversy exists between SWB and CNA or Continental Insurance. (Id. at ¶¶ 37-45).

In their supporting brief, CNA, Continental Insurance, and Continental Casualty renew those same arguments. They contend that business interruption coverage is clearly inapplicable in that it necessitates losses "caused by direct physical loss of or damage to covered property," which "requires a distinct, demonstrable, and physical alteration of [SWB's] property." (Docket Entry No. 13 at pp. 8, 18). They state that the ruling in Ungarean v. CNA, 2021 WL 1164836 (Alleg. Co. 2021), *app. pending*, No. 490 WDA 2021 (Pa. Super.) "is an outlier decision that deviates from numerous other cases applying Pennsylvania law to COVID-19 coverage disputes, without any basis to distinguish those cases." (Id. at p. 16). The insurers posit that "a court cannot rewrite the terms of a policy," and allege that "Judge [Christine] Ward [in Ungarean] did exactly that by reading the phrase 'of use' into the policy's requirement for 'direct physical loss of or damage to property.'" (Id. at pp. 16-17). They "submit that the Ungarean decision is a singular decision standing for an otherwise unsupported principle, and this Court should decline to follow it." (Id. at p. 17).

CNA, Continental Insurance, and Continental Casualty next argue that civil authority coverage applies only if access to SWB's premises was "prohibited by order of civil authority" based upon "physical loss or damage to property at or in the immediate vicinity" of SWB's premises. (Id. at p. 23). In addition to renewing their argument that physical loss or damage to property has not been alleged, the insurers stress that SWB consistently avers throughout the complaint that its losses resulted from postponements and cancellations declared by MiLB, rather than Governor Wolf or some other civil authority. (Id. at pp. 24-26). Citing the policy's "Time Element Exclusion," CNA, Continental Insurance, and Continental Casualty contend that "even if this Court found

that the policy provides coverage for the alleged loss of use stemming from Governor Wolf's closure Orders, [SWB's] claims would still be precluded because of the cancellation of the 2020 MiLB season." (Id. at pp. 27-28). Finally, they argue that SWB's "statutory bad faith claim fails as a matter of law" because their "coverage determination was both reasonable and correct," and allege that CNA and Continental Insurance "should be dismissed because neither [CNA] nor [Continental Insurance] are parties to any contract with [SWB]." (Id. at pp. 28-30).

In response, SWB states that it has specifically alleged that the SARS-CoV-2 virus was physically present on its covered property, and that "[c]ourts have concluded that contamination and suspected contamination making property dangerous to use can constitute 'physical loss or damage.'" (Docket Entry No. 17 at pp. 18-20). Relying upon Ungarean, it alternatively argues that "[t]he phrase 'physical loss or physical damage' is not limited to physical alter[]ation of or damage to [SWB's] property, but includes the loss of use of [SWB's] property." (Id. at pp. 12-14). SWB maintains that it "has alleged sufficient facts to state a claim under the policy's civil authority coverage," but does not proffer an explanation for its serial allegations that access to its property was denied by MiLB's directives. (Id. at pp. 22-23). Besides asserting that it "has pled enough facts to raise a reasonable expectation that discovery will reveal evidence of bad faith on the part of" CNA, Continental Insurance, and Continental Casualty, SWB argues that it should be "permitted to conduct additional discovery on the corporate structure" of the named defendants in order to determine whether they are proper parties in this case. (Id. at pp. 24-27).

- 15 -

After the Court Administrator had scheduled oral argument on July 8, 2021, CNA, Continental Insurance, and Continental Casualty filed a "Reply and Notice of Supplemental Authority in Support of Motion for Judgment on the Pleadings" in which they assert that "The Scranton Club was correctly decided and warrants judgment in [their] favor," and that SWB's "reliance on other cases from outside the Commonwealth is misplaced."[3]  (Docket Entry No. 21; Docket Entry No. 22 at pp. 1-2, 7).  With leave of court, SWB filed a supplemental brief on July 23, 2021, addressing only the "Time Element" exclusion asserted by CNA, Continental Insurance, and Continental Casualty. (Docket Entry No. 24).

SWB advances two arguments as to why that policy exclusion is inapplicable. First, it submits that the insurers "have not offered any legitimate reason why [SWB] 'would not or could not' have conducted business other than the threat of the coronavirus." (Id. at p. 4).  SWB states that 'the 2020 MiLB Season was cancelled because of the risk of the spread of COVID-19," and citing relevant allegations contained in the complaint, it maintains that "but for the actual presence, or risk of the presence, of COVID-19 on [SWB's] property, it would have been able to conduct business" at its stadium. (Id. at pp. 4-5).  Second, citing Heller v. Pennsylvania League of Cities and Municipalities, 613 Pa. 143, 32 A.3d 1213 (2011), SWB claims that the exclusion "is vague, ambiguous, and void as against public policy," since it "fails to specifically identify what is being excluded under the policy," and as such, "renders the coverage

---

[3]Lacka. Co. R.C.P. 211(c)-(f) and 1034(a) govern the filing of briefs in connection with a motion for judgment on the pleadings, and provide for the moving party to file a supporting brief and the responding party to file a brief in opposition.  Leave of court is required to submit supplemental briefs before or after oral argument. See, e.g., Alward v. Housing Authority of the County of Lackawanna, 2018 WL 1766967, at *3 (Lacka. Co. 2018).

illusory." (Id. at pp. 3-4). It contends that "[t]his exclusion would in essence cancel all coverage under the policy and convert the 'all-risk' policy into a 'named-perils' policy." (Id. at p. 4).

Following SWB's submission of its supplemental brief, CNA, Continental Insurance, and Continental Casualty requested, and were granted, leave of court to file a responsive brief solely with regard to the Time Element exclusion. (Docket Entry No. 25). In their supplemental reply brief, they contend that the exclusion unambiguously states that "if a policyholder's business was not operating – or could not operate – due to reasons other than the type of physical damage covered by the policy, coverage under the Time Element provisions is not available." (Docket Entry No. 26 at p. 3). The insurers assert that business interruption coverage is barred by that exclusion inasmuch as "the 2020 MiLB season was cancelled because of the risk of the spread of COVID-19 and the general presence of the virus in the United States," and "the MiLB's decision to cancel the season was not driven by the alleged actual presence of the COVID-19 virus at [SWB's] property." (Id. at p. 5). Challenging SWB's contention that the Time Element exclusion is void as against public policy for affording illusory coverage, CNA, Continental Insurance, and Continental Casualty submit that "the operative language is clearly limited in scope to Time Element coverages expressly defined in the policy," and "only applies in a limited set of circumstances where a loss occurs when the policyholder's business would not otherwise be operating." (Id. at pp. 3, 6). Upon the submission of that supplemental reply brief on August 2, 2021, the motion for judgment on the pleadings became ripe for disposition.

## II.   DISCUSSION

### (A)  STANDARD OF REVIEW

"Entry of judgment on the pleadings is permitted under Pennsylvania Rule of Civil Procedure 1034, which provides that 'after the pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for judgment on the pleadings.'" Kote v. Bank of New York Mellon, 169 A.3d 1103, 1107 (Pa. Super. 2017), app. denied, 645 Pa. 700, 182 A.3d 434 (2018). "A motion for judgment on the pleadings is similar to a demurrer," Erie Insurance Exchange v. Mione, 2021 WL 1847751, at *4 (Pa. Super. 2021); Kote, supra. Our Supreme Court has "explained that the same principles apply to a judgment on the pleadings as apply to a preliminary objection in the nature of a demurrer." Cagey v. Commonwealth, 645 Pa. 268, 278 n.2, 179 A.3d 458, 463 n.2 (2018).

"Judgment on the pleadings is properly entered where the pleadings and documents admitted in the pleadings establish that there are no disputed issues of fact and that the defendant is entitled to judgment as a matter of law." Grabowski v. Carelink Community Support Services, Inc., 230 A.3d 465, 470 (Pa. Super. 2020). "In determining if there is a dispute as to facts, the court must confine its consideration to the pleadings and relevant documents.'" Erie Insurance Exchange v. Petrie, 242 A.3d 915, 919 n.5 (Pa. Super. 2020) (quoting Forbes v. King Shooters Supply, 230 A.3d 1181, 1187 (Pa. Super. 2020)). "The court must accept as true all well-pleaded statements of fact, admissions, and any documents properly attached to the pleadings presented by the party against whom the motion is filed, considering only those facts which were specifically admitted." Erie Insurance Exchange v. King, 246 A.3d 332, 336 (Pa. Super. 2020), app. denied, 2021 WL

3076375 (Pa. 2021). A motion for judgment on the pleadings may be granted "only when the moving party's right to succeed is certain and the case is so free from doubt that the trial would clearly be a fruitless exercise." Mione, supra; King, supra; Kote, supra.

### (B)  INSURANCE CONTRACT CONSTRUCTION

CNA, Continental Insurance, and Continental Casualty allege that SWB's claims for declaratory judgment relief and breach of contract are insufficient as a matter of law since the language of the policy clearly does not afford business income, extra expense, or civil authority coverage based upon the factual averments set forth in the complaint. (Docket Entry No. 13 at p. 2). "The interpretation of an insurance contract regarding the existence or nonexistence of coverage is generally performed by the court." Donegal Mut. Ins. Co. v. Baumhammers, 595 Pa. 147, 154-155, 938 A.2d 286, 290 (2007); Brogan v. Rosenn, Jenkins & Greenwald, LLP.; 35 Pa. D. & C. 5th 500, 520 (Lacka. Co. 2014). When construing insurance policies, courts "are guided by the polestar principle that insurance policies are contracts between an insurer and a policyholder" and must "apply traditional principles of contract interpretation in ascertaining the meaning of the terms used therein." Kurach v. Truck Insurance Exchange; 235 A.3d 1106, 1116 (Pa. 2020). "In so doing, we must 'ascertain the intent of the parties as manifested by the terms used in the written insurance policy.'" Gallagher v. GEICO Indemnity Co., 650 Pa. 600, 622, 201 A.3d 131, 137 (2010) (quoting 401 Fourth Street, Inc. v. Investors Ins. Group, 583 Pa. 445, 879 A.2d 166, 171 (2005)); Evans v. Travelers Ins. Co., 226 A.3d 96, 100 (Pa. Super. 2020) (same).

"The proper focus regarding issues of coverage under insurance contracts is the reasonable expectations of the insured," and "[i]n determining the reasonable

expectations of the insured, courts must examine the totality of the insurance transaction involved." Consolidated Rail Corporation v. ACE Property & Casualty Ins. Co., 182 A.3d 1011, 1026 (Pa. Super. 2018), *app. denied*, 648 Pa. 165, 191 A.3d 1288 (2018). But, if the policy terms are clear and unambiguous, courts are required to give effect to the language of the contract and the plain and ordinary meaning of those terms. Kurach, supra; Penn Psychiatric Center v. United States Liability Ins. Co., 2021 WL 2460789, at * 4 (Pa. Super. 2021); Tuscarora Wayne Ins. Co. v. Hebron, Inc., 197 A.3d 267, 272 (Pa. Super. 2018), *app. denied*, 651 Pa. 358, 205 A.3d 273 (2019). "[W]hile reasonable expectations of the insured are focal points in interpreting the contract language of insurance policies, an insured may not complain that its reasonable expectations were frustrated by policy limitations which are clear and unambiguous."[4] Consolidated Rail Corporation, supra. However, when a provision of a policy is ambiguous, it must be construed in favor of the insured and against the insurer as the drafter of the policy which

---

[4] The Supreme Court of Pennsylvania has applied the "reasonable expectations" approach in insurance coverage disputes involving non-commercial insureds. *See, e.g.*, Tonkovic v. State Farm Mutual Automobile Ins. Co., 513 Pa. 445, 455, 521 A.2d 920, 925 (1987); Collister v. Nationwide Life Ins. Co., 479 Pa. 579, 594, 388 A.2d 1346, 1353 (1978). The United States Court of Appeals for the Third Circuit has "predicted that Pennsylvania courts would apply that doctrine even where the insured is a sophisticated purchaser of insurance - - i.e., 'a large commercial enterprise that has substantial economic strength, desirability as a customer, and an understanding of insurance matters, or readily available assistance in understanding and procuring insurance.'" UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 503 (3d Cir. 2004) (quoting Reliance Ins. Co. v. Moessner, 121 F.3d 895, 904-905 n.8 (3d Cir. 1997)). The federal district courts in Pennsylvania have likewise concluded that the reasonable expectations doctrine may apply to commercial entities and sophisticated purchasers of insurance. *See* Downey v. First Indemnity Insurance, 214 F.Supp.3d 414, 424 (E.D. Pa. 2016); Austin James Associates, Inc. v. American International Specialty Lines Ins. Co., 2012 WL 4755394, at * 5 (M.D. Pa. 2012); Whole Enchilada, Inc. v. Travelers Property Casualty Company of America, 581 F.Supp.2d 677, 690 (W.D. Pa. 2008). Although the Superior Court of Pennsylvania originally left "for another day" the issue of "whether the 'reasonable expectations' doctrine can be invoked by a 'sophisticated' commercial enterprise," Millers Capital Ins. Co. v. Gambone Brothers Development Co., 941 A.2d 706, 717, n. 10 (Pa. Super. 2007), *app. denied*, 600 Pa. 734, 963 A.2d 471 (2008), it has more recently applied the doctrine in insurance coverage litigation involving the interpretation of commercial insurance policies issued to business enterprises. *See* Consolidated Rail Corporation, supra (commercial policy insuring railroad company); Good v. Frankie & Eddie's Hanover Inn, LLP, 171 A.3d 792, 797 (Pa. Super. 2017) (commercial policy issued to a hotel).

selected the language used.  Kurach, supra; Penn Psychiatric Center, supra; Gemini Ins. Co. v. Meyer Jabara Hotels, LLC, 231 A.3d 839, 847-848 (Pa. Super. 2020),

Insurance policy terms "are ambiguous 'if they are subject to more than one reasonable interpretation when applied to a particular set of facts.'"  Erie Insurance Exchange v. Moore, 228 A.3d 258, 267 (Pa. 2020) (quoting Madison Construction Co. v. Harleysville Mut. Ins., 557 Pa. 595, 606, 735 A.2d 100, 106 (1999)); Pass v. Palmiero Automotive of Butler, Inc., 229 A.3d 1, 5 (Pa. Super. 2020) (quoting Murphy v. Duquesne University of the Holy Ghost, 565 Pa. 571, 591, 777 A.2d 418, 430 (2001)). "However, the lack of a definition for an operative term in an insurance policy does not necessarily render the policy ambiguous." Gemini Ins. Co., 231 A.3d at 848.  Moreover, a particular policy provision will not be deemed ambiguous "simply because the parties disagree" on the meaning or proper construction of certain words. Van Divner v. Sweger, 2021 WL 2584114, at * 3 (Pa. Super. 2021); State Farm Automobile Ins. Co. v. Dooner, 189 A. 3d 479, 482-483 (Pa. Super. 2018).  "While courts are responsible for deciding whether, as a matter of law, written contract terms are either clear or ambiguous; it is for the fact-finder to resolve ambiguities and find the parties' intent." Windows v. Erie Insurance Exchange, 161 A.3d 953, 957 (Pa. Super. 2017).

### (C)  COVID-19 BUSINESS INTERRUPTION INSURANCE LITIGATION IN PENNSYLVANIA

"The onset of the novel coronavirus pandemic and the resulting government orders closing businesses predictably generated claims by those businesses against their commercial property insurers based upon the business income, extra expense, and civil authority provisions of their policies." The Scranton Club, supra, at *9.  According to the

"COVID Coverage Litigation Tracker" maintained by the University of Pennsylvania

Law School, 1,960 lawsuits challenging insurers' denials of such claims have been filed

in federal and state courts as of July 12, 2021. *See* https://cclt.law.upenn.edu.  Rulings

made in those lawsuits involve the interpretation and application of the virus exclusion,

the "physical loss or damage" requirement for business income and extra expense

coverages, and the availability of civil authority coverage, and are based upon the

language of the applicable insurance policies, the laws of the forum states, and the

allegations set forth in the complaints.  *See* John K. DiMugno, "Implications of COVID-

19 for the Insurance Industry and its Customers: An Update," *Insurance Litigation*

*Reporter*, Vol. 42, No. 18 at pp. 514-531 (Nov. 6, 2020).  Although several common

pleas courts in this Commonwealth have issued decisions in business interruption

coverage disputes arising from the coronavirus pandemic and government closure orders,

and even more federal district courts in Pennsylvania have had occasion to consider

similar insurance coverage issues, no appellate court in Pennsylvania has yet had an

opportunity to address these insurance coverage questions.  *See* The Scranton Club,

supra, at *9-10; Samuel W. Braver & Deborah A. Little, "Insurance Coverage for

Businesses' Economic Losses Due to COVID-19," *The Pennsylvania Lawyer*, Vol. 43,

No. 4 at p. 41 (July/August 2021).

        (1)    Federal District Court Rulings Applying
             *Port Authority* and *Hardinger*

The federal trial court holdings regarding business interruption insurance claims

resulting from coronavirus-related closure orders are based, in part, upon the "physical

loss or damage" standard established by the United States Court of Appeals for the Third

Circuit in two decisions that predated the COVID-19 pandemic.  In Port Authority of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226 (3d Cir. 2002), the owners of "numerous facilities in New York and New Jersey that incorporated asbestos products in their construction" brought an action against their commercial insurers to recover the cost of asbestos abatement, and "contend[ed] that physical damage ha[d] occurred in these structures as a result of the 'presence of asbestos,' 'threat of release and reintrainment of asbestos fibers,' and the 'actual release and reintrainment of asbestos fibers.'" Id. at 230. The trial court granted the insurers' motion for summary judgment, finding "that unless asbestos in a building was of such quantity and condition as to make the structure unusable, the expense of correcting the situation was not within the scope of a first party insurance policy covering 'physical loss or damage.'" Id.

On appeal, the Third Circuit examined the insurance laws of New York and New Jersey where the insured facilities were located, and remarked that it was confronted "with a diversity case in which applicable state law provides no guidance and the parties rely upon appellate decisions from jurisdictions having no relationship with the entities involved in this dispute." Id. at 235.  It stated that in common parlance, "physical damage to property" ordinarily means "a distinct, demonstrable, and physical alteration of a structure," and reasoned that "[p]hysical damage to a building as an entity by sources unnoticeable to the naked eye must meet a higher threshold." Id. at 235.  In support of that test, it cited the seminal contamination decision in Western Fire Ins. Co. v. First Presbyterian Church, 165 Colo. 34; 437 P.2d 52 (1968), which is discussed in Section II(D) below, where the Colorado Supreme Court "concluded that coverage was triggered when authorities ordered a building closed after gasoline fumes seeped into a building's

structure and made its use unsafe," even though "neither the building nor its elements were demonstrably altered," but "its function was eliminated." Id.

Applying that standard, Port Authority held that "[w]hen the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct loss to its owner." Id. at 236.  It posited that "[t]he requirement that the contamination reach such a level in order to come within coverage limitation establishes a reasonable and realistic standard for identifying physical loss or damage," and that "[a] less demanding standard would require compensation for repairs caused by the inevitable deterioration of materials used in the construction of the building." Id.  In affirming the lower court ruling, it observed that "[a]lthough the plaintiffs demonstrated that many of its structures used asbestos-containing substances, those buildings had continuous and uninterrupted usage for many years." Id.

Three years later, the Third Circuit considered the application of the Port Authority standard in an insurance coverage dispute involving property whose "well was contaminated with e-coli bacteria" and a policy that required "direct physical loss" as a condition to coverage.  In Motorists Mutual Ins. Co. v. Hardinger, 131 Fed.Appx. 823 (3d Cir. 2005), the district court granted the insurer's "motion for summary judgment on the basis that the Hardingers failed to establish a physical loss, a prerequisite for coverage under the policy." Id. at 825.  "While the bacteria allegedly made the house uninhabitable, the [trial] court deemed this a 'constructive loss,' and held it insufficient to satisfy the policy's requirement of 'physical loss.'" Id.

The federal appellate court noted on appeal that "[n]o Pennsylvania Supreme Court case . . . directly addresses whether loss of use may constitute a physical loss." Id. at 826.

Nevertheless, it deemed "[i]nstructive" the ruling by Cumberland County Judge Kevin Hess in Hetrick v. Valley Mutual Ins. Co., 15 Pa. D. & C. 4th 271 (Cumb. Co. 1992), which is also discussed in greater detail in Section II(D) below, where "the court gave substantial attention and approval to Western Fire Insurance Co. v. First Presbyterian Church; 165 Colo. 34, 38-39, 437 P.2d 52 (1968)." Id. at n.4. With regard to the district court's conclusion that "Port Authority is inapplicable," the Third Circuit declared "[w]e find nothing, however, in New York, New Jersey, or Pennsylvania law that would cause us to disregard Port Authority under Pennsylvania law," and that it did not "appear that there is any substantive law in Pennsylvania at odds with Port Authority." Id. at 826.

Based upon that reasoning, Hardinger determined that Port Authority is "instructive in a case where sources unnoticeable to the naked eye have allegedly reduced the use of the property to a substantial degree." Id. Thus, it held:

> We predict that the Pennsylvania Supreme Court would adopt a similar principle as we did in Port Authority. Applying Port Authority's standard here, we believe there is a genuine issue of fact whether the functionality of the Hardinger's property was nearly eliminated or destroyed, or whether their property was made useless or uninhabitable.

Id. at 826-827. In reversing the trial court's finding that bacteria contamination did not satisfy the "direct physical loss" requirement for coverage, the Third Circuit stated that "[s]ummary judgment was not proper because there is a genuine issue of material fact whether there was a physical loss." Id. at 828.

Relying upon the "physical loss or damage" analysis articulated in Port Authority and Hardinger, those federal district courts in Pennsylvania which have addressed the merits of COVID-19 business interruption insurance claims under Pennsylvania law have uniformly denied coverage on the ground that the insureds were unable to satisfy the

"physical loss or damage" requirement in their insurance policies.[5] The only four federal courts in the Middle District and Western District which have considered coronavirus-related business income loss claims have found that the "physical loss or damage" provisions in the policies were unambiguous and barred coverage based upon the facts alleged. *See* 44 Hummelstown Associates, LLC v. American Select Ins. Co., 2021 WL 2312778, at *7-8 (M.D. Pa. 2021) (Kane, J.); 1 S.A.N.T., Inc. v. Berkshire Hathaway, Inc., 2021 WL 147139, at * 5 (W.D. Pa. 2021) (Stickman, J.); Windber Hospital v. Travelers Property Cas. Co., 2021 WL 1061849, at *4-5 (W.D. Pa. 2021) (Gibson, J.); Kahn v. Pennsylvania Nat. Mut. Ins. Co., 2021 WL 422607, at *5-8 (M.D. Pa 2021) (Jones, C.J.).  Fifteen of the sixteen federal judges in the Eastern District, who have analyzed the "physical loss or damage" condition, have also determined that business losses caused by government closure orders stemming from the COVID-19 pandemic cannot satisfy the "physical loss or damage" requirement for coverage. *See* Boscov's Department Store, Inc. v. American Guarantee and Liability Ins. Co., 2021 WL 2681591, at *5-6 (E.D. Pa. 2021) (Gallagher, J.); RDS Vending, LLC v. Union Ins. Co., 2021 WL 1923024, at *4 (E.D. Pa. 2021) (Rufe, J.); Marcik Inc. v. State Farm Fire & Casualty Co.,

---

[5]Because of the uncertainty surrounding COVID-19 business interruption insurance claims under Pennsylvania law, and the public policy interest in having those state law claims decided by Pennsylvania courts, at least seven federal judges in this state have declined to exercise jurisdiction pursuant to Reifer v. Westport Ins. Co., 751 F.3d 129, 146 (3d Cir. 2014), and have either dismissed insurance coverage disputes without prejudice to the right to refile the actions in state court, or have remanded to state court any proceedings that were removed to federal court. *See, e.g.,* Commercial Office Furniture Co., Inc. v. Charter Oak Fire Ins. Co., 2021 WL 1837412, at *5 (E.D. Pa. 2021) (Padova, J.); Amos Inc. v. Firstline Nat'l Ins. Co., 2021 WL 1375472, at *1 (W.D. Pa. 2021) (Wiegand, J); Schwartz Law Firm, LLC v. Selective Ins. Co. of South Carolina, 2021 WL 698189, at *3 (E.D. Pa. 2021) (Pappert, J.); V & S Elmwood Lanes, Inc. v. Everest National Ins. Co., 2021 WL 84066, at *4 (E.D. Pa. 2021) (DuBois, J.); Venezie Sporting Goods, Inc. LLC v. Allied Ins. Co. of America, 2020 WL 5651598, at *5 (W.D. Pa. 2020) (Hornak, C.J.); Dianola's Eatery, LLC v. Motorist Mut. Ins. Co., 2020 WL 5051459, at *4 (W.D. Pa. 2020) (Fischer, J.); Greg Prosmushkin, P.C. v. Hanover Ins. Group, 2020 WL 4735498, at *5 (E.D. Pa. 2020) (Jones, J.).

2021 WL 1940647, at * 4-5 (E.D. Pa. 2021) (Alejandro, J.); Lansdale 329 Prop LLC v. Hartford Underwriters Ins. Co., 2021 WL 1667424, at *5-10 (E.D. Pa. 2021) (Goldberg, J.); SSN Hotel Management, LLC v. Hartford Mut. Ins. Co., 2021 WL 1339993, at *4-5 (E.D. Pa. 2021) (Kenney, J.); Eric R. Shantzer, D.D.S. v. Travelers Cas. Ins. Co., 2021 WL 1209845, at *4-5 (E.D. Pa. 2021) (Sanchez, C.J.); Chester County Sports Arena v. Cincinnati Specialties Underwriters Ins. Co., 2021 WL 1200444, at * 6-7 (E.D. Pa. 2021) (Baylson, J.); Tria WS, LLC v. Allianz Global Risks U.S. Ins. Co., 2021 WL 1193370, at *4-5 (E.D. Pa. 2021) (Beetlestone, J.); Fuel Recharge Yourself, Inc. v. AMCO Ins. Co., 2021 WL 510170, at *5 (E.D. Pa. 2021) (McHugh, J.); Frank Van's Auto Tag, LLC v. Selective Ins. Co., 2021 WL 289547, at *4-7 (E.D. Pa. 2021) (Pratter, J.); Humans & Resources, LLC v. First Line National Ins. Co., 2021 WL 75775, at *7 (E.D. Pa. 2021) (Joyner, J.); Newchops Restaurant Comcast v. Admiral Indemnity Co., 2020 WL 7395153, at *5 (E.D. Pa. 2020) (Savage, J.); Kessler Dental Associates, P.C. v. Dentist Ins. Co., 2020 WL 7181057, at *4 (E.D. Pa. 2020) (Wolson, J.) 4431, Inc. v. Cincinnati Ins. Companies, 2020 WL 7075318, at *10 (E.D. Pa.2020) (Leeson, J.); Brian Handel, D.M.D., P.C. v. Allstate Ins. Co., 2020 WL6545893, at *3 (E.D. Pa. 2020) (Bartle, J.).  In Susan Spath Hegedus, Inc. v.  ACE Fire Underwriters Ins. Co., 2021 WL 1837479 (E.D. Pa. 2021) (Schiller, J.), the court "conclude[d] that the phrase 'direct physical loss of or damage to property at the described premises' in the context of Business Income and Extra Expense insurance is ambiguous," and found that "[t]he allegations in Plaintiff's Complaint regarding its suspension of operations could plausibly constitute a 'direct physical loss of . . . property at the described premises,' in that Plaintiff lost the ability to physically operate its business at the described premises." Id. at *9.  However, Susan

Spath Hegedus denied the insurer's motion to dismiss based upon its interpretation and application of California law, not Pennsylvania law. Id. at *3, 8-10.[6]

### (2)    State Trial Court Decisions

The first reported reference to a business interruption insurance ruling by a state court judge is found in an order that was issued by Philadelphia County Judge Gary Glazer on August 31, 2020, in Ridley Park Fitness, LLC v. Philadelphia Indemnity Ins. Co., 2020 WL 8613467 (Phila. Co. 2020), *reconsideration denied*, 2020 WL 8613466 (Phila. Co. 2020). In addressing the insurer's preliminary objections asserting "that certain clauses including a virus exclusion and 'direct physical loss' bar coverage," he stated in a footnote:

> At this very early stage, it would be premature for this court [to] resolve the factual determinations put forth by defendants to dismiss plaintiff's claims. Taking the factual allegations made in plaintiff's complaint as true, as this court must at this time, plaintiff has successfully pled to survive this stage of the proceedings. As such, the preliminary objections are overruled.

Id. at *1 n.1. On October 26, 2020, Judge Glazer entered an essentially identical one-sentence order in a separate case, which included the same footnote as Ridley Part Fitness, but added the sentence "[m]oreover, the law and facts are rapidly evolving in the area of COVID-19 business losses." Taps & Bourbon on Terrace, LLC v. Underwriters at Lloyds London, 2020 WL 6380449, at *1 n.1 (Phila. Co. 2020). Neither order identifies the specific policy language at issue in those cases or the legal authority relied upon by the court.

---

[6] Another Eastern District judge recently dismissed a business interruption coverage claim by a business that was closed due to the novel coronavirus and state closure orders, but did so based upon the virus exclusion contained in the policy, rather than the "physical loss or damage" prerequisite. *See* Vinart Management Company, Inc. v. Employers Mut. Cas. Co., 2021 WL 3033819, at *4 (E.D. Pa. 2021) (Schmehl, J.).

On January 25, 2021, we issued a Memorandum and Order in The Scranton Club sustaining the insurer's demurrer based upon the failure of a private social club to allege "any facts which may arguably satisfy the 'direct physical loss or damage' requirement for business income and extra expense coverage under the policy." The Scranton Club, supra, at *16. In contradistinction to SWB's averments in this case, the insured in The Scranton Club affirmatively alleged that "'[t]here is no evidence that the coronavirus was present within The Scranton Club's premises at the time that it closed its business,'" and even asserted that "its 'loss of business income was not caused by a virus within its premises' but was 'due to the Governor's and Pennsylvania Department of Health Secretary's orders that were issued in response to the pandemic.'" Id. at *4. Hence, after reviewing the "physical loss or damage" test formulated in Port Authority and Hardinger, we stated:

> Per the Scranton Club's binding judicial admissions, the coronavirus was never present on its premises, nor did any occupant of its property ever test positive for COVID-19. In short, there has never been an allegation by the Scranton Club that the presence of the novel coronavirus on its property caused some form of physical damage to its premises that rendered it uninhabitable or unusable.

Id. at *15. For that reason, we sustained the insurer's demurrer after concluding that "[t]he Scranton Club is mistaken that Studio 417 [Inc. v. Cincinnati Insurance Company, 478 F.Supp.3d 794 (W.D. Mo. 2020)] warrants a contrary conclusion since, unlike the instant case, the business in Studio 417 specifically alleged that the 'physical substance' of the coronavirus 'lived on,' was 'active on,' and 'attached to' the 'physical surfaces' on

its property, 'making it unsafe and unusable,' and 'causing it to cease or suspend operations.'"[7] Id. at *16 (quoting Studio 417, 478 F.Supp.3d at 798, 802).

      Lancaster County Judge Thomas Sponaugle filed an order on March 2, 2021, granting the insurer's motion for judgment on the pleadings in a business interruption insurance action that was commenced by a restaurant, and citing Hardinger, he found that "Plaintiff suffered no direct physical loss or damage to its premises." Isaac's at Spring Ridge, LLP v. MMG Ins. Co., 2021 WL 1650789, at *1 n.1 (Lanc. Co. 2021), app. pending, No. 455 MDA 2021 (Pa. Super.)  After the insured filed an appeal, Judge Sponaugle issued an opinion pursuant to Pa.R.A.P. 1925(a): Isaac's at Spring Ridge, LLP v. MMG Ins. Co., No. CI-20-03613, Sponaugle, J. (Lanc. Co. June 11, 2021).  In that Opinion, he stated that "[t]he losses were the result of the virus which is specifically excluded as a covered loss under the policy," and that "Plaintiff sustained no distinct, demonstrable, and physical alteration of its property, and therefore has no physical loss and no coverage." Id. at p. 6.  As further support for the dismissal, he noted that "at no point was Plaintiff prohibited from access to its premises" since it "continued to employ individuals to take orders, make and package food, receive payment, and deliver food" and "patrons were permitted to enter upon the property for delivery of their ordered food." Id. at p. 7.

---

[7] It is presumed that the Scranton Club asserted that the SARS-CoV-2 virus was never present on its premises in order to avoid the application of the policy's virus exclusion, which it succeeded in doing so. Id. at *11-13. One commentator has described such a strategy as a "pleading Catch-22" in which an insured's allegation that the virus did not exist on its covered premises forestalls the application of the virus exclusion, while simultaneously operating to prevent satisfaction of the "physical damage" requirement for business income and extra expense coverage. See John K. DiMugno, "The Implications of COVID-19 for the Insurance Industry and Its Customers: 2021 Developments," Insurance Litigation Reporter, Vol. 43, No. 3 at pp. 63-65 (Mar. 12, 2021) (discussing The Scranton Club, supra).

The Ungarean decision on March 25, 2021, represents the first instance in which a Pennsylvania court determined, as a matter of law, that an insured was entitled to business income, extra expense, and civil authority coverage, and granted the insured's motion for summary judgment seeking declaratory judgment relief on that basis. Allegheny County Judge Christine Ward reasoned that "[w]hile some courts have interpreted 'direct physical loss of or damage to property' as requiring some form of physical alteration and/or harm to property in order for the insured to be entitled to coverage, this Court reasonably determines that any such interpretation improperly conflates 'direct physical loss of' with 'direct physical . . . damage to' and ignores the fact that these two phrases are separated in the contract by the disjunctive 'or.'" Ungarean, supra, at *6. After she "looked to the ordinary, dictionary definitions of the terms 'direct,' 'physical,' 'loss,' and 'damage,'" she concluded:

> Accordingly, in this instance, the most reasonable definition of 'loss' is one that focuses on the act of losing possession and/or deprivation of property instead of one that encompasses various forms of damage to property; i.e., destruction and ruin. Applying this definition gives the term 'loss' meaning that is different from the term 'damage.' Specifically, whereas the meaning of the term 'damage' encompasses all forms of harm to Plaintiff's property (complete or partial), this Court concludes that the meaning of the term 'loss' reasonably encompasses the act of losing possession and/or deprivation, which includes the loss of use of property absent any harm to property.

Id. To that end, she remarked that "the spread of COVID-19 and social distancing measures (with or without the Governor's orders) caused plaintiff, and many other businesses, to *physically* limit the use of property and the number of people that could inhabit *physical* buildings at any given time," such that "the spread of COVID-19 did not,

as [the insurers] contend, merely impose economic limitations" in that the "economic losses were secondary to the businesses' *physical* losses." Id. at *7 (emphasis in original).

Judge Ward also addressed the insurers' contention "that the insurance contract's definition for 'period of restoration' suggests that the contract expressly contemplates and necessitates the existence of actual tangible damage in order for Plaintiff to be entitled to business income and extra expense coverage" Id. She observed that "the threat of COVID-19 has necessitated many physical changes to business properties across the Commonwealth," including "the installation of partitions, additional handwashing /sanitizations stations, and the installation or renovation of ventilation systems," and stated that "[t]hese changes would undoubtedly constitute 'repairs' or 'rebuilding' of property." Id. at *8 (citing In re Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation, 2021 WL 679109, at *9 (N.D. Ill. 2021) (finding that "the 'Period of Restoration' describes a *time* period during which loss of business income will be covered, rather than an explicit definition of coverage," noting the policy's use of the words "repaired" and "replaced" and stating that if "the coronavirus risk could be minimized by the installation of partitions and a particular ventilation system, then the restaurants would be expected to 'repair' the space by installing those safety features," and holding that "the definition of the Period of Restoration is consistent with interpreting direct physical loss of property to include the loss of physical use of the covered property imposed by the shutdown orders."). Ergo, she held:

> Whether or not Plaintiff in the instant matter actually undertook such changes, or resumed its business at a new location, is of no moment. The "period of restoration" does not require repairs, rebuilding, replacement, or relocation of Plaintiff's property in order for Plaintiff to be entitled to coverage. The "period of restoration" merely imposes a time limit on

available coverage, which ends when such measures, if undertaken, would have been completed with reasonable speed and similar quality. To put this another way, the "period of restoration" ends when Plaintiff's business is once again operating at normal capacity, or reasonably could be operating at normal capacity. The "period of restoration" does not somehow redefine or place substantive limits on types of available coverage. Defendants cannot avoid providing coverage that is otherwise available simply because the end point with regard to the "period of restoration" may be, at times, slightly more difficult to pinpoint in the context of the COVID-19 pandemic.

Id.  Judge Ward later issued a comparable ruling in granting an insured's motion for partial summary judgment seeking declaratory judgment relief with regard to business income loss coverage.  *See*, MacMiles, LLC v. Erie Insurance Exchange, 2021 WL 3079941, at *6-9 (Alleg. Co. 2021), *as supplemented*, No. GD-20-7753, Ward, J., at pp. 14-18 (Alleg. Co. Aug. 2, 2021), *app. pending*, No. 740 WDA 2021 (Pa. Super.).

On May 20, 2021, Lawrence County Judge J. Craig Cox reached a contrary result in Venezie Sporting Goods, LLC v. Allied Ins. Co. of America, No. 10397 of 2020, Cox, J. (Lawrence Co. 2021), and sustained the insurer's preliminary objections based upon the "direct physical loss of or damage to property" provision and virus exclusion in the policy. After reviewing the foregoing decisions in The Scranton Club and Ungarean, Id. at pp. 9-17, he stated that "the Court finds the approach adopted by The Scranton Club Court and the United States District Courts for the Eastern, Middle and Western Districts of Pennsylvania to be persuasive and consistent with the language contained within the subject insurance policy." Id. at p. 19.  Judge Cox determined that "the analysis provided in Ungarean is not consistent with the language contained within the current insurance policy as closure of the facility to a majority portion of the public does not render the premises uninhabitable or rendered useless." Id.  He affirmed the denial of coverage on

the basis that "[i]t is apparent the COVID-19 pandemic did not demonstrably alter the components of Plaintiff's building nor did it cause any other form of physical damage to the property." Id. Moreover, he also rejected the availability of civil authority coverage since "Plaintiff's employees and staff were still permitted to access the property despite the orders, much in the same way as the dental practice in Brian Handel D.M.D. and the private social club in The Scranton Club." Id. at p. 20.

More recently, two members of the Court of Common Pleas of Philadelphia County issued decisions in business interruption insurance coverage cases on June 17, 2021. In Lehigh Valley Baseball, L.P. v. Philadelphia Indemnity Ins. Co., No. 0958, December Term 2020, Glazer, J. (Phila. Co. 2021), *app. pending*, No. 1413 EDA 2021 (Pa. Super.), Judge Gary Glazer, who authored the 2020 orders in the Ridley Park Fitness and Taps & Bourbon overruling the insurers' preliminary objections, sustained the insurer's demurrer and dismissed the insurance coverage action filed by the owner of Minor League Baseball teams. He noted that the policy in that case "contain[ed] an 'Exclusion of Loss Due to Virus or Bacteria,' upon which [the insurer] relie[d] heavily for its argument that there is no coverage for the MiLB insureds' business income losses sustained during the COVID-19 pandemic." Id. at p. 5. Referencing the "direct physical loss" requirement in the policy and the holdings in Port Authority and Hardinger, Judge Glazer stated that "[n]either the fact that the Major League Baseball teams failed to supply players for the 2020 season, nor the governmental stay-at-home- orders and other governmental responses to the pandemic, caused any physical alteration or impact to the [Minor League Baseball] insureds' real or personal property, nor to nearby real or personal property, nor did those events render real or personal property completely

uninhabitable or unusable." Id. at p. 8.  After emphasizing that the insureds had merely alleged that "the virus likely was physically present at their stadiums," he held that "[e]ven if such contamination constituted physical loss or damage, coverage for such loss or damage, and the resulting loss of business income, is clearly barred by the policies' virus exclusion because such 'loss or damage was caused by or resulted from a virus, bacterium, or other micro-organism that induces or is capable of inducing physical distress, illness, or disease.'"[8] Id. at p. 9.

On the same day, Philadelphia County Judge Nina Wright Padilla filed an Opinion in Spector Gadon Rosen Vinci P. C. v. Valley Forge Insurance Company, No. 1636, May Term 2020, Padilla, J. (Phila. Co. 2021), app. pending, No. 1314 EDA 2021 (Pa. Super.) granting the insurer's motion for summary judgment and dismissing a law firm's claim for business income, extra expense, and civil authority coverage.  The law firm "argue[d] that 'physical loss of . . . property does not require physical alteration to property, but instead solely requires a 'loss of use' of property," but she rejected that argument and "found that 'loss of use' of the property alone . . . is not enough to trigger coverage." Id. at p. 5 & n.10.  Judge Padilla underscored that "there is no allegation or evidence that the virus was actually present at the [law firm's] building or that the threat of the virus spreading made the property 'uninhabitable and unusable,'" and held that "the absence of direct physical loss of or damage to the property as described by Port Authority fails to trigger coverage under the business income and extra expense coverage of Valley Forge's policy," Id. at p.

---

[8] In a footnote, Judge Glazer also stated that "[t]o the extent that this ruling appears inconsistent with any prior ruling of this court in any similar coverage case, the court welcomes further motion practice in that case." Id. at p. 10 n.1.

7. She likewise found the civil authority coverage inapplicable since "[t]here [wa]s no evidence that the virus was present at the property necessitating the issuance of the government shutdown orders or that the virus was present at a property locating within five miles of [the insured's] law office." Id. at p. 8.

Three weeks ago, we considered another case-dispositive motion presented by an insurer in an action that was filed by a gym and fitness center which sought business income, extra expense, and civil authority coverage for the revenues that it lost and the additional costs it incurred due to the COVID-19 public health emergency and the resulting government closure orders. Unlike The Scranton Club, the insurance policy in Brown's Gym did not contain a virus exclusion in its business interruption insurance coverages, and the gym had specifically averred that the SARS-CoV-2 virus was continuously present on its covered premises and the neighboring properties, and that all public access to the insured property was prohibited as a consequence. Brown's Gym, supra, at *2, 4. In overruling the insurer's demurrer, we reasoned:

> Prior to the COVID-19 pandemic, appellate and state courts in this Commonwealth established a "reasonable and realistic standard for identifying physical loss or damage" to property in cases "where sources unnoticeable to the naked eye" substantially reduced the use of the property, and held that an insured may satisfy the "direct physical loss or damage" requirement for insurance coverage if the infectious pathogen, disease-causing agent, or contaminant renders the property "useless or uninhabitable," or the property's functionality is "nearly eliminated or destroyed" by that invisible source. Under this "physical contamination" theory, courts concluded that ammonia fumes, e-coli bacteria, carbon-monoxide, gas vapors, lead intrusion, and odor from cat urine or methamphetamine cooking, which made covered premises unusable, unsafe, or unfit for their intended use, constituted "physical loss or damage" for purposes of insurance coverage. In the wake of the COVID-19 pandemic and the accompanying government closure orders, better reasoned decisions across the country have applied the "physical contamination" theory in recognizing the applicability of business

- 36 -

interruption insurance coverage only if the insured asserts that (a) the coronavirus was actually present on or attached to surfaces on the covered property, and (b) its presence caused the insured premises to become uninhabitable, unusable, inaccessible, or unduly dangerous to use.

Based upon the gym's specific averments regarding the "continuous presence" of the coronavirus on its property that rendered it unusable, unsafe, inaccessible, and unfit for its intended use, the gym has sufficiently alleged "direct physical loss or damage" to its property under the "physical contamination" theory as a necessary condition to business interruption insurance coverage.

Id. at *1-2. The availability of business income and extra expense coverage was also deemed to be supported by the language of the policy in that "[the insurer's] business income and extra expense provisions identif[ied] 26 exclusions from coverage, but not a virus exclusion, and implie[d] that virus-related damages [we]re not intended to be similarly excluded from that same coverage." Id. at *21.

As interpreted by the foregoing state court rulings, Port Authority and Hardinger confirm that, in cases claiming "physical damage" to property caused by "sources unnoticeable to the naked eye," the contaminant, pathogen, or other offending microorganism must render the insured structure uninhabitable or unusable, or nearly destroy its functionality, in order to constitute "physical damage" for purposes of business interruption insurance coverage. Brown's Gym, supra, at *5. An insured's failure to allege that the coronavirus was present on the covered premises is fatal to a claim for business income or extra expense coverage. Spector Gadon Rosen Vinci, supra, at p. 7; The Scranton Club, supra, at *4, 15. Furthermore, the fact that the insured still enjoys limited or modified use of the property, notwithstanding a government closure order, generally makes civil authority coverage inapplicable. Venezie Sporting Goods, supra, at p. 20; Isaac's at Spring Ridge, supra, at p. 7. Additionally, Ungarean stands for the

minority proposition that the phrase "direct physical loss" encompasses "the act of losing possession and/or deprivation" of property, "which includes the loss of use of property absent any harm to property." The merits of the parties' insurance coverage arguments will be considered with the benefit of that decisional guidance.

### (D)  PHYSICAL DAMAGE FROM CORONAVIRUS CONTAMINATION OF PROPERTY

CNA, Continental Insurance, and Continental Casualty contend that the "policy expressly and unambiguously provides that business interruption losses are covered only if those losses result from direct physical loss of or damage to covered property," as a result of which SWB's claims for business income, extra expense, and civil authority coverage must be dismissed due to its failure to allege any direct "physical damage" or "physical loss" to its covered property. (Docket Entry No. 13 at p. 9).  In insurance disputes, "it is a necessary prerequisite to recovery upon a policy for the insured to show a claim within the coverage provided by the policy." McEwing v. Lititz Mut. Ins. Co., 77 A.3d 639, 646 (Pa. Super. 2013); Brogan, 35 Pa. D. & C. 5th at 525.  It bears noting that SWB purchased an "all risk," as opposed to a "named perils" or "specific perils," policy. "Named perils" or "specific perils" policies provide coverage only for those specific risks that are enumerated in the policy, and exclude all other risks that are not expressly identified in the policies. Western Metal Bed Co., Inc. v. Lexington Ins. Co., 2007 WL 5479851, at *4 n.19 (Phila. Co. 2007), aff'd, 963 A.2d 581 (Pa. Super. 2008); 7 Couch On Insurance § 101; 7 (3d ed.).  In contrast, "the policy in this case is an 'all risk' policy, meaning that all losses to the [building] and its contents are covered except for those specifically excluded." Spece v. Erie Ins. Group, 850 A.2d 679, 683 (Pa. Super. 2004).

SWB has averred that the coronavirus was present on its property and that such contamination can constitute physical damage, and in the alternative, contends that the "loss of use" of its property also qualifies as "physical loss." (Docket Entry No. 17 at pp. 12-14, 18-20). Under the physical contamination theory proposed by SWB's in its first argument, "[t]he presence of bacteria, odor, smoke or noxious gases may constitute physical loss or damage where insured property has been rendered uninhabitable or unusable for its intended purpose." Scott G. Johnson, "What Constitutes Physical Loss or Damage in a Property Insurance Policy?," 54 Tort Trial & Ins. Prac. L. J. 95, 114 (Winter 2019). Prior to the decision by the Supreme Court of Colorado in Western Fire Ins. Co., other courts had "suggest[ed] that physical loss or damage requires a demonstrable physical change to insured property." Id. at 100. In Western Fire Ins. Co., gasoline had infiltrated "the soil under and around the [church] building" that was insured, and gasoline vapors throughout the "hall and rooms of the church building" made "the same uninhabitable" and rendered "the use of the building dangerous." Western Fire Ins. Co., 165 Colo. at 36-37, 437 P.2d at 54. Rejecting the property insurer's contention "that the insured sustained no 'direct physical loss,'" the court reasoned that gasoline infiltration on other property and the resulting vapors caused the building to become "uninhabitable" and made "further use of the building highly dangerous," as a result of which "the insured established that there was a direct physical loss occasioned to the church building within the policy period of the insurance contract." Id. at 39-40, 437 P.2d at 55.

Almost 30 years ago, the Cumberland County court adopted the reasoning in Western Fire Ins. Co. in deciding whether property damage coverage was applicable after a "fuel oil tank ruptured, spilling approximately 250 gallons of oil into the ground causing

the pollution of ground water." Hetrick, 15 Pa. D. & C. 4th at 271. Relying upon the rationale in Western Fire Ins. Co., that "direct physical loss" can be established where contamination makes "the building uninhabitable and highly dangerous to use," Hetrick "conclude[d] that an oil spill which pollutes the ground water may make a building uninhabitable," and that "if the building is uninhabitable, then there is a direct loss to that building." Id. at 273-274 (citing Gibson v. Secretary of U. S. Dept. of Housing, 479 F.Supp.3 (M.D. Pa. 1978)).

As noted in Section II(C)(1) above, the Third Circuit Court of Appeals has cited Western Fire Ins. Co. with approval, see Port Authority, 311 F.3d at 235; and also described Hetrick as "instructive." Hardinger, 131 Fed. Appx. at 826 n.4. Prior to the onset of the COVID-19 pandemic, courts throughout the country adopted the contamination theory in recognizing that the existence of odors, bacteria, and other imperceptible agents such as ammonia, salmonella, lead, e-coli bacteria, and carbon-monoxide, may constitute physical damage or loss to a property if its presence renders the structure uninhabitable or unusable, or essentially destroys its functionality. See Mellin v. Northern Security Ins. Co., Inc., 167 N.H. 544, 548, 550, 115 A.3d 799, 803, 805 (2015) (finding that the pervasive odor of cat urine was "physical loss to the property," "conclud[ing] that 'physical loss' need not be read to include only tangible changes to the property that can be seen or touched, but can also encompass changes that are perceived by the sense of smell," and "hold[ing] that physical loss may include not only tangible changes to the insured property, but also changes that are perceived by the sense of smell and that exist in the absence of structural damage."); Netherlands Ins. Co. v. Main Street Ingredients, LLC, 745 F.3d 909, 916-917 (8th Cir. 2014) (insured sustained physical

damage under its commercial insurance policy when its dried milk and instant oatmeal became contaminated with salmonella); Widder v. Louisiana Citizens Prop. Ins. Corp., 82 So. 3d 294, 296 (La. App. 4 Cir. 2011) (reversing trial court ruling that lead contamination in a home was not a "direct physical loss" for which there was coverage, and "find[ing] the intrusion of the lead to be a direct physical loss that has rendered the home unusable and uninhabitable."), cert. denied, 76 So. 3d 1179 (La. 2011); Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 406 (1st Cir. 2009) ("[W]e are persuaded both that odor can constitute physical injury to property under Massachusetts law, and also that allegations that an unwanted odor permeated the building and resulted in a loss of use of the building are reasonably susceptible to an interpretation that physical injury to property has been claimed."); General Mills, Inc. v. Gold Medal Ins. Co., 622 N.W.2d 147, 152 (Minn. Ct. App. 2001) (concluding that a food manufacturer sustained direct physical damage to its cereal product after the oats were treated with an unapproved pesticide, and reasoning "that direct physical loss can exist without actual destruction of property or structural damage to property; it is sufficient to show that insured property is injured in some way."); Azalea, Ltd. v. American States Ins. Co., 656 So.2d 600, 602 (Fla. Ct. App. 1995) (reversing trial court and finding that a direct physical loss had been established after an unseen contaminant entered the insured's sewage treatment system and destroyed the bacteria colony that was integral to its operation); Farmers Ins. Co. of Oregon v. Trutanich, 123 Or. App. 6, 10-11, 858 P.2d 1332, 1335-36 (1993) (rejecting insurer's contention that the trial "court erred in ruling that [the insured's] losses caused by odor from the methamphetamine 'cooking' constituted 'direct physical loss,'" and holding that damages caused by odor from methamphetamine cooking represented direct

physical loss covered by the policy); Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of America, 2014 WL 6675 934, at *6 (D.N.J. 2014) (stating that "non-structural property damage claims have found that buildings rendered uninhabitable by dangerous gases or bacteria suffered direct physical loss or damage," and finding "that the ammonia release physically transformed the air within Gregory Packaging's facility so that it contained an unsafe amount of ammonia or that the heightened ammonia levels rendered the facility unfit for occupancy until the ammonia could be dissipated," such "that the ammonia discharge inflicted 'direct physical loss of or damage to' Gregory Packaging's facility."); Association of Apartment Owners of Imperial Plaza v. Fireman's Fund Insurance Company, 939 F.Supp.2d 1059, 1068-69 (D. Haw. 2013) (concluding that the invisible release of arsenic and resulting contamination of the building's carpet, concrete, and interior objects established "direct physical damage" to the building); TRAVCO Ins. Co. v. Ward, 715 F.Supp.2d 699, 709 (E.D. Va. 2010) (toxic gas released by defective drywall, which rendered the home uninhabitable, satisfied the "direct physical loss or damage" requirement), aff'd, 504 Fed. Appx. 251 (4th Cir. 2013); Stack Metallurgical Services, Inc. v. Travelers Indemnity Co. of Connecticut, 2007 WL 464715, at *8 (D. Or. 2007) (finding that the release of lead, which prevented the use of a furnace for its expected purpose, was "fairly characterized as 'direct physical damage'" to the furnace); Cooper v. Travelers Indemnity Co. of Illinois, 2002 WL 32775680, at *5 (N.D. Cal. 2002) (concluding that the suspension of a tavern's operations "resulted from direct physical damage to the property" since it was caused by e-coli bacteria in well water); Yale University v. Cigna Ins. Co., 224 F.Supp.2d 402, 413-414 (D. Conn. 2002) (presence of lead contamination constituted physical loss or damage to property); Prudential Prop. &

Cas. Ins. Co. v. Lillard-Roberts, 2002 WL 31495830, at *8-9 (D. Or. 2002) (stating "that physical damage can occur at the molecular level and can be undetectable in a cursory inspection," and finding that "[b]ecause mold may be a 'direct' and 'physical' loss covered by the policy in this case, Prudential is not entitled to summary judgment."); Matzner v. Seaco Ins. Co., 1998 WL 566658, at *4 (Mass. Super. 1998) (concluding "that carbon-monoxide contamination constitutes 'direct physical loss of or damage to' property, namely the insured building, 'caused by or resulting from any covered cause of loss,' namely the *risk* of carbon monoxide contamination.")(emphasis in original); Arbeiter v. Cambridge Mut. Fire Ins. Co., 1996 WL 1250616, at *2 (Mass. Super. 1996) ("The existence of fumes may be a physical loss. The plaintiffs argue persuasively that fumes are a physical loss which attaches to the property.").

At the outset of the COVID-19 public health crisis, and in anticipation of insurers' arguments that insureds could not satisfy the "physical damage" requirement for business interruption insurance coverage, insurance law commentators opined:

> Business owners should argue that the mere presence of the coronavirus constitutes "physical damage" to business premises because the coronavirus attaches to surfaces and is capable of causing potentially fatal infection upon contact and prevents business owners from using and enjoying their property.

Charles S. LiMandri, Milan L. Brandon and Noel J. Meza, "Business Interruption Coverage for the COVID-19 Pandemic: Insurance Industry Fights Biggest Battle Ever Against Difficult Odds," *Insurance Litigation Reporter*, Vol. 42, No. 10 at p. 285 (June 19, 2020). They indicated that "scientific research confirms that the coronavirus can linger on surfaces for days and that it can be transmitted through 'fomites' (objects or materials likely to carry infection, such as furniture)." Id. (citing Neetjle van Dormalen et

- 43 -

al., "Aerosol and Surface Stability of SARS-CoV-2 as compared with SARS-CoV-1," 382 New Eng. J. Med. 1564 (2020)). As for any resulting repairs to restore the property in the wake of the novel coronavirus, those commentators stated that "a strong argument can be advanced that 'there was a physical deposit of hazardous biological material (coronavirus particles) upon property, such that disinfection was reasonably required before the property could be used again." Id. at 286 (quoting Nick Bond and Mark Maclean, "Is Coronavirus Contamination Considered Property Damage in the Context of Business Interruption Insurance?," *Kennedys Law* (Mar. 26, 2020)).

Studio 417, Inc. v. Cincinnati Ins. Co., 478 F.Supp.3d 794 (W.D. Mo. 2020) is the first reported case that employed such a rationale in addressing Cincinnati's denial of a coronavirus-related business interruption insurance claim on the basis that "direct physical loss requires actual, tangible, permanent, physical alteration of property." Id. at 800. The hair salons in that case had alleged "that COVID-19 'is a physical substance,' that it 'lives on' and is "active on inert physical surfaces," and "attached to and deprived [them] of their property, making it 'unsafe and unusable, resulting in a direct physical loss to the premises and property.'" Not unlike SWB's policy, Cincinnati's policy in Studio 417 did not define the words "direct," "physical," "loss," or "damage." Id. Citing Port Authority, the federal district court stated that "[o]ther courts have similarly recognized that even absent a physical alteration, a physical loss may occur when the property is uninhabitable or unusable for its intended purpose." Id. at 801. In finding that the salons had adequately alleged that they suffered direct physical loss or damage, Studio 417 stressed that they had averred "that COVID-19 particles attached to and damaged their property, which made their premises unsafe and unusable." Id. at 802. *Accord* NeCo, Inc. v.

- 44 -

Owners Ins. Co., 2021 WL 601501, at *4 (W.D. Mo. 2021) (holding that "Plaintiff has adequately alleged a claim for direct physical loss" by asserting "that COVID-19 was present on Plaintiff's premises" and that "the presence of COVID-19 on property impairs its value, usefulness, and/or normal function."); Blue Springs Dental Care, LLC v. Owners Ins. Co., 488 F.Supp.3d 867, 874 (W.D. Mo. 2020) (denying motion to dismiss for failure to allege physical damage in light of dental clinics' allegations that it "suspended operations due to COVID-19 to prevent physical damages to the premises by the presence or proliferation of the virus" and "that COVID-19 physically attached itself to their dental clinics, thereby depriving them of the possession and use of those insured properties.").

Elegant Massage, LLC v. State Farm Mutual Auto. Ins. Co., 506 F.Supp.3d 360 (E.D. Va. 2020) utilized similar reasoning in treating COVID-19 contamination of insured premises like contamination by ammonia, toxic gas, or noxious odors when determining whether the direct physical loss or damage threshold for coverage was met. The trial court in that action deemed it "plausible that a fortuitous 'direct physical loss' could mean that the property is uninhabitable, inaccessible, or dangerous to use because of intangible, or non-structural, sources." Id. at 376. In denying the insurer's motion to dismiss, Elegant Massage stated:

> Here, while the Light Stream Spa was not structurally damaged, it is plausible that Plaintiff experienced a direct physical loss when the property was deemed uninhabitable, inaccessible, or dangerous to use by the Executive Orders because of its high risk for spreading COVID-19, an invisible but highly lethal virus. That is, the facts of this case are similar to those where courts found that asbestos, ammonia, odor from methamphetamine lab, or toxic gasses from drywall, which caused properties to become uninhabitable, inaccessible, and dangerous to use, constituted a direct physical loss.

Id. *See also* Cibus, LLC v. Eagle West Ins. Co., 2021 WL 1566306, at *5 (D. Ariz. 2021)
(following Studio 417 and holding that plaintiff "sufficiently alleged that [it] suffered a
direct physical loss of or damage to its property when COVID-19 contaminated the
property and that this physical loss caused the business disruption and extra expenses.");

Last month, the United States Court of Appeals for the Eighth Circuit considered
an appeal involving the "physical loss" or "physical damage" requirement under Iowa
law. The oral and maxillofacial surgery group in Oral Surgeons, P.C. v. Cincinnati Ins.
Co., 491 F.Supp.3d 455 (S.D. Iowa 2020) did not allege that the coronavirus was present
in its offices, and "instead contend[ed] its loss was caused by the COVID-19 coronavirus
and the government actions to suspend temporarily non-emergency dental procedures."
Id. at 456. On appeal, the Eighth Circuit considered "only the question whether the
COVID-19 pandemic and the related-government imposed restrictions constitute direct
'accidental physical loss or accidental physical damage' under the policy" and Iowa law.
Oral Surgeons, P.C. v. Cincinnati Ins. Co., 2021 WL 2753874, at *3 n. 2 (8th Cir. 2021).
Although the appellate court affirmed the lower court dismissal and rejected the
"conten[tion] that 'physical loss' occurs whenever the insured is physically deprived of
the insured property," Id. at *1; it reasoned that "there must be some physicality to the
loss or damage of property – *e.g.*, a physical alteration, *physical contamination*, or
physical destruction." Id. at *2 (emphasis added).

In order for an insured to sustain a claim of physical loss or damage based upon the
contamination theory recognized in Studio 417, the insured must expressly aver that the
coronavirus was present on its covered property. *See* Hair Studio 1208, LLC v. Hartford

Underwriters Ins. Co., 2021 WL 1945712, at *8 (E.D. Pa. 2021) ("Unlike in [Hardinger] where there were specific allegations of bacteria in the insured property, Plaintiff does not assert the presence of COVID-19 on its property."); Muriel's New Orleans, LLC v. State Farm Fire and Cas. Co., 2021 WL 1614812, at *8 (E.D. La. 2021) ("find[ing] the reasoning in Studio 417 inapplicable here" because "Muriel's does not allege that COVID-19 physically infiltrated the premises; rather, Muriel's alleges that 'the shutdown orders issued by the City of New Orleans and the State of Louisiana, and their effects on Muriel's business, property, and operations, constitute a direct physical loss to covered property.'"); Goodwill Industries of Central Oklahoma, Inc. v. Philadelphia Indemnity Ins. Co., 499 F.Supp.3d 1098, 1104 (W.D. Ok. 2020) ("Here, however, Goodwill only states that the government's mandated closures rendered it unusable, not that COVID-19 attached to or deprived it of its property."). In fact, we found Studio 417 to be inapplicable in The Scranton Club because there had "never been an allegation by the Scranton Club that the presence of the novel coronavirus on its property" rendered "it uninhabitable or unusable," and to the contrary, the Scranton Club had distinctly alleged that "its 'loss of business income was not caused by a virus within its premises.'" The Scranton Club, supra, at *4, 15. The federal district court in Mudpie, Inc. v. Travelers Casualty Ins. Co. of America, 487 F.Supp.3d 834 (N.D. Cal. 2020) also found "that Mudpie has failed to establish a 'direct physical loss of property' under its insurance policy," but further explained:

> Had Mudpie alleged the presence of COVID-19 in its store, the Court's conclusion about an intervening physical force would be different. SARS-CoV-2 - - the coronavirus responsible for the COVID-19 pandemic, which is transmitted either through respiratory droplets or through aerosols which can remain suspended in the air for prolonged periods of time - - is no less a

"physical force" than the "accumulation of gasoline" in Western Fire Insurance or the "ammonia release which physically transformed the air" in Gregory Packaging.

Id. at 841 & n.7. *Accord* Cinemark Holdings, Inc. v. Factory Mutual Ins. Co., 500 F.Supp.3d 565, 569 (E.D. Tex. 2021) ("Unlike Selery [Fullfillment, Inc. v. Colony Ins. Co., 2021 WL 963742 (E.D.Tex. 2021)], Cinemark alleges that COVID-19 was actually present and actually damaged the property by changing the content of the air."); Derek Scott Williams PLLC v. Cincinnati Ins. Co., 2021 WL 767617, at *2, 4 (N.D. Ill. 2021) (addressing Cincinnati's contentions "that physical *alteration* to the property is required" and that coronavirus contamination "does not constitute damage to an insured's property because it can be removed by cleaning," and concluding "that a reasonable factfinder could find that the term 'physical loss' is broad enough to cover, as Williams argues, a deprivation of the use of its business premises.")(emphasis in original); Henderson Road Restaurant Systems, Inc. v. Zurich American Ins. Co., 2021 WL 168422, at *13 (N.D. Oh. 2021) ("After considering the ordinary definitions of the undefined words in the policy, the Court finds that the Plaintiffs have shown that their business operations were suspended by direct physical loss of or damage to property at the premises" due to the presence of the coronavirus there.).

State trial courts throughout the nation have agreed with the foregoing rationale articulated in the federal case law in denying insurers' attempts to dismiss business interruption insurance claims filed by insureds who assert that the SARS-CoV-2 virus was present on their covered property. *See, e.g.*, McKinley Development Leasing Co. Ltd. v. Westfield Ins. Co., 2021 WL 506266, at *4 (Stark Co. Oh. 2021) (following Henderson Road Restaurant and holding that "McKinley has adequately stated a claim for direct

physical loss" from the presence of the coronavirus); Goodwill Industries of Orange Co. v. Philadelphia Indemnity Ins. Co., 2021 WL 476268, at *3 (Orange Co. Calif. 2021) (citing Studio 417, noting that the insured alleged "that coronavirus and COVID-19 were present at its properties at the time of the State and County closure orders," and declining to hold "as a matter of law that the coronavirus and COVID-19 have not, in some manner, caused physical damage to property."); Cherokee Nation v. Lexington Ins. Co., 2021 WL 506271, at *4-5, 9 (Cherokee Co. Okl. 2021) (finding that an averment that the existence of the coronavirus on its covered property "rendered it unusable for its intended purpose" established "direct physical loss or damage."); North State Deli, LLC v. The Cincinnati Ins. Co., 2020 WL 6281507, at *3 (N.C. Super. 2020) (stating "that the ordinary meaning of the phrase 'direct physical loss' includes the inability to utilize or possess something in the real, material, or bodily world," finding that "Plaintiffs were expressly forbidden by government decree from accessing or putting their property to use for the income-generating purposes for which the property was insured," and concluding that "this loss is unambiguously a 'direct physical loss,' and the policies afford coverage").  In addition, the federal district court in Legacy Sports Barbershop, LLC v. Continental Casualty Co., 2021 WL 2206161 (N.D. Ill. 2021) fashioned an alternative test for determining whether the coronavirus caused a "distinct, demonstrable, physical alteration" of the covered premises.  Id. at *2.  It noted that the insureds not only alleged "that COVID-19 was present on their properties," but further averred that they were required to "install social distancing barriers" and other measures "to promote proper social distancing."  Id. at *3.  In denying the insurer's motion to dismiss, Legacy Sports Barbershop reasoned that the insured "sufficiently alleged that the properties underwent a 'distinct, demonstrable,

physical alteration' and therefore suffered 'physical loss of or damage to' the properties"
as a result of the presence of the coronavirus and the resulting installation of social
distancing protections.  Id.

The policy in question does not define the words "direct," "physical," "loss," or
"damage." "Words of 'common usage' in an insurance policy are to be construed in their
natural, plain, and ordinary sense, and a court may inform its understanding of these terms
by considering their dictionary definitions." Allstate Fire and Cas. Ins. Co. v. Hymes, 29
A.3d 1169, 1172 (Pa. Super. 2011), app. denied, 616 Pa. 625, 46 A.3d 715 (2012).
Dictionaries define "the adjective 'direct' as 'stemming immediately from a source' and
'characterized by close logical, causal, or consequential relationship.'" DiFabio v.
Centaur Ins. Co., 366 Pa. Super. 590, 595, 531 A.2d 1141, 1143 (1987).  "'Physical' is
defined as 'having material existence: perceptible especially through the senses and
subject to the laws of nature.'" Tria WS LLC, supra, at *4.  Damage means "loss or harm
resulting from injury to person, property, or reputation." Com v. White, 2017 WL
5187751, at *4 (Pa. Super. 2017); 44 Hummelstown Associates, supra, at *7.  "Loss"
refers to "destruction, ruin" and "the act of losing possession" or "deprivation." 44
Hummelstown Associates, supra; Ungarean, supra, at *6.

Under the "reasonable and realistic standard for identifying physical loss or
damage" established in Port Authority and Hardinger for cases "where sources
unnoticeable to the naked eye" substantially reduce the use of property, an insured may
satisfy the "direct physical loss or damage" prerequisite for coverage if the invisible agent
renders the property "useless or uninhabitable," or the property's functionality is "nearly
eliminated or destroyed" by that source.  In pre-COVID-19 case law, including the

Western Fire Insurance decision cited by Port Authority and Hardinger, the requisite "physical loss or damage" was established when vapors, odors, fumes, and other contaminants from ammonia, carbon-monoxide, arsenic, salmonella, lead, and other non-visual sources made property uninhabitable or unusable, or nearly destroyed or eliminated its functionality. Thus, in instances where the insured avers that the SARS-CoV-2 virus was present on the insured premises and caused the covered property to become uninhabitable or unusable, or nearly eliminated or destroyed its functionality, the conclusion in Studio 417 and its progeny that "physical loss or damage" is sufficiently alleged is consistent with the physical contamination theory formulated in Port Authority and Hardinger. Brown's Gym, supra, at *20. Such "loss or harm" to property "stem[s] immediately from a [coronavirus] source," and is perceptible "through the senses and subject to the laws of nature."[9] As some commentators have observed, "[t]he virus does not need to 'wreck' some property; it just has to be present to make the property unusable to the policyholder." Erik S. Knutsen & Jeffrey W. Stempel, "Infected Judgment: Problematic Rush to Conventional Wisdom and Insurance Coverage Denial in

---

[9]Our Supreme Court has stated "[w]e have no hesitation in concluding that the ongoing COVID-19 pandemic equates to a natural disaster." Pennsylvania Democratic Party v. Boockvar, 238 A.3d 345, 370 (Pa. 2020), cert. denied sub nom., Republican Party of Pennsylvania v. Degraffenreid, 141 S.Ct. 732 (U.S. 2021). In support of their argument that the coronavirus causes physical damage to property, some insureds have quoted the following language used by the Supreme Court in first holding that the COVID-19 pandemic qualified as a "natural disaster" under the Emergency Management Services Code, 35 Pa.C.S. §§ 7101-79a31:

> First, the specific disasters in the definition of "natural disaster" themselves lack commonality, as while some are weather related (e.g., hurricane, tornado, storm), several others are not (tidal wave, earthquake, fire, explosion). To the contrary, the only commonality among the disparate types of specific disasters referenced is that *they all involve "substantial damage to property,* hardship, suffering or possible loss of life." In this respect, *the COVID-19 pandemic is of the "same general nature or class as those specifically enumerated,"* and thus is included, rather than excluded, as a type of "natural disaster."

Friends of Danny DeVito, 227 A.3d at 888-889(emphasis added).

a Pandemic," 27 Conn. Ins. L.J. 186, 241 (2020). Based upon SWB's averments regarding the "continuous presence" of the coronavirus on its covered premises that rendered its property "unsafe" and "unfit for its intended use," (Docket Entry No. 1 at ¶ 49), SWB has adequately alleged "physical loss or damage" to its property under the contamination theory for purposes of business interruption insurance coverage. *Compare* Lehigh Valley Baseball, *supra*, at p. 9 (denying coverage where insured merely alleged that the coronavirus was "likely present" on its property, and stating that "[e]ven if such contamination constituted physical loss or damage," business interruption coverage was "clearly barred by the policies' virus exclusion.").

A finding of business interruption insurance coverage based upon the facts alleged is also supported by hornbook principles of insurance contract construction and the specific language contained in the subject policy. "An insurance policy must be read as whole, and not 'in discrete units.'" Clarke v. MMG Ins. Co., 100 A.3d 271, 276 (Pa. Super. 2014) (quoting Luko v. Lloyd's London, 393 Pa. Super. 165, 573 A.2d 1139, 1142 (1990)), *app. denied*, 632 Pa. 666, 117 A.3d 294 (2015). When construing an insurance contract, the court must give effect to all of the policy's language and not treat any of its provisions "as mere surplusage." Penn Psychiatric Center, *supra*, at *5; Indalex, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA, 83 A.3d 418, 421 (Pa. Super. 2013), *app. denied*, 627 Pa. 759, 99 A.3d 926 (2014); Millers Capital Ins. Co. v. Gambone Bros. Development Co., Inc., 941 A.2d 706, 715 (Pa. Super. 2007), *app. denied*, 600 Pa. 734, 963 A.2d 471 (2008). "Indeed, if the court is 'forced to choose between two competing interpretations of an insurance policy, we are bound, as a matter of law, to choose the

interpretation which allows us to give effect to all of the policy's language.'" Clarke, 100

A.3d at 276 (quoting Millers Capital Ins. Co., 941 A.2d at 716).

The policy in this case identifies 30 separate exclusions from coverage in its Group

1, Group 2, and Time Element exclusions. (Docket Entry No. 1 at pp. 57-60). Included

among those stated exclusions are exclusions from business interruption coverage for any

damages caused by "contaminants," "pollutants," "fungi," and "microbes." Those

exclusions would arguably render coverage inapplicable for the physical harm at issue in

Hardinger, Western Fire Insurance, General Mills, and Azalea Ltd. " Insurers cannot

claim that the [COVID-19] pandemic was completely unforeseen as an event,"

particularly in light of the "health epidemics in recent decades, from Ebola to SARS

H1N1, swine flu, Zika, MERS, and HIV/AIDS." Knutsen & Stempel, 27 Conn. Ins. L.J.

at 196. Nevertheless, no virus exclusion is included among the 30 exclusions from

business income and extra expense coverage in the subject policy, even though CNA,

Continental Insurance, and Continental Casualty alone possessed the power, as the sole

drafters of the policy, to preclude such coverage for any loss caused by a virus. See

Housing and Redevelopment Ins. Exchange v. Lycoming County Housing County, 58 Pa.

D. & C. 4th 321, 346-347 (Lacka. Co. 2001) ("We are mindful that [the insurer], as the

drafter of the insurance policy, had the ability to control its exposure and indemnity

obligations by inserting language that expressly excluded liability for constitutional torts,

or by defining the phrase 'wrongful act' more narrowly so as to eliminate coverage for

claims involving violations of the First Amendment, Due Process Clause, or

Whistleblower Law."), aff'd, 809 A.2d 1096 (Pa. Cmwlth. 2002).

"The maxim *expressio unius est exclusio alterius* is applicable to insurance policy exclusions." Slate Construction Co. v. Bituminous Cas. Corp., 228 Pa. Super. 1, 8 n.9, 323 A.2d 141, 145 n.9 (1974) (*en banc*). Under that interpretive rule, "the mention of one thing implies the exclusion of another thing." Clarke, 100 A.3d at 276. The fact that the business income and extra expense provisions in the policy drafted by CNA, Continental Insurance, and Continental Casualty identify 30 exclusions from coverage, but not a virus exclusion, implies that virus-related damages are not intended to be similarly excluded from that same coverage. *See* Mutual of Omaha Ins. Co. v. Bosses, 428 Pa. 250, 252, 237 A.2d 218, 219 (1968) ("When . . . the insurer declared that undisclosed sickness would not be covered by the policy, it excluded rescission. *Expressio unius est exclusio alterius*.").

The applicability of SWB's business interruption coverage for physical damage caused by the coronavirus is also consistent with "the reasonable expectations of the insured" based upon "the totality of the insurance transaction involved." Consolidated Rail Corp., 182 A.3d at 1026. SWB has averred that its "[p]olicy is an 'all-risk' policy that provides broad coverage for losses caused by any cause unless expressly excluded." (Docket Entry No. 1 at ¶ 39). It further asserts that "unlike many commercial property policies available in the market, the policy sold by [CNA, Continental Insurance, and Continental Casualty] does not include an exclusion for loss caused by a virus," as a result of which SWB "reasonably expected that the insurance it purchased from [them] included coverage for property losses and business interruption losses caused by viruses like the COVID-19 virus." (Id. at ¶ 33). Based upon the totality of the circumstances alleged in the complaint, a legitimate argument can be made that SWB had a reasonable expectation

- 54 -

that business interruption coverage would be provided for losses caused by the presence of the SARS-CoV-2 virus on its covered premises.

Citing the language in the policy affording business interruption protection "for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property" affected, (Docket Entry No. 1 at p. 46), CNA, Continental Insurance, and Continental Casualty contend that the policy "requires the replacement or repair of property" as a condition to coverage. (Docket Entry No. 13 at p. 23). It is not clear and free from doubt that the proffered condition cannot be satisfied by any repairs or remedial measures undertaken by SWB in the form of "the installation of partitions" and "hand washing/sanitation stations" and other actions to renovate the covered premises in order to make the property safe for public use. *See* Legacy Sports Barbershop, supra, at *3. Giving effect to all the policy's language, including the exclusions stated, and not stated, in the policy, SWB has sufficiently alleged a claim for business interruption coverage based upon "physical damage" from the coronavirus under the physical contamination theory recognized in Port Authority and Hardinger. *See* Betz v. Erie Insurance Exchange, 957 A.2d 1244, 1255-56 (Pa. Super. 2008) (stating that an "all-risk" policy "by definition covers every kind of insurable loss except what is specifically excluded."), *app. denied*, 606 Pa. 659, 995 A.2d 350 (2010). Since CNA, Continental Insurance, and Continental Casualty have not established that it is clear and free from doubt that, based upon the facts alleged in the complaint and all inferences fairly deducible from those facts, SWB is unable to satisfy

the "physical damage" requirement for business interruption coverage, their motion for judgment on the pleadings on that basis will be denied.[10]

### (E)   TIME ELEMENT EXCLUSION

CNA, Continental Insurance, and Continental Casualty contend that even if SWB can establish the requisite "physical loss of or damage to" property, coverage is clearly precluded by the "Time Element Exclusion" which bars coverage for "[a]ny loss during a period which business would not or could not have been conducted for any reason other than physical damage of the type insured against herein."[11] (Docket Entry No. 13 at p. 5). They contend that "the Complaint places [SWB's] losses squarely within the scope of the policy's Time Element Exclusion," which prohibits coverage "for economic losses such as [SWB's], that occurred during a period in which business would not or could not have been conducted for any reason other than physical damage to the insured location." (Id. at p. 27). The insurers posit that "[s]imply put, the cancellation of the 2020 MiLB season means that regardless of the effect of Governor Wolf's Orders and regardless of the condition of [SWB's] property, [SWB] would not and could not have conducted its business during the 2020 MiLB season." (Id. at p. 28).

---

[10] In light of the denial of the insurers' case-dispositive motion based upon the contamination theory, it is unnecessary to address SWB's alternate argument that physical loss or damage to property includes the mere "loss of use" of the covered property. See Seifert v. IMT Ins. Co., 2021 WL 2228158, at *5 (D. Minn. 2021) ("In sum, the Court concludes that a plaintiff would plausibly demonstrate a direct physical loss of property by alleging that executive orders forced a business to close because the property was deemed dangerous to use and its owner was thereby deprived of lawfully occupying and controlling the premises to provide services within it."); In re Society Insurance Co. COVID-19 Business Interruption Protection Insurance Litigation, supra, at *9 (holding "a reasonable jury can find that the Plaintiffs did suffer a direct 'physical' loss of property on their premises" since "the pandemic-caused shutdown orders do impose a *physical* limit; the restaurants are limited from using much of their physical space.")(emphasis in original).

[11] The policy defines the phrase "Time Element" as "Business Interruption (Gross Earnings), Expediting Expense, Extra Expense, Rental Value, Leasehold Interest, Contingent Business Interruption (Gross Earnings), Rents." (Docket Entry No. 1 at p. 72).

SWB counters that the presence of the coronavirus on its insured property was the cause of its losses, as manifested by the cancellation of its 2020 minor league season. (Docket Entry No. 24 at p. 4). It submits that "it would have been able to conduct business" at its stadium "but for the actual presence" of the SARS-CoV-2 virus. (Id: at p. 5). SWB further argues that the exclusion is void as against public policy in that it renders the coverage illusory by failing to expressly identify "what is being excluded under the policy." (Id. at pp. 3-4).

An insurer who denies coverage based upon an exclusion in a policy has asserted an affirmative defense. Windows, 161 A.3d at 957. Therefore, where coverage is denied in reliance upon a policy exclusion, the insurer bears the burden of proving the applicability of the exclusion. Penn Psychiatric Center, supra, at *4; Nationwide Mutual Insurance Company v. Arnold, 214 A.3d 688, 695 (Pa. Super. 2019). Moreover, "policy exclusions are to be construed narrowly in favor of coverage," Mutual Benefit Ins. Co. v. Politsopoulos, 631 Pa. 628, 640 n.6, 115 A.3d 844, 852 n.6 (2015), and must be "'strictly construed against the insurer and in favor of the insured.'" Hebron, 197 A.3d at 272 (quoting Swarner v. Mutual Ben. Group, 72 A.3d 641, 645 (Pa. Super. 2013)).

With respect to the exclusions identified as "Group 1 Exclusions," the policy states that it "excludes loss or damage directly or indirectly caused by or resulting from any of the following [stated exclusions] regardless of (a) the cause of the excluded event; or (b) other causes of the loss; or (c) any other causes or events, whether or not insured under this policy, which may have contributed concurrently or in any sequence with the excluded event to produce the loss." (Docket Entry No. 1 at p. 57). The inclusion of such "anti-concurrent causation" language in insurance policy provisions addressing exclusions

from coverage has been interpreted as negating the application of the "concurrent causation" or "efficient proximate cause" doctrine, which states that when there are two or more causes of a loss, the policyholder's claim is covered as long as the proximate cause of the loss is covered by the policy.  Colella v. State Farm Fire and Casualty Co., 407 Fed.Appx. 616, 622 (3d Cir. 2011) (applying Pennsylvania law); Heller's Gas Inc. v. International Insurance Company of Hanover Ltd., 2017 WL 4119809, at *12 & n.117 (M.D. Pa. 2017); St. Mary's Area Water Authority v. St. Paul Fire & Marine Ins. Co., 472 F.Supp.2d 630, 636 (M.D. Pa. 2007).  For that reason, when a virus exclusion expressly incorporates anti-concurrent causation language, "the virus need only be one cause of loss, not the sole or proximate cause of loss, for the exclusion to bar coverage."  Moody Jones v. The Hartford Financial Group, Inc., 2021 WL 135897, at *9 (E.D. Pa. 2021); Zagafen Bala, LLC v. Twin City Fire Ins. Co., 2021 WL 131657, at *7 (E.D. Pa. 2021).

However, when an insurance policy does not include "anti-concurrent causation" wording in its provisions governing a particular exclusion, the applicability of that exclusion is governed by the "efficient proximate cause" or "concurrent causation" doctrine.  Colella, supra; St. Mary's Area Water Authority, supra.  The specific exclusion relied upon by CNA, Continental Insurance, and Continental Casualty is not included among the "Group 1 Exclusions," and instead is contained in the "Time Element Exclusions" which do not contain "anti-concurrent causation" language like the "Group 1 Exclusions."  (Docket Entry No. 1 at p. 60).  Consequently, the application of that "Time Element" exclusion is subject to the "efficient proximate cause" or "concurrent causation" doctrine.  The Scranton Club, supra, at *12.

-58-

Under the proximate cause analysis, a covered risk and an excluded risk may combine to concurrently cause a loss, with the resulting damage being covered by the policy. *See* Trexler Lumber Co. v. Allemannia Fire Ins. Co. of Pittsburgh, 289 Pa. 13, 17-18, 136 A. 856, 858 (1927) (where a windstorm (covered loss) and 16-20 inches of heavy snow (excluded loss) contributed to the collapse of the insured's lumber sheds, the property loss was covered since the windstorm "was the proximate cause of the loss" and the fact that snow pressure contributed to the collapse did "not defeat plaintiff's right of action ."); DiFabio v. Centaur Ins. Co., 366 Pa. Super. 590, 595-596, 531 A.2d 1141, 1143-44 (1987) (where a covered loss (windstorm) "blew the back doors off Ms. DiFabio's laundromat" and the "water pipes inside the laundromat froze and burst," the property damage claim was covered notwithstanding the policy exclusion for damage caused "by frost or cold weather," and despite the fact that "[c]ertainly both the wind and the cold weather contributed to the loss suffered by Ms. DiFabio."); Marks v. Lumbermen's Ins. Co. of Philadelphia, 160 Pa. Super. 66, 67-68, 49 A.2d 855, 856 (1946) (where a windstorm (covered risk) caused high waters to produce water damage (non-covered risk) to the property, the water damage claim was covered since the two risks contributed to the ultimate harm, but the windstorm was the proximate cause). As former Beaver County (now Superior Court) Judge Deborah Kunselman has aptly observed "[i]n essence, the efficient proximate cause rule states that a loss is covered under the insurance policy when the loss is caused by a covered peril, even though other excluded perils contributed to the loss." Tatalovich v. Pennsylvania Nat. Mut. Cas. Ins. Co., 2003 WL 22844173, at * 1 (Beaver Co. 2003) (holding that if the insureds could demonstrate that the proximate cause of the mold (excluded risk) was water leaking from the roof (covered

risk) into the bathroom where the mold was discovered, they "can recover under the terms of their insurance policy."). In denying the insurer's demurrer in The Scranton Club based upon the virus exclusion contained in the insurance policy sold by Tuscarora Wayne Mutual Group, we reasoned:

> The Scranton Club avers that the coronavirus was never present at its insured premises and that the cause of its business losses was the government closure orders, whereas Tuscarora asserts that the closure orders and resulting losses were solely traceable to COVID-19. The closure orders implemented across the nation were in response to the transmission of COVID-19 and the desire of state and local governments to control the further spread of that virus. But those closure orders were not issued uniformly, or even consistently, based upon the extent that the coronavirus was present in each state. While Pennsylvania continued to impose complete or partial restrictions on business activities, other states such as Florida, Georgia, and Texas, which had comparable or greater per capita incidence of positive COVID-19 cases, allowed their businesses to operate without limitations or with significantly lesser constraints. [footnote omitted] In that respect, the closure orders, rather than the novel coronavirus itself, determined the gains or losses experienced by the businesses in those states. Although the parties did not raise the disparity in the various states' closure orders in their submissions, it is appropriate to consider that documented variability in determining whether the law states with certainty that the coronavirus was the proximate cause of the Scranton Club's business losses.
>
> Tuscarora's virus exclusion lacks the anti-concurrent causation language contained in the insurance policies that were analyzed by the federal rulings cited by Tuscarora, as a result of which Tuscarora's demurrer may be sustained only if it is clear and free from doubt that, based upon the allegations of the Scranton Club's complaint, the virus exclusion bars coverage as a matter of law. Such a conclusion would necessitate a definitive finding that the coronavirus, not the particular closure orders issued in Pennsylvania, was the proximate cause of the Scranton Club's business losses. While those closure orders and the coronavirus may have been concurring causes of the Scranton Club's business losses, it cannot be declared as a matter of law that the coronavirus was the efficient proximate cause based upon the factual allegations of the complaint. See Henderson Road Restaurant System, supra, at * 14 (concluding that since there was "no known or presumed infected person with COVID-19 at any of the insured premises . . . it was clearly the government's orders that caused the closures."); Elegant Massage, LLC v. State Farm Mut. Auto Ins. Co., 2020

- 60 -

WL 7249624, at * 12-13 (E.D. Va. 2020) (finding that "in applying the virus exclusion there must be a direct connection between the exclusion and the claimed loss," noting that plaintiff did not allege "that there is a presence of a virus at the covered property," stating that the executive directives "selectively ordered that [plaintiff's spa] be closed as a preventative health measure" while "some businesses could continue operating despite the COVID-19 social distancing guidelines," and holding that the insurer "failed to meet its burden to show that the virus exclusion applies to plaintiff's claim."). Since that fact-specific proximate cause determination cannot be made as a matter of law based upon the Scranton Club's averments, and Pennsylvania law requires exclusionary clauses to be strictly construed in favor of the insured; Tuscarora's demurrer premised upon the virus exclusion will be overruled. *See* Urogynecology Specialist of Florida, LLC v. Sentinel Ins. Co., Ltd.; 2020 WL 5939172, at * 4 (M.D. Fla. 2020) ("Thus; without any binding case law on the issue of the effects of COVID-19 on insurance contracts' virus exclusions, the Court finds that Plaintiff has stated a plausible claim at this juncture.").

The Scranton Club, supra, at *13.

Applying that same rationale, and accepting as true SWB's allegations that the actual presence of the SARS-CoV-2 virus on its property was the principal reason why the 2020 season was cancelled and its insured stadium was rendered unusable, it cannot be held as a matter of law that the "efficient proximate cause" of SWB's losses was a reason other than the physical contamination of its property with the coronavirus. Coverage may exist under the "efficient proximate cause" or "concurrent causation" doctrine if an excluded peril and a covered risk combine to concurrently cause a loss. It is conceivable that the presence of the SARS-CoV-2 virus, MiLB's actions, and the government closure orders were concurrent causes

In preventing scheduled business from being conducted at the insured stadium.[12] Except in the clearest of cases where reasonable minds could not differ as to the "efficient proximate cause" of damage, those causation determinations are the province of the fact-finder, not the court. *See* Trexler Lumber Co., 289 Pa. at 19, 136 A. at 858 (in deciding "from which of concurrent causes the loss resulted," the issue of proximate cause "can be properly determined only by triers of the facts."); Tatalovich, *supra*, at *2 (denying insurer's motion for summary judgment based upon a policy exclusion, and finding that "[a] factual dispute still exists as to whether the mold was caused by a covered peril."). Based upon the facts alleged and admitted by SWB, and the failure of CNA, Continental Insurance, and Continental Casualty to include "anti-concurrent causation" language in their Time Element exclusion, an "efficient proximate cause" or "concurrent causation" determination cannot be made as a matter of law.

CNA, Continental Insurance, and Continental Casualty bear the burden of proving that it is "free from doubt," Mione, *supra*, that coverage is precluded by the Time Element exclusion, which must be construed narrowly in favor of SWB and the existence of coverage. Politsopoulos, *supra*; Hebron, *supra*. Under the "efficient proximate cause" analysis governing that exclusion, and in light of SWB's factual admissions and averments, the insurers have not established their

---

[12]By way of illustration, although MLB allowed major league baseball teams to play their regular season home games in their stadiums without fans present in 2020, and with fans attending in 2021, the Canadian government barred the Toronto Blue Jays from playing any home games at Rogers Centre in Toronto prior to July 30, 2021. *See* "After a Winding Journey, the Blue Jays Will Return to Canada," https://www.nytimes.com/2021/07/16/ sports/ baseball/toronto-blue-jays.html.  Before that date, the Blue Jays were required to play their home games in Buffalo, New York, and Dunedin, Florida, rather than Toronto, despite the actions of MLB. Id.

right to judgment in their favor based upon the cited exclusion, as a result of which their motion for judgment on the pleadings premised upon that exclusion will be denied. By virtue of that denial, it is not necessary to address SWB's alternate argument that the Time Element exclusion is void as against public policy for rendering coverage illusory.

### (F)  CIVIL AUTHORITY COVERAGE

CNA, Continental Insurance, and Continental Casualty separately demur to SWB's claim for civil authority coverage.   The policy in question affords coverage for "the actual loss sustained" by SWB during the time period that "access to [its] Location is prohibited by order of civil authority," provided that "such order is given as a direct result of physical loss or damage to property" which occurs "in the immediate vicinity of said Location." (Docket Entry No. 1 at pp. 47, 49). Throughout its complaint, SWB avers that its business interruption losses were caused by the presence of the SARS-CoV-2 virus on its property and MiLB's postponements and cancellations. (Docket Entry No. 1 at ¶¶ 6, 28-29, 31, 38, 42-43, 53-55, 57, 61-63, 90, 92-93, 96).  Asserting that MiLB cannot be deemed a "civil authority" under the policy, CNA, Continental Insurance, and Continental Casualty seek to dismiss SWB's civil authority coverage claim for failure to allege that prerequisite to coverage.  (Docket Entry No. 13 at pp. 23-27).

Since the phrase "civil authority" is not defined in the policy, it should be construed according to its accepted and ordinary meaning. Meyer Jabara Hotels, 231 A.3d at 848; Hebron, 197 A.3d at 272. The only reported case law interpreting "civil authority" in the context of civil authority insurance coverage has defined it as encompassing "'civil officers in whom a portion of the sovereignty is vested and in whom

the enforcement of municipal regulations or the control of the general interest of society is confided.'" Narricot Industries, Inc. v. Fireman's Fund Insurance Company, 2002 WL 31247972, at *4 (E.D. Pa. 2002) (quoting Princess Garment Co. v. Fireman's Fund Ins. Co. of San Francisco, 115 F.2d 380, 382 (6th Cir. 1940)). *Accord* Wayne D. Taylor, Arthur J. Park, Sean O'Brien, "Unique Coverage Issues in Flood Losses," 48 Tort Trial & Ins. Prac. L.J. 619, 646 (Winter 2013); 10A *Couch On Insurance* § 149:40 at n.2 (3d ed.). As a result, civil authority coverage is triggered only when a governmental official or agency bars or limits access to property. *See, e.g.*, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, LLP v. National Fire Ins. Co. of Hartford, 2007 WL 2489711, at *3 (M.D. La. 2007) (in response to Hurricane Katrina, "Governor Kathleen Blanco declared a state of emergency in Louisiana on August 26, 2005, as a result of the hurricane, and both the Louisiana State Police and local government officials were 'asking' and 'encouraging' residents to stay off the streets on August 29, 2005, if possible."); Narricot Industries, Inc., supra (mayor declared a state of emergency following a hurricane, and "[t]he Town of Tarboro hand-delivered a letter to each industrial facility, including Narricot, prohibiting it from operating" and "sent police officers to bar access to Anaconda Road, on which Narricot is located.").

In the case at bar, SWB alleges that its loss of business income was caused by the novel coronavirus on its property and MiLB's original postponement and subsequent cancellation of the 2020 season. SWB does not allege the MiLB is vested with the power to enforce governmental regulations or directives, and courts have identified it as a

component of MLB.[13]  *See* Senne v. Kansas City Royals Baseball Corp., 934 F.3d 918, 923 (9th Cir. 2019) (stating the MiLB serves as the "farm system" for MLB, and "has nearly 200 affiliates across the country and employs approximately 6,000 minor league players," with each minor league club being "associated with one of the thirty franchise MLB teams"), *cert. denied*, 141 S.Ct. 248 (U.S. 2020); Miranda v. Selig, 860 F.3d 1237, 1242 (9th Cir. 2017) (observing that minor league baseball players "are employed and paid by MLB," and that the Curt Flood Act "explicitly maintained the baseball [antitrust] exemption for anything related to the employment of minor league baseball players."), *cert. denied*, 138 S.Ct. 1045 (U.S. 2018). Nor has SWB averred that it was denied access to its own premises due to the physical contamination of other property with the SARS-CoV-2 virus "in the immediate vicinity" of its covered premises.

It is beyond cavil that MiLB is not a "civil authority" for purposes of business income protection under civil authority coverage. As such, SWB has not stated a plausible claim for civil authority coverage based upon the facts alleged in the complaint. Thus, the motion for judgment on the pleadings with respect to SWB's civil authority coverage claim will be granted.

### (G)  BAD FAITH LIABILITY CLAIM

CNA, Continental Insurance, and Continental Casualty next demur to SWB's claim asserting bad faith liability under 42 Pa.C.S. § 8371. They submit that their denial of coverage to SWB "was both reasonable and correct" and "based on a reasonable

---

[13] Ironically, our Supreme Court has concluded that for purposes of Section 506(d)(1) of the Right to Know Law, 65 P.S. § 67.506(d)(1), SWB agreed to perform a governmental function when the Stadium Authority entered into a contract with SWB pursuant to which SWB served as the manager of baseball operations and other entertainment activities at PNC Field. SWB Yankees, 615 Pa. at 664-665, 45 A.3d at 1043-44.

interpretation of the policy." (Docket Entry No. 13 at p. 30). Claiming that "the lynchpin of a statutory bad faith claim is the denial of coverage by an insurer when it has no good reason to do so," the insurers allege that SWB's "statutory bad faith claim fails as a matter of law." Id.

Pennsylvania has long recognized a cause of action for third party bad faith since Cowden v. Aetna Casualty and Surety Co., 389 Pa. 459; 134 A.2d 223 (1957), but a claim for first party bad faith did not exist in this Commonwealth until 42 Pa.C.S. § 8371 was enacted in 1990.[14] Olsofsky v. Progressive Ins. Co., 52 Pa. D. & C. 4th 449, 457-458 (Lacka. Co. 2001). Section 8371 of the Judicial Code, 42 Pa.C.S.; "authorizes courts, which find that an insurer has acted in bad faith towards its insured, to award punitive damages, attorneys' fees, interest and costs." Birth Center v. St. Paul Companies, Inc., 567 Pa. 386, 402-403, 787 A.2d 376; 386 (2001); Brogan, 35 Pa. D. & C. 5th at 526-527. That statute provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1)  Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2)  Award punitive damages against the insurer.
>
> (3)  Assess court costs and attorney fees against the insurer.

---

[14]"First party insurance applies 'where the insured is seeking coverage against loss or damage sustained by the insured,' such as 'damage to his own property,' while third party insurance is applicable if 'the insured is seeking coverage against liability of the insured to another.'" Penn National Sec. Ins. Co. v. Kapinus, 2017 WL 2989245, at * 6 (Lacka. Co, 2017) (quoting Sean W. Gallagher, "The Public Policy Exclusion and Insurance for Intentional Employment Discrimination," 92 Mich. L. Rev. 1256, 1263 n.31 (March 1994)).

42 Pa.C.S. § 8371.  Because Section 8371 states that "the court may" award punitive

damages, counsel fees, interest, and costs, "the decision to award attorneys' fees and costs

'upon a finding of bad faith is wholly within the discretion of the trial court.'"  Clemens v.

New York Central Mut. Fire Ins. Co., 903 F.3d 396, 399 (3d Cir. 2018) (quoting Polselli

v. Nationwide Mut. Fire Ins. Co., 126 F.3d 524, 534 (3d Cir. 1997))..

      "Section 8371 does not define 'bad faith,' set forth the manner in which plaintiffs

must prove bad faith, or distinguish the manner of proof for punitive damages from other

bad faith damages." Rancosky v. Washington National Ins. Co., 642 Pa. 153, 168, 170

A.3d 364, 372 (2017).  Our "courts generally have defined the term as 'any frivolous or

unfounded refusal to pay proceeds of a policy,'" Wenk v. State Farm Fire & Cas. Co.,

228 A.3d 540, 547 (Pa. Super. 2020) (quoting Terletsky, 437 Pa. Super. at 125, 649 A.2d

at 688), app. denied, 242 A.3d 309 (Pa. 2020).  However, "mere negligence or bad

judgment" is not bad faith. Grossi v. Travelers Personal Ins. Co., 79 A.3d 1141, 1149 (Pa.

Super. 2013); app. denied, 627 Pa. 766, 101 A.3d 103 (2014); Rutkowski v. Allstate Ins.

Co., 69 Pa. D. & C. 4th 10, 37 (Lacka. Co, 2004).

      In light of "the insurer's status as fiduciary for its insured under the insurance

contract, which gives the insurer the right, inter alia, to handle and process claims," every

"insurer must act with the utmost good faith towards its insured." Berg v. Nationwide Mutual

Insurance Company, Inc., 189 A.3d 1030, 1037 (Pa. Super. 2018), app. dismissed, 235 A.3d

1223 (Pa. 2020).  "[T]o prevail in a bad faith insurance claim pursuant to Section 8371, a

plaintiff must demonstrate, by clear and convincing evidence, (1) that the insurer did not

have a reasonable basis for denying benefits under the policy and (2) that the insurer knew

or recklessly disregarded its lack of a reasonable basis in denying the claim." Rancosky,

642 Pa. at 175-176, 170 A.3d at 377. Under the first prong of the Rancosky/Terletsky

test, the question of "whether the insurer had a reasonable basis for denying benefits is an

objective inquiry into whether a reasonable insurer would have denied payment of the

claim under the facts and circumstances presented." Id. at 170, 170 A.3d at 374. Accord

Kunji Harrisburg, LLC v. Axis Surplus Ins. Co., 447 F.Supp.3d 303, 309 (E.D. Pa. 2020).

"[P]roof of the insurer's knowledge or reckless disregard for its lack of reasonable basis in

denying the claim is sufficient for demonstrating bad faith under the second prong" of the

Rancosky/Terletsky framework, and evidence of "the insurer's subjective motive of self-

interest or ill-will, while perhaps probative of the second prong of the above test, is not a

necessary prerequisite to succeeding in a bad faith claim." Rancosky, 642 Pa. at 176, 170

A.3d at 377.

     "Claims of bad faith are fact specific and depend on the conduct of the insurer

toward its insured." Wenk, 228 A.3d at 547. SWB has alleged that CNA, Continental

Insurance, and Continental Casualty misrepresented the policy terms and coverages,

asserted frivolous defenses, and violated the UTPCPL. (Docket Entry No. 1 at ¶¶ 81,

84(b), (c), (e), (f), (i), (x), (yy)-(ddd)). Those insurers reportedly denied coverage based

upon the "contaminants or pollutants" exclusion and the "fungi, wet rot, dry rot and

microbes" exclusion notwithstanding their obvious inapplicability. (Id. at ¶¶ 32-33, 41,

72-75). SWB argues that their denial of coverage was driven by the insurers' "desire to

preempt [their] own financial exposure," rather than "a full and fair investigation of the

claims." (Id. at ¶¶ 34-35).

     Exclusions for contaminants, pollutants, fungi, wet rot, dry rot, and microbes have

operated to bar coronavirus-related business interruption coverage claims only when the

exclusion at issue also contains the word "virus." *See* Ascent Hospital Management Company, LLC v. Emps. Ins. Co. of Wausau, 2021 WL 1791490, at *1 (N.D. Ala. 2021); Mohawk Gaming Enterprises, LLC v. Affiliated FM Ins. Co., 2021 WL 1419782, at *3 (N.D.N.Y. 2021); Circus Circus LV, LP v. AIG Specialty Ins. Co., 2021 WL 769660, at *5 (D. Nev. 2021). Absent express inclusion of the word "virus" within the exclusion, such exclusions have been interpreted as not prohibiting business interruption coverage for losses caused by COVID-19. *See, e.g.,* Cinemark Holdings, Inc., 500 F.Supp.3d at 567-569 & n.3. In fact, Continental Casualty's coverage exclusion for damage caused by fungi, wet or dry rot, or microbes has been construed by courts as not precluding business interruption coverage for losses caused by the SARS-CoV-2 virus. Legacy Sports Barbershop, *supra*, at *3 ("Thus, it is not clear to us whether 'microbe' as defined under the policies includes a virus such as SARS-CoV-2 because that virus, of course, can spread from person to person. We therefore do not believe Continental has established that the claims are excluded from coverage at this stage."). Inasmuch as the foregoing two exclusions cited by CNA, Continental Insurance, and Continental Casualty in their original denial of coverage do not even reference the word "virus," the governing law does not support their contention that those exclusions bar coverage for SWB.

Although the contamination theory precedent which predated the COVID-19 pandemic militates in favor of a finding of coverage for SWB, "the issue of what type of damage or loss related to the novel coronavirus and accompanying closure orders constitutes 'physical loss or damage' was an open question . . . when [CNA, Continental Insurance and Continental Casualty] denied [SWB's] claim, in part, on that basis." Brown's Gym, *supra*, at *25. Nevertheless, the insurers' purported misrepresentations

concerning the policy's coverages and terms would sustain a finding of bad faith. An insurer's "investigation must be 'honest, intelligent and objective,'" and "misrepresentations constitute evidence that [its] investigation was neither honest nor objective." Mohney v. American General Life Ins. Co., 116 A.3d 1123, 1135-36 (Pa. Super. 2015), *app. denied*, 634 Pa. 749, 130 A.3d 1291 (2015). Furthermore, an insurance "claim must be evaluated on its merits alone, by examining the particular situation and the injury for which recovery is sought," and "[a]n insurance company may not look to its own economic considerations" and "seek to limit its potential liability, and operate in a fashion designed to 'send a message.'" Bonenberger v. Nationwide Mut. Ins. Co., 791 A.2d 378, 382 (Pa. Super. 2002); Rutkowski, 69 Pa. D. & C. 4th at 37.

CNA, Continental Insurance, and Continental Casualty maintain that SWB's bad faith claim is insufficient as a matter of law since their denial of coverage "was both reasonable and correct." (Docket Entry No. 13 at p. 3). Based upon SWB's allegations regarding the insurers' conduct, including its purported misrepresentation of policy terms and the priority that it allegedly gave to its own economic considerations, a cognizable claim for bad faith has been alleged under 42 Pa. C.S. § 8371. *See* Hayes v. Harleysville Mut. Ins. Co., 841 A.2d 121, 127 (Pa. Super. 2004), *app. denied*, 582 Pa. 686, 870 A.2d 322 (2005). Therefore, the motion for judgment on the pleadings as to SWB's bad faith claims will be denied.

## (H)  PROPER DEFENDANTS

Last, CNA and Continental Insurance separately challenge the legal sufficiency of SWB's claims against them, and allege that "the policy at issue in this case was issued by Continental Casualty" and that "the required privity of contract is lacking as to [CNA] and

[Continental Insurance]." (Docket Entry No. 13 at pp. 30-31). In their answer and new matter, the insurers made those same factual assertions, and further alleged that CNA "is the parent company of the Continental Corporation, which in turn is the parent company of Continental Casualty Company," and that "Continental Casualty Company is the parent company of the Continental Insurance Company." (Docket Entry No. 8 at ¶¶ 128-133). Pursuant to Pa.R.C.P. 1029(c), SWB denied those allegations on the basis that, after reasonable investigation, it was without knowledge or information sufficient to form a belief as to the truth of those averments. (Docket Entry No. 9 at ¶¶ 128-133).

In addressing the instant motion for judgment on the pleadings, only those facts which have been specifically alleged or admitted by SWB may be considered. King, 246 A.3d at 336; Kote, 169 A.3d at 1107. SWB has not admitted that the policy in question was issued only by Continental Casualty, or that CNA and Continental Insurance have no involvement in this matter. Furthermore, "[t]he creative utilization of compound business structures to secure various advantages is by now familiar," and discovery may establish a basis for imposing liability upon CNA and Continental Insurance based upon the enterprise or single entity theory for piercing the corporate veil, as recently adopted by our Supreme Court on July 21, 2021. Mortimer v. McCool, 2021 WL 3073332, at *16; 19-20 (Pa. 2021). In the interim, the standard of review governing motions for judgment on the pleadings does not permit the dismissal of CNA and Continental Insurance as named parties on the grounds asserted. For that reason, their motion for judgment on the pleadings will be denied. An appropriate Order follows.

- 71 -

SWB YANKEES, LLC,                          : IN THE COURT OF COMMON PLEAS
                                           :   OF LACKAWANNA COUNTY
                         Plaintiff         :
                                           :
            vs.                            :        CIVIL ACTION - LAW
                                           :
CNA FINANCIAL CORPORATION; THE             :
CONTINENTAL INSURANCE COMPANY,             :
and CONTINENTIAL CASUALTY                  :
COMPANY,                                   :
                                           :
                         Defendants        :        NO. 20 CV 2155


## ORDER

AND NOW, this 4th day of August, 2021, upon consideration of "Defendants'
Motion for Judgment on the Pleadings," the memoranda of law submitted by the parties,
and the oral argument of counsel, and based upon the reasoning set forth in the foregoing
Memorandum, it is hereby ORDERED and DECREED that:

1.      Defendants' Motion for Judgment on the Pleadings is GRANTED in part
and DENIED in part;

2       Defendants' Motion for Judgment on the Pleadings with respect to
plaintiff's claim for civil authority coverage is GRANTED, (Docket Entry No. 14 at ¶¶
29-31), and plaintiff's claims based upon Section II(C)(10) of the "CNA Property Policy,
entitled "Denial of Access by Civil Authority and Ingress-Egress," are DISMISSED; and

3.    In all other respects, Defendants' Motion for Judgment on the Pleadings is DENIED.

BY THE COURT:

_Terrence R. Nealon_    J.

Terrence R. Nealon

cc:    *Written notice of the entry of the foregoing Memorandum and Order has been provided to each party pursuant to Pa. R. C. P. 236 (a)(2) and (d) by transmitting time-stamped copies via electronic mail to:*

Daniel W. Munley, Esquire                    dan@munley.com
Katie Nealon, Esquire                        knealon@munley.com
Munley Law
227 Penn Avenue
Scranton, PA  18503
        Counsel for Plaintiff

Robert M. Runyon, III, Esquire               rrunyon@hkr.law
Matthew B. Malamud, Esquire                  mmalamud@hkr.law
Horst Krekstein & Runyon, LLC
Suite 350, 610 West Germantown Pike
Plymouth Meeting, PA  19462
        Counsel for Defendants

**<u>EXHIBIT I</u>**

BROWN'S GYM, INC.,     : IN THE COURT OF COMMON PLEAS
            :  OF LACKAWANNA COUNTY
            :
      Plaintiff   :
            :
     vs.      :  CIVIL ACTION - LAW
            :
THE CINCINNATI INSURANCE  :
COMPANY and C. C. YOUNG and :
HENKELMAN INSURANCE,   :
            :
      Defendants  :  NO. 20 CV 3113

## MEMORANDUM AND ORDER

<u>NEALON, J.</u>

  A gym and fitness center, which was required to close its premises and cease business operations in compliance with government orders issued in response to the COVID-19 pandemic, has instituted this action against its commercial insurer and insurance agent after the insurer denied the gym's claim for property damage and business interruption insurance for losses caused by the "necessary suspension" of its operations. The gym maintains that it requested and purchased an "all risk" policy that provides coverages for business closure losses caused by a government order or civil authority measure, and does not contain any policy exclusion for losses caused by a virus or pandemic. It has asserted claims against the insurer seeking a declaratory judgment that its pandemic-related losses are covered by the policy, compensatory damages for breach

of their insurance agreement, and extra-contractual damages for bad faith liability under 42 Pa.C.S. § 8371.  In the event that the gym does not prevail with its contract-based claims against the insurer, it alternatively advances negligence and negligent misrepresentation claims against its insurance agent for failing to obtain the insurance coverage it requested.  The insurance agent has filed preliminary objections seeking the dismissal of those claims on the grounds that (1) it did not owe a recognized duty to the gym  under the circumstances, (2) the "reasonable expectations" doctrine does not apply to a commercial insured, and (3) it was not a named party to the insurance agreement.

Based upon the allegations of the complaint, the insurance agent arguably breached its duty to exercise reasonable care, skill, and judgment in securing the insurance coverage that was specifically requested by the gym.  Although it is unclear whether the "reasonable expectations" doctrine can be applied to a commercial insured, the success of the gym's negligence claims against the insurance agent is not dependent upon the application of that doctrine.  Additionally, the insurance agent need not be a named party to the insurance contract in order for the gym to state cognizable negligence claims against the agent.  Consequently, the insurance agent's preliminary objections in the nature of a demurrer will be overruled.

## I.   FACTUAL BACKGROUND

Plaintiff, Brown's Gym, Inc. ("Brown's"), which owns and operates a gym in Clarks  Summit, contends that it "sought commercial property insurance" coverage for its business from an insurance broker, C.C. Young & Henkelman Insurance ("C.C. Young"), which acted as Brown's "insurance agent that was responsible for procuring insurance to cover [its] business premises." (Docket Entry No. 1 at ¶¶ 4, 6, 10, 14).  C.C. Young

- 2 -

reportedly served as the actual or ostensible agent of the Cincinnati Insurance Company ("Cincinnati Insurance"), and "[i]n exchange for substantial premiums paid by Brown's," Cincinnati Insurance and C.C. Young "sold a commercial property insurance policy" to Brown's for the coverage period from May 5, 2019, to May 5, 2020. (Id. at ¶¶ 9, 15). Brown's claims to have purchased this insurance coverage based upon representations made by C.C. Young "regarding the amounts and applicability of the business income, contingent business income, extra expense, and civil authority coverage under the policy, which, per Brown's instructions, were to be "as broad as possible for the coverage period. (Id. at ¶¶ 117, 123).

It is alleged that, "unlike many commercial property policies available in the market," the policy in question "does not include an exclusion for loss caused by a virus," nor is there an "applicable exclusion in the policy for pandemic related losses." (Id. at ¶¶ 26-27). Rather, "[t]he policy is an 'all risk' policy that provides broad coverage for losses caused by any cause, unless expressly excluded," and distinctly "promis[es] to indemnify [Brown's] for losses resulting from occurrences, including the 'necessary suspension' of business operations at the insured location caused by a government order" or "in the event of business closures by order of Civil Authority." (Id. at ¶¶ 31-32, 34). In addition to affording coverage for "property damage losses," the policy that Brown's purchased from Cincinnati Insurance through C.C. Young also provides coverage "for the actual loss of business income" and "extended business income," as well as the payment of "necessary extra expense," resulting from "the necessary suspension" or "period of interruption" of Brown's business operations due to a government order or the "action of civil authority that prohibits access" to Brown's business. (Id. at ¶¶ 35-42).

- 3 -

After "the World Health Organization declared that the emerging threat from the novel coronavirus, otherwise known as COVID-19, constituted a global pandemic," Governor Tom Wolf "issued a Proclamation of Disaster Emergency" due "to the emergence of COVID-19" and "the spread of the coronavirus throughout Pennsylvania." (Id. at ¶¶ 43-45). On March 19, 2020, "Governor Wolf issued an Order providing that 'no person or entity shall operate a place of business that is not a life-sustaining business,'" thereby "closing all 'non-essential' businesses, including all gyms and fitness centers." (Id. at ¶¶ 46, 52). Brown's asserts that "[t]he continuous presence of the coronavirus on or around [Brown's] premises has rendered those premises unsafe and unfit for [their] intended use," and that the Orders issued by Governor Wolf and the Secretary of the Pennsylvania Department of Health "prohibited the public from accessing [Brown's] gym and fitness center" and "caus[ed] the necessary suspension of its operations and triggered the Civil Authority coverage under the policy." (Id. at ¶¶ 50-51).

As a result of those government Orders, Brown's claims that it has suffered "substantial lost revenues," "substantial business income and extended business income losses," "incurred expense," and "been forced to furlough or lay off the majority of its employees." (Id. at ¶¶ 14, 23, 55). Brown's submitted a timely claim to Cincinnati Insurance "requesting coverage for its business interruption losses under the policy," but on April 15, 2020, Cincinnati Insurance issued a denial of coverage that is "inconsistent with the facts and plain language of the policy and Pennsylvania law." (Id. at ¶¶ 28, 56, 78). Brown's maintains that although the "obvious and apparent" terms of the policy identify the applicable coverage limits as $1,000,000.00 per occurrence/$3,000,000.00 general aggregate, Cincinnati Insurance has attempted to arbitrarily assert a clearly

- 4 -

"inapplicable" coverage limit to Brown's business income and extra expense coverage claims.  (Id. at ¶¶ 64-69).

On August 11, 2020, Brown's commenced this litigation against Cincinnati Insurance and C.C. Young.  (Docket Entry No. 1).  In Count I of the Complaint, Brown's advances a declaratory judgment claim against Cincinnati Insurance, and seeks a judicial declaration that its "losses incurred in connection with the Closure Orders and the necessary interruption of [its] business stemming from the COVID-19 pandemic are insured losses under the policy," and that Cincinnati Insurance "is obligated to pay [Brown's] for the full amount of the losses incurred, and to be incurred, in connection with the covered business losses related to the Closure Orders."  (Id. at ¶¶ 95-99).  Count II asserts a breach of contract claim against Cincinnati Insurance, whereas Count III states a bad faith claim against Cincinnati Insurance pursuant to 42 Pa.C.S. § 8371.  (Id. at ¶¶ 101-107, 109-113).

Assuming *arguendo* that Brown's claims against Cincinnati Insurance do not succeed, Brown's has pled, in the alternative, negligence claims against C.C. Young.  Specifically, Counts IV, V, and VI of the Complaint set forth negligence and negligent misrepresentation claims against C.C. Young, and each Count states that "[i] the event that the fact-finder determines that the policy does not cover [Brown's] losses in  full, this Count is pleaded in the alternative to Counts I to III and only against" C.C. Young.  (Id. at ¶¶ 115, 122, 128).  Brown's maintains that C.C. Young had "a duty to exercise reasonable care and/or skill and knowledge normally possessed by insurance brokers in selecting, preparing, and processing [Brown's] policy application and in obtaining an insurance policy" which was to provide "as broad as possible business income, contingent business income, extra expense, and civil

- 5 -

authority coverage," as expressly requested by Brown's.  (Id. at ¶¶ 116-117).  In addition to asserting a breach of that duty of care which caused Brown's to sustain "substantial damages" that have not been covered by Cincinnati Insurance, (Id. at ¶¶ 119-120), Brown's also charges C.C. Young with negligent misrepresentation for "negligently supplying incorrect and incomplete information to [Brown's] regarding the amounts and applicability of the business income, contingent business income, extra expense, and civil authority coverage under the policy," and doing so "with the intent that [Brown's] purchase the policy."  (Id. at ¶¶ 123-124).  It submits that it "foreseeably and justifiably relied to its detriment" on C.C. Young's "recommendations, expertise, and affiliations," and suffered uninsured damages "if the fact-finder determines that the policy does not cover [Brown's] losses in full."  (Id. at ¶¶ 125, 131).

C.C. Young has filed preliminary objections raising three arguments.  First, it alleges that it owed "no duty under Pennsylvania law" to Brown's since "an insurance agent does not have a duty, as a matter of law, to advise an insured regarding policy terms, conditions, provisions, and exclusions which are clear and unambiguous."  (Docket Entry No. 4 at ¶ 15, Docket Entry No. 12 at p. 6).  In support of that argument, it contends that Brown's reference to the "plain language of the policy" and its "obvious and apparent" monetary coverage limitations constitute binding judicial admissions that the terms of the policy are clear and unambiguous.  (Docket Entry No. 8 at ¶¶ 4-5, 14, 17; Docket Entry No. 12 at pp. 3, 6, 10).  Based upon that reasoning, C.C. Young asserts that Brown's cannot "state a claim for relief against C.C. Young for negligence, negligent supply of information, and negligent misrepresentation in Counts IV, V, and VI of the Complaint."  (Docket Entry No. 4 at ¶ 17; Docket Entry No. 12 at p. 10).

C.C. Young also demurs to Brown's claims in paragraphs 26 and 118 of the Complaint that it "reasonably expected" insurance coverage for its claims in light of the language of its "all risk" policy, the lack of any applicable exclusion, and its instructions to C.C. Young. (Docket Entry No. 4 at ¶¶ 6, 20-21; Docket Entry No. 12 at pp. 3, 6). It notes that the Complaint avers "that [Brown's] is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania," but does not "allege that it is a non-commercial insured." (Docket Entry No. 4 at ¶¶ 22-23; Docket Entry No. 12 at p. 10). Citing Maryland Cas. Co. v. McGrath, 2015 WL 9264576 (Pa. Super. 2015), it argues that the "reasonable expectations" doctrine "applies only to *non-commercial insureds* and only to policy language which is ambiguous."[1] (Docket Entry No. 4 at ¶ 25; Docket Entry No. 12 at p. 11)(emphasis in original). C.C. Young does not seek to simply strike any reference to what Brown's "reasonably expected," and instead requests the dismissal of all claims on the ground that Brown's has "failed to state a claim upon which relief can be granted as a matter of law." (Docket Entry No. 4 at ¶ 26; Docket Entry No. 12 at p. 11).

C.C. Young's final objection concerns Brown's averments in paragraphs 5, 17, 85, 86, and 87 of the Complaint that Cincinnati Insurance and C.C. Young both "issued a policy of insurance" to Brown's, failed "to honor [their] obligations under the commercial businessowner insurance policy issued to [Brown's]," neglected "to inquire into documentation pertaining to loss of business income," "never intended to fairly and objectively evaluate [Brown's] business interruption claim," and forced "[Brown's] to retain

---

[1]Although unpublished, memorandum decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value, E.G.G. v. Pennsylvania State Police, 219 A.3d 679, 684 n.6 (Pa. Super. 2019), unpublished, memorandum decisions issued prior to May 1, 2019, have no precedential value and may not be relied upon or cited by the court or a party. State Farm Mut. Auto Ins. Co. v. Foster, 585 Pa. 529, 534 n.2, 889 A.2d 78, 81 n.2 (2005)

counsel to obtain benefits that are due and owed under the policy" (Docket Entry No. 4 at ¶ 28, Docket Entry No. 12 at pp. 11-12). C.C. Young seeks to strike those five paragraphs from the complaint on the basis that it was "not a party to the insuring agreement between [Brown's] and Defendant Cincinnati Insurance." (Docket Entry No. 12 at p. 11). It alleges that "[t]hese averments are invalid as a matter of law as they are inconsistent with the plain language of the insuring agreement, to which only [Brown's] and Defendant Cincinnati Insurance are parties." (Docket Entry No. 4 at ¶ 29; Docket Entry No. 12 at p. 12).

In response to C.C. Young's demurrer, Brown's maintains that "an insurance agent is held to the standard of care found in Section 299 of the Restatement (Second) of Torts and given that standard the agent has a correlative duty to advise insureds of the availability of other types of insurance benefits." (Docket Entry No. 14 at p. 14). It observes that its pleading alleges that C.C. Young "undertook a duty to exercise reasonable care and/or skill and knowledge normally possessed by insurance brokers in selecting, preparing, and processing [Brown's] policy application and in obtaining an insurance policy including business income, contingent business income, extra expense, and civil authority coverages." (Id. at p. 15). Brown's states that it specifically directed C.C. Young "to secure as broad as possible business income, contingent business income, extra expense, and civil authority coverage." (Id.). Moreover, with respect to its negligent misrepresentation claim, Brown's "alleges it foreseeability and justifiably relied to its detriment on [C.C. Young's] recommendations, expertise and affiliations, and followed its advice, which, in fact, included material and negligent misrepresentations and/or omissions." (Id. at p. 17). It posits that it "must be permitted to conduct discovery on the insurance transaction between [Brown's] and

- 8 -

Defendants before this Honorable Court considers dismissal of [Brown's] entire case against [C.C. Young]." (Id. at p. 18).

As to the challenge to Brown's allegations regarding the insurance coverage it "reasonably expected," Brown's asserts that Pennsylvania "case law does not say that the reasonable expectations doctrine **must only** apply to non-commercial insured," but, to date, "it *has only* been applied to protect non-commercial insureds from policy terms not readily apparent." (Id. at p. 19)(emphasis in original). Finally, with regard to the motion to strike paragraphs 5, 17, 85, 86, and 87 of the Complaint, Brown submits that it has specifically averred that C.C. Young acted as Cincinnati Insurance's actual and ostensible agent, that it was authorized by Cincinnati Insurance " to bind coverage and did bind coverage" pursuant to "a business arrangement" between C.C. Young and Cincinnati Insurance for "their mutual pecuniary benefit," and that Cincinnati Insurance is, therefore, bound by the actions of C.C. Young. (Id. at pp. 22-23). It is noteworthy that Brown's only asserts contract-based claims against Cincinnati Insurance in Counts I, II, and III of the Complaint, and limits its theories of liability against C.C. Young to negligence causes of action. Following the completion of oral argument on December 17, 2020, C.C. Young's preliminary objections were submitted for a decision. (Docket Entry No. 9).

## II.  DISCUSSION

### (A)  STANDARD OF REVIEW

Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint, Catanzaro v. Pennell, 238 A.3d 504, 507 (Pa. Super. 2020), and may be sustained only in cases that are clear and free from doubt. Fulano v. Fanjul Corp., 236 A.3d 1, 12 (Pa. Super. 2020); Sawyers v. Davis, 222 A.3d 1, 5 (Pa. Super. 2019), *app.*

*denied,* 233 A.3d 675 (Pa. 2020).  To be clear and free from doubt, it must appear with certainty that the law would not permit recovery based upon the facts averred in the complaint.  Keller v. Bank of New York Mellon, 212 A.3d 52, 56 (Pa. Super. 2019), *app. denied,* 219 A.3d 1104 (Pa. 2019).  When considering preliminary objections under Rule 1028(a)(4), all material facts set forth in the challenged pleading, as well as all reasonable inferences which may be drawn from those facts, are accepted as true.  Ladd v. Real Estate Commission, 230 A.3d 1096, 1103 (Pa. 2020).  If any doubt exists as to whether preliminary objections seeking to dismiss an action should be sustained, that doubt should be resolved in favor of overruling the preliminary objections.  Harrison v. Health Network Laboratories Limited Partnerships, 232 A.3d 674, 678 (Pa. 2020); Fiedler v. Spencer, 231 A.3d 831, 835-836 (Pa. Super. 2020).

### (B)  INSURANCE AGENT'S DUTY OF CARE

C.C. Young's first demurrer asserts that, as a matter of law, it owed no duty of care to Brown's.  It posits that absent such a duty, Brown's cannot maintain any negligence claims against it.  To prevail in any negligence action, the plaintiff must establish the following elements: (1) the defendant owed a duty of care to the injured party; (2) the defendant breached that duty; (3) the injured party suffered actual harm; and (4) a causal relationship exists between the breach of duty and that harm.  Mitchell v. Shikora, 209 A.3d 307, 314 (Pa. 2019); McFeeley v. Shah, 226 A.3d 582, 594 (Pa. Super. 2020).

"'The primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff.'"  Grove v. Port Authority of Allegheny County, 218 A.3d 877, 888 (Pa. 2019) (quoting Bilt-Rite Contractors, Inc. v. The Architectural Studio, Inc., 581 Pa. 454, 471, 866 A.2d 270, 280 (2005)).  The existence of a duty on the part of the

- 10 -

alleged tortfeasor presents a question of law for the court to decide.  Walters v. UPMC

Presbyterian Shadyside, 646 Pa. 746, 758-759, 187 A.3d 214, 221-222 (2018); Straw v.

Fair, 187 A.3d 966, 983 (Pa. Super. 2018), *app. denied*, 202 A.3d 49 (Pa. 2019).  But, if

the plaintiff makes a *prima facie* showing of a duty, the issue of whether the defendant

breached that duty is generally for the fact-finder.  Maas v. UPMC Presbyterian

Shadyside, 234 A.3d 427, 436 (Pa. 2020); Barrett v. Chervanka, 61 Pa. D. & C. 5th 530,

538 (Lacka. Co. 2016).  In contrast, where the plaintiff fails to make a *prima facie*

showing of a duty, and is thereby unable to establish one of the essential elements of

actionable negligence, the alleged tortfeasor is entitled to the entry of judgment as a

matter of law.  Chepkevich v. Hidden Valley Resort, L.P., 607 Pa. 1, 21-25, 2 A.3d 1174,

1186-1188 (2010); Alexander v. City of Meadeville, 61 A.3d 218, 227-228 (Pa. Super.

2012); Mills v. Gubbio's LLC, 50 Pa. D. & C 5th 520, 527 (Lacka. Co. 2015), *aff'd*, 153

A.3d 1120 (Pa. Super. 2016); Sedor v. Community Medical Center, 16 Pa. D. & C. 5th

193, 202 (Lacka. Co. 2010).

  Pennsylvania has adopted Section 299A of the Restatement (Second) of Torts, and

recognizes that an insurance agent or broker is "required to exercise the skill and

knowledge normally possessed by members of that profession" and will be "liable for any

loss of coverage" for "the failure to do so."  Pressley v. Travelers Property & Casualty

Corp, 817 A.2d 1131, 1138 (Pa. Super. 2003); Argenta v. A. J. Lupas Insurance Agency,

Inc., 104 Lacka. Jur. 430, 443 (2003), *aff'd*, 881 A.2d 876 (Pa. Super. 2005).  As part of

that duty, an insurance broker or agent is obligated "to make sure that the coverage sought

by the insured is the coverage received."  Sherman v. John Brown Ins. Agency, Inc. 38

F.Supp.3d 658, 663 (W.D. Pa. 2014) (citing Pressley, supra).  An insurance broker or

agent also has a duty "to exercise the care that a reasonably prudent businessman in the

brokerage field would exercise under similar circumstances," and the duty to act with

reasonable care, skill and judgment extends to the selection of the insurer chosen by the

broker or agent.  Al's Café, Inc. v. Sanders Ins. Agency, 820 A.2d 745, 750 (Pa. Super.

2003); Berenato v. Seneca Specialty Ins. Co., 240 F.Supp.3d 351, 362 (E.D. Pa. 2017).

The gravamen of C.C. Young's objection is that Brown's single reference to the

"plain language of the policy" in paragraph 28 of the Complaint and the subsequent

mention of the "obvious and apparent" coverage limits in paragraphs 69 and 74 constitute

conclusive admissions that all of the language in the policy is clear and unambiguous.

"An admission is not conclusively binding as a judicial admission unless the testimony is

clear and unequivocal." In re Risperdal Litigation, 223 A.3d 633, 641 n.5 (Pa. 2019).  For

a statement of fact in a pleading to qualify as a judicial admission, "it must be a clear and

unequivocal admission of fact," as opposed to "legal theories and conclusions of law,"

and may "not be merely an interpretation of the statement that is purported to be a judicial

admission." Porter v. Toll Brothers, Inc., 217 A.3d 337, 350 (Pa. Super. 2019), *app.

denied*, 229 A.3d 909 (Pa. 2020).

The averments cited by C.C. Young have been taken out of context, and cannot be

construed as conclusive judicial admissions that all provisions in the subject policy are

clear and unambiguous.  Paragraph 28 merely alleges that Cincinnati Insurance's denial of

Brown's coverage claim is "inconsistent with the facts and plain language of the policy"

entitling Brown's to coverage for property damage and business interruption losses

resulting from COVID-19 and the closure of its business.  Similarly, paragraphs 69 and 74

simply state that Cincinnati Insurance's attempt in its denial letter to impose a cap of

- 12 -

$25,000.00 for business income and extra expense coverage is contrary to the "obvious and apparent" policy limits of $1,000,000.00 per occurrence/$3,000,000.00 general aggregate. When examined in the context that they appear, those averments, which actually are legal conclusions rather than statements of fact, cannot be deemed blanket admissions that all terms and provisions set forth in the policy are clear and unambiguous. Hence, C.C. Young has not established that it is clear and free from doubt that it owed no duty of care to Brown's, as a result of which its first demurrer will be overruled.[2]

## (C)   "REASONABLE EXPECTATIONS" ALLEGATIONS

C.C. Young's second demurrer is predicated upon averments contained in two paragraphs of the complaint which is comprised of 132 paragraphs. This preliminary objection under Pa.R.C.P. 1028(a)(4) focuses upon Brown's allegations that it "reasonably expected that the insurance it purchased . . . included coverage for property damage and business interruption losses caused by viruses like COVID-19" and that "it had a reasonable expectation in purchasing the business income, contingent business income, extra expense, and civil authority coverage that such coverages would apply in the event that a civil authority issued an order effectively closing [Brown's] business because of a public health emergency, such as the COVID-19 pandemic." (Docket Entry No. at ¶¶ 26, 118). C.C. Young seeks to dismiss Brown's three negligence claims in their entirety on the

---

[2] C.C. Young's objection this in regard also overlooks the fact that the claims against C.C. Young have been "pleaded in the alternative" to the contract-based claims against Cincinnati Insurance, and only "[i]n the event that the fact-finder determines that the policy does not cover [Brown's] losses in full." (Docket Entry No. 1 at ¶¶ 115, 122, 128). "Our Rules of Civil Procedure specifically provide for the alternative pleading of causes of action." Lugo v. Farmers Pride, Inc. 967 A.2d 963, 970 (Pa. Super. 2009) (citing Pa.R.C.P. 1029(c)), *app. denied*, 602 Pa. 668, 980 A.2d 609 (2009). Under Rule 1020(c), a party may plead alternative causes of action even if they advance inconsistent and conflicting theories of relief. Shafer Electric & Construction v. Mantia, 67 A.3d 8, 9 n.2 (Pa. Super 2013), *aff'd*, 626 Pa. 258, 96 A.3d 989 (2014); Lugo, supra.

- 13 -

ground that the "reasonable expectation" doctrine does not apply to a commercial insured such as Brown's.

Under the reasonable expectations doctrine, when interpreting a policy of insurance, the court should focus upon whether the insurer or its agent created in the insured a reasonable expectation of coverage that is not supported by the policy terms. *See* Safe Auto Ins. Co. v. Berlin, 991 A.2d 327, 331-332 (Pa. Super. 2010); Farber v. Erie Insurance Exchange, 2020 WL 3886328, at *7 (Lacka. Co. 2020). To date, the Supreme Court of Pennsylvania has applied the "reasonable expectations" approach only in instances involving non-commercial insureds. *See, e.g.*, Tonkovic v. State Farm Mutual Automobile Insurance Company, 513 Pa. 445, 455, 521 A.2d 920, 925 (1987); Collister v. Nationwide Life Insurance Company, 479 Pa. 579, 594, 388 A.2d 1346, 1353 (1978). However, the United States Court of Appeals for the Third Circuit has "predicted that Pennsylvania courts would apply that doctrine even where the insured is a sophisticated purchaser of insurance - - i.e., "a large commercial enterprise that has substantial economic strength, desirability as a customer, and an understanding of insurance matters, or readily available assistance in understanding and procuring insurance." UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 503 (3d Cir. 2004) (quoting Reliance Ins. Co. v. Moessner, 121 F.3d 895, 904-905 n.8 (3d Cir. 1997)). The federal district courts in Pennsylvania have likewise concluded that the "reasonable expectations" doctrine may apply to commercial entities and sophisticated purchasers of insurance. *See* Downey v. First Indemnity Insurance, 214 F.Supp.3d 414, 424 (E.D. Pa. 2016); Austin James Associates, Inc. v. American International Specialty Lines Ins. Co., 2012 WL 4755394, at

- 14 -

*5 (M.D. Pa. 2012); Whole Enchilada, Inc. v. Travelers Property Casualty Company of America, 581 F.Supp.2d 677, 690 (W.D. Pa. 2008).

In the 2015 unpublished memorandum opinion cited by C.C. Young, (*see* n.1, supra), the Superior Court of Pennsylvania did not squarely hold that the "reasonable expectations" doctrine can never apply to a commercial insured.  It simply noted that the trial court held, *inter alia*, that "the reasonable expectations doctrine does not apply to protect a commercial insured from the plain meaning of the exclusion in a commercial general liability policy," and "affirm[ed] on the basis of the trial court's opinion." McGrath, supra, at *2.  In its published precedential decisions, the Superior Court has declined to expressly address the narrow issue of whether this doctrine applies to a sophisticated, commercial enterprise. *See* Millers Capital Ins. Co. v. Gambone Brothers Development Co., Inc., 941 A.2d 706, 717 n.10 (Pa. Super. 2007) ("The parties disagree as to whether the 'reasonable expectations' doctrine can be invoked by a 'sophisticated' commercial enterprise. [citations omitted].  The parties further disagree as to how to define what constitutes a 'sophisticated' commercial enterprise.  Due to our disposition of this appeal, we leave these questions for another day."), *app. denied*, 600 Pa. 734, 963 A.2d 471 (2008).

Regardless of whether the Pennsylvania courts would apply the "reasonable expectations" doctrine to a commercial business like Brown's, C.C. Young has not established that Brown's claims for negligence and negligent misrepresentation must be dismissed based upon the limited references in the complaint to what Brown's "reasonably expected" based upon the policy language and its directives to C.C. Young.  C.C. Young may revisit this issue by way of a pre-trial motion *in limine* or an objection to a proposed jury instruction requesting a charge on the "reasonable expectations" doctrine.  In the interim,

- 15 -

however, it is not free and clear from doubt that Brown's is unable to recover damages from C.C. Young based upon the totality of the facts alleged in the complaint. For that reason, C.C. Young's second demurrer will also be overruled.

### (D)   INSURER LIABILITY FOR ACTIONS OF AGENTS

Last, C.C. Young seeks to strike Brown's allegations in paragraphs 5, 17, 85, 86, and 87 since "C.C. Young is not a party to the insuring agreement." (Docket Entry No. 12 at p. 11). Brown's counters that its allegations in those paragraphs merely relate to C.C. Young's actions as the actual or ostensible agent of Cincinnati Insurance, and its corresponding ability to bind Cincinnati Insurance to the insurance coverages requested by Brown's .

In the insurance setting, "[t]he key and distinctive feature of an agency relationship is the agent's power to affect the legal relationship of the principal with third parties, e.g., entering into contracts for them, buying or selling goods for them, or subjecting the principal to potential liability." Wisniski v. Brown & Brown Ins. Co. of Pa., 906 A.2d 571, 577 (Pa. Super. 2006), app. denied, 591 Pa. 728, 920 A.2d 834 (2007). Brown's avers that "there was a business arrangement between [Cincinnati Insurance] and [C.C. Young] to their mutual pecuniary benefit," that C.C. Young "was authorized by [Cincinnati Insurance] to bind coverage and did bind coverage on behalf of [Cincinnati Insurance]," that C.C. Young "was an agent, servant and/or employee" of Cincinnati Insurance, that Brown's "sought commercial property insurance" through C.C. Young, and that Cincinnati Insurance and C.C. Young "directed and controlled the activities" with regard to Brown's insurance coverage and its subsequent claim. (Docket Entry No. 1 at ¶¶ 7-11). Based upon those averments and the asserted agency relationship between

- 16 -

Cincinnati Insurance and C.C. Young, there is no legitimate basis upon which to strike paragraphs 5, 17, 85, 86, and 87 of the complaint.  Thus, C.C. Young's final preliminary objection will also be overruled.  An appropriate Order follows.

| | | |
|---|---|---|
| BROWN'S GYM, INC., | : | IN THE COURT OF COMMON PLEAS |
| | : | OF LACKAWANNA COUNTY |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | CIVIL ACTION - LAW |
| | : | |
| | : | |
| THE CINCINNATI INSURANCE | : | |
| COMPANY and C. C. YOUNG and | : | |
| HENKELMAN INSURANCE, | : | |
| | : | |
| | : | |
| Defendants | : | NO. 20 CV 3113 |

## ORDER

AND NOW, this 18th day of December, 2020, upon consideration of the "Preliminary Objections of Defendant, C.C. Young and Henkelman Insurance, to Plaintiff's Complaint," the memoranda of law submitted by the parties, and the oral argument of counsel, and based upon the reasoning set forth in the foregoing Memorandum, it is hereby ORDERED and DECREED that:

1.      The "Preliminary Objections of Defendant, C.C. Young and Henkelman Insurance, to Plaintiff's Complaint" are OVERRULED; and

2.      Within the next twenty (20) days, defendant, C.C. Young and Henkelman Insurance, shall file a responsive pleading to the complaint.

BY THE COURT:

_Terrence R. Nealon_ J.
Terrence R. Nealon

- 18 -

cc:    *Written notice of the entry of the foregoing Memorandum and Order has been provided to each party pursuant to Pa. R. C. P. 236 (a)(2) and (d) by transmitting time-stamped copies via electronic mail to:*

John M. Mulcahey, Esquire                    jmulcahey@munley.com
Munley Law, P.C.
227 Penn Avenue
Scranton, PA 28503
        Counsel for Plaintiff


Lawrence M. Silverman, Esquire               silverman@litchfieldcavo.com
Litchfield Cavo LLP
Suite 1220, 1515 Market Street
Philadelphia, PA  19102
        Counsel for Defendant, The Cincinnati Insurance Company


Anthony D. Cox, Jr., Esquire                 Acox@dmclaw.com
Dickie, McCamey & Chilcote, P.C.
Suite 105, 2578 Interstate Drive
Harrisburg, PA  17110
        Counsel for Defendant, C.C. Young and Henkelman Insurance

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Submitted by: <u>Plaintiff</u>

Signature: <u>Scott Cooper (Trial Laptop 3 (Sep 23, 2021 08:54 EDT)</u>

Name: <u>Scott B. Cooper</u>

Attorney No. (if applicable): <u>70242</u>

## **CERTIFICATE OF SERVICE**

AND NOW, this 23rd day of September, 2021, I, Ashley N. Burris, an

employee of Schmidt Kramer PC, hereby certify that I have this day served a

true and correct copy of the foregoing document by email, addressed to:

Nicholas L. Paone, Esquire
Farber Brocks & Zane LLP
400 Garden City Plaza, Ste 100
Garden City, NY  11530
Attorney for: Utica First Insurance Company;

By: _____
       Ashley N. Burris